**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

| | |
|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN REZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, <br><br> Plaintiffs, <br><br> v. <br><br> GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, <br><br> Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) Case No. 1:20-cv-4043 |

**LIST OF EXHIBITS
NOTICE OF REMOVAL**

| Exh. | Date | Document |
|---|---|---|
| A | 02/13/2020 | Summons Issued [Returned 02/24/2020] |
| B | 01/07/2020 | Complaint |
| C | 06/19/2020 | Plaintiffs' Unopposed Motion for Leave to File Amended Complaint |
| D | 06/30/2020 | Amended Complaint |
| E | 07/07/2020 | Affidavit of Mohammed Al-Miqdadi |
| F | 04/01/2020 | Appearance of John Murphy for Chicago South Loop Holdings III, LLC |
| G | 04/01/2020 | Additional Appearance of Matthew Allison for Chicago South Loop Holdings III LLC |
| H | 04/01/2020 | Defendant Chicago South Loop Holdings III, LLC's Combined Section 2-615 and Section 2-619 Motions to Dismiss |
| I | 04/01/2020 | Notice of Filing - Defendant Chicago South Loop Holdings III, LLC's Combined Section 2-615 and Section 2-619 Motions to Dismiss |
| J | 04/01/2020 | Defendant Chicago South Loop Holdings III, LLC's Memorandum in Support of Its Combined Section 2-615 and Section 2-619 Motions to Dismiss |
| K | 04/01/2020 | Notice of Filing - Defendant Chicago South Loop Holdings III, LLC's Memorandum in Support of Its Combined Section 2-615 and Section 2-619 Motions to Dismiss |
| L | 04/21/2020 | Motion for Substitution of Judge as a Matter of Right |
| M | 04/23/2020 | ORDER - granting Motion for Substitution of Judge as a Matter of Right |
| N | 04/23/2020 | REASSIGNMENT ORDER - reassigning Judge Diane M Kelley to the case |

| O | 06/27/2020 | ORDER: (i) granting motion to file amended complaint before 7/2/20; (ii) voluntary withdrawal of motion to dismiss and answer due by 7/16/20; and (iii) if defendant pleads, copy of pleading should be sent to Court via email |
|---|---|---|
| P | 04/06/2020 | Chicago South Loop Holdings III's Jurisdictional Written Interrogatories to Each Plaintiff, Other Than QMQQ LLC |
| Q | 04/06/2020 | Chicago South Loop Holdings III's Jurisdictional Written Interrogatories to Plaintiff QMQQ LLC |
| R | 04/06/2020 | Chicago South Loop Holdings III's Rule 216 Requests for Admission to Each of the Individual Plaintiffs |

# EXHIBIT  A

 CT Corporation

# Service of Process Transmittal
03/02/2020
CT Log Number 537304474

**TO:** JASON OLSEN
Baker & McKenzie LLP
2 EMBARCADERO CTR STE 1100
SAN FRANCISCO, CA 94111-3911

**RE:** **Process Served in Delaware**

**FOR:** Chicago South Loop Holdings III, LLC  (Domestic State: DE)

**ENCLOSED ARE COPIES OF LEGAL PROCESS RECEIVED BY THE STATUTORY AGENT OF THE ABOVE COMPANY AS FOLLOWS:**

| | |
|---|---|
| **TITLE OF ACTION:** | Ali Baghdadi, et al., Pltfs. vs. General Mediterranean Holding, S.A., Spf; And Chicago South Loop Holdings III, LLC, Dfts. |
| **DOCUMENT(S) SERVED:** | Summons, Complaint, Attachment(s), Exhibit(s), Affidavit |
| **COURT/AGENCY:** | Cook County Circuit Court - County Department - Law Division, IL Case # 2020L000292 |
| **NATURE OF ACTION:** | Breach of Fiduciary Duty |
| **ON WHOM PROCESS WAS SERVED:** | The Corporation Trust Company, Wilmington, DE |
| **DATE AND HOUR OF SERVICE:** | By Process Server on 03/02/2020 at 15:52 |
| **JURISDICTION SERVED :** | Delaware |
| **APPEARANCE OR ANSWER DUE:** | Within 30 days after service of this Summons, not counting the day of service |
| **ATTORNEY(S) / SENDER(S):** | Edward T. Joyce The .Law Offices of Edward T. Joyce & Assoc. PC 135 S. LaSalle St., Ste., 2200 Chicago, IL 60603 312-641-2600 |
| **ACTION ITEMS:** | SOP Papers with Transmittal, via  UPS Next Day Air , 1ZX212780116925715 |
| | Image SOP |
| | Email Notification,  JASON OLSEN  jason.olsen@bakermckenzie.com |
| **SIGNED:** | The Corporation Trust Company |
| **ADDRESS:** | 2875 Michelle Ste. 100 Irvine, CA 92606-1024 |
| **For Questions:** | 800-874-5258 WestTeam1@wolterskluwer.com |

Page 1 of  1 / NM

Information displayed on this transmittal is for CT Corporation's record keeping purposes only and is provided to the recipient for quick reference. This information does not constitute a legal opinion as to the nature of action, the amount of damages, the answer date, or any information contained in the documents themselves. Recipient is responsible for interpreting said documents and for taking appropriate action. Signatures on certified mail receipts confirm receipt of package only, not contents.

 Wolters Kluwer

# PROCESS SERVER DELIVERY DETAILS

**Date:**           Mon, Mar 2, 2020

**Server Name:**    Wilmington Drop Serve

**Location:**       Wilmington, DE

| | |
|---|---|
| Entity Served | CHICAGO SOUTH LOOP HOLDINGS III, LLC |
| Agent Name | THE CORPORATION TRUST COMPANY |
| Case Number | 2020L000292 |
| Jurisdiction | DE |



FILED DATE: 2/13/2020 12:00 AM   2020L000292

| | |
|---|---|
| 2120 - Served | 2121 - Served |
| 2220 - Not Served | 2221 - Not Served |
| 2320 - Served By Mail | 2321 - Served By Mail |
| 2420 - Served By Publication | 2421 - Served By Publication |
| Summons - Alias Summons | **(08/01/18) CCG 0001 A** |

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

ALI BAGHDADI, etc.
_____

(Name all parties)

v.

General Mediterranean Holding, S.A., Spf; and
Chicago South Loop Holdings III, LLC
_____

Case No.   2020 L 000292
_____

PLEASE SERVE:  Chicago South Loop Holdings III, LLC
c/o The Corporation Trust Center
1209 Orange Street, Wilmington, DE  19801

### ☑ SUMMONS   ☐ ALIAS SUMMONS

To each Defendant:

YOU ARE SUMMONED and required to file an answer to the complaint in this case, a copy of which is hereto attached, or otherwise file your appearance and pay the required fee **within thirty (30) days after service of this Summons,** not counting the day of service.  To file your answer or appearance you need access to the internet.  Please visit www.cookcountyclerkofcourt.org to initiate this process.  Kiosks with internet access are available at all Clerk's Office locations.  Please refer to the last page of this document for location information.

**If you fail to do so, a judgment by default may be entered against you for the relief requested in the complaint.**

To the Officer:

This Summons must be returned by the officer or other person to whom it was given for service, with endorsement of service and fees, if any, immediately after service.  If service cannot be made, this Summons shall be returned so endorsed. This Summons may not be served later than thirty (30) days after its date.

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**
Page 1 of 3

**Summons - Alias Summons**            **(08/01/18) CCG 0001 B**

E-filing is now mandatory for documents in civil cases with limited exemptions. To e-file, you must first create an account with an e-filing service provider. Visit http://efile.illinoiscourts.gov/service-providers.htm to learn more and to select a service provider. If you need additional help or have trouble e-filing, visit http://www.illinoiscourts.gov/FAQ/gethelp.asp, or talk with your local circuit clerk's office.

Atty. No.: 47922

Witness: _____

Atty Name: Law Offices of Edward T. Joyce

**2/13/2020 12:00 AM DOROTHY BROWN**

Atty. for: Plaintiffs

DOROTHY BROWN, Clerk of Court

Address: 135 South LaSalle Street, Suite 2200

City: Chicago

Date of Service: _____

State: IL    Zip: 60603

(To be inserted by officer on copy left with

Telephone: (312) 641-2600

Defendant or other p...

Primary Email: rcarroll@joycelaw.com

FILED DATE: 2/13/2020 12:00 AM   2020L000292

# CLERK OF THE CIRCUIT COURT OF COOK COUNTY OFFICE LOCATIONS

FILED DATE: 2/13/2020 12:00 AM   2020L000292

- ⦿ Richard J Daley Center
  50 W Washington
  Chicago, IL 60602

- ○ District 2 - Skokie
  5600 Old Orchard Rd
  Skokie, IL 60077

- ○ District 3 - Rolling Meadows
  2121 Euclid
  Rolling Meadows, IL 60008

- ○ District 4 - Maywood
  1500 Maybrook Ave
  Maywood, IL 60153

- ○ District 5 - Bridgeview
  10220 S 76th Ave
  Bridgeview, IL 60455

- ○ District 6 - Markham
  16501 S Kedzie Pkwy
  Markham, IL 60428

- ○ Domestic Violence Court
  555 W Harrison
  Chicago, IL 60607

- ○ Juvenile Center Building
  2245 W Ogden Ave, Rm 13
  Chicago, IL 60602

- ○ Criminal Court Building
  2650 S California Ave, Rm 526
  Chicago, IL 60608

**Daley Center Divisions/Departments**

- ○ Civil Division
  Richard J Daley Center
  50 W Washington, Rm 601
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Chancery Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Domestic Relations Division
  Richard J Daley Center
  50 W Washington, Rm 802
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Civil Appeals
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Criminal Department
  Richard J Daley Center
  50 W Washington, Rm 1006
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ County Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Probate Division
  Richard J Daley Center
  50 W Washington, Rm 1202
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Law Division
  Richard J Daley Center
  50 W Washington, Rm 801
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

- ○ Traffic Division
  Richard J Daley Center
  50 W Washington, Lower Level
  Chicago, IL 60602
  Hours:  8:30 am - 4:30 pm

**Dorothy Brown, Clerk of the Circuit Court of Cook County, Illinois**
**cookcountyclerkofcourt.org**

**Affidavit of Service of Summons**           **(02/05/16) CCG N074**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Ali Baghdadi, etc.
_____

v.         Case No.   2020 L 000292

General Mediterranean Holdings, S.A. Spf; and Chicago South

### AFFIDAVIT OF SERVICE OF SUMMONS OUTSIDE COOK COUNTY

State of   Delaware
_____

County of   New Castle    ss:
_____

_____ on oath states:

I am over 21 years of age and not a party to this case. I served the summons and a copy of the complaint upon defendant as follows:

a. ☐ on defendant _____, by leaving a copy of the summons and of the complaint with the

defendant personally on _____, at _____ ○ AM ○ PM at _____,

County of _____.

b. ☐ on defendant _____ on (date) _____, at _____ ○ AM ○ PM, by leaving a

copy of the summons and of the complaint at _____, County

of _____, the defendant's usual place of abode with _____, a person of the

defendant's family or a person residing there, of the age of 13 years or upwards, who, to the best of my knowledge is _____

years of age, ○ Male ○ Female and described by me as follows:

_____

_____

_____

and informing that person of the content of the summons, and also by sending on (date) _____, a copy of the summons
and of the complaint in a sealed envelope with postage fully prepaid, addressed to the defendant at his or her usual place of
abode.

c. ☐ on defendant corporation _____, by leaving a copy of the

summons and of the complaint with _____,

                                           (name)

○ registered agent ○ officer ○ agent of the corporation on _____, at the hour of _____ ○ AM ○ PM at

_____, County of _____.

Atty. No.:   47922 _____

Name:   Law Offices of Edward T. Joyce & Associates, P.C.             Signature of Affiant

Atty for:   Plaintiff

Address:   135 S. LaSalle Street             Signed and sworn to before me dated: _____

City:   Chicago      State:   IL     Zip:   60603

Telephone:   (312) 641-2600                        Notary Public

Primary Email:   rcarroll@joycelaw.com

Secondary Email:   ejoyce@joycelaw.com

Tertiary Email:   mccarey@joycelaw.com

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

**Affidavit of Service of Summons**                                    **(02/05/16) CCG N074**

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

Ali Baghdadi, etc.
_____

                          v.                          Case No.    2020 L 000292 _____

General Mediterranean Holdings, S.A. Spf; and Chicago South

### AFFIDAVIT OF SERVICE OF SUMMONS OUTSIDE COOK COUNTY

State of  Delaware _____

                                    ss:
County of  New Castle _____

_____ on oath states:

I am over 21 years of age and not a party to this case.  I served the summons and a copy of the complaint upon defendant as follows:

a.  ☐  on defendant _____, by leaving a copy of the summons and of the complaint with the

defendant personally on _____, at _____  ○ AM  ○ PM at _____,

County of _____.

b.  ☐  on defendant _____ on (date) _____, at _____  ○ AM  ○ PM, by leaving a

copy of the summons and of the complaint at _____, County

of _____, the defendant's usual place of abode with _____, a person of the

defendant's family or a person residing there, of the age of 13 years or upwards, who, to the best of my knowledge is _____

years of age,  ○ Male  ○ Female and described by me as follows:

_____

_____

_____

and informing that person of the content of the summons, and also by sending on (date) _____, a copy of the summons and of the complaint in a sealed envelope with postage fully prepaid, addressed to the defendant at his or her usual place of abode.

c.  ☐  on defendant corporation _____, by leaving a copy of the

summons and of the complaint with _____,

                                                                 (name)

○ registered agent  ○ officer  ○ agent  of the corporation on _____, at the hour of _____  ○ AM  ○ PM at

_____, County of _____.

Atty. No.:  47922 _____                        _____

Name:  Law Offices of Edward T. Joyce & Associates, P.C.                        Signature of Affiant

Atty for:  Plaintiff _____

Address:  135 S. LaSalle Street _____                        Signed and sworn to before me dated:  _____

City:  Chicago _____  State:  IL  Zip:  60603 ____

Telephone:  (312) 641-2600 _____                        _____

Primary Email:  rcarroll@joycelaw.com ____                        Notary Public

Secondary Email:  ejoyce@joycelaw.com ____

Tertiary Email:  mccarey@joycelaw.com ____

### DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
Page 1 of 1

FILED
1/7/2020 7:23 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

7982994

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

ALI BAGHDADI, FOUAD CHAMON, )
ANTOINE KORKIS, NAJAH NAJJAR, )
JACQUELINE NAJJAR, SUHAIL )
NAMMARI, NACHWAN RAZKO, )
BURT REZKO, MILAD SAAD, )
MICHAEL SAHLI, GEORGES ZOUKI, )
KHALED SHAIR, LAYLA EL SHAIR, )
AND QMQQ LLC, )
)
       Plaintiffs, )
)
    v. )    No.
)
GENERAL MEDITERRANEAN )
HOLDING, S.A., Spf; and CHICAGO )
SOUTH LOOP HOLDINGS III, LLC, )
)
       Defendants. )

2020L000292

**JURY DEMANDED**

## COMPLAINT

Plaintiffs Ali Baghdadi ("Baghdadi"), Fouad Chamon ("Chamon"), Antoine Korkis

("Korkis"), Najah Najjar ("N. Najjar"), Jacqueline Najjar ("J. Najjar"), Suhail Nammari

("Nammari"), Nachwan Razko ("Razko"), Burt Rezko ("B. Rezko"), Milad Saad ("Saad"),

Michael Sahli ("Sahli"), Georges Zouki ("Zouki") Khaled Shair ("K. Shair"), Layla El Shair ("L.

Shair") and QMQQ, LLC ("QMQQ") (collectively, "Plaintiffs"), by and through their attorneys,

The Law Offices of Edward T. Joyce & Associates, P.C., respectfully state as follows for their

Complaint against Defendants General Mediterranean Holding, S.A., SpF and Chicago South

Loop Holdings III (collectively, "Defendants"):

FILED DATE: 1/7/2020 7:23 PM 2020L000292

FILED DATE: 1/7/2020 7:23 PM 2020L000292

## INTRODUCTION

1.     This case arises out of a multi-billion dollar company's efforts to deprive minority investors of their right to participate in one of the most promising real estate development projects in Chicago.

2.     In January 2006, Antoin S. Rezko ("Rezko") and a business partner were the owners of MT Property Holdings, LLC ("MT"). At that time, MT owned 100% of Heritage Development Partners, LLC ("Heritage"). Heritage owned 50% of the common units and 49% of the voting units of Riverside District Development, LLC ("Riverside"), which owned a 62-acre parcel of land that is now known as the "78." Defendant General Mediterranean Holding, S.A., SpF ("GMH") owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units.

3.     In July 2007, Rezko assigned 30.497% of his economic/distributional interests in MT to Plaintiffs.

4.     All of MT's interest holders, including Plaintiffs, were entitled to participate in and profit from the future development of the Property through MT's ownership interest in the Heritage, which was the company responsible for developing the Property. MT's (and thus Plaintiffs') future development rights were not limited solely to activities carried out by Heritage. Instead, if a co-owner of Heritage or one of its affiliates decided to develop the property through a different vehicle, the Heritage operating agreement expressly granted MT the right to acquire a share of that other development company. By doing so, the Heritage Operating Agreement ensured that MT (and its interest owners) could not be deprived of the opportunity to participate in the future development of the property, regardless of the form or ultimate ownership structure of the project.

2

FILED DATE: 1/7/2020 7:23 PM 2020L000292

5.      However, seven years after Plaintiffs acquired their interests in MT, GMH attempted to cut Plaintiffs and all other non-GMH affiliated investors out of the development project. By early 2014, GMH obtained complete control over Heritage. Using this control, GMH caused the Property to be transferred to one of its shell companies and replaced Heritage as the developer of the Property with a new company owned and controlled solely by GMH. GMH did all of this without providing any notices to Plaintiffs.

6.      GMH then attempted to cover its tracks and forever extinguish Plaintiffs' ability to participate in the development of the Property by dissolving Heritage and MT. Once again, GMH took this step by exercising the control it had acquired through its web of shell companies. And, once again, GMH did not provide notice to Plaintiffs of what it was doing. Plaintiffs have only recently learned about GMH's attempt to cut them out of the development of the Property through news reports about the Property and communications with each other. Plaintiffs have brought this action to require GMH and MT's former member-manager, Chicago South Loop Holdings III, LLC ("South Loop III), which GMH controlled, to account for the harm done to Plaintiffs.

## PARTIES

7.      On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Baghdadi.

8.      On July 26, 2007, Rezko assigned a 3.5014% economic, non-member interest in MT to Chamon.

9.      On August 13, 2007, Rezko assigned a 0.8582% economic, non-member interest in MT to Korkis.

10.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to N. Najjar.

3

FILED DATE: 1/7/2020 7:23 PM   2020L000292

11.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to J. Najjar.

12.     On July 26, 2007, Rezko assigned a 5.1491% economic, non-member interest in MT to Nammari.

13.     On July 26, 2007, Rezko assigned a 1.6437% economic, non-member interest in MT to Razko.

14.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to B. Rezko.

15.     On July 26, 2007, Rezko assigned a 1.2871% economic, non-member interest in MT to Saad.

16.     On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Sahli.

17.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to Zouki.

18.     On July 26, 2007, Rezko assigned a 1.225% economic, non-member interest in MT to K. Shair and L. Shair.

19.     On April 22, 2014, QMQQ was assigned Rezko's 5.8917% interest in MT.

20.     Defendant GMH is a Luxembourg-based company. Its principal place of business is located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg, Grand-Duche de Luxembourg.

21.     Defendant South Loop III is a Delaware limited liability company that GMH indirectly owns and controls. Its principal place of business is located at 211 West Wacker Drive, Suite 1050, Chicago, Illinois.

4

FILED DATE: 1/7/2020 7:23 PM   2020L000292

22.   This Court has personal jurisdiction over GMH pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

23.   This Court has personal jurisdiction over South Loop III pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10) and (11).

24.   Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (a) a defendant joined in good faith and with probable cause for the purpose of obtaining a judgment against it and not solely for the purpose of fixing venue resides here and (b) the transaction or some part thereof out of which Plaintiffs' cause of action arose occurred in this county.

## FACTUAL ALLEGATIONS

**A.      The Property was a unique parcel of real estate with significant potential for substantial returns once development was complete.**

25.   The Property is located in Chicago's South Loop at the southwest corner of Clark Street and Roosevelt Road.

26.   At 62 acres, the Property has been one of the largest parcels of undeveloped land in Chicago and one of the largest contiguous in-fill parcels in any major city in the United States.

27.   The Property offers impressive views of Chicago's skyline and includes one-half mile of frontage along the Chicago River.

28.   The Property is less than a mile from Chicago's Central Business District, Grant Park, the Museum Campus, McCormick Place, and other significant locations in the city.

29.   The Property also has convenient access to public transit – including a Metra line, three "L" lines, and a bus line – and to major highways – including the Dan Ryan and Eisenhower Expressways and Lake Shore Drive.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

30.     In light of these features, the Property is a unique opportunity for a large mix-use development combining hundreds of thousands of square feet in commercial space with several thousand residential units.

**B.      Through various entities, Rezko and GMH acquire the Property**

31.     In the early 2000s, Rezko and GMH recognized the tremendous potential for the Property and they decided to purchase and develop it as partners.

32.     Rezko was responsible for overseeing the development of the Property. During 20 years in the Chicago real estate industry, Rezko had acquired extensive knowledge about real estate development and cultivated relationships with a wide array of professionals from engineers and architects to consultants and attorneys.

33.     GMH was responsible for providing most of the capital needed for the project. As an international holding company with billions of dollars of assets, GMH could not only fund the purchase of the Property but also supply the money that would be needed on an ongoing basis to pay for development efforts.

34.     Mohammed Al-Miqdadi ("Al-Miqdadi") was responsible for the day-to-day business of GMH related to the Property. Al-Miqdadi was the Director of Project Development at GMH and, in this capacity, reported directly to Nadmi Auchi ("Auchi"), who was GMH's sole owner, Chairman, and Chief Executive Officer. Al-Miqdadi is also Auchi's son-in-law.

35.     As of January 1, 2006, the Property was owned by Riverside. GMH owned 50% of Riverside's common units, 51% of its voting units and 100% of its preferred units. Heritage owned the other 50% of Riverside's common units and 49% of its voting units. MT, which was owned and controlled by Rezko and his business partner, Michael Ruman ("Ruman") was the sole owner of Heritage.

6

FILED DATE: 1/7/2020 7:23 PM 2020L000292

36.     The chart below graphically reflects the ownership structure as of January 1, 2006



C.      **Heritage raises additional capital from Baghdadi and others through a private placement offering**

37.     In early 2006, Heritage conducted a private placement offering to raise additional capital.

38.     Through the offering, Heritage sold Class A Units.

39.     The Class A Units were purchased by Royal Heritage Investments LLC ("Royal Heritage"), Baghdadi and his wife Darlene ("D. Baghdadi"), and Roosevelt-Clark, LLC ("Roosevelt-Clark") (the "Class A Investors").

40.     Under the Heritage operating agreement, these Class A Units had only limited voting rights. Most of the voting power in Heritage belonged only to the members who held Class B Units. However, as explained below, Section 7.2 of the Heritage operating agreement granted Class A and Class B members the same right to participate in the future development of the Property.

41.     Section 7.2 of Heritage's operating agreement states that "no Member holding Class B Units or an Affiliate of such Member (either one a 'Related Developer') shall enter into any transaction with respect to the development of all or any portion of the Property unless the

7

FILED DATE: 1/7/2020 7:23 PM   2020L000292

each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" (Ex. 1, Heritage's Operating Agreement, §7.2.)

42.    In short, this portion of §7.2 prohibited any members of Heritage holding Class B Units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless all members of Heritage were granted an opportunity to own a common interest in the Related Developer.

43.    Section 7.2 also set forth a formula to calculate the share of the common ownership interest in the Related Developer that a member would have the right to own. (Ex. 1, Heritage's Operating Agreement, §7.2.) Specifically, each member was entitled to a share of the common ownership interests in the Related Developer that was "equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class[,] by (z) the total number of Units then outstanding, determined regardless of class." *Id.* Under this equation, each member thus was entitled to retain the same proportion of ownership in the Related Developer that it had in the original developer, Heritage.

**D.     Rezko is indicted, GMH takes control of Heritage and MT, and Rezko assigns 30.497% of his economic interest in MT to Plaintiffs**

44.    In October 2006, it was publicly revealed that the government had indicted Rezko on fraud and bribery charges.

45.    GMH concluded that the indictment made Rezko a liability to its efforts to develop the Property.

46.    Therefore, on July 24, 2007, GMH caused a wholly-owned and wholly-controlled affiliate named Orifarm, S.A. ("Orifarm"), to acquire 60 Class B Units of Heritage from MT. In addition, Heritage admitted Orifarm as a member.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

47.     Thus, following this July 24, 2007 transaction, Orifarm owned 60% of Heritage, MT owned 38.1% of Heritage and the Class A Investors owned 1.9% of Heritage.

48.     At or about the same time, Orifarm acquired all of Rezko's and Ruman's membership interests in MT and was admitted as a member. Because MT was a member-managed LLC, Orifarm, as the only admitted member of MT, gained complete control of MT.

49.     Through its ownership of 60% of Heritage's Class B Units and its control of MT, which owned Heritage's other Class B Units, Orifarm gained complete control of the majority of Heritage's voting rights. Because GMH owned and controlled Orifarm, this meant that GMH had in effect gained complete control of Heritage.

50.     On July 26, 2007, Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs (except for Korkis and QMQQ, who received their assigned interests on August 13, 2007 and September 6, 2007 respectively.)

51.     As a member of Heritage, MT was entitled to receive its share of any distributions that flowed from the development of the Property. As owners of an economic interest in MT, Plaintiffs were each entitled to receive their proportionate share of any such distributions that MT received.

52.     Because Orifarm was the only admitted member and manager of MT, it exercised complete control over MT's operations and investment in the development of the Property. Thus, Orifarm had complete control over Plaintiffs' economic interests in the development of the Property. Accordingly, Plaintiffs placed their trust and confidence in Orifarm to protect, preserve and advance MT's interests in the development of the Property.

53.     When Rezko transferred control of MT to Orifarm, it was his expectation and intent that Orifarm would facilitate the future development of the Property for the benefit of MT and that

9

FILED DATE: 1/7/2020 7:23 PM   2020L000292

Orifarm would not take any actions to dilute, extinguish or interfere with Plaintiffs' economic interests in MT.

54.     The chart below reflects the ownership of the Property and its development after GMH completed its buy out of Rezko.



55.     GMH further secured its control over Heritage by installing one of its own executives as Heritage's manager.

56.     Heritage's operating agreement provided that it was to be a manager-managed LLC. (Ex. 1, Heritage's Operating Agreement, §9.1.) The operating agreement also vested the manager with significant power to control Heritage's operations. (*Id.* §§9.1-9.7.)

57.     On July 24, 2007, GMH installed Illinois Developer, LLC ("Illinois Developer") as Heritage's new manager.

58.     Illinois Developer was managed and controlled by a British Virgin Islands corporation called Moni Equities, Inc., which was wholly owned and controlled by GMH. Al-Miqdadi was president of Moni Equities and one of its three directors.

59.     GMH also installed Al-Miqdadi as president of Illinois Developer.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

**E.    GMH developed a scheme to deprive Heritage's Class A Investors and Plaintiffs of their right to participate in and profit from the development of the Property**

60.    In 2014, after having amassed total control over Heritage, GMH set its sights on depriving Heritage's Class A Members and Plaintiffs of their rights to participate in and profit from the development of the Property.

61.    GMH did this in three steps.

62.    **Step One**. In 2014, GMH caused Orifarm to dissolve and to transfer all its interests in Heritage and MT to South Loop III. Through a web of shell companies, GMH owned and controlled South Loop III. Specifically, South Loop III was wholly-owned by CSLH Incorporated ("CSLH Inc."), which was wholly-owned by CSLH Lux I S.àr.l ("CSLH Lux I"), which was wholly-owned by CSLH Lux II S.àr.l ("CSLH Lux II"), which was wholly-owned by GMH.

63.    GMH also exercised complete control over South Loop III's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop III's president. Also, South Loop III's manager was CSLH Manager Incorporated ("CSLH Manager"). CSLH Manager was directly owned by CSLH Inc. Thus, GMH ultimately owned and controlled CSLH Manager.

64.    As the member-manager of MT, South Loop III exercised complete control over MT's operations and its investment in the development of the Property. Plaintiffs placed their trust and confidence in MT's member-manager, first Orifarm and then South Loop III, to protect, preserve and advance MT's interests in the development of the Property.

65.    **Step Two**. On April 28, 2014, GMH caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC ("South Loop II"). Through a web of shell companies, GMH owned and controlled South Loop II. Specifically, South Loop II was wholly owned by

FILED DATE: 1/7/2020 7:23 PM 2020L000292

Chicago South Loop Holdings I, LLC ("South Loop I") which was wholly owned by CSLH Inc., which was wholly owned by CSLH Lux I, which was wholly owned by CSLH Lux II, which was wholly owned by GMH.

66. GMH also exercised complete control over South Loop II's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop II's president. Also, South Loop II's manager was CSLH Manager, which GMH ultimately owned and controlled.

67. Under Section 7.2 of Heritage's operating agreement, MT's rights were triggered if a transaction met two requirements: (1) it involved a Class B member or its affiliate, and (2) it was with respect to the development of the Property.

68. With respect to the first requirement, the two parties to the transfer of the Property on April 28 were South Loop II and Riverside.

69. Both South Loop II and Riverside were affiliates South Loop III, which was a Class B Member of Heritage.

70. In that regard, under §1.3 of Heritage's operating agreement, any entity "under common Control" with South Loop III was one of South Loop III's affiliates. (Ex. 1, Heritage Operating Agreement, §1.3.) Because South Loop III was under the control of GMH, any other developer entity controlled by GMH was "under common Control" with South Loop III for purposes of §7.2. Under §1.20 of Heritage's operating agreement, GMH controlled an entity if it either (1) possessed, directly or indirectly, at least (a) 10% of its voting power, if a corporation, or (b) 10% of its ownership interest if not a corporation, or (2) had the power to direct or cause the direction of its management and policies. (Ex. 1, Heritage Operating Agreement §1.20.)

71. Both South Loop II and Riverside satisfied this standard.

12

FILED DATE: 1/7/2020 7:23 PM    2020L000292

72. Because GMH controlled South Loop II and Riverside (within the meaning of §1.20), they were both affiliates of a Class B Member of Heritage (South Loop III), within the meaning of §7.2. Thus, the April 28 transfer of the Property from Riverside to South Loop II satisfied the first requirement of §7.2.

73. The April 28 transfer of the Property also satisfied the second requirement of §7.2.

74. The purpose of this transaction (i.e., transferring the Property from Riverside to South Loop II) was to allow South Loop II to hold title to the Property and to engage in future transactions with respect to its development. That means the April 28th transfer of the Property was a transaction with respect to the development of the Property within the meaning of §7.2 of Heritage's operating agreement.

75. **Step Three**. In May 2014, GMH, through its control of South Loop III and Illinois Developer, caused Heritage and MT to be dissolved.

76. Defendants did not provide Plaintiffs with any notice of any of the facts alleged in paragraphs 60-73 above.

77. Instead of dissolving MT, South Loop III (which was controlled by GMH) should have caused MT to acquire an ownership interest in South Loop II as required by §7.2 of Heritage's operating agreement.

78. However, South Loop III/GMH did not do this because GMH's goal with the restructuring was to deprive Heritage's Class A Investors and Plaintiffs of their economic interests in the development of the Property.

79. Through its control of Illinois Developer, South Loop III and Heritage, GMH caused Heritage to breach its operating agreement by failing to provide MT with an ownership interest in South Loop II.

13

FILED DATE: 1/7/2020 7:23 PM   2020L000292

80.    Plaintiffs thus were improperly deprived of the opportunity to participate in the development of the Property through their economic interest in MT. GMH and South Loop III's actions have caused Plaintiffs' valuable economic interests in MT to become worthless.

**F.**    **GMH formed a new joint venture to develop the Property without offering Plaintiffs the opportunity to participate**

81.    On information and belief, after dissolving Heritage and MT, GMH engaged in extensive discussions with companies that wanted to partner with GMH to develop the Property.

82.    GMH spent over a year soliciting and reviewing offers and negotiating with interested companies.

83.    Eventually, GMH decided to partner with The Related Companies, L.P., a multi-billion-dollar real estate company based on New York.

84.    By May 2015, GMH had signed a letter of intent with Related Midwest to form a joint venture that would own and develop the Property.

85.    As part of that joint venture, South Loop II and Related R/C LLC formed Roosevelt/Clark Partners LLC ("RCP").

86.    On May 9, 2016 South Loop II and RCP executed a special warranty deed conveying the Property to RCP.

87.    GMH and Related subsequently took significant steps to develop the Property.

88.    Under §7.2 of the Heritage operating agreement, MT had the right to acquire a share of any Class B Member or an affiliate of such a member that entered into a transaction with respect to the development of the Property. (Ex. 1, Heritage's operating agreement, §7.2.)

89.    When Heritage's articles of dissolution were filed in 2014, South Loop III was a Class B Member. Under the terms of Heritage's operating agreement, both South Loop II and GMH were affiliates of South Loop III. That means §7.2 granted MT the right to own a common

14

FILED DATE: 1/7/2020 7:23 PM   2020L000292

ownership share of South Loop II when it engaged in a transaction with respect to the development of the Property. The joint venture with Related clearly is such a transaction.

90.     However, MT did not exercise its rights under §7.2 or give Plaintiffs notice of GMH's dealings with Related because GMH wanted to shut Plaintiffs out of the development project.

91.     GMH carried out every aspect of its scheme in secrecy and never disclosed to Plaintiffs information about the transfers it made and actions it took with respect to the development project.

92.     The Baghdadi's, who were also Class A Investors in Heritage, did not find out what GMH had done until 2019 when GMH and Related filed Economic Disclosure Statements with the City of Chicago. (On April 26, 2019, the Baghdadi's have filed a separate lawsuit as Class A Investors).

93.     Likewise, because of GMH's attempts to conceal its scheme, the other Plaintiffs did not find out what GMH had done until 2019 through news reports concerning the development and/or conversations with each other.

<u>**COUNT I**</u>

**Breach of Fiduciary Duty**
**Against Defendants GMH and South Loop III**

94.     Plaintiffs incorporate the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.     As the sole member-manager of MT, South Loop III exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in South Loop III to protect, preserve and advance MT's interests in the development of the Property.

15

FILED DATE: 1/7/2020 7:23 PM 2020L000292

96.     Through its indirect ownership of South Loop III, GMH exercised complete control over South Loop III. Therefore, GMH in effect exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in GMH to protect, preserve and advance MT's interests in the development of the Property.

97.     As a result of the nature of the relationship between Plaintiffs and South Loop III, including the control and dominance that South Loop III exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in South Loop III as to those interests, South Loop III owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

98.     As a result of the nature of the relationship between Plaintiffs and GMH, including the control and dominance that GMH exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in GMH as to those interests, GMH owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

99.     GMH and South Loop III breached their fiduciary duties to Plaintiffs by: (a) causing the Property to be transferred from Riverside to South Loop II without providing MT with an ownership interest in South Loop II as required by Section 7.2 of Heritage's operating agreement, (b) causing MT to be dissolved, (c) failing to disclose these facts to Plaintiffs, (d) excluding Plaintiffs from the joint venture between South Loop II and Related, and (e) excluding Plaintiffs from the benefits of any development of the Property.

100.    As a result of these breaches, Plaintiffs have lost their interests in the development of the Property and thus have been damaged in excess of $50,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

16

FILED DATE: 1/7/2020 7:23 PM   2020L000292

a) awarding compensatory damages to Plaintiffs;

b) awarding punitive damages to Plaintiffs

c) awarding equitable pre-judgment interest to Plaintiffs; and,

d) for any and all further relief that the Court deems just, equitable and proper.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMON,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL    NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, AND
QMQQ LLC,

By:    /s/  Edward T. Joyce
                One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

17

FILED DATE: 1/7/2020 7:23 PM   2020L000292

# Exhibit 1

FILED DATE: 1/7/2020 7:23 PM   2020L000292

# HERITAGE DEVELOPMENT PARTNERS, LLC

## OPERATING AGREEMENT

FILED DATE: 1/7/2020 7:23 PM   2020L000292

# INDEX

|  |  | Page |
|---|---|---|
| **ARTICLE 1** | **DEFINITIONS** | 1 |
| **ARTICLE 2** | **FORMATION OF THE COMPANY** | 7 |
| | 2.1 *Formation* | 7 |
| | 2.2 *Name* | 8 |
| | 2.3 *Purpose; Powers* | 8 |
| | 2.4 *Term* | 8 |
| | 2.5 *Principal Place of Business* | 8 |
| | 2.6 *Registered Office and Registered Agent* | 8 |
| | 2.7 *Continuation of Company* | 8 |
| | 2.8 *Qualification in Other Jurisdictions* | 8 |
| **ARTICLE 3** | **UNITS** | 9 |
| | 3.1 *Units* | 9 |
| | 3.2 *Persons Deemed Members* | 9 |
| | 3.3 *Subscriptions* | 9 |
| | 3.4 *Waiver of Dissenters* | 9 |
| | 3.5 *Expulsion* | 9 |
| **ARTICLE 4** | **CAPITAL CONTRIBUTIONS** | 10 |
| | 4.2 *Capital Contributions of Members* | 10 |
| | 4.2 *Additional Capital Contributions* | 10 |
| | 4.3 *Capital Accounts* | 10 |
| | 4.4 *Interest on Capital Contributions* | 11 |
| | 4.5 *Withdrawal* | 12 |
| | 4.6 *Return of Capital* | 12 |
| | 4.7 *Liability of Members* | 12 |
| **ARTICLE 5** | **ALLOCATION OF COMPANY PROFITS AND LOSSES** | 12 |
| | 5.1 *Allocations* | 12 |
| | 5.2 *Special Allocations* | 12 |
| | 5.3 *Other Allocation Rules* | 15 |
| | 5.4 *Allocations Solely For Tax Purposes* | 16 |
| **ARTICLE 6** | **DISTRIBUTIONS AND DISTRIBUTABLE CASH** | 16 |
| | 6.1 *Timing and Amount* | 16 |
| | 6.2 *Distributions for Tax Purposes* | 17 |
| | 6.3 *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items* | 17 |
| | 6.4 *Limitations on Distributions* | 18 |
| | 6.5 *Redemption of the Class A Units* | 18 |
| **ARTICLE 7** | **RESTRICTED TRANSACTIONS** | 18 |
| | 7.1 *Compensation and Distribution* | 18 |
| | 7.2 *Affiliate Transaction Rights* | 18 |

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM   2020L000292

**ARTICLE 8  ROLE OF MEMBERS** .................................................................. 19
    8.1    *General Rules* ................................................................. 19
    8.2    *Meetings of the Members* ............................................. 19
    8.3    *Indemnification of Members* ....................................... 21
**ARTICLE 9  MANAGEMENT** ......................................................................... 21
    9.1    *General Powers of the Manager* ................................. 21
    9.2    *Number and Election* .................................................. 21
    9.3    *Removal and Vacancies* .............................................. 22
    9.4    *Vacancies.* ................................................................... 22
    9.5    *Quorum, Required Vote and Adjournment.* .................. 22
    9.4    *No Liability* ................................................................. 22
    9.5    *Certain Powers of the Manager* .................................. 22
    9.7    *Exculpation From Liability For Certain Acts* ............. 24
    9.9    *Indemnification* .......................................................... 25
    9.10    *Interested Manager* ..................................................... 25
    9.11    *Compensation to Manager* ......................................... 25
**ARTICLE 10 LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS** ......... 26
    10.1    *Restriction on Transfers; Investment Representations and Warranties.* 26
    10.2    *Permitted Transfers* .................................................... 26
    10.3    *Sale of the Company* ................................................... 27
    10.4    *Restrictions on Transfers* ............................................ 28
    10.5    *Prohibited Transfers.* .................................................. 29
    10.6    *Rights of Unadmitted Assignees* .................................. 29
    10.7    *Admission of Transferees as Members* ........................ 29
    10.8    *Covenants; Representations Regarding Transfers; Legend* ................ 30
    10.9    *Distribution and Allocations in Respect to Transferred Interests* ......... 31
    10.10  *Termination of Restrictions* ......................................... 31
    10.11  *Waiver of Redemption of Distributional Interest.* .......... 31
**ARTICLE 11 DISSOLUTION AND TERMINATION** ........................................ 32
    11.1    *Events of Dissolution* .................................................. 32
    11.2    *Liquidation* ................................................................. 32
    11.3    *Filings.* ........................................................................ 33
    11.4    *Termination* ................................................................ 33
**ARTICLE 12 BOOKS AND RECORDS** ......................................................... 34
    12.1    *Books and Records; Accounting* .................................. 34
    12.2    *Access to Records, Financial Statements* ..................... 34
    12.3    *Annual Reports* ........................................................... 34
    12.4    *Bank Account(s)* ......................................................... 34
**ARTICLE 13 TAX MATTERS** ..................................................................... 34
    13.1    *Company Tax Returns* ................................................. 34
    13.2    *Schedules K-1 and Forms 1065* .................................. 35
    13.3    *Taxation as Partnership* .............................................. 35

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM 2020L000292

| | | |
|---|---|---|
| 13.4 | *Withholding* | 35 |
| **ARTICLE 14 MISCELLANEOUS** | | 36 |
| 14.1 | *Reimbursements* | 36 |
| 14.2 | *Amendments* | 36 |
| 14.3 | *Successors* | 37 |
| 14.4 | *Counterparts* | 37 |
| 14.5 | *Integration* | 37 |
| 14.6 | *Entire Agreement* | 37 |
| 14.7 | *Governing Law* | 37 |
| 14.8 | *Severability* | 37 |
| 14.9 | *Headings* | 37 |
| 14.10 | *Waiver* | 37 |
| 14.11 | *Filings* | 38 |
| 14.12 | *Notices* | 38 |
| 14.13 | *Mediation* | 38 |
| 14.14 | *Arbitration* | 38 |
| 14.15 | *Equitable Remedies* | 38 |
| 14.16 | *Company Losses Due to Member's Litigation* | 39 |
| 14.17 | *Title to Company Assets* | 39 |
| 14.18 | *Execution of Additional Documents* | 39 |
| 14.19 | *Confidentiality* | 39 |

FILED DATE: 1/7/2020 7:23 PM   2020L000292

# OPERATING AGREEMENT of

# HERITAGE DEVELOPMENT PARTNERS, LLC

This Operating Agreement is entered into by and among the Persons whose names are set forth on the signature pages hereof and any Person who hereafter becomes a party hereto pursuant to the provisions hereof, and is made effective as of January 1, 2006.

## RECITALS

Heritage Development Partners, LLC (the "Company") was organized pursuant to the Illinois Limited Liability Company Act (the "Act") upon the filing of the Articles of Organization (the "Articles") with the office of Secretary of State of the State of Illinois August 15, 2005, as amended on October 19, 2005.

Subsequent to its formation, the Company admitted Michael Rumman and Antion S. Rezko as its initial members (collectively, the "Initial Members") who caused the Company to enter into various transactions, including the acquisition of membership interests in Riverside District Development, LLC, an Illinois limited liability company.

The Initial Members, as of the date of first written above, along with the additional Persons when are set forth in this signature pages hereto, desire to operate the Company in accordance with and subject to the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the persons set forth in the signature pages hereto, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms used herein shall have the following meanings (unless otherwise expressly provided herein, or unless the context clearly indicates otherwise):

1.1     **"Act"** means the Illinois Limited Liability Company Act, 805 ILCS 180/1-1, et seq., as amended from time to time (or any corresponding provisions of succeeding law).

1.2     **"Affiliate of the Company"** means any Person directly or indirectly, Controlling, Controlled by or under common Control with the Company or any other Affiliate of the Company.

---

FILED DATE: 1/7/2020 7:23 PM 2020L000292

1.3 **"Affiliate of a Member"** means, in respect of a Member, any other Person, directly or indirectly, Controlling, Controlled by or under common Control with that Person.

1.4 **"Agreement"** means this Operating Agreement of Heritage Development Partners, LLC, as from time to time amended.

1.5 **"Annual Tax Distribution"** means that distribution provided in Section 6.2.

1.6 **"Articles"** means the Articles of Organization filed with the Office of the Secretary of State of Illinois, and all amendments thereto.

1.7 **"Bankruptcy"** means with respect to a Person: (a) a filing by the Person of a voluntary petition in bankruptcy, the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due or the filing against a Member of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (b) the making by the Person of a general assignment for the benefit of creditors, (c) the filing by the Person of an answer admitting the material allegations of, or its consenting to, or defaulting in answering, a bankruptcy petition filed against it in any bankruptcy proceeding, (d) the entry of an order, judgment, decree by any court of competent jurisdiction adjudicating the Person a bankrupt or appointing a trustee of its assets, or (e) any levy of execution being made upon the Interest of the Person in the Company.

1.8 **"Book Value"** means, with respect to any property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g).

1.9 **"Capital Account"** means the account maintained for each Member in accordance with the provisions of the Code and the regulations promulgated thereunder, including but not limited to the rules regarding maintenance of capital accounts set forth in Treasury Regulations Section 1.704-1.

1.10 **"Capital Contribution"** means, with respect to any Member executing this Agreement, the capital contribution such Member actually makes pursuant to Article 4 hereof.

1.11 **"Code"** means the Internal Revenue Code of 1986, as amended. Any reference to any specific provision of the Code or any regulations promulgated thereunder shall also refer to any successor provisions thereto.

1.12 **"Common Units"** means, collectively, the Non-Voting Common Units and the Voting Common Units.

1.13 **"Company"** means Heritage Development Partners, LLC, the Illinois limited liability company to be operated in accordance with the provisions of this Agreement.

---

FILED DATE: 1/7/2020 7:23 PM  2020L000292

1.14  **"Company Business"** is defined in <u>Section 2.3.</u>

1.15  **"Company Expenses"** means all costs and expenses incurred in connection with the business and affairs of the Company, including, without limitation, costs and expenses of acquiring, owning, operating and disposing of Company Investments, and fees and expenses of legal counsel, accountants, appraisers, investment bankers and third party consultants and advisors.

1.16  **"Company Investment"** means the interest of the Company in any business and other assets, owned, directly or indirectly, by the Company and acquired by the Company in one transaction or a series of related transactions, as determined by the Manager (as defined in <u>Section 9.1</u>).

1.17  **"Company Loss"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any loss and net of any gain realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment), where the aggregate of all such items during any applicable period results in a net loss to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.18  **"Company Minimum Gain"** means an amount equal to the Company minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(d).

1.19  **"Company Profit"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any gain and net of any loss realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment ), where the aggregate of all such items during any applicable period results in net income to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.20  **"Control"** (including, with correlative meanings, the terms "Controlling," "Controlled by" and "under common Control with"), as applied to any Person, includes the possession, directly or indirectly, of ten percent (10%) or more of the Voting Power (or in the case of a Person which is not a corporation, 10% or more of the ownership interest, beneficial or otherwise) of such Person or the power otherwise to direct or cause the direction of the management and policies of that Person, whether through voting, by contract or otherwise.

1.21  **"Deficit Capital Account"** means, with respect to any Member, the deficit balance (if any) in such Member's Capital Account as of the end of the Fiscal Period or Fiscal Year, after giving effect to the following adjustments:

1.21.1  credit to such Capital Account any amount which such Member is treated as being obligated to restore under Treasury Regulations Section 1 704-1(b)(2)(ii)(c), as well as

---

FILED DATE: 1/7/2020 7:23 PM 2020L000292

any addition thereto pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (i)(5), after taking into account any changes during the period in Company Minimum Gain and in the Member Minimum Gain; and

      1.21.2 debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(ii)(d)(4), (5) and (6).

This definition of "Deficit Capital Account" is intended to comply with Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be construed in a manner consistent with those provisions.

    1.22   **"Dissociation"** of a Member shall have the meaning provided under Section 35-45 of the Act.

    1.23   **"Distribution Interest"** means the right to receive the shares of revenues from production and other income, receipts, or gain of the Company, or of any other distributions from the Company, with respect to an Interest in the Company. The holder of a Distributional Interest is not a Member, nor has any of the other rights herein conferred upon such Member, including the right to vote as a Member until such holder is admitted as a Member (if at all).

    1.24   **"Fiscal Period"** means any interim accounting period within a Fiscal Year which is established by the Manager and which is required or permitted under the Code or Treasury Regulations.

    1.25   **"Fiscal Year"** means the Company's annual accounting period established pursuant to <u>Section 12.1</u> of this Agreement.

    1.26   **"Illinois Replacement Tax"** means (a) the Illinois Personal Property Tax Replacement Income Tax, 35 ILCS 5/201 et seq., as amended from time to time, and (b) if the Company is subject to any other state tax (i.e., state tax other than Illinois Replacement Tax) the amount of which is dependent upon the tax character of some or all of the Members, the Manager may, in its discretion, treat such other state tax as Illinois Replacement Tax for all purposes of this Agreement.

    1.27   **"Illinois Replacement Tax Savings"** means, with respect to a Fiscal Year for which the Company is subject to Illinois Replacement Tax, the amount (if any) of additional Illinois Replacement Tax that would have been imposed upon the Company for such Fiscal Year but for the fact that some of the Members are themselves subject to the Illinois Replacement Tax for such Fiscal Year.

    1.28   **"Independent Third Party"** means any Person who, immediately prior to the contemplated transaction, does not own in excess of five percent of the Units on a fully-diluted basis

FILED DATE: 1/7/2020 7:23 PM  2020L000292

(a "5% Owner"), who is not Controlling, Controlled by or under common Control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of any such 5% Owner and/or such other Persons.

1.29 **"Interest"** means the personal property ownership right of a Member, such personal property ownership right being evidenced by and composed of Units, in the Company entitling such Member to, among other things, an allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and a share of distributions made by the Company. Each Member's allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and share of the Company's distributions, as applicable, shall be determined in accordance with this Agreement based upon the number of Units owned by such Member.

1.30 **"Interest Holder"** means any Member, assignee or other transferee of a Member who is not admitted as a Member, but is a holder of a Distributional Interest.

1.31 **"Manager"** means the Person appointed as the manager of the Company under the Act and Article 9 of this Agreement.

1.32 **"Member"** means any Person that holds an Interest in the Company represented by Units and is admitted as a Member of the Company pursuant to this Agreement.

1.33 **"Member Minimum Gain"** means an amount, with respect to each Member Non-recourse Debt, equal to the Company Minimum Gain that would result if such Member Non-recourse Debt were treated as a Company non-recourse liability, as determined in accordance with Treasury Regulations Section 1.704-2.

1.34 **"Member Non-Recourse Debt"** shall have the same meaning as the term "partner non-recourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

1.35 **"Member Non-Recourse Deductions"** shall have the same meaning as the term "partner non-recourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(1) and 1.704-2(i)(2).

1.36 **"Net Cash"** means, for each Fiscal Year or a portion thereof, (a) all cash of the Company derived from Company operations, after deducting: (i) all cash expenditures incurred in connection with the operation of the Company's business; (ii) an amount necessary to pay all liabilities of the Company then due and owing including, without limitation, all loans to the Company and all advances made by any Member to the Company; and (iii) an amount determined by the Manager to be reasonably necessary or desirable as a reserve for the operation of the Company business, liabilities of the Company not yet due, and/or future or contingent liabilities of the Company, and (b) the net cash proceeds from all sales and other dispositions and all refinancing of

---

FILED DATE: 1/7/2020 7:23 PM  2020L000292

Company Investments, less any portion thereof used to establish reserves, all as determined by the Manager.

1.37 **"Net Invested Capital Balance"** means as to each Member, the cash contributed by such Member to the capital of the Company, less amounts distributed to such Member pursuant to Section 6.1.2 hereof.

1.38 **"Non-Recourse Deductions"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

1.39 **"Non-Recourse Liability"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1.40 **"Ownership Percentage"** means, with respect to any Member as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate of all Units held by all Members on such date.

1.41 **"Person"** means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

1.42 **"Property"** means certain real property located at Roosevelt Road and Clark Street in Chicago, Illinois currently owned by Riverside District Development, LLC.

1.43 **"Quarterly Estimated Tax Distribution"** is defined in <u>Section 6.2.</u>

1.44 **"Redemption Amount"** shall mean an amount sufficient to cause each holder of Class A Units to receive the sum of (x) an amount equal to a 20% per annum return on such holder's Capital Contributions made to the Company plus (y) a return of all Capital Contributions made to the Company by such holder.

1.45 **"Sale of the Company"** means the sale of the Company to an Independent Third Party or group of Independent Third Parties pursuant to which such party or parties acquire (i) Units of the Company possessing the voting power under normal circumstances to elect the Company's Manager (whether by merger, consolidation or sale or transfer of Units) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

1.46 **"Securities Act"** means the Securities Act of 1933, as amended from time to time.

1.47 **"Tax Allowance Amount"** means, with respect to any Member for any calendar quarter, an amount reasonably determined by the Manager, in good faith, to be the estimated income tax liability of such Member (or the owners of such Member that is a flow-through entity for federal income tax purposes) arising from its ownership of Units. The Tax Allowance Amount for each

FILED DATE: 1/7/2020 7:23 PM   2020L000292

Member shall be computed on the assumption that all Members are subject to taxation at the same combined federal and state income tax rates, which shall be the highest combined rates applicable to any Member, as determined by the Manager.. The amount so determined by the Manager shall be the Tax Allowance Amount for such period and shall be final and binding on all Members.

1.48 **"Tax Matters Partner"** means the Person designated as such in <u>Section 13.1.2</u> of this Agreement.

1.49 **"Transfer"** means, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, or otherwise dispose of.

1.50 **"Treasury Regulations"** means the proposed, temporary and final regulations promulgated under the Code, as amended from time to time.

1.51 **"Unreturned Capital"** means, with respect to a Unit, the excess, if any, of the Capital Contribution made or deemed made in exchange for or on account of such Unit over all Distributions made by the Company with respect to such Unit pursuant to <u>Section 6.1(i)</u>.

1.52 **"Voting Power"** of any Person, means the total number of votes, which may be cast by the holders of the total number of outstanding shares of stock, units or interests of any class or classes of such Person in any election of directors of such Person.

1.53 **"Unit"** means a reference to a Class A Units and Class B Units and represents an ownership Interest issued by the Company represented by Units, with rights, interests, duties and obligations set forth in this Agreement with respect to Units, and representing a Capital Contribution in cash or other property equal to the price per Unit or fraction thereof paid by a Member and set forth on <u>**Schedule I**</u>. Except as otherwise provided in this Agreement, Class A Units shall be non-voting Units.

1.54 **"Withdrawal"** means, with respect to any Member, the death or Bankruptcy of such Member or a complete assignment or disposition of such Member's entire Interest in the Company made during the lifetime (or other existence) of such Member, and with respect to a Manager (in its capacity of Manager), the death, Bankruptcy, or legal incapacity of the Manager, or the Manager's continued failure to perform its duties as a Manager.

## ARTICLE 2
## FORMATION OF THE COMPANY

2.1 *Formation*. The Company has been organized as an Illinois Limited Liability Company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

---

FILED DATE: 1/7/2020 7:23 PM   2020L000292

2.2   *Name.*  The name of the Company is Heritage Development Partners, LLC, and appropriate certificates and affidavits shall be filed and recorded as may be necessary to secure said name.  The name of the Company shall be subject to change by the Manager.

2.3   *Purpose; Powers.*  The purpose of the Company is (i) to own a membership interest in Riverside District Development, LLC, an Illinois limited liability company and (ii) to carry on any and all other lawful business, purpose or activity, except for any purposes prohibited under the Act (the "Company Business").  The Company shall possess and may exercise all powers and privileges granted by the Act, any other law, or by the Agreement, including incidental powers thereto, to the extent that such powers and privileges are necessary, customary, convenient or incidental to the attainment of the Company's purposes.

2.4   *Term.*  The term of the Company commenced on the date that the Articles was filed in the office of the Secretary of State of the State of Illinois and shall continue until the Company is dissolved in accordance with the provisions of either this Agreement or the Act.

2.5   *Principal Place of Business.*  The principal place of business of the Company shall initially be located at 233 South Wacker Drive, 95th Floor, Chicago, IL 60606, or at such other location or locations as the Manager may from time to time designate.

2.6   *Registered Office and Registered Agent.*  The Company's initial registered office shall be at the office of its registered agent at 233 South Wacker Drive, Chicago, Illinois 60606, and the name of its initial registered agent at such address shall be Michael Rumman.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Office of the Secretary of State of the State of Illinois, and paying any fees required under the Act.

2.7   *Continuation of Company.*  The Members hereby agree that the Company shall be organized, administered, operated and terminated in accordance with the provisions of this Agreement and the Act. The Members hereby further agree that the rights, duties, liabilities and obligations of the Members, and each Class thereof, shall be governed by the provisions of this Agreement and the Act.

2.8   *Qualification in Other Jurisdictions.*  The Manager shall have the authority to cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company conducts business and in which such qualification, formation or registration is required by law or deemed advisable by the Manager. The Manager, or its authorized representative, as an authorized Person within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to do business.

---

FILED DATE: 1/7/2020 7:23 PM    2020L000292

# ARTICLE 3
## UNITS

3.1     *Units*.  The Interests in the Company shall be designated as Units and shall be divided into two series, *"Class A Units"* and *"Class B Units."*  The Units of each Member in the Company are personal property.  All Units redeemed, purchased or otherwise acquired by the Company shall be canceled and thereupon restored to the status of authorized but unissued Units.  Holders of Units shall have the respective rights, interests, duties, and obligations that are set forth in this Agreement.  Except as otherwise provided in this Agreement, the Manager may, with the consent of the Members holding at least fifty percent (50%) of the Class A Units, issue new or additional Units or options or other securities to purchase or otherwise acquire or convert to new or additional Units, at any time and from time to time.

3.2     *Persons Deemed Members*.  The Company may treat the Person in whose name any Unit shall be registered on the books and records of the Company as a Member and the sole holder of such Unit for all purposes whatsoever and, accordingly, shall not be bound to recognize any equitable or other claims to or interest in such Unit or the part of any other Person, whether or not the company shall have actual or other notice thereof.

3.3     *Subscriptions*.  A prospective Member of the Company may enter into a Subscription Agreement for the purchase of Units, or fractions thereof.  A Person may not be admitted as a Member until such Person has: (a) executed this Agreement, which may be pursuant to an Additional Member Signature Page in the form attached to this Agreement, (b) purchased Units, and (c) executed and delivered to the Company such other agreements (including, without limitation, purchase agreements and investment representations) as the Manager may require.

3.4     *Waiver of Dissenters' Rights*.  The Members hereby waive any and all contractual appraisal rights or dissenters' rights, if any, with respect to their Units and any or all similar rights whether set forth in any other applicable law or in any agreement with respect to which the Company or a Member is a party or beneficiary.

3.5     *Expulsion*.          Any Member may be expelled as required in Section 35-45(6) of the Act.

FILED DATE: 1/7/2020 7:23 PM  2020L000292

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.1    *Capital Contributions of Members, Ownership.* The Members of the Company as of the Acquisition Date are maintained on the Company's books and records. Set forth on **Schedule 1** "Ownership of Members" attached hereto are the number and class of Units issued to each Member. Each Member shall receive, in exchange for the capital contribution of such Member, the number and class of Units set forth opposite such Member's name thereon. Additional capital contributions may be in the form of cash or cash equivalents, unless otherwise determined by the Manager. The initial values of the Members' Capital Accounts are maintained on the Company's books and records.

4.2    *Additional Capital Contributions.* The Members shall not be obligated to contribute additional capital, however, any additional capital contributions shall be in the form of cash unless otherwise approved by the Manager.

4.3    *Capital Accounts.*

4.3.1.  A separate Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv) and 1.704-2, as amended. Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to for purposes of Code Section 752); and (3) allocations to such Member of Company Profits and other allocations to such Member of items of Company income or gain. Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); and (3) allocations to such Member of Company Losses and other allocations to such Member of items of Company loss or deduction. The Company may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

4.3.2.  For purposes of computing the amount of any item of Company income, gain, loss or deduction to be reflected in the Members' Capital Accounts and to be allocated pursuant to Article 5 of this Agreement, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose), provided that:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM 2020L000292

4.3.2.1    The computation of all items of income, gain, loss and deduction shall include income and expense of the Company that is exempt from federal income tax and also those items described in Code Section 705(a)(1)(B) or Treasury Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includible in gross income or deductible for federal income tax purposes;

4.3.2.2    If the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from a disposition of such property;

4.3.2.3    Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property;

4.3.2.4    Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

4.3.2.5    To the extent an adjustment pursuant to Code Section 732(d), 734(b) or 743(b) to the adjusted tax basis of any Company property is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis) or loss (if the adjustment decreases the tax basis); and

4.3.2.6    Items of Company income, gain, loss or deduction that are specially allocated pursuant to Section 5.2 shall be determined in the same manner as Company Profits and Company Losses, but such specially allocated items shall not be taken into account in computing Company Profits and Company Losses.

4.3.3.    The rules set forth in this Section 4 are intended to comply with the requirements of the Code and Treasury Regulations. If, in the opinion of the Manager, the rules set forth in this Section 4.3 must be modified in order for the Company to comply with the requirements of the Code or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified.

4.4    *Interest on Capital Contributions*. Except as otherwise expressly provided in this Agreement, no Member shall receive interest on such Member's Capital Contribution.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM   2020L000292

**4.5** *Withdrawal.* Each Member hereby covenants that he shall not willfully Dissociate himself as a Member without the consent of the Manager. Any Member that voluntarily Dissociates himself as a Member pursuant to Section 35-45(1) of the Act shall be liable to the Company and its Members for all damages and costs that result from such Dissociations and any consequential dissolution of the Company. Upon the Dissociation of any Member, such Member shall no longer participate in the management or conduct of the Company's business.

**4.6** *Return of Capital.* Except as otherwise provided in <u>Article 6</u> and <u>Section 11.2</u>, or another express provision of this Agreement, or required under the Act, no Member shall have priority over any other Member as to the return of any Capital Contribution. Any return of capital to the Members shall be solely from Company assets and the Members shall not be personally liable for any such return except as provided in the Act.

**4.7** *Liability of Members.* Except as required under the Act or any other provision of this Agreement, no Member shall have any obligation to restore any portion of any Capital Account deficit or to contribute to the capital of the Company; nor shall any Member have any personal liability for debts or other obligations of the Company, including without limitation obligations for federal and state income taxes and any state replacement taxes.

## ARTICLE 5
## ALLOCATION OF COMPANY PROFITS AND LOSSES

**5.1** *Allocations.* Except as otherwise provided in <u>Section 5.2</u>, Company Profits and Company Losses for any Fiscal Period shall be allocated among the Interest Holders such that, as of the end of such Fiscal Period, the Capital Account of each Interest Holder shall equal (a) the amount which would be distributed to him or it or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such liquidation pursuant to <u>Section 6.1</u> *minus* (b) the sum of (i) such Interest Holder's share of Company Minimum Gain (as determined according to Treasury Regulation Sections 1.704-2(d) and (g)(3)) and such Interest Holder's partner minimum gain (as determined according to Treasury Regulation Section 1 704-2(i)) and (ii) the amount, if any, which such Interest Holder is obligated to contribute to the capital of the Company as of the last day of such Fiscal Period.

**5.2** *Special Allocations.* The following special allocations will be made in the following order:

**5.2.1.** *Company Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this <u>Article 5</u>, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM    2020L000292

Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2.1 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

    5.2.2. *Member Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article 5, if there is a net decrease in Member Minimum Gain attributable to a Member Non-Recourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2.2 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

    5.2.3. *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Deficit Capital Account.

    5.2.4. *Gross Income Allocation.* In the event any Member has a Deficit Capital Account at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have a Deficit Capital Account after all other allocations provided for in this Article 5 (other than Section 5.2.3 and 5.2.4) have been made.

FILED DATE: 1/7/2020 7:23 PM 2020L000292

**5.2.5.** *Non-Recourse Deductions.*  Non-Recourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Ownership Percentage.

**5.2.6.** *Member Non-Recourse Deductions.*  Member Non-Recourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Non-Recourse Debt to which such Member Non-Recourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

**5.2.7.** *Section 754 Adjustments.*  To the extent that an adjustment to the tax basis of any Company property pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or (m)(4) to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain or loss and shall be specially allocated to the Members in proportion to their respective Ownership Percentage in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.  Other items of gain or loss described in Section 4.3.2.5 shall be allocated in a manner consistent with the manner in which the corresponding adjustments to Capital Accounts are made.

**5.2.8.** *Curative Allocations.*

**5.2.8.1**  The special allocations required under this Section 5.2 are intended to comply with the Treasury Regulations.  It is the intent of the Company and each of the Members that all special allocations made pursuant to Section 5.2.1 through Section 5.2.7 shall be offset either with other special allocations made pursuant to Section 5.2.1 through Section 5.2.7 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 5.2.8.  Therefore, the Manager may, in its sole discretion, make, pursuant to this Section 5.2.8, such offsetting special allocations of Company income, gain, loss or deduction in any manner the Manager determines to be appropriate, consistent with the goal that each Member's Capital Account balance be, to the extent possible, equal to the Capital Account balance such Member would have had in the absence of any allocations pursuant to Section 5.2.1 through 5.2.7.

**5.2.8.2**  The Members expect and intend that upon the liquidation of the Company, after giving effect to all contributions and all allocations for all periods, each Member's Capital Account will have a positive balance equal to the amount of proceeds distributable to such Member.  If in the opinion of the Manager this intended result would not be achieved without modification of the allocations required under this Article 5, then the allocations required under this Article 5 shall

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM    2020L000292

be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause each Member's Capital Account to have a balance equal to the amount of proceeds distributable to such Member upon the liquidation of the Company.

5.2.8.3    If the Manager determines that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this _Article 5_ (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit under this _Article 5_ is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii) (a "misallocated item"), then the Manager may allocate such unallocated item, or reallocate such misallocated item, to reflect the Members' economic interests in the Company.

5.2.9.    _Allocations Relating to Taxable Issuance of Units._  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of a Unit by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if such items had not been realized.

5.2.10. _Allocations Relating to Illinois Personal Property Tax Replacement Income Tax and Comparable Items._  If the Company incurs liability for Illinois Replacement Tax for a Fiscal Year with respect to which the Company also realizes Illinois Replacement Tax Savings, then items of Company loss or deduction attributable to the Company's Illinois Replacement Tax expense shall be allocated to the Members that are not themselves subject to the Illinois Replacement Tax for such Fiscal Year and such allocation shall be made in proportion to the amount of Company Profits allocated to such Members for the period with respect to which such Illinois Replacement Tax is imposed.  The principles of this _Section 5.2.10_ shall also apply if the Company is subject to any other tax, the computation of which depends in whole or in part upon the character of the Members.

5.2    _Other Allocation Rules._

5.3.1.    Company Profits, Company Losses, and all other items of Company income, gain, loss, deduction and credit shall be determined by the Manager on a daily, monthly or other basis, using any method permitted under Code Section 706 and the Treasury Regulations.

5.3.2.    The Members are aware of the tax consequences of the allocations required under this _Article 5_ and each Member hereby agrees to be bound by the provisions of this

---

FILED DATE: 1/7/2020 7:23 PM  2020L000292

Article 5 in reporting such Member's share of Company income, gain, loss and deduction for federal income tax purposes.

5.3.3.  Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), such Member's interests in Company profits are in proportion to such Member's Ownership Percentage.

5.3.4.  As between a Member and any permitted (under this Agreement) transferee of all or any portion of such Member's Units, Company Profits and Company Losses shall be allocated by the Manager in a manner intended to comply with Section 706 of the Code and the Treasury Regulations promulgated thereunder. In order to make such an allocation, the Manager may, in its discretion, close the Company's books on the date of such permitted transfer.

5.3    *Allocations Solely For Tax Purposes.*

5.4.1.  Allocations required under this Section 5.4 are solely for tax purposes and shall not affect any Member's Capital Account or any Member's share of any distribution from the Company.

5.4.2.  Allocations of tax credits, tax credit recapture, tax benefit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

5.4.3.  Items of Company income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variance between the tax basis of such property to the Company and its Book Value.

5.4.4.  If the Book Value of any Company property is adjusted pursuant to Section 4.3.2, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such Company property shall take account of any variation between the tax basis of such Company property and its Book Value in the same manner as required under Code Section 704(c).

## ARTICLE 6
## DISTRIBUTIONS AND DISTRIBUTABLE CASH

6.1    *Timing and Amount.*  At such times as it shall determine, the Manager shall calculate the amount of Net Cash, if any, available for distribution to the Members at least quarterly and promptly distribute such amounts in the following order of priority:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM   2020L000292

(i)     First, to the holders of the Class A Units (in the proportion that the number of Class A Units held by each holder bears to the aggregate number of Class A Units outstanding immediately prior to such Distribution) until the aggregate amount of Unreturned Capital with respect to the Class A Units has been reduced to zero;

(ii)    The balance, to the holders of the Class A Units and the Class B Units (ratably among such Holders based upon the number of outstanding Units held by each such Holder, regardless of class, immediately prior to such Distribution).

6.2     *Distributions for Tax Purposes.*  To the extent authorized by the Manager, on or before the 90th day after the end of each Fiscal Year, the Company shall distribute to the Members out of Net Cash the cash amount equal to the Tax Allowance Amount multiplied by the excess, if any, of (a) the amount of taxable income allocated to such Members under this Agreement for such Fiscal Year, over (b) the amount, if any, by which the sum of all items of deduction and loss allocated to such Members under this Agreement for all prior Fiscal Years exceeds the sum of all items of taxable income allocated to such Members for all prior Fiscal Years (the "Annual Tax Distribution").  At the end of each quarter of the Fiscal Year, the Manager shall estimate the portion of the current Annual Tax Distribution attributable to such quarter and allocable to specific Members (the "Quarterly Estimated Tax Distribution") and to the extent authorized by the Manager, within 15 days of the end of such Fiscal quarter, the Company shall make a cash distribution to the Members of such Quarterly Estimated Tax Distribution allocable to such Members such that Members may make quarterly estimated federal and estimated state income tax payments. Any Quarterly Estimated Tax Distributions shall be credited against any Annual Tax Distribution due a Member, with any excess Quarterly Estimated Tax Distributions for such Fiscal Year credited against the next Quarterly Estimated Tax Distributions for the following Fiscal Years.  Any Annual Tax Distributions or Quarterly Estimated Tax Distributions may be directly deposited with the appropriate federal or state tax authority for a Member's benefit in lieu of an actual distribution.  Any amounts distributed to a Member under this Section 6.2 shall be credited against future amounts otherwise distributed to such member under Section 6.1.

6.3     *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items.*  On or before the 90th day following the close of each Fiscal Year, the Company shall distribute to the Members that are themselves subject to the Illinois Replacement Tax for such Fiscal Year an amount equal to the Company's Illinois Replacement Tax Savings for such Fiscal Year.  Such distribution shall be made to and among such Members in proportion to the amount of Company Profits allocated to such Members for such Fiscal Year.  The Company shall also make distributions to Members, at such times and in such proportionate amounts as provided for in this Section 6.3, in respect of any tax that would have been imposed upon the Company in a Fiscal Year but for the fact that some Members are themselves subject to such tax.

---

FILED DATE: 1/7/2020 7:23 PM  2020L000292

6.4    *Limitations on Distributions.*    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to any Member if such distribution would violate Section 180/25-30 of the Act or other comparable applicable law.

6.5    *Redemption of the Class A Units.*    In the event that, on or before December 31, 2006, Riverside District Development, LLC has entered into one or more contracts to sell all of the Property and the Manager, in good faith, determines that such contracts are with bona fide purchasers, the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Class A Units then outstanding (the "Redemption Right"). In the event that the Company desires to exercise its Redemption Right pursuant to this Section 6.5, the Company may exercise its Redemption Right only by satisfying the following conditions: (i) delivery of written notice to the holders of the Class A Units of the Company's intent to exercise the Redemption Rights, and (ii) making a distribution to the holders of the Class A Units on or before June 30, 2007 of an amount sufficient to cause the cumulative amount distributed to such holders pursuant to Sections 6.1 and 6.2 and this Section 6.5 to be equal to the Redemption Amount. In the event that the Company exercises its Redemption Right in accordance with this Section 6.5, the holders of the Class A Units will cease to be Members for all purposes of this Agreement and their respective rights as a holder of Class A Units shall cease as of the earlier of March 31, 2007 or the date set forth in the written notice delivered to such holders pursuant to this Section.

## ARTICLE 7
## RESTRICTED TRANSACTIONS

7.1    *Compensation and Distributions.*    Unless otherwise approved by the Manager, all compensation, profits or distributions by the Company to any of the Members must be paid in accordance with Article 6 and Article 9. This covenant shall not restrict the payment of bona fide debt due a Member.

7.2    *Affiliate Transaction Rights.*    The Members agree that no Member holding Class B Units or an Affiliate of such Member (either one a "Related Developer") shall enter into any transaction with respect to the development of all or any portion of the Property unless the each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer, which may be in the form of common stock if the Related Developer is a corporation, or common membership interests if the Related Developer is a limited liability company, and shall provide each other Member with the rights, other than voting rights, that are materially equivalent to the rights that a holder of a Unit has with respect to the Company pursuant to this Agreement. The common interests in the Related Developer owned by the other Member shall be subject to the rights of any preferred interest in such Related Developer. The share of common interests each other Member shall own in the Related Developer shall be equal to equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class. by (z) the total number of Units then outstanding, determined regardless of class.

FILED DATE: 1/7/2020 7:23 PM 2020L000292

## ARTICLE 8;
## ROLE OF MEMBERS; INDEMNIFICATION OF MEMBERS

8.1 *General Rules.* Except as otherwise stated in this Agreement or required under the Act, Members shall not take any part in the day-to-day management or conduct of the business of the Company, nor shall such Members have any right or authority to act for or bind the Company. Except as otherwise required under the Act, any action of the Members shall be taken by the affirmative vote of the holders of a majority of the Class B Units then outstanding.

8.2 *Meetings of the Members.* Except as otherwise stated in this Agreement or required under the Act, the following provisions shall apply to all meetings of Members:

8.2.1 <u>Place and Time of Annual Meetings.</u> An annual meeting of the Members shall be held each year on the first Tuesday in the month of April at 10:00 o'clock a.m., unless such day should fall on a legal holiday, in which event the meeting shall be held at the same hour on the next succeeding business day that is not a legal holiday for the purpose of electing the one or more Managers and conducting such other proper business as may come before the meeting. The date, time and place of the annual meeting shall be determined by the Manager.

8.2.2 <u>Special Meetings.</u> Special meetings of Members may be called for any purpose and may be held at such time and place, within or without the State of Illinois, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof. Special meetings of the Members may be called by the Manager or by the holders of not less than 51% of all outstanding Class B Units entitled to vote on the matter for which the meeting is called.

8.2.3 <u>Place of Meetings.</u> The Manager may designate any place, either within or without the State of Illinois, as the place of meeting for any annual meeting or for any special meeting called. If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the Company.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

**8.2.4   Notice of Meetings.**   Unless otherwise provided by statute, whenever Members are required or permitted to take action at a meeting, written or printed notice stating the place, day, and hour, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each Member entitled to vote at such meeting and to the Manager not less than 10 nor more than 60 days before the date of the meeting or in the case of a merger, consolidation, Unit exchange, dissolution or sale, lease or exchange of all or substantially all assets not less than 20 nor more than 60 days before the date of the meeting. All such notices shall be delivered, either personally or by mail, by or at the direction of the Manager, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the Member at his, her or its address as the same appears on the records of the Company.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Notice may also be waived in writing by any Member.  Unless otherwise provided by herein or by law, neither the business to be transacted at, or the purpose of, any regular or special meeting need be specified in any written waiver of notice.

**8.2.5   Quorum.**   Unless otherwise provided herein or by statute, the holder or holders of a majority of the outstanding Class B Units entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the Members, however, a quorum shall not consist of less than one-third of the outstanding Units entitled to vote. If a quorum is not present, the holders of a majority of the Class B Units present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  Members may participate in any meeting of Members by means of conference telephone or similar communication equipment by means of which all Members participating in such meeting can hear each other, and such participation shall constitute presence in person at such meeting.

**8.2.6   Proxies.**  Each Member may appoint a proxy to vote or otherwise act for him or her by signing an appointment form and delivering it to the person so appointed, but no such proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

**8.2.7   Voting of Units.**  Each outstanding Class B Unit shall be entitled to one vote, and each outstanding fractional Class B Unit shall be entitled such percentage of one vote that is represented by the fractional Class B Unit, in each matter submitted to vote at a meeting of Members, and in all elections for the Manager, every Member shall have the right to vote the number of Class B Units owned by such Member for the Manager.  Each Member may vote either in person or by proxy as provided herein.  Except as otherwise provided in Section 3.1, the Class A Units shall have no voting rights other than on matters for which voting by all Members is required under the Act.  In the event that the Company engages in

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM    2020L000292

an act that requires the vote of all Members under the Act, this <u>Section 8.2.7</u> shall apply to both the Class A Units of the Class B Units, regardless of class.

8.2.8  <u>Informal Action</u>.  Unless otherwise provided by statute, any action required to be taken at any annual or special meeting of the Members of the Company, or any other action which may be taken at a meeting of the Members may be taken without a meeting and without a vote if a consent in writing setting forth the action so taken shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voting.  If such consent is signed by less than all of the Members entitled to vote, then such consent shall become effective only if at least five days prior to execution of the consent a notice in writing is delivered to all the Members entitled to vote with respect to the subject matter thereof and, after the effective date of the consent, prompt notice of the taking of the Company action without a meeting by less than unanimous written consent shall be delivered in writing to those Members who have not consented in writing.

8.3  *Indemnification of Members*.  The Company shall, to the fullest extent permitted by law, indemnify, defend and hold harmless its Members and former Members (collectively, the "Indemnified Parties"), from any and all claims, actions, causes of action, suits, proceedings, losses, damages, liability, costs and expenses (including, without limitation, attorneys' fees and court costs) asserted against or incurred or sustained by them by reason of their status as Members of the Company, or by reason of any act performed by them or any omission on their part while acting for or on behalf of the Company and in furtherance of its interests provided that the Indemnified Party acted in good faith and in a manner such party reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, such Indemnified Party had no reason to believe that his or her conduct was unlawful.

## ARTICLE 9
## MANAGEMENT

9.1  *General Powers of the Manager*.  The management of the Company shall be vested in a Manager designated by the Members as provided in Section 9.2 hereof.  Except as otherwise stated in this Agreement or required under the Act, the Manager shall have full and complete authority, power, an discretion to direct, manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

9.2  *Number and Election*.  Initially, the Company shall have one (1) Manager, who shall be Heritage Property Development, Inc., an Illinois corporation.  The Members may change the number of Managers upon the affirmative vote of the holders of a majority of the Class B Units then outstanding.  The Members, by signing this Agreement, hereby designate the aforementioned

---

FILED DATE: 1/7/2020 7:23 PM    2020L000292

Persons as Managers of the Company until its successors are designated. Any Manager elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided. Managers need not be residents of the State of Illinois or Members of the Company.

   9.3    *Removal and Resignation.* Any Manager may be removed at any time, with or without cause, by the holders of two-thirds of the Units then entitled to vote at an election of Managers. In the event a Manager dies or is unwilling or unable to serve as such, a successor to such Manager shall be appointed pursuant to Section 9.4. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute the Dissociation of such Member. A Manager may resign from the position of Manager at any time by giving written notice to the Company. The resignation shall take effect ten (10) days after receipt by the Company of that notice or, if later, at such time as may be specified in such notice, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. Upon the Withdrawal of any Manager, such Manager shall be treated as having resigned as of the date of Withdrawal and shall automatically cease to be a Manager as of the date of such Withdrawal. Except in the case of resignation by reason of Withdrawal, the resignation of a Manager pursuant to this Section 9.3 shall not affect such Member's rights as a Member and shall not constitute a Dissociation of such Member.

   9.4    *Vacancies.* Vacancies and newly created Manager positions resulting from any increase in the authorized number of Managers may be filled by two-thirds of the Managers then in office. Each Manager so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided. Any vacancy that results for any reason other than an increase in the authorized number of Managers shall be filled as provided in Section 9.2.

   9.5    *Quorum, Required Vote and Adjournment.* Each Manager shall have one vote. At any time when more than one (1) Manager is in office, a majority of the total number of Managers shall constitute a quorum for the transaction of business. The vote of a majority of Managers present at a meeting at which a quorum is present shall be the act of the Manager. If a quorum shall not be present at any meeting of the Manager, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

   9.6    *No Liability.* No Manager shall be liable under a judgment, decree or order of a court or in any other manner, for a debt, obligation or other liability of the Company.

   9.7    *Certain Powers of the Manager.* Without limiting the generality of Section 9.1 above, the Manager shall have the right and power and authority, except as otherwise stated in Article 7 or Section 9.12 hereof or otherwise in this Agreement, or required under the Act, on behalf of the Company to:

FILED DATE: 1/7/2020 7:23 PM  2020L000292

9.7.1    authorize, execute and engage in contracts, transactions, investments and dealings on behalf of the Company, including contracts, transactions, investments and dealings with any Member;

9.7.2    borrow money on behalf of the Company, and mortgage, pledge or otherwise encumber any assets of the Company;

9.7.3    collect all amounts due to the Company;

9.7.4    call meetings of Members;

9.7.5    issue Units in accordance with the restrictions of Article 3 and the other provisions of this Agreement;

9.7.6    pay all expenses incurred in forming the Company;

9.7.7    lend money;

9.7.8    determine and make distributions, in cash or otherwise, in respect of Interests, in accordance with the provisions of this Agreement and the Act;

9.7.9    establish a record date with respect to all actions to be taken hereunder that require a record date to be established;

9.7.10   establish or set aside any reasonable reserve or reserves for contingencies and for any other reasonable and proper Company purpose;

9.7.11   appoint (and dismiss from appointment) attorneys and agents on behalf of the Company, and employ or otherwise engage (and dismiss from employment or other engagement) any and all persons providing legal, accounting or financial services to the Company, and such employees, consultants, independent contractors, or agents as the Manager deems necessary or desirable for the management and operation of the Company, including, without limitation, any Member;

9.7.12   incur and pay all expenses and obligations incident to the formation, operation and management of the Company, including, without limitation, the services referred to in the preceding paragraph, taxes, interest, travel, rent, insurance, supplies, salaries and wages of the Company's employees and agents;

FILED DATE: 1/7/2020 7:23 PM 2020L000292

9.7.13 acquire and enter into any contract of insurance necessary or desirable for the protection or conservation of the Company and its assets or otherwise in the interest of the Company as the Manager shall determine;

9.7.14 open accounts and deposit, maintain and withdraw funds in the name of the Company in banks, savings and loan associations, brokerage firms or other financial institutions;

9.7.15 bring, defend, arbitrate, prosecute or compromise on behalf of the Company actions and proceedings at law or equity before any court or governmental, administrative or other regulatory agency, body or commission or otherwise;

9.7.16 prepare and cause to be prepared reports, statements and other relevant information for distribution to Members as may be required or determined to be necessary or desirable by the Manager from time to time;

9.7.17 prepare and file all necessary returns and statements and pay all taxes, charges, assessments and other impositions applicable with respect to the Company or its income or assets;

9.7.18 prosecute, protest, defend and/or protect all proprietary rights (including all trade names, trademarks and service marks, and all licenses and permits and applications with respect thereto) of the Company and all rights of the Company in connection therewith;

9.7.19 execute and deliver, for and on behalf of the Company, promissory notes, evidences of indebtedness, agreements, assignments, deeds, leases, loan agreements, mortgages and other security instruments, in each case as the Manager deems necessary or appropriate for the objects and purposes of the Company;

9.7.20 create offices of the Company, designate the duties of such offices, and select officers; and

9.7.21 execute all other documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary or desirable or incidental to the foregoing.

The express grant of any power or authority in this Agreement to the Manager shall not in any way limit or exclude any other power or authority of the Manager that is not specifically or expressly set forth in this Agreement.

9.8 *Exculpation From Liability For Certain Acts.* No Manager shall be liable to the Company or any Member for damages attributable to any breach of duty owed by a Manager (by

virtue of being a Manager) to the Company or the other Members, except to the extent (i) required under the Act or (ii) such breach of duty is based upon a knowing violation of applicable law or this Agreement or (iii) such breach of duty is based upon violation of applicable law or this Agreement arising out of such Person's gross negligence or willful misconduct as determined conclusively in a final order of a court of competent jurisdiction. The Managers shall not be liable to the Company or any Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by a Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on the Manager by or pursuant to this Agreement. The Managers shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.9     *Indemnification.*     The Company shall, to the fullest extent permitted by law, indemnify and defend any Manager against and hold each Manager harmless from any losses, judgments, liabilities and expenses (including reasonable attorney fees) incurred by any Manager by reason of any act or omission (other than any act or omission carried out in willful misconduct, gross negligence or knowing violation of this Agreement or the Act) performed or omitted in good faith on behalf of the Company and in a manner reasonably believed by such Manager to be within the scope of the authority of the Manager. The Company may also indemnify its employees and other agents who are not a Manager to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by the Manager.

9.10     *Interested Manager.*     No contract or transaction between the Company and any Manager, or between the Company and any other limited liability company, corporation, partnership, association or other organization in which a Manager is a manager or an officer, or has a financial interest, shall be void or voidable solely for this reason, or solely because the Manager or officer is present at or participates in the meeting of the Manager, or solely because his votes are counted for such purpose, if: (a) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon without counting the vote of any Member who is an interested Manager, and the contract or transaction is specifically approved in good faith by vote of the Members; or (b) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers or the Members; or (c) the transaction is one described is Section 7.2 hereof.

9.11     *Compensation to Manager.*     The Company shall pay a management fee to the Manager equal to $1,000 per month.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

9.12  *Additional Consent Required for Specified Actions.*  At all times during which Michael Rumman is a member of MT Property Holdings, LLC and during which MT Property Holdings, LLC is a Member, the Company shall not undertake those actions set forth in Sections 9.7.2, 9.7.5 and 9.7.7 unless the Manager has obtained the prior written consent of Michael Rumman for such action, which such consent may be granted or withheld in his sole and absolute discretion.

## ARTICLE 10
## LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS

10.1  *Restriction on Transfers; Investment Representations and Warranties.*

10.1.1 Except as otherwise permitted by this Article 10 or elsewhere in this Agreement, no Member shall Transfer all or any portion of Units or any interest therein without the prior written consent of the Manager.

10.1.2 Each Member hereby represents and warrants to the Company that its acquisition of its Interest is made as principal for its own account, for investment purposes only, and not with a view to the resale or distribution of such Interest. Each Member agrees that it will not sell, assign, give, hypothecate, pledge, transfer, or otherwise dispose of any or all of its Interest to any Person who or which does not similarly represent and warrant and agree as provided in this Section 10.1.1.

10.2  *Permitted Transfers.*

10.2.1 Subject to the conditions and restrictions set forth in Section 10.2.2, a Member may at any time Transfer all or any portion of his Units to (a) to any member of the transferor's family, or to a custodian, trustee, family limited partnership or other fiduciary for the account of such Member or member of his family or to trusts for the benefit of the family of such Member, as the case may be; provided, that in each case such transfer is made pursuant to a bona fide estate planning transaction, (b) any Affiliate of a Member (including of the transferor), or (c) the transferor's executor, administrator, trustee, or personal representative to whom such Units are transferred at death or involuntarily by operation of law. For purposes of this Article 10, a Member's "family" shall include only such Member's spouse, natural or adoptive lineal ancestors or descendants, brothers or sisters.

10.2.2  A Transfer shall not be treated as a Permitted Transfer under Section 10.2.1 unless and until the following conditions are satisfied:

10.2.2.1  Except in the case of a Transfer of Units at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to

---

FILED DATE: 1/7/2020 7:23 PM    2020L000292

confirm the agreement of the transferee to be bound by the provisions of this Article 10. In the case of a Transfer of Units at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

10.2.2.2 The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

10.2.2.3 Except in the case of a Transfer of Units at death or involuntarily by operation of law, either (a) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) such Transfer will be exempt from all applicable registration requirements and will not violate any applicable laws regulating the Transfer of securities and, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to such effect.

10.2.2.4 Except in the case of a Transfer of Units at death or involuntarily by operation of law, such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940 as amended, and the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager to such effect and the Manager shall provide to such counsel any information available to them relevant to such opinion.

10.3    *Sale of the Company.*

10.3.1 If the Manager and the holders of the Units then outstanding approve a Sale of the Company (the "Approved Company Sale"), each Member shall consent to and raise no objections against the Approved Company Sale. If the Approved Company Sale is structured as a (i) merger or consolidation, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (ii) sale of Units, each Member shall agree to sell all of his Units and rights to acquire Units on the terms and conditions approved by the Manager. Each Member shall take all necessary or desirable actions no connection

---

FILED DATE: 1/7/2020 7:23 PM  2020L000292

with the consummation of the Approved Company Sale as requested by the Company.

10.3.2 The obligations of the Members with respect to the Approved Company Sale are subject to the satisfaction of the following conditions: (i) upon the consummation of the Approved Company Sale, each Member shall receive the same form of consideration and the same portion of the aggregate consideration such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the consummation of the Approved Company Sale and; (ii) each holder of then currently exercisable rights to acquire a class of Units shall be given an opportunity to exercise such rights prior to the consummation of the Approved Company Sale and participate in such sale as holders of such class of Units.

10.3.3 All Members will bear their pro-rata share (based upon the number of Units sold) of the costs of any sale of Units pursuant to an Approved Company Sale to the extent such costs are incurred for the benefit of all such Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by the Members on their own behalf will not be considered costs of the Approved Company Sale.

10.4 *Restrictions on Transfers.*  Unless otherwise approved by the Manager, no Transfer of Units shall be made except upon terms which would not, in the opinion of counsel chosen by and mutually acceptable to the Manager and the transferor Member, result in the termination of the Company within the meaning of Section 708 of the Code or cause the application of the rules of Sections 168(g)(1)(B) and 168(h) of the Code or similar rules to apply to the Company.  If the immediate Transfer of such Unit would, in the opinion of such counsel, cause a termination within the meaning of Section 708 of the Code, then if, in the opinion of such counsel, the following action would not precipitate such termination, the transferor Member shall be entitled (or required, as the case may be) (i) immediately to Transfer only that portion of his Units as may, in the opinion of such counsel, be transferred without causing such a termination and (ii) to enter into an agreement to Transfer the remainder of his Units, in one or more Transfers, at the earliest date or dates on which such Transfer or Transfers may be effected without causing such termination. The purchase price for the Units shall be allocated between the immediate Transfer and the deferred Transfer or Transfers pro rata on the basis of the percentage of the aggregate Units being transferred, each portion to be payable when the respective Transfer is consummated, unless otherwise agreed by the parties to the Transfer. In the case of a Transfer by one Member to another Member, the deferred purchase price shall be deposited in an interest-bearing escrow account unless another method of securing the payment thereof is agreed upon by the transferor Member and the transferee Member.  In determining whether a particular proposed Transfer will result in a termination of the Company, counsel to the Company shall take into account the existence of prior written commitments to

FILED DATE: 1/7/2020 7:23 PM   2020L000292

Transfer made pursuant to this Agreement and such commitments shall always be given precedence over subsequent proposed Transfers.

10.5 *Prohibited Transfers.* Any purported Transfer of Units that is not effected in accordance with the terms and conditions of this Article 10 shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the interest Transferred shall be strictly limited to the transferor's rights to distributions as provided by this Agreement with respect to the transferred Units, which distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Units may have to the Company. In the case of a Transfer or attempted Transfer of Units that is effected in accordance with the terms and conditions of this Article 10, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, increment tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.6 *Rights of Unadmitted Assignees.* A Person who acquires one or more Units but who is not admitted as a substituted Member pursuant to Section 10.8 shall hold only a Distribution Interest and be entitled only to allocations and distributions with respect to such Interests in accordance with this Agreement, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.7 *Admission of Transferees as Members.* Subject to the other provisions of this Article 10, a transferee of Units may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 10.8:

10.7.1 The Manager consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Manager;

10.7.2 The Units with respect to which the transferee is being admitted were acquired in accordance with the other terms and conditions of this Article 10;

10.7.3 The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Manager may reasonably request as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement;

10.7.4 The transferee shall have delivered to the Manager a letter containing a representation and an agreement in the form set forth in Section 10.1.1 of this Agreement;

---

FILED DATE: 1/7/2020 7:23 PM   2020L000292

10.7.5  if the Transferee is not an individual, the Transferee shall have provided the Manager with satisfactory evidence of the Transferee's authority to become a Member under the terms and provisions of this Agreement; and

10.7.6  The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Member incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units.

10.8    *Covenants; Representations Regarding Transfers; Legend.*

10.8.1  Each Member hereby represents, covenants and agrees with the Company for the benefit of the Company and all Members, that (i) he is not currently making a market in Units and will not in the future make a market in Units, (ii) he will not Transfer his Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of partnership interests and which are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Units through a matching service that is not approved in advance by the Company. Each Member further agrees that he will not Transfer any Units to any Person unless such Person agrees to be bound by this Section 10.8 and to Transfer such Units only to Persons who agree to be similarly bound. The Company shall, from time to time and at the request of a Member, consider whether to approve a matching service and shall notify all Members of any matching service that is so approved.

10.8.2  Each Member hereby agrees that the following legend shall be placed upon any document or instrument evidencing ownership of Units:

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY FEDERAL OR STATE SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED. SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE

FILED DATE: 1/7/2020 7:23 PM 2020L000292

AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER OF THE UNITS.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION, OR ASSIGNMENT AS SET FORTH IN THE OPERATING AGREEMENT BETWEEN THE ISSUER OF THE UNITS AND ITS MEMBERS. A COPY OF SUCH OPERATING AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

10.9     *Distribution and Allocations in Respect to Transferred Interests.*  If any Unit is sold, assigned, or Transferred during any Fiscal Year in compliance with the provisions of this Article 10, income, loss, deduction, credit, each item thereof, and all other items attributable to the Transferred Unit for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, such Transfer shall be recognized not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten business days prior to the Transfer, the Company shall recognize such Transfer as the date of such Transfer, and provided further that, if the Company does not receive a notice stating the date Units were Transferred and such other information as the Manager may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all such times shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company was the owner of the Units on the last day of the Fiscal Year during which the Transfer occurs.  Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.10, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Unit.

10.10     *Termination of Restrictions.*  The restrictions set forth in this Article 10 will continue with respect to each Unit until the earliest of (i) the 2010 anniversary of the date of this Agreement and (ii) the consummation of a Sale of the Company.

10.11     *Waiver of Redemption of Distributional Interest*  Members hereby agree that no Member shall have a right to have his or her Distributional Interest redeemed by the Company upon Dissociation pursuant to Section 35-60 of the Act

---

FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1  *Events of Dissolution.*  The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

        11.1.1      the consent of the holders of a majority of the Class B Units then outstanding; and

        11.1.2      the sale of substantially all the assets of the Company;

        11.1.3      the entry of a decree of judicial dissolution or an administrative dissolution under the Act; and

        11.1.4      any other event requiring the dissolution of the Company under Section 35-1 of the Act.

Notwithstanding the foregoing, if the Members (and any dissociated Member whose Dissociation caused such dissolution) elect to waive such dissolution as provided under Section 35-3 of the Act, the Company may carry on its business as if no dissolution occurred.

11.2  *Liquidation.*  If the Company shall be dissolved by reason of the occurrence of any of the circumstances described in <u>Section 11.1</u>, no further business shall be conducted by the Company except for taking such action as shall be necessary for the winding up of its affairs and the distribution of its assets to the Members.  Upon such dissolution of the Company, the Manager shall take the following steps:

        11.2.1      Unless otherwise approved by the Members in accordance with <u>Article 7</u>, dispose of all other Company properties and assets at the best cash price obtainable therefor under the circumstances.

        11.2.2      Pay all Company debts and liabilities, in the order of priority as provided under applicable law, or otherwise make adequate provision therefor.

        11.2.3      Determine by independent appraisal the fair market value of the Company properties and assets to be distributed in kind (if permitted under <u>Article 7</u>), and credit or charge (as the case may be) the Capital Account of each Member with the amount that would have been credited or charged to such Member in accordance with <u>Article 4</u> if such properties and assets had been sold at fair market value.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

11.2.4        Credit or charge (as the case may be) each Member's Capital Account with such Member's share of all Company Profits and Company Losses that were not previously reflected in any Capital Accounts and that were realized or incurred during the Fiscal Year or Fiscal Years which include the dissolution and termination, up to and including the date of distribution, net of all distributions that were not previously reflected in any Capital Accounts and that were made to such Member during such Fiscal Years up to but not including such date.

11.2.5        Distribute to each of the Members the balance, if any, of the properties and assets of the Company in accordance with each Member's Capital Account, as adjusted pursuant to Sections 11.2.3 and 11.2.4.

11.2.6        Notwithstanding Sections 11.2.1 through 11.2.5, if any Member shall be indebted to the Company for any reason whatsoever, the liquidator may apply any cash allocated to such Member in accordance with this Section 11.2 to the payment of such indebtedness.  If such cash is not sufficient to liquidate such indebtedness in its entirety then, until payment in full of such indebtedness by such Member, the liquidator shall retain such Member's distributive share of the Company properties and assets and, after applying the cost of operation of such properties and assets during the period of such liquidation against the income therefrom, shall apply the balance of such income toward the liquidation of such indebtedness; provided, however, that if upon the expiration of six months after notice of such outstanding indebtedness has been given to such Member, such amount has not been paid or otherwise liquidated in full, the liquidator may sell the assets allocable to such Member at private or public sale at the best cash price immediately obtainable under the circumstances, and so much of the proceeds of such sale as shall be necessary to liquidate such indebtedness shall then be so applied, and the balance (if any) of such proceeds shall be distributed to such Member.

11.2.7        The liquidator shall comply with all requirements of the Act, or other applicable law, pertaining to the winding up of a limited liability company.

11.3    *Filings*.  Upon dissolution and complete winding up of the Company, the liquidator shall file any and all certificates and other documents required under the Act including, but not limited to, Articles of Dissolution as required by Section 35-20 of the Act.

11.4    *Termination*.  The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.2 of this Agreement, and the Articles shall have been canceled in the manner required by the Act.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ARTICLE 12
## BOOKS AND RECORDS

**12.1** *Books and Records; Accounting.* The Manager shall keep or cause to be kept at the address of the Company (or at such other place the Manager shall determine) accurate and proper books and records regarding the status of the business and financial conditions of the Company. The Fiscal Year of the Company shall be the calendar year

**12.2** *Access to Records, Financial Statements.* Each Member shall have the right to review all Company records, agreements, tax returns, financial statements, balance sheet, and financial projections of the Company, which may be prepared from time to time by or at the request of the Manager or an officer of the Company. The Company shall prepare and furnish to each Member promptly after the close of each fiscal quarter an unaudited statement showing the operations of the Company for such quarter and the balance in each Member's Capital Account. The Manager has the authority to select the Company's accountants and determine whether or not to obtain an audit of the Company's books and records.

**12.3** *Annual Reports.* Within ninety (90) days after the end of each Fiscal Year, the Manager shall cause to be prepared and each Member furnished with unaudited financial statements accompanied by a report thereon of the Company's accountants stating that such statements are prepared and fairly stated in all material respects in accordance with generally accepted accounting principles, and, to the extent inconsistent therewith, in accordance with this agreement, including: (i) a copy of the balance sheet of the Company as of the last day of such Fiscal Year; (ii) a statement of income or loss for the Company for the Company for such Fiscal Year; (iii) a statement of the Members' Capital Accounts and changes therein for such Fiscal Year; and (iv) a statement of Company cash flow for such Fiscal Year.

**12.4** *Bank Account(s).* All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be agreed upon by the Manager and checks drawn on such account(s) shall require the signature of a Manager. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

## ARTICLE 13
## TAX MATTERS

**13.1** *Company Tax Returns.*

   **13.1.1** The Manager shall cause to be prepared and timely filed all tax returns required to be filed for the Company, and shall cause to be timely paid all taxes owed by the

---

FILED DATE: 1/7/2020 7:23 PM 2020L000292

Company. The Company shall make an election under Code Section 754. The Manager may, in its discretion, make or refrain from making, any other foreign, federal, state or local income or other tax elections for the Company that it deems necessary or advisable.

13.1.2 MT Property Holdings, LLC is hereby designated as the Company's "Tax Matters Partner" under Code Section 6231(a)(7) and shall have all the powers and responsibilities of such position as provided in the Code. The Manager is specifically directed and authorized to take whatever steps the Manager, in its discretion, deem necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the regulations issued under the Code. Each Member hereby agrees to cooperate with the Tax Matters Partner with respect to all matters within its authority as Tax Matters Partner. Expenses incurred by the Tax Matters Partner, in its capacity as such, will be borne by the Company.

13.2 *Schedules K-1 and Forms 1065.* The Manager shall, as promptly as practicable and in any event within 90 days after the end of each Fiscal Year, cause to be prepared and mailed to each Member of record an Internal Revenue Service Form K-1, Internal Revenue Service Form 1065, and any other forms which are necessary or advisable for the Members to satisfy their federal tax reporting obligations.

13.3 *Taxation as Partnership.* The Members agree that the Company will seek to be treated as a partnership for United States federal income tax purposes. The Manager shall operate the Company in a manner intended to preserve, to the extent practical, the Company's treatment as a partnership for United States federal income tax purposes.

13.4 *Withholding.* Each Member certifies that they are U.S. persons within the meaning of code Section 7701(a)(30). Any Person who may subsequently become a Member shall either (i) provide a certificate of non-foreign status to all Members or (ii) be subject to withholding on all distributions as may be required under the Code.

FILED DATE: 1/7/2020 7:23 PM 2020L000292

## ARTICLE 14
## MISCELLANEOUS

14.1 *Reimbursements.* The Company shall reimburse the Members and the Managers for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such expenses shall not include any expenses incurred in connection with a Member's or Manager's exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business. The sole determination of the Manager of which expenses are allocated and reimbursed as a result of the Company's activities or business and the amount of such expenses shall be conclusive. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

14.2 *Amendments.* In addition to amendments to this Agreement otherwise authorized under this Agreement, the Manager may, at any time and without consent of any Member, make any amendment to this Agreement provided that such amendment:

14.2.1 does not adversely affect the rights of the Members or their assignees in any material respect;

14.2.2 merely corrects an error or resolves an ambiguity in, or inconsistency among, the provisions of this Agreement;

14.2.3 deletes or adds any provision of this Agreement that is required to be so deleted or added by any federal or state governmental authority;

14.2.4 merely amends this Agreement or the Company's Articles to admit new Members in accordance with this Agreement;

14.2.5 amends Article 4 in accordance with Section 4.3.3;

14.2.6 amends Article 5 in accordance with Section 5.2.8; or

14.2.7 reflects a change in the Act that permits or requires an amendment, without adversely affecting the rights of any Member in any material respect.

Except as otherwise provided in this Agreement, this Agreement may be amended solely by a written instrument executed by the holders of a majority of the Class B Units then outstanding.

FILED DATE: 1/7/2020 7:23 PM    2020L000292

**14.3** *Successors.* This Agreement shall be binding as to the executors, administrators, estates, heirs and legal successors, or nominees or representatives, of the Members. Except as otherwise provided in this Agreement, no persons other than the Members and their respective executors, administrators, estates, heirs and legal successors, or their nominees or representatives, shall obtain any rights by virtue of this Agreement.

**14.4** *Counterparts.* This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

**14.5** *Integration.* This Agreement constitutes the entire agreement among the Members pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and undertakings of the Members in connection therewith.

**14.6** *Entire Agreement.* This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. It supersedes any prior agreement or understandings between them relating to the subject matter hereof, and it may not be modified or amended except in a writing executed by all parties hereto.

**14.7** *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to the principles of conflict of laws thereof.

**14.8** *Severability.* This Agreement shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Act. If, notwithstanding the previous sentence, a court of competent jurisdiction concludes that any provisions or wording of this Agreement is invalid or unenforceable under the Act or other applicable law, the invalidity or unenforceability or such provisions or wording will not invalidate the entire Agreement. In such a case, this Agreement will be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of applicable law and, in the event such term or provisions cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable provisions or term. If it is determined that any provision relating to the distributions and allocations of the Company or to any fee payable by the Company is invalid or unenforceable, this Agreement shall be construed or interpreted so as (a) to make it enforceable or valid and (b) to make the distributions and allocations as closely equivalent to those set forth in this Agreement as permissible under applicable law.

**14.9** *Headings.* The Headings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

**14.10** *Waiver.* No consent or waiver, express or implied, by any Member to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such Member hereunder. Failure on the part of any Member to complain of any act or failure to act of any other Member or to declare any

---

other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Company, of its rights hereunder.

14.11  *Filings.* Following the execution and delivery of this Agreement, the Manager shall promptly prepare any documents required to be filed and recorded under the Act, and the Manager shall promptly cause each such document to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. The Manager shall also promptly cause to be filed, recorded and published such statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

14.12  *Notices.* Notices, requests, reports, payments, calls or other communications required to be given or made to any Member hereunder shall be in writing and shall be delivered personally or mailed, certified mail, return receipt requested, or delivered by overnight courier service to such Member at such Member's address last shown on the Company's books and records, or such other address as any party hereto designates by written notice to the Company, and shall be deemed to have been given upon delivery, if delivered personally, three days after mailing, if mailed, or one business day after delivery to the courier, if delivered by overnight courier service. Addresses shown under the signatures of each Member shall be considered the last known address of such Member unless and until the Company is otherwise notified by such Member.

14.13  *Mediation.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation, the Company and each Member agrees to seek resolution of such controversy or claim through mediation in accordance with the current Commercial Mediation Rules of the American Arbitration Association before resorting to arbitration, litigation, or some other form of dispute resolution.

14.14  *Arbitration.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation or mediation, the Company and each Member agrees to seek resolution of such controversy or claim through arbitration in accordance with the current Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of arbitration shall be allocated among the parties as directed by the arbitrator(s).

14.15  *Equitable Remedies.* The rights and remedies of the Members hereunder shall not be mutually exclusive, i.e., the exercise of rights granted under any provisions hereof shall not preclude the exercise of any other provisions hereof. The Members confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise

of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this subsection to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

14.16  *Company Losses Due to Member's Litigation.*  In the event the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with any Member's obligations or liabilities which do not arise out of or relate to the business of the Company, and which are not covered by the Company's insurance coverage, such Member shall reimburse the Company for all such expenses incurred, including attorneys' fees, and the interest of such Member in this Company may be charged therefor.

14.17  *Title to Company Assets.*  The assets of the Company shall be owned by the Company as an entity, and no Member shall have any direct ownership interest in such assets or any portion thereof.

14.18  *Execution of Additional Documents.*  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments reasonably necessary for the Company to comply with any applicable laws, rules or regulations.

14.19  *Confidentiality.*  Any mediators or mediators appointed pursuant to this Agreement shall be under a duty to maintain in confidence, to the greatest extent reasonably possible, any and all information relating to the Company and/or its Members or creditors.

***Signature Page Follows***

FILED DATE: 1/7/2020 7:23 PM  2020L000292

## ADDITIONAL MEMBER SIGNATURE PAGE

The undersigned hereby executes the Operating Agreement, dated as of August 15, 2005 ("Agreement"), by and among Heritage Development Partners, LLC, an Illinois limited liability company (the "Company"), and the Members listed on the signature pages thereto.  Each of the parties other than the Company may be referred to individually as a "Member" and collectively as the "Members".

Date: _____, 2206

_____
Name

_____
Address

_____
Signature

HERITAGE DEVELOPMENT PARTNERS, LLC
(on behalf of itself and the Members)

By: _____
Authorized Manager

FILED DATE: 1/7/2020 7:23 PM    2020L000292

## SCHEDULE 1
## TO THE
## HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT

### Ownership of Members as of January 1, 2006

| Member | Class A Units | Class B Units | Capital Contribution |
|---|---|---|---|
| MT Property Holdings, LLC | None | 72,000 | $1,000 |
| | | None | |
| Total | | 72,000 | $1,000 |

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:           **HERITAGE DEVELOPMENT PARTNERS, LLC,**
an Illinois limited liability company

By: **HERITAGE PROPERTY DEVELOPMENT , INC.**
Its: Manager

By: Michael Ruffman
Its: President

MEMBER:           **MT PROPERTY HOLDINGS, LLC,**
an Illinois limited liability company

By: Michael Ruffman
Its: Member

By: Antion S. Rezko
Its: Member

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 1/7/2020 7:23 PM   2020L000292

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:             **HERITAGE DEVELOPMENT PARTNERS, LLC,**
                     an Illinois limited liability company

                     By: **HERITAGE PROPERTY DEVELOPMENT , INC.**
                     Its: Manager

                     By: Michael Rumman
                     Its: President

MEMBER:              **MT PROPERTY HOLDINGS, LLC,**
                     an Illinois limited liability company

                     By: Michael Rumman
                     Its: Member

                     By: Antion S. Rezko
                     Its: Member

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

*Page -40-*

# EXHIBIT  B

# Bloomberg
## LAW

BAGHDADI ALI v. GENERAL MEDITERRANEAN HOL, Docket No. 2020-L-000292 (Ill. Cir. Ct. Jan 07, 2020), Court Docket

**Printed By:**     LDAVIS109 on Friday, February 14, 2020 - 12:41 PM

**6-Person Jury**

FILED
1/7/2020 7:23 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

7982994

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| **ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN RAZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC,** | ) ) ) ) ) ) ) ) ) ) ) | |
| **Plaintiffs,** | ) ) | |
| **v.** | ) ) | **2020L000292**  **No.** |
| **GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC,** | ) ) ) ) | **JURY DEMANDED** |
| **Defendants.** | ) ) | |

## COMPLAINT

Plaintiffs Ali Baghdadi ("Baghdadi"), Fouad Chamon ("Chamon"), Antoine Korkis ("Korkis"), Najah Najjar ("N. Najjar"), Jacqueline Najjar ("J. Najjar"), Suhail Nammari ("Nammari"), Nachwan Razko ("Razko"), Burt Rezko ("B. Rezko"), Milad Saad ("Saad"), Michael Sahli ("Sahli"), Georges Zouki ("Zouki") Khaled Shair ("K. Shair"), Layla El Shair ("L. Shair") and QMQQ, LLC ("QMQQ") (collectively, "Plaintiffs"), by and through their attorneys, The Law Offices of Edward T. Joyce & Associates, P.C., respectfully state as follows for their Complaint against Defendants General Mediterranean Holding, S.A., SpF and Chicago South Loop Holdings III (collectively, "Defendants"):

FILED DATE: 1/7/2020 7:23 PM    2020L000292

## INTRODUCTION

1.      This case arises out of a multi-billion dollar company's efforts to deprive minority investors of their right to participate in one of the most promising real estate development projects in Chicago.

2.      In January 2006, Antoin S. Rezko ("Rezko") and a business partner were the owners of MT Property Holdings, LLC ("MT"). At that time, MT owned 100% of Heritage Development Partners, LLC ("Heritage"). Heritage owned 50% of the common units and 49% of the voting units of Riverside District Development, LLC ("Riverside"), which owned a 62-acre parcel of land that is now known as the "78." Defendant General Mediterranean Holding, S.A., SpF ("GMH") owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units.

3.      In July 2007, Rezko assigned 30.497% of his economic/distributional interests in MT to Plaintiffs.

4.      All of MT's interest holders, including Plaintiffs, were entitled to participate in and profit from the future development of the Property through MT's ownership interest in the Heritage, which was the company responsible for developing the Property. MT's (and thus Plaintiffs') future development rights were not limited solely to activities carried out by Heritage. Instead, if a co-owner of Heritage or one of its affiliates decided to develop the property through a different vehicle, the Heritage operating agreement expressly granted MT the right to acquire a share of that other development company. By doing so, the Heritage Operating Agreement ensured that MT (and its interest owners) could not be deprived of the opportunity to participate in the future development of the property, regardless of the form or ultimate ownership structure of the project.

2

FILED DATE: 1/7/2020 7:23 PM   2020L000292

5.      However, seven years after Plaintiffs acquired their interests in MT, GMH attempted to cut Plaintiffs and all other non-GMH affiliated investors out of the development project. By early 2014, GMH obtained complete control over Heritage. Using this control, GMH caused the Property to be transferred to one of its shell companies and replaced Heritage as the developer of the Property with a new company owned and controlled solely by GMH. GMH did all of this without providing any notices to Plaintiffs.

6.      GMH then attempted to cover its tracks and forever extinguish Plaintiffs' ability to participate in the development of the Property by dissolving Heritage and MT. Once again, GMH took this step by exercising the control it had acquired through its web of shell companies. And, once again, GMH did not provide notice to Plaintiffs of what it was doing.  Plaintiffs have only recently learned about GMH's attempt to cut them out of the development of the Property through news reports about the Property and communications with each other. Plaintiffs have brought this action to require GMH and MT's former member-manager, Chicago South Loop Holdings III, LLC ("South Loop III), which GMH controlled, to account for the harm done to Plaintiffs.

## **PARTIES**

7.      On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Baghdadi.

8.      On July 26, 2007, Rezko assigned a 3.5014% economic, non-member interest in MT to Chamon.

9.      On August 13, 2007, Rezko assigned a 0.8582% economic, non-member interest in MT to Korkis.

10.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to N. Najjar.

3

FILED DATE: 1/7/2020 7:23 PM   2020L000292

11.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to J. Najjar.

12.     On July 26, 2007, Rezko assigned a 5.1491% economic, non-member interest in MT to Nammari.

13.     On July 26, 2007, Rezko assigned a 1.6437% economic, non-member interest in MT to Razko.

14.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to B. Rezko.

15.     On July 26, 2007, Rezko assigned a 1.2871% economic, non-member interest in MT to Saad.

16.     On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Sahli.

17.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to Zouki.

18.     On July 26, 2007, Rezko assigned a 1.225% economic, non-member interest in MT to K. Shair and L. Shair.

19.     On April 22, 2014, QMQQ was assigned Rezko's 5.8917% interest in MT.

20.     Defendant GMH is a Luxembourg-based company. Its principal place of business is located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg, Grand-Duche de Luxembourg.

21.     Defendant South Loop III is a Delaware limited liability company that GMH indirectly owns and controls. Its principal place of business is located at 211 West Wacker Drive, Suite 1050, Chicago, Illinois.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

22.     This Court has personal jurisdiction over GMH pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

23.     This Court has personal jurisdiction over South Loop III pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10) and (11).

24.     Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (a) a defendant joined in good faith and with probable cause for the purpose of obtaining a judgment against it and not solely for the purpose of fixing venue resides here and (b) the transaction or some part thereof out of which Plaintiffs' cause of action arose occurred in this county.

## FACTUAL ALLEGATIONS

**A.      The Property was a unique parcel of real estate with significant potential for substantial returns once development was complete.**

25.     The Property is located in Chicago's South Loop at the southwest corner of Clark Street and Roosevelt Road.

26.     At 62 acres, the Property has been one of the largest parcels of undeveloped land in Chicago and one of the largest contiguous in-fill parcels in any major city in the United States.

27.     The Property offers impressive views of Chicago's skyline and includes one-half mile of frontage along the Chicago River.

28.     The Property is less than a mile from Chicago's Central Business District, Grant Park, the Museum Campus, McCormick Place, and other significant locations in the city.

29.     The Property also has convenient access to public transit – including a Metra line, three "L" lines, and a bus line – and to major highways – including the Dan Ryan and Eisenhower Expressways and Lake Shore Drive.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

30.     In light of these features, the Property is a unique opportunity for a large mix-use development combining hundreds of thousands of square feet in commercial space with several thousand residential units.

**B.**     **Through various entities, Rezko and GMH acquire the Property**

31.     In the early 2000s, Rezko and GMH recognized the tremendous potential for the Property and they decided to purchase and develop it as partners.

32.     Rezko was responsible for overseeing the development of the Property. During 20 years in the Chicago real estate industry, Rezko had acquired extensive knowledge about real estate development and cultivated relationships with a wide array of professionals from engineers and architects to consultants and attorneys.

33.     GMH was responsible for providing most of the capital needed for the project. As an international holding company with billions of dollars of assets, GMH could not only fund the purchase of the Property but also supply the money that would be needed on an ongoing basis to pay for development efforts.

34.     Mohammed Al-Miqdadi ("Al-Miqdadi") was responsible for the day-to-day business of GMH related to the Property. Al-Miqdadi was the Director of Project Development at GMH and, in this capacity, reported directly to Nadmi Auchi ("Auchi"), who was GMH's sole owner, Chairman, and Chief Executive Officer. Al-Miqdadi is also Auchi's son-in-law.

35.     As of January 1, 2006, the Property was owned by Riverside. GMH owned 50% of Riverside's common units, 51% of its voting units and 100% of its preferred units. Heritage owned the other 50% of Riverside's common units and 49% of its voting units. MT, which was owned and controlled by Rezko and his business partner, Michael Ruman ("Ruman") was the sole owner of Heritage.

6

FILED DATE: 1/7/2020 7:23 PM    2020L000292

36.    The chart below graphically reflects the ownership structure as of January 1, 2006



C.    **Heritage raises additional capital from Baghdadi and others through a private placement offering**

37.    In early 2006, Heritage conducted a private placement offering to raise additional capital.

38.    Through the offering, Heritage sold Class A Units.

39.    The Class A Units were purchased by Royal Heritage Investments LLC ("Royal Heritage"), Baghdadi and his wife Darlene ("D. Baghdadi"), and Roosevelt-Clark, LLC ("Roosevelt-Clark") (the "Class A Investors").

40.    Under the Heritage operating agreement, these Class A Units had only limited voting rights. Most of the voting power in Heritage belonged only to the members who held Class B Units. However, as explained below, Section 7.2 of the Heritage operating agreement granted Class A and Class B members the same right to participate in the future development of the Property.

41.    Section 7.2 of Heritage's operating agreement states that "no Member holding Class B Units or an Affiliate of such Member (either one a 'Related Developer') shall enter into any transaction with respect to the development of all or any portion of the Property unless the

7

FILED DATE: 1/7/2020 7:23 PM   2020L000292

each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" (Ex. 1, Heritage's Operating Agreement, §7.2.)

42.     In short, this portion of §7.2 prohibited any members of Heritage holding Class B Units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless all members of Heritage were granted an opportunity to own a common interest in the Related Developer.

43.     Section 7.2 also set forth a formula to calculate the share of the common ownership interest in the Related Developer that a member would have the right to own. (Ex. 1, Heritage's Operating Agreement, §7.2.) Specifically, each member was entitled to a share of the common ownership interests in the Related Developer that was "equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class[,] by (z) the total number of Units then outstanding, determined regardless of class." *Id.* Under this equation, each member thus was entitled to retain the same proportion of ownership in the Related Developer that it had in the original developer, Heritage.

**D.     Rezko is indicted, GMH takes control of Heritage and MT, and Rezko assigns 30.497% of his economic interest in MT to Plaintiffs**

44.     In October 2006, it was publicly revealed that the government had indicted Rezko on fraud and bribery charges.

45.     GMH concluded that the indictment made Rezko a liability to its efforts to develop the Property.

46.     Therefore, on July 24, 2007, GMH caused a wholly-owned and wholly-controlled affiliate named Orifarm, S.A. ("Orifarm"), to acquire 60 Class B Units of Heritage from MT. In addition, Heritage admitted Orifarm as a member.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

47.     Thus, following this July 24, 2007 transaction, Orifarm owned 60% of Heritage, MT owned 38.1% of Heritage and the Class A Investors owned 1.9% of Heritage.

48.     At or about the same time, Orifarm acquired all of Rezko's and Ruman's membership interests in MT and was admitted as a member. Because MT was a member-managed LLC, Orifarm, as the only admitted member of MT, gained complete control of MT.

49.     Through its ownership of 60% of Heritage's Class B Units and its control of MT, which owned Heritage's other Class B Units, Orifarm gained complete control of the majority of Heritage's voting rights. Because GMH owned and controlled Orifarm, this meant that GMH had in effect gained complete control of Heritage.

50.     On July 26, 2007, Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs (except for Korkis and QMQQ, who received their assigned interests on August 13, 2007 and September 6, 2007 respectively.)

51.     As a member of Heritage, MT was entitled to receive its share of any distributions that flowed from the development of the Property. As owners of an economic interest in MT, Plaintiffs were each entitled to receive their proportionate share of any such distributions that MT received.

52.     Because Orifarm was the only admitted member and manager of MT, it exercised complete control over MT's operations and investment in the development of the Property. Thus, Orifarm had complete control over Plaintiffs' economic interests in the development of the Property. Accordingly, Plaintiffs placed their trust and confidence in Orifarm to protect, preserve and advance MT's interests in the development of the Property.

53.     When Rezko transferred control of MT to Orifarm, it was his expectation and intent that Orifarm would facilitate the future development of the Property for the benefit of MT and that

9

FILED DATE: 1/7/2020 7:23 PM    2020L000292

Orifarm would not take any actions to dilute, extinguish or interfere with Plaintiffs' economic interests in MT.

54.     The chart below reflects the ownership of the Property and its development after GMH completed its buy out of Rezko.



55.     GMH further secured its control over Heritage by installing one of its own executives as Heritage's manager.

56.     Heritage's operating agreement provided that it was to be a manager-managed LLC. (Ex. 1, Heritage's Operating Agreement, §9.1.) The operating agreement also vested the manager with significant power to control Heritage's operations. (*Id.* §§9.1-9.7.)

57.     On July 24, 2007, GMH installed Illinois Developer, LLC ("Illinois Developer") as Heritage's new manager.

58.     Illinois Developer was managed and controlled by a British Virgin Islands corporation called Moni Equities, Inc., which was wholly owned and controlled by GMH. Al-Miqdadi was president of Moni Equities and one of its three directors.

59.     GMH also installed Al-Miqdadi as president of Illinois Developer.

10

FILED DATE: 1/7/2020 7:23 PM   2020L000292

**E.      GMH developed a scheme to deprive Heritage's Class A Investors and Plaintiffs of their right to participate in and profit from the development of the Property**

60.      In 2014, after having amassed total control over Heritage, GMH set its sights on depriving Heritage's Class A Members and Plaintiffs of their rights to participate in and profit from the development of the Property.

61.      GMH did this in three steps.

62.      **Step One**. In 2014, GMH caused Orifarm to dissolve and to transfer all its interests in Heritage and MT to South Loop III. Through a web of shell companies, GMH owned and controlled South Loop III. Specifically, South Loop III was wholly-owned by CSLH Incorporated ("CSLH Inc."), which was wholly-owned by CSLH Lux I S.àr.l ("CSLH Lux I"), which was wholly-owned by CSLH Lux II S.àr.l ("CSLH Lux II"), which was wholly-owned by GMH.

63.      GMH also exercised complete control over South Loop III's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop III's president. Also, South Loop III's manager was CSLH Manager Incorporated ("CSLH Manager"). CSLH Manager was directly owned by CSLH Inc. Thus, GMH ultimately owned and controlled CSLH Manager.

64.      As the member-manager of MT, South Loop III exercised complete control over MT's operations and its investment in the development of the Property. Plaintiffs placed their trust and confidence in MT's member-manager, first Orifarm and then South Loop III, to protect, preserve and advance MT's interests in the development of the Property.

65.      **Step Two**. On April 28, 2014, GMH caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC ("South Loop II"). Through a web of shell companies, GMH owned and controlled South Loop II. Specifically, South Loop II was wholly owned by

11

FILED DATE: 1/7/2020 7:23 PM    2020L000292

Chicago South Loop Holdings I, LLC ("South Loop I") which was wholly owned by CSLH Inc., which was wholly owned by CSLH Lux I, which was wholly owned by CSLH Lux II, which was wholly owned by GMH.

66.    GMH also exercised complete control over South Loop II's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop II's president. Also, South Loop II's manager was CSLH Manager, which GMH ultimately owned and controlled.

67.    Under Section 7.2 of Heritage's operating agreement, MT's rights were triggered if a transaction met two requirements: (1) it involved a Class B member or its affiliate, and (2) it was with respect to the development of the Property.

68.    With respect to the first requirement, the two parties to the transfer of the Property on April 28 were South Loop II and Riverside.

69.    Both South Loop II and Riverside were affiliates South Loop III, which was a Class B Member of Heritage.

70.    In that regard, under §1.3 of Heritage's operating agreement, any entity "under common Control" with South Loop III was one of South Loop III's affiliates. (Ex. 1, Heritage Operating Agreement, §1.3.) Because South Loop III was under the control of GMH, any other developer entity controlled by GMH was "under common Control" with South Loop III for purposes of §7.2. Under §1.20 of Heritage's operating agreement, GMH controlled an entity if it either (1) possessed, directly or indirectly, at least (a) 10% of its voting power, if a corporation, or (b) 10% of its ownership interest if not a corporation, or (2) had the power to direct or cause the direction of its management and policies. (Ex. 1, Heritage Operating Agreement §1.20.)

71.    Both South Loop II and Riverside satisfied this standard.

12

FILED DATE: 1/7/2020 7:23 PM   2020L000292

72.      Because GMH controlled South Loop II and Riverside (within the meaning of §1.20), they were both affiliates of a Class B Member of Heritage (South Loop III), within the meaning of §7.2. Thus, the April 28 transfer of the Property from Riverside to South Loop II satisfied the first requirement of §7.2.

73.      The April 28 transfer of the Property also satisfied the second requirement of §7.2.

74.      The purpose of this transaction (i.e., transferring the Property from Riverside to South Loop II) was to allow South Loop II to hold title to the Property and to engage in future transactions with respect to its development. That means the April 28th transfer of the Property was a transaction with respect to the development of the Property within the meaning of §7.2 of Heritage's operating agreement.

75.      **Step Three**. In May 2014, GMH, through its control of South Loop III and Illinois Developer, caused Heritage and MT to be dissolved.

76.      Defendants did not provide Plaintiffs with any notice of any of the facts alleged in paragraphs 60-73 above.

77.      Instead of dissolving MT, South Loop III (which was controlled by GMH) should have caused MT to acquire an ownership interest in South Loop II as required by §7.2 of Heritage's operating agreement.

78.      However, South Loop III/GMH did not do this because GMH's goal with the restructuring was to deprive Heritage's Class A Investors and Plaintiffs of their economic interests in the development of the Property.

79.      Through its control of Illinois Developer, South Loop III and Heritage, GMH caused Heritage to breach its operating agreement by failing to provide MT with an ownership interest in South Loop II.

FILED DATE: 1/7/2020 7:23 PM   2020L000292

80.     Plaintiffs thus were improperly deprived of the opportunity to participate in the development of the Property through their economic interest in MT. GMH and South Loop III's actions have caused Plaintiffs' valuable economic interests in MT to become worthless.

**F.      GMH formed a new joint venture to develop the Property without offering Plaintiffs the opportunity to participate**

81.     On information and belief, after dissolving Heritage and MT, GMH engaged in extensive discussions with companies that wanted to partner with GMH to develop the Property.

82.     GMH spent over a year soliciting and reviewing offers and negotiating with interested companies.

83.     Eventually, GMH decided to partner with The Related Companies, L.P., a multi-billion-dollar real estate company based on New York.

84.     By May 2015, GMH had signed a letter of intent with Related Midwest to form a joint venture that would own and develop the Property.

85.     As part of that joint venture, South Loop II and Related R/C LLC formed Roosevelt/Clark Partners LLC ("RCP").

86.     On May 9, 2016 South Loop II and RCP executed a special warranty deed conveying the Property to RCP.

87.     GMH and Related subsequently took significant steps to develop the Property.

88.     Under §7.2 of the Heritage operating agreement, MT had the right to acquire a share of any Class B Member or an affiliate of such a member that entered into a transaction with respect to the development of the Property. (Ex. 1, Heritage's operating agreement, §7.2.)

89.     When Heritage's articles of dissolution were filed in 2014, South Loop III was a Class B Member. Under the terms of Heritage's operating agreement, both South Loop II and GMH were affiliates of South Loop III. That means §7.2 granted MT the right to own a common

14

FILED DATE: 1/7/2020 7:23 PM   2020L000292

ownership share of South Loop II when it engaged in a transaction with respect to the development of the Property. The joint venture with Related clearly is such a transaction.

90.    However, MT did not exercise its rights under §7.2 or give Plaintiffs notice of GMH's dealings with Related because GMH wanted to shut Plaintiffs out of the development project.

91.    GMH carried out every aspect of its scheme in secrecy and never disclosed to Plaintiffs information about the transfers it made and actions it took with respect to the development project.

92.    The Baghdadi's, who were also Class A Investors in Heritage, did not find out what GMH had done until 2019 when GMH and Related filed Economic Disclosure Statements with the City of Chicago. (On April 26, 2019, the Baghdadi's have filed a separate lawsuit as Class A Investors).

93.    Likewise, because of GMH's attempts to conceal its scheme, the other Plaintiffs did not find out what GMH had done until 2019 through news reports concerning the development and/or conversations with each other.

## COUNT I

### Breach of Fiduciary Duty
### Against Defendants GMH and South Loop III

94.    Plaintiffs incorporate the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.    As the sole member-manager of MT, South Loop III exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in South Loop III to protect, preserve and advance MT's interests in the development of the Property.

15

FILED DATE: 1/7/2020 7:23 PM   2020L000292

96.     Through its indirect ownership of South Loop III, GMH exercised complete control over South Loop III. Therefore, GMH in effect exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in GMH to protect, preserve and advance MT's interests in the development of the Property.

97.     As a result of the nature of the relationship between Plaintiffs and South Loop III, including the control and dominance that South Loop III exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in South Loop III as to those interests, South Loop III owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

98.     As a result of the nature of the relationship between Plaintiffs and GMH, including the control and dominance that GMH exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in GMH as to those interests, GMH owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

99.     GMH and South Loop III breached their fiduciary duties to Plaintiffs by: (a) causing the Property to be transferred from Riverside to South Loop II without providing MT with an ownership interest in South Loop II as required by Section 7.2 of Heritage's operating agreement, (b) causing MT to be dissolved, (c) failing to disclose these facts to Plaintiffs, (d) excluding Plaintiffs from the joint venture between South Loop II and Related, and (e) excluding Plaintiffs from the benefits of any development of the Property.

100.    As a result of these breaches, Plaintiffs have lost their interests in the development of the Property and thus have been damaged in excess of $50,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

16

FILED DATE: 1/7/2020 7:23 PM   2020L000292

a)   awarding compensatory damages to Plaintiffs;

b)   awarding punitive damages to Plaintiffs

c)   awarding equitable pre-judgment interest to Plaintiffs; and,

d)   for any and all further relief that the Court deems just, equitable and proper.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMON,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL   NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, AND
QMQQ LLC,

By:  ___/s/  Edward T. Joyce_____
         One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

17

# EXHIBIT C

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMOUN, | ) | |
| ANTOINE KORKIS, NAJAH NAJJAR, | ) | |
| JACQUELINE NAJJAR, SUHAIL | ) | |
| NAMMARI, NACHWAN RAZKO, | ) | |
| BURT REZKO, MILAD SAAD, | ) | |
| MICHAEL SAHLI, GEORGES ZOUKI, | ) | |
| KHALED SHAIR, LAYLA EL SHAIR, | ) | |
| QMQQ LLC, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No. 2020 L 000292 |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf; and CHICAGO | ) | JURY DEMANDED |
| SOUTH LOOP HOLDINGS III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' UNOPPOSED MOTION
FOR LEAVE TO FILE AMENDED COMPLAINT**

Plaintiffs Ali Baghdadi, Fouad Chamon, Antoine Korkis, Najah Najjar, Jacqueline Najjar, Suhail Nammari, Nachwan Razko, Burt Rezko, Milad Saad, Michael Sahli, Georges Zouki, Khaled Shair, Layla El Shair and QMQQ, LLC, by and through their attorneys, The Law Offices of Edward T. Joyce & Associates, P.C., respectfully move for leave to file the attached proposed amended complaint. In support of this motion, Plaintiffs state as follows:

1. Plaintiffs filed their original complaint on January 7, 2020. The Plaintiffs brought claims against South Loop Holdings III, LLC ("South Loop III"), the sole member-manager of MT Holdings ("MT"), and General Mediterranean Holding, S.A., Spf. ("GMH"), who indirectly owned and controlled South Loop III, for breaching their fiduciary duties by: (a) causing development property, in which the Plaintiffs had an economic interest, to be transferred to another indirect subsidiary of GMH, South Loop II, without providing MT with an ownership interest in

South Loop II as required by the Heritage operating agreement, a company in which MT had an interest; (b) causing MT to dissolve; (c) failing to disclose this information to Plaintiffs; (d) excluding Plaintiffs from the joint venture between South Loop II and Related, a real estate company GMH partnered with; and (e) excluding Plaintiffs from the benefits of any development of the development property.

2. Plaintiffs' original complaint was served upon South Loop III on March 5, 2020. Plaintiffs contend that they have also served GMH via South Loop but anticipate that this issue will be disputed. South Loop has appeared in the case. GMH has not.

3. South Loop III filed a combined 2-615 and 2-619 motion to dismiss on April 1, 2020. Due to the pandemic and court closure, the motion was not presented for a briefing schedule. Moreover, because Plaintiffs notified Defendants of an intention to amend, the parties did not enter into an agreed briefing schedule order. Plaintiffs have prepared an amended complaint to address purported deficiencies raised in the motion to dismiss, add a plaintiff, George Merjan, who was inadvertently left out of the original complaint, and include allegations relating to diversity jurisdiction. A copy of the proposed amended complaint is attached hereto as Ex. A.

4. South Loop has stated that it does not object to Plaintiffs' request for leave to file the attached amended complaint.

WHEREFORE, Plaintiffs respectfully request that the motion for leave to file its amended complaint be granted.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMOUN,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL   NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, QMQQ
LLC

By:    /s/  Edward T. Joyce
                        One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

## <u>CERTIFICATE OF SERVICE</u>

I, Edward T. Joyce, an attorney, certify that on June 19, 2020, I caused a true and correct copy of the foregoing PLAINTIFFS' UNOPPOSED MOTION FOR LEAVE TO FILE AMENDED COMPLAINT to be filed and served via the Circuit Court of Cook County's electronic filing system upon all counsel of record as listed below,

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.


/s/ Edward T. Joyce

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000 Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

# Exhibit A

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMOUN, | ) | |
| ANTOINE KORKIS, NAJAH NAJJAR, | ) | |
| JACQUELINE NAJJAR, SUHAIL | ) | |
| NAMMARI, NACHWAN RAZKO, | ) | |
| BURT REZKO, MILAD SAAD, | ) | |
| MICHAEL SAHLI, GEORGES ZOUKI, | ) | |
| KHALED SHAIR, LAYLA EL SHAIR, | ) | |
| QMQQ LLC and GEORGE MERJAN, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | No.  2020 L 000292 |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf; and CHICAGO | ) | JURY DEMANDED |
| SOUTH LOOP HOLDINGS III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## <u>AMENDED COMPLAINT</u>

Plaintiffs Ali Baghdadi ("Baghdadi"), Fouad Chamoun ("Chamon"), Antoine Korkis ("Korkis"),

Najah Najjar ("N. Najjar"), Jacqueline Najjar ("J. Najjar"), Suhail Nammari ("Nammari"),

Nachwan Razko ("Razko"), Burt Rezko ("B. Rezko"), Milad Saad ("Saad"), Michael Sahli

("Sahli"), Georges Zouki ("Zouki") Khaled Shair ("K. Shair"), Layla El Shair ("L. Shair") QMQQ,

LLC ("QMQQ"), and George Merjan ("Merjan") (collectively, "Plaintiffs"), by and through their

attorneys, The Law Offices of Edward T. Joyce & Associates, P.C., respectfully state as follows

for their Amended Complaint against Defendants General Mediterranean Holding, S.A., SpF and

Chicago South Loop Holdings III (collectively, "Defendants"):

## INTRODUCTION

1. This case arises out of a multi-billion dollar company's efforts to deprive minority investors of their contractual and statutory rights to participate in one of the most promising real estate development projects in Chicago.

2. In January 2006, Antoin S. Rezko ("Rezko") and one of his business partners were the owners of MT Property Holdings, LLC ("MT"). At that time, MT owned 100% of Heritage Development Partners, LLC ("Heritage"). Heritage owned 50% of the common units and 49% of the voting units of Riverside District Development, LLC ("Riverside"). Riverside owned a 62-acre parcel of land that is now known as the "78" ("Property"). Defendant General Mediterranean Holding, S.A., SpF ("GMH") owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units.

3. In July 2007, Rezko assigned over 30% of his economic/distributional interests in MT to Plaintiffs.

4. All of MT's interest holders, including Plaintiffs, were entitled to participate in and profit from the future development of the Property through MT's ownership interest in the Heritage, which was the company responsible for developing the Property. MT's (and thus Plaintiffs') development rights were not limited solely to activities carried out by Heritage. Instead, if a co-owner of Heritage or one of its affiliates decided to develop the property through a different vehicle, the Heritage operating agreement expressly granted MT the right to acquire a share of that other development company. By doing so, the Heritage operating agreement ensured that MT (and its interest owners) could not be deprived of the opportunity to participate in the future development of the property, regardless of the form or ultimate ownership structure of the project.

5. However, seven years after Plaintiffs acquired their interests in MT, GMH attempted to cut Plaintiffs and all other non-GMH affiliated investors out of the development project. By early 2014, GMH obtained complete control over Heritage. Using this control, GMH caused the Property to be transferred to one of its shell companies and replaced Heritage as the developer of the Property with a new company owned and controlled solely by GMH. Plaintiffs were not informed of and had no reason to suspect GMH's actions.

6. GMH then attempted to cover its tracks and forever extinguish Plaintiffs' ability to participate in the development of the Property by dissolving Heritage and MT.

7. Upon the dissolution of MT, Plaintiffs did not receive their proportional share of MT's assets, specifically their interest in the future development of the Property, which they should have received pursuant to the Illinois Limited Liability Company Act (the "Act") and MT's operating agreement.

8. Once again, GMH took this step by exercising the control it had acquired through its web of shell companies. And, once again, Plaintiffs were not informed of and did not have knowledge of GMH's activities. Plaintiffs have only recently learned about GMH's attempt to cut them out of the development of the Property through news reports about the Property and communications with each other. Plaintiffs have brought this action to require GMH and MT's former member-manager, Chicago South Loop Holdings III, LLC ("South Loop III"), which GMH controlled, to account for the harm done to Plaintiffs.

## PARTIES

9. Baghdadi is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Baghdadi.

10.     Chamoun is an individual. He is a citizen of Quebec, Canada. On July 26, 2007, Rezko assigned a 3.5014% economic, non-member interest in MT to Chamon.

11.     Korkis is an individual. He is a citizen of Buenos Aires, Argentina. On August 13, 2007, Rezko assigned a 0.8582% economic, non-member interest in MT to Korkis.

12.     N. Najjar is an individual. Her primary residence is in Illinois and she is a citizen of Syria. On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to N. Najjar.

13.     J. Najjar is an individual. Her primary residence is in Illinois and she is a citizen of Syria. On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to J. Najjar.

14.     Nammari is an individual. He is a citizen of Indiana. On July 26, 2007, Rezko assigned a 5.1491% economic, non-member interest in MT to Nammari.

15.     Razko is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 1.6437% economic, non-member interest in MT to Razko.

16.     B. Rezko is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to B. Rezko.

17.     Saad is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 1.2871% economic, non-member interest in MT to Saad.

18.     Sahli is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Sahli.

19.     Zouki is an individual. He is a citizen of Quebec, Canada. On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to Zouki.

20.     K. Shair and L. Shair are individuals. They are citizens of Illinois. On July 26, 2007, Rezko assigned a 1.225% economic, non-member interest in MT to K. Shair and L. Shair.

21.     QMQQ is a limited liability company. Its sole member is a citizen of Pennsylvania. On April 22, 2014, QMQQ was assigned Rezko's 5.8917% interest in MT.

22.     Merjan is an individual. He is a citizen of Illinois. On or about July 26, 2007, Rezko assigned an economic, non-member interest in MT to Merjan.

23.     Defendant GMH is a Luxembourg-based company. Its principal place of business is located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg, Grand-Duche de Luxembourg.

24.     Defendant South Loop III is a limited liability company. Its sole member is CSLH, Inc., ("CSLH"). CSLH is a Delaware corporation. GMH indirectly owns and controls both CSLH and South Loop III.

25.     This Court has personal jurisdiction over GMH pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

26.     This Court has personal jurisdiction over South Loop III pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10) and (11).

27.     Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (a) a defendant joined in good faith and with probable cause for the purpose of obtaining a judgment against it and not solely for the purpose of fixing venue resides here and (b) the transaction or some part thereof out of which Plaintiffs' cause of action arose occurred in this county.

## FACTUAL ALLEGATIONS

**A.      The Property is a unique parcel of real estate with significant potential for substantial returns once development is complete.**

28.     The Property is located in Chicago's South Loop at the southwest corner of Clark Street and Roosevelt Road.

29.     At 62 acres, the Property has been one of the largest parcels of undeveloped land in Chicago and one of the largest contiguous in-fill parcels in any major city in the United States.

30.     The Property offers impressive views of Chicago's skyline and includes one-half mile of frontage along the Chicago River.

31.     The Property is less than a mile from Chicago's Central Business District, Grant Park, the Museum Campus, McCormick Place, and other significant locations in the city.

32.     The Property also has convenient access to public transit – including a Metra line, three "L" lines, and a bus line – and two major highways – including the Dan Ryan and Eisenhower Expressways and Lake Shore Drive.

33.     In light of these features, the Property is a unique opportunity for a large mix-use development combining hundreds of thousands of square feet in commercial space with several thousand residential units.

**B.     Through various entities, Rezko and GMH acquire the Property**

34.     In the early 2000s, Rezko and GMH recognized the tremendous potential for the Property and they decided to purchase and develop it as partners.

35.     Rezko was responsible for overseeing the development of the Property. During 20 years in the Chicago real estate industry, Rezko had acquired extensive knowledge about real estate development and cultivated relationships with a wide array of professionals from engineers and architects to consultants and attorneys.

36.     GMH was responsible for providing most of the capital needed for the project. As an international holding company with billions of dollars of assets, GMH could not only fund the purchase of the Property but also supply the money that would be needed on an ongoing basis to pay for development efforts.

37.     Mohammed Al-Miqdadi ("Al-Miqdadi") was responsible for the day-to-day business of GMH related to the Property. Al-Miqdadi was the Director of Project Development at GMH and, in this capacity, reported directly to Nadmi Auchi ("Auchi"), who was GMH's sole owner, Chairman, and Chief Executive Officer. Al-Miqdadi is also Auchi's son-in-law.

38.     As of January 1, 2006, the Property was owned by Riverside. GMH owned 50% of Riverside's common units, 51% of its voting units and 100% of its preferred units. Heritage owned the other 50% of Riverside's common units and 49% of its voting units. MT, which was owned and controlled by Rezko and his business partner, Michael Ruman ("Ruman"), was the sole owner of Heritage.

39.     The chart below graphically reflects the ownership structure as of January 1, 2006



## C.     Heritage raises additional capital from Baghdadi and others through a private placement offering

40.     In early 2006, Heritage conducted a private placement offering to raise additional capital.

41.     Through the offering, Heritage sold Class A Units.

42.     The Class A Units were purchased by Royal Heritage Investments LLC ("Royal Heritage"), Baghdadi and his wife Darlene ("D. Baghdadi"), and Roosevelt-Clark, LLC ("Roosevelt-Clark") (the "Class A Investors").

43.     Under the Heritage operating agreement, these Class A Units had only limited voting rights. Most of the voting power in Heritage belonged only to the members who held Class B Units. However, as explained below, Section 7.2 of the Heritage operating agreement granted Class A and Class B members the same right to participate in the future development of the Property.

44.     Section 7.2 of Heritage's operating agreement states that "no Member holding Class B Units or an Affiliate of such Member (either one a 'Related Developer') shall enter into any transaction with respect to the development of all or any portion of the Property unless each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" (Ex. 1, Heritage's Operating Agreement, §7.2.)

45.     In short, this portion of §7.2 prohibited any members of Heritage holding Class B Units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless all members of Heritage were granted an opportunity to own a common interest in the Related Developer.

46.     Section 7.2 also set forth a formula to calculate the share of the common ownership interest in the Related Developer that a member would have the right to own. (Ex. 1, Heritage's Operating Agreement, §7.2.) Specifically, each member was entitled to a share of the common ownership interests in the Related Developer that was "equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class[,] by (z) the total number of Units then outstanding, determined regardless of class." *Id*. Under this equation, each

member thus was entitled to retain the same proportion of ownership in the Related Developer that it had in the original developer, Heritage.

**D.  Rezko is indicted, GMH takes control of Heritage and MT, and Rezko assigns a large percentage of his economic interest in MT to Plaintiffs**

47.  In October 2006, it was publicly revealed that the government had indicted Rezko.

48.  GMH concluded that the indictment made Rezko a liability to its efforts to develop the Property.

49.  Therefore, on July 24, 2007, GMH caused a wholly-owned and wholly-controlled affiliate named Orifarm, S.A. ("Orifarm"), to acquire 60 Class B Units of Heritage from MT. In addition, Heritage admitted Orifarm as a member.

50.  Thus, following this July 24, 2007 transaction, Orifarm owned 60% of Heritage, MT owned 38.1% of Heritage and the Class A Investors owned 1.9% of Heritage.

51.  At or about the same time, Orifarm acquired all of Rezko's and Ruman's membership interests in MT and was admitted as a member. Because MT was a member-managed LLC, Orifarm, as the only admitted member of MT, gained complete control of MT.

52.  Through its ownership of 60% of Heritage's Class B Units and its control of MT, which owned Heritage's other Class B Units, Orifarm gained complete control of the majority of Heritage's voting rights. Because GMH owned and controlled Orifarm, this meant that GMH had in effect gained complete control of Heritage.

53.  On July 26, 2007, Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs (except for Korkis and QMQQ, who received their assigned interests on August 13, 2007 and September 6, 2007 respectively) in accordance with § 6.1 of the MT operating agreement.

54.     Orifarm knew about and consented to Rezko's assignments of these economic interests.

55.     As a member of Heritage, MT was entitled to receive its share of any distributions that flowed from the development of the Property. As owners of an economic interest in MT, Plaintiffs were each entitled to receive their proportionate share of any such distributions that MT received.

56.     Because Orifarm was the only admitted member and manager of MT, it exercised complete control over MT's operations and investment in the development of the Property. Thus, Orifarm had complete control over Plaintiffs' economic interests in the development of the Property. Despite the change in management, Plaintiffs still had a right to receive distributions from MT under the MT operating agreement.

57.     When Rezko transferred control of MT to Orifarm, it was his expectation and intent that Orifarm would facilitate the future development of the Property for the benefit of MT and that Orifarm would not take any actions to dilute, extinguish or interfere with Plaintiffs' economic interests in MT.

58.     The chart below reflects the ownership of the Property and its development after GMH completed its buy out of Rezko.



59.    GMH further secured its control over Heritage by installing one of its own executives as Heritage's manager.

60.    Heritage's operating agreement provided that it was to be a manager-managed LLC. (Ex. 1, Heritage's Operating Agreement, §9.1.) The operating agreement also vested the manager with significant power to control Heritage's operations. (*Id*. §§9.1-9.7.)

61.    On July 24, 2007, GMH installed Illinois Developer, LLC ("Illinois Developer") as Heritage's new manager.

62.    Illinois Developer was managed and controlled by a British Virgin Islands corporation called Moni Equities, Inc., which was wholly owned and controlled by GMH. Al-Miqdadi was president of Moni Equities and one of its three directors.

63.    GMH also installed Al-Miqdadi as president of Illinois Developer.

E. **GMH developed a scheme to interfere with and deprive Heritage's Class A Investors and Plaintiffs of their statutory right to profit from the development of the Property**

64.     In 2014, after having amassed total control over Heritage, GMH set its sights on depriving Heritage's Class A Members and Plaintiffs of their statutory right to profit from the development of the Property.

65.     GMH did this in three steps.

66.     **Step One**. In 2014, GMH caused Orifarm to dissolve and to transfer all its interests in Heritage and MT to South Loop III. Through a web of shell companies, GMH owned and controlled South Loop III. Specifically, South Loop III was wholly-owned by CSLH Incorporated ("CSLH Inc."), which was wholly-owned by CSLH Lux I S.àr.l ("CSLH Lux I"), which was wholly-owned by CSLH Lux II S.àr.l ("CSLH Lux II"), which was wholly-owned by GMH.

67.     GMH also exercised complete control over South Loop III's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop III's president. Also, South Loop III's manager was CSLH Manager Incorporated ("CSLH Manager"). CSLH Manager was directly owned by CSLH Inc. Thus, GMH ultimately owned and controlled CSLH Manager.

68.     As the member-manager of MT, South Loop III exercised complete control over MT's operations and its investment in the development of the Property. South Loop III, within its capacity as a member-manager of MT, was to make distributions to the interest-holders of MT in accordance with the MT operating agreement. Plaintiffs placed their trust and confidence in MT's member-manager, first Orifarm and then South Loop III, to protect, preserve and advance MT's interests in the development of the Property.

69.     **Step Two**. On April 28, 2014, GMH caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC ("South Loop II"). Through a web of shell companies, GMH owned and controlled South Loop II. Specifically, South Loop II was wholly owned by Chicago South Loop Holdings I, LLC ("South Loop I") which was wholly owned by CSLH Inc., which was wholly owned by CSLH Lux I, which was wholly owned by CSLH Lux II, which was wholly owned by GMH.

70.     GMH also exercised complete control over South Loop II's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop II's president. Also, South Loop II's manager was CSLH Manager, which GMH ultimately owned and controlled.

71.     Under Section 7.2 of Heritage's operating agreement, MT's rights were triggered if a transaction met two requirements: (1) it involved a Class B member or its affiliate, and (2) it was with respect to the development of the Property.

72.     With respect to the first requirement, the two parties to the transfer of the Property on April 28 were South Loop II and Riverside.

73.     Both South Loop II and Riverside were affiliates of South Loop III, which was a Class B Member of Heritage.

74.     In that regard, under §1.3 of Heritage's operating agreement, any entity "under common Control" with South Loop III was one of South Loop III's affiliates. (Ex. 1, Heritage Operating Agreement, §1.3.) Because South Loop III was under the control of GMH, any other developer entity controlled by GMH was "under common Control" with South Loop III for purposes of §7.2. Under §1.20 of Heritage's operating agreement, GMH controlled an entity if it either (1) possessed, directly or indirectly, at least (a) 10% of its voting power, if a corporation, or

(b) 10% of its ownership interest if not a corporation, or (2) had the power to direct or cause the direction of its management and policies. (Ex. 1, Heritage Operating Agreement §1.20.)

75.     Both South Loop II and Riverside satisfied this standard.

76.     Because GMH controlled South Loop II and Riverside (within the meaning of §1.20), they were both affiliates of a Class B Member of Heritage (South Loop III), within the meaning of §7.2. Thus, the April 28 transfer of the Property from Riverside to South Loop II satisfied the first requirement of §7.2.

77.     The April 28 transfer of the Property also satisfied the second requirement of §7.2.

78.     The purpose of this transaction (i.e., transferring the Property from Riverside to South Loop II) was to allow South Loop II to hold title to the Property and to engage in future transactions with respect to its development. That means the April 28th transfer of the Property was a transaction with respect to the development of the Property within the meaning of §7.2 of Heritage's operating agreement.

79.     **Step Three**. In May 2014, GMH, through its control of South Loop III and Illinois Developer, caused Heritage and MT to be dissolved.

80.     South Loop III did not provide Plaintiffs with any notice of any of the facts alleged in paragraphs 64-79 above.

81.     Instead of dissolving MT, South Loop III (which was controlled by GMH) should have caused MT to acquire an ownership interest in South Loop II as required by §7.2 of Heritage's operating agreement.

82.     Upon dissolving MT, South Loop III should have distributed the right to participate in the future development of the Property to the Plaintiffs as required by § 7.2 of MT's operating agreement.

83.     However, South Loop III (and GMH) did not act in accordance with the operating agreements of MT or the Heritage because GMH's goal with the restructuring was to interfere with and deprive Heritage's Class A Investors and Plaintiffs of their economic interests in the development of the Property.

84.     Through its control of Illinois Developer, South Loop III and Heritage, GMH caused Heritage to breach its operating agreement by failing to provide MT with an ownership interest in South Loop II.

85.     Through its control of South Loop III, GMH also caused MT Holdings to breach its operating agreement by failing to distribute the assets of MT (i.e., the right to participate in the future development of the Property) upon its dissolution.

86.     Plaintiffs thus were improperly deprived of the opportunity to participate in and the right to profit from the development of the Property and to receive their proportionate share of assets through their economic interest in MT. GMH and South Loop III's actions have caused Plaintiffs' valuable economic interests in MT to become worthless.

**F.     GMH formed a new joint venture to develop the Property without offering Plaintiffs the opportunity to participate and receive the value of their interest in the Property**

87.     On information and belief, after dissolving Heritage and MT, GMH engaged in extensive discussions with companies that wanted to partner with GMH to develop the Property.

88.     GMH spent over a year soliciting and reviewing offers and negotiating with interested companies.

89.     Eventually, GMH decided to partner with The Related Companies, L.P., a multi-billion-dollar real estate company based in New York.

90.     By May 2015, GMH had signed a letter of intent with Related Midwest to form a joint venture that would own and develop the Property.

91.     As part of that joint venture, South Loop II and Related R/C LLC formed Roosevelt/Clark Partners LLC ("RCP").

92.     On May 9, 2016 South Loop II and RCP executed a special warranty deed conveying the Property to RCP.

93.     GMH and Related subsequently took significant steps to develop the Property.

94.     Under §7.2 of the Heritage operating agreement, MT had the right to acquire a share of any Class B Member or an affiliate of such a member that entered into a transaction with respect to the development of the Property. (Ex. 1, Heritage's operating agreement, §7.2.)

95.     When Heritage's articles of dissolution were filed in 2014, South Loop III was a Class B Member. Under the terms of Heritage's operating agreement, both South Loop II and GMH were affiliates of South Loop III. That means §7.2 granted MT the right to own a common ownership share of South Loop II when it engaged in a transaction with respect to the development of the Property. The joint venture with Related clearly is such a transaction.

96.     However, MT did not exercise its rights under §7.2 or give Plaintiffs notice of GMH's dealings with Related because GMH wanted to shut Plaintiffs out of the development project.

97.     The dissolution of MT Holdings triggered § 7.2 of the MT operating agreement which requires the member-managers, as a part of the winding up process, to distribute the assets of the company first to its creditors and subsequently to its interest holders.

98.     As assignees of Rezko's economic interest, Plaintiffs were the interest holders of MT and had a right to receive the value of their economic interest.

99.     South Loop III carried out every aspect of its scheme in secrecy and never disclosed to Plaintiffs information about the transfers it made and actions it took with respect to the development project.

100.    The Baghdadi's, who were also Class A Investors in Heritage, did not find out what GMH and South Loop III had done until 2019 when GMH and Related filed Economic Disclosure Statements with the City of Chicago. (On April 26, 2019, the Baghdadi's have filed a separate lawsuit as Class A Investors).

101.    Likewise, because of the attempts of South Loop III to conceal its scheme and the restriction of Plaintiffs' access to information of company affairs, the other Plaintiffs did not find out what GMH and South Loop III had done until 2019 through news reports concerning the development and/or conversations with each other.

<u>**COUNT I**</u>

**Breach of Fiduciary Duty**
**Against Defendant South Loop III**

102.    Plaintiffs incorporate the allegations of paragraphs 1 through 101 as though fully set forth herein.

103.    As the sole member-manager of MT, South Loop III exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in South Loop III to protect, preserve and advance MT's interests in the development of the Property.

104.    As a result of the nature of the relationship between Plaintiffs and South Loop III, including the control and dominance that South Loop III exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in South Loop III as to those

interests, South Loop III owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

105.     South Loop III breached its fiduciary duties to Plaintiffs by: (a) causing the Property to be transferred from Riverside to South Loop II without providing MT with an ownership interest in South Loop II as required by Section 7.2 of Heritage's operating agreement, (b) causing MT to be dissolved, (c) failing to disclose these facts to Plaintiffs, (d) excluding Plaintiffs from the joint venture between South Loop II and Related, and (e) excluding Plaintiffs from the benefits of any development of the Property.

106.     As a result of these breaches, Plaintiffs have each lost their interests in the development of the Property and thus have each been damaged in excess of $75,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

    a)  awarding compensatory damages to Plaintiffs;

    b)  awarding punitive damages to Plaintiffs

    c)  awarding equitable pre-judgment interest to Plaintiffs; and,

    d)  for any and all further relief that the Court deems just, equitable and proper.

### COUNT II

**Violation of Plaintiff's Statutory Right to Receive
Distributions by South Loop III**

107.     Plaintiffs incorporate the allegations of paragraphs of 1-106 as though fully set forth herein.

108.     As non-member transferees of Rezko's economic interest, Plaintiffs are entitled to distributions of the assets of MT from its dissolution pursuant to 805 ILCS 180/30-10 and § 7.2 of the MT operating agreement.

109.    The assets Plaintiffs are entitled to consist of the value of their interest in the development of the Property.

110.    South Loop III violated Plaintiffs' statutory right and right under the MT operating agreement by failing to make distributions to Plaintiffs while winding up the affairs of MT. As a direct and proximate result, Plaintiffs have each been injured in an amount exceeding $75,000.

WHEREFORE Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

a)   awarding the value of Plaintiffs' interest in the development of the Property;

b)   for any and all further relief that the Court deems just, equitable and proper.

## COUNT III

### Tortious Interference with the Contractual Agreement between Rezko and Plaintiffs for distributions from MT against GMH and South Loop III

111.    Plaintiffs incorporate the allegations of paragraphs of 1-110 as though fully set forth herein.

112.    For good and valuable consideration, Rezko and Plaintiffs entered a contractual agreement whereby Rezko assigned his economic interest in MT to the Plaintiffs.

113.    GMH and Orifarm knew about and consented to these assignments.

114.    Through South Loop III, GMH caused MT to dissolve without distributing its assets to its interest-holders, the Plaintiffs.

115.    This was an intentional act by GMH and South Loop III to exclude the Plaintiffs and non-GMH affiliates from participating in and profiting from the development of the Property.

116.    The dissolution of MT and the failure of South Loop III as the member-manager to distribute the assets of MT to the Plaintiffs pursuant to § 30-10 of the Illinois Limited Liability Company Act and § 7.2 of the MT operating agreement caused MT to breach its contractual

obligations to Plaintiffs under its operating agreement. As a direct and proximate result, each of the Plaintiffs have been injured in an amount exceeding $75,000.

WHEREFORE Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

    a)   awarding the value of the Plaintiffs' interest in MT;

    b)   for any and all further relief that the Court deems just, equitable and proper.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMOUN,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL   NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, QMQQ
LLC, GEORGE MERJAN

By: ___/s/ Edward T. Joyce_____
                 One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

# EXHIBIT D

FILED
6/30/2020 1:52 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

FILED DATE: 6/30/2020 1:52 PM   2020L000292

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMOUN, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN RAZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, QMQQ LLC and GEORGE MERJAN, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) ) | |
| v. | ) ) | No.  2020 L 000292 |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) ) | JURY DEMANDED |
| Defendants. | ) | |

## AMENDED COMPLAINT

Plaintiffs Ali Baghdadi ("Baghdadi"), Fouad Chamoun ("Chamon"), Antoine Korkis ("Korkis"),

Najah Najjar ("N. Najjar"), Jacqueline Najjar ("J. Najjar"), Suhail Nammari ("Nammari"),

Nachwan Razko ("Razko"), Burt Rezko ("B. Rezko"), Milad Saad ("Saad"), Michael Sahli

("Sahli"), Georges Zouki ("Zouki") Khaled Shair ("K. Shair"), Layla El Shair ("L. Shair") QMQQ,

LLC ("QMQQ"), and George Merjan ("Merjan") (collectively, "Plaintiffs"), by and through their

attorneys, The Law Offices of Edward T. Joyce & Associates, P.C., respectfully state as follows

for their Amended Complaint against Defendants General Mediterranean Holding, S.A., SpF and

Chicago South Loop Holdings III (collectively, "Defendants"):

FILED DATE: 6/30/2020 1:52 PM 2020L000292

## INTRODUCTION

1.     This case arises out of a multi-billion dollar company's efforts to deprive minority investors of their contractual and statutory rights to participate in one of the most promising real estate development projects in Chicago.

2.     In January 2006, Antoin S. Rezko ("Rezko") and one of his business partners were the owners of MT Property Holdings, LLC ("MT"). At that time, MT owned 100% of Heritage Development Partners, LLC ("Heritage"). Heritage owned 50% of the common units and 49% of the voting units of Riverside District Development, LLC ("Riverside"). Riverside owned a 62-acre parcel of land that is now known as the "78" ("Property"). Defendant General Mediterranean Holding, S.A., SpF ("GMH") owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units.

3.     In July 2007, Rezko assigned over 30% of his economic/distributional interests in MT to Plaintiffs.

4.     All of MT's interest holders, including Plaintiffs, were entitled to participate in and profit from the future development of the Property through MT's ownership interest in the Heritage, which was the company responsible for developing the Property. MT's (and thus Plaintiffs') development rights were not limited solely to activities carried out by Heritage. Instead, if a co-owner of Heritage or one of its affiliates decided to develop the property through a different vehicle, the Heritage operating agreement expressly granted MT the right to acquire a share of that other development company. By doing so, the Heritage operating agreement ensured that MT (and its interest owners) could not be deprived of the opportunity to participate in the future development of the property, regardless of the form or ultimate ownership structure of the project.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

5.      However, seven years after Plaintiffs acquired their interests in MT, GMH attempted to cut Plaintiffs and all other non-GMH affiliated investors out of the development project. By early 2014, GMH obtained complete control over Heritage. Using this control, GMH caused the Property to be transferred to one of its shell companies and replaced Heritage as the developer of the Property with a new company owned and controlled solely by GMH. Plaintiffs were not informed of and had no reason to suspect GMH's actions.

6.      GMH then attempted to cover its tracks and forever extinguish Plaintiffs' ability to participate in the development of the Property by dissolving Heritage and MT.

7.      Upon the dissolution of MT, Plaintiffs did not receive their proportional share of MT's assets, specifically their interest in the future development of the Property, which they should have received pursuant to the Illinois Limited Liability Company Act (the "Act") and MT's operating agreement.

8.      Once again, GMH took this step by exercising the control it had acquired through its web of shell companies. And, once again, Plaintiffs were not informed of and did not have knowledge of GMH's activities. Plaintiffs have only recently learned about GMH's attempt to cut them out of the development of the Property through news reports about the Property and communications with each other. Plaintiffs have brought this action to require GMH and MT's former member-manager, Chicago South Loop Holdings III, LLC ("South Loop III"), which GMH controlled, to account for the harm done to Plaintiffs.

## PARTIES

9.      Baghdadi is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Baghdadi.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

10.      Chamoun is an individual. He is a citizen of Quebec, Canada. On July 26, 2007, Rezko assigned a 3.5014% economic, non-member interest in MT to Chamon.

11.      Korkis is an individual. He is a citizen of Buenos Aires, Argentina. On August 13, 2007, Rezko assigned a 0.8582% economic, non-member interest in MT to Korkis.

12.      N. Najjar is an individual. Her primary residence is in Illinois and she is a citizen of Syria. On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to N. Najjar.

13.      J. Najjar is an individual. Her primary residence is in Illinois and she is a citizen of Syria. On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to J. Najjar.

14.      Nammari is an individual. He is a citizen of Indiana. On July 26, 2007, Rezko assigned a 5.1491% economic, non-member interest in MT to Nammari.

15.      Razko is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 1.6437% economic, non-member interest in MT to Razko.

16.      B. Rezko is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to B. Rezko.

17.      Saad is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 1.2871% economic, non-member interest in MT to Saad.

18.      Sahli is an individual. He is a citizen of Illinois. On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Sahli.

19.      Zouki is an individual. He is a citizen of Quebec, Canada. On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to Zouki.

FILED DATE: 6/30/2020 1:52 PM   2020L000292

20.     K. Shair and L. Shair are individuals. They are citizens of Illinois. On July 26, 2007, Rezko assigned a 1.225% economic, non-member interest in MT to K. Shair and L. Shair.

21.     QMQQ is a limited liability company. Its sole member is a citizen of Pennsylvania. On April 22, 2014, QMQQ was assigned Rezko's 5.8917% interest in MT.

22.     Merjan is an individual. He is a citizen of Illinois. On or about July 26, 2007, Rezko assigned an economic, non-member interest in MT to Merjan.

23.     Defendant GMH is a Luxembourg-based company. Its principal place of business is located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg, Grand-Duche de Luxembourg.

24.     Defendant South Loop III is a limited liability company. Its sole member is CSLH, Inc., ("CSLH"). CSLH is a Delaware corporation. GMH indirectly owns and controls both CSLH and South Loop III.

25.     This Court has personal jurisdiction over GMH pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

26.     This Court has personal jurisdiction over South Loop III pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10) and (11).

27.     Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (a) a defendant joined in good faith and with probable cause for the purpose of obtaining a judgment against it and not solely for the purpose of fixing venue resides here and (b) the transaction or some part thereof out of which Plaintiffs' cause of action arose occurred in this county.

## **FACTUAL ALLEGATIONS**

**A.      The Property is a unique parcel of real estate with significant potential for substantial returns once development is complete.**

28.     The Property is located in Chicago's South Loop at the southwest corner of Clark Street and Roosevelt Road.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

29.     At 62 acres, the Property has been one of the largest parcels of undeveloped land in Chicago and one of the largest contiguous in-fill parcels in any major city in the United States.

30.     The Property offers impressive views of Chicago's skyline and includes one-half mile of frontage along the Chicago River.

31.     The Property is less than a mile from Chicago's Central Business District, Grant Park, the Museum Campus, McCormick Place, and other significant locations in the city.

32.     The Property also has convenient access to public transit – including a Metra line, three "L" lines, and a bus line – and two major highways – including the Dan Ryan and Eisenhower Expressways and Lake Shore Drive.

33.     In light of these features, the Property is a unique opportunity for a large mix-use development combining hundreds of thousands of square feet in commercial space with several thousand residential units.

**B.      Through various entities, Rezko and GMH acquire the Property**

34.     In the early 2000s, Rezko and GMH recognized the tremendous potential for the Property and they decided to purchase and develop it as partners.

35.     Rezko was responsible for overseeing the development of the Property. During 20 years in the Chicago real estate industry, Rezko had acquired extensive knowledge about real estate development and cultivated relationships with a wide array of professionals from engineers and architects to consultants and attorneys.

36.     GMH was responsible for providing most of the capital needed for the project. As an international holding company with billions of dollars of assets, GMH could not only fund the purchase of the Property but also supply the money that would be needed on an ongoing basis to pay for development efforts.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

37.    Mohammed Al-Miqdadi ("Al-Miqdadi") was responsible for the day-to-day business of GMH related to the Property. Al-Miqdadi was the Director of Project Development at GMH and, in this capacity, reported directly to Nadmi Auchi ("Auchi"), who was GMH's sole owner, Chairman, and Chief Executive Officer. Al-Miqdadi is also Auchi's son-in-law.

38.    As of January 1, 2006, the Property was owned by Riverside. GMH owned 50% of Riverside's common units, 51% of its voting units and 100% of its preferred units. Heritage owned the other 50% of Riverside's common units and 49% of its voting units. MT, which was owned and controlled by Rezko and his business partner, Michael Ruman ("Ruman"), was the sole owner of Heritage.

39.    The chart below graphically reflects the ownership structure as of January 1, 2006



**C.    Heritage raises additional capital from Baghdadi and others through a private placement offering**

40.    In early 2006, Heritage conducted a private placement offering to raise additional capital.

41.    Through the offering, Heritage sold Class A Units.

FILED DATE: 6/30/2020 1:52 PM        2020L000292

42.     The Class A Units were purchased by Royal Heritage Investments LLC ("Royal Heritage"), Baghdadi and his wife Darlene ("D. Baghdadi"), and Roosevelt-Clark, LLC ("Roosevelt-Clark") (the "Class A Investors").

43.     Under the Heritage operating agreement, these Class A Units had only limited voting rights. Most of the voting power in Heritage belonged only to the members who held Class B Units. However, as explained below, Section 7.2 of the Heritage operating agreement granted Class A and Class B members the same right to participate in the future development of the Property.

44.     Section 7.2 of Heritage's operating agreement states that "no Member holding Class B Units or an Affiliate of such Member (either one a '<u>Related Developer</u>') shall enter into any transaction with respect to the development of all or any portion of the Property unless each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" (Ex. 1, Heritage's Operating Agreement, §7.2.)

45.     In short, this portion of §7.2 prohibited any members of Heritage holding Class B Units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless <u>all</u> members of Heritage were granted an opportunity to own a common interest in the Related Developer.

46.     Section 7.2 also set forth a formula to calculate the share of the common ownership interest in the Related Developer that a member would have the right to own. (Ex. 1, Heritage's Operating Agreement, §7.2.) Specifically, each member was entitled to a share of the common ownership interests in the Related Developer that was "equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class[,] by (z) the total number of Units then outstanding, determined regardless of class." *Id*. Under this equation, each

FILED DATE: 6/30/2020 1:52 PM    2020L000292

member thus was entitled to retain the same proportion of ownership in the Related Developer that it had in the original developer, Heritage.

      **D.**      **Rezko is indicted, GMH takes control of Heritage and MT, and Rezko assigns a large percentage of his economic interest in MT to Plaintiffs**

47.      In October 2006, it was publicly revealed that the government had indicted Rezko.

48.      GMH concluded that the indictment made Rezko a liability to its efforts to develop the Property.

49.      Therefore, on July 24, 2007, GMH caused a wholly-owned and wholly-controlled affiliate named Orifarm, S.A. ("Orifarm"), to acquire 60 Class B Units of Heritage from MT. In addition, Heritage admitted Orifarm as a member.

50.      Thus, following this July 24, 2007 transaction, Orifarm owned 60% of Heritage, MT owned 38.1% of Heritage and the Class A Investors owned 1.9% of Heritage.

51.      At or about the same time, Orifarm acquired all of Rezko's and Ruman's membership interests in MT and was admitted as a member. Because MT was a member-managed LLC, Orifarm, as the only admitted member of MT, gained complete control of MT.

52.      Through its ownership of 60% of Heritage's Class B Units and its control of MT, which owned Heritage's other Class B Units, Orifarm gained complete control of the majority of Heritage's voting rights. Because GMH owned and controlled Orifarm, this meant that GMH had in effect gained complete control of Heritage.

53.      On July 26, 2007, Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs (except for Korkis and QMQQ, who received their assigned interests on August 13, 2007 and September 6, 2007 respectively) in accordance with § 6.1 of the MT operating agreement.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

54.     Orifarm knew about and consented to Rezko's assignments of these economic interests.

55.     As a member of Heritage, MT was entitled to receive its share of any distributions that flowed from the development of the Property. As owners of an economic interest in MT, Plaintiffs were each entitled to receive their proportionate share of any such distributions that MT received.

56.     Because Orifarm was the only admitted member and manager of MT, it exercised complete control over MT's operations and investment in the development of the Property. Thus, Orifarm had complete control over Plaintiffs' economic interests in the development of the Property. Despite the change in management, Plaintiffs still had a right to receive distributions from MT under the MT operating agreement.

57.     When Rezko transferred control of MT to Orifarm, it was his expectation and intent that Orifarm would facilitate the future development of the Property for the benefit of MT and that Orifarm would not take any actions to dilute, extinguish or interfere with Plaintiffs' economic interests in MT.

58.     The chart below reflects the ownership of the Property and its development after GMH completed its buy out of Rezko.

FILED DATE: 6/30/2020 1:52 PM   2020L000292



59.     GMH further secured its control over Heritage by installing one of its own executives as Heritage's manager.

60.     Heritage's operating agreement provided that it was to be a manager-managed LLC. (Ex. 1, Heritage's Operating Agreement, §9.1.) The operating agreement also vested the manager with significant power to control Heritage's operations. (*Id*. §§9.1-9.7.)

61.     On July 24, 2007, GMH installed Illinois Developer, LLC ("Illinois Developer") as Heritage's new manager.

62.     Illinois Developer was managed and controlled by a British Virgin Islands corporation called Moni Equities, Inc., which was wholly owned and controlled by GMH. Al-Miqdadi was president of Moni Equities and one of its three directors.

63.     GMH also installed Al-Miqdadi as president of Illinois Developer.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

**E.  GMH developed a scheme to interfere with and deprive Heritage's Class A Investors and Plaintiffs of their statutory right to profit from the development of the Property**

64.     In 2014, after having amassed total control over Heritage, GMH set its sights on depriving Heritage's Class A Members and Plaintiffs of their statutory right to profit from the development of the Property.

65.     GMH did this in three steps.

66.     **Step One**. In 2014, GMH caused Orifarm to dissolve and to transfer all its interests in Heritage and MT to South Loop III. Through a web of shell companies, GMH owned and controlled South Loop III. Specifically, South Loop III was wholly-owned by CSLH Incorporated ("CSLH Inc."), which was wholly-owned by CSLH Lux I S.àr.l ("CSLH Lux I"), which was wholly-owned by CSLH Lux II S.àr.l ("CSLH Lux II"), which was wholly-owned by GMH.

67.     GMH also exercised complete control over South Loop III's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop III's president. Also, South Loop III's manager was CSLH Manager Incorporated ("CSLH Manager"). CSLH Manager was directly owned by CSLH Inc. Thus, GMH ultimately owned and controlled CSLH Manager.

68.     As the member-manager of MT, South Loop III exercised complete control over MT's operations and its investment in the development of the Property. South Loop III, within its capacity as a member-manager of MT, was to make distributions to the interest-holders of MT in accordance with the MT operating agreement. Plaintiffs placed their trust and confidence in MT's member-manager, first Orifarm and then South Loop III, to protect, preserve and advance MT's interests in the development of the Property.

12

FILED DATE: 6/30/2020 1:52 PM    2020L000292

69.    **Step Two**. On April 28, 2014, GMH caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC ("South Loop II"). Through a web of shell companies, GMH owned and controlled South Loop II. Specifically, South Loop II was wholly owned by Chicago South Loop Holdings I, LLC ("South Loop I") which was wholly owned by CSLH Inc., which was wholly owned by CSLH Lux I, which was wholly owned by CSLH Lux II, which was wholly owned by GMH.

70.    GMH also exercised complete control over South Loop II's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop II's president. Also, South Loop II's manager was CSLH Manager, which GMH ultimately owned and controlled.

71.    Under Section 7.2 of Heritage's operating agreement, MT's rights were triggered if a transaction met two requirements: (1) it involved a Class B member or its affiliate, and (2) it was with respect to the development of the Property.

72.    With respect to the first requirement, the two parties to the transfer of the Property on April 28 were South Loop II and Riverside.

73.    Both South Loop II and Riverside were affiliates of South Loop III, which was a Class B Member of Heritage.

74.    In that regard, under §1.3 of Heritage's operating agreement, any entity "under common Control" with South Loop III was one of South Loop III's affiliates. (Ex. 1, Heritage Operating Agreement, §1.3.) Because South Loop III was under the control of GMH, any other developer entity controlled by GMH was "under common Control" with South Loop III for purposes of §7.2. Under §1.20 of Heritage's operating agreement, GMH controlled an entity if it either (1) possessed, directly or indirectly, at least (a) 10% of its voting power, if a corporation, or

(b) 10% of its ownership interest if not a corporation, or (2) had the power to direct or cause the direction of its management and policies. (Ex. 1, Heritage Operating Agreement §1.20.)

75.     Both South Loop II and Riverside satisfied this standard.

76.     Because GMH controlled South Loop II and Riverside (within the meaning of §1.20), they were both affiliates of a Class B Member of Heritage (South Loop III), within the meaning of §7.2. Thus, the April 28 transfer of the Property from Riverside to South Loop II satisfied the first requirement of §7.2.

77.     The April 28 transfer of the Property also satisfied the second requirement of §7.2.

78.     The purpose of this transaction (i.e., transferring the Property from Riverside to South Loop II) was to allow South Loop II to hold title to the Property and to engage in future transactions with respect to its development. That means the April 28th transfer of the Property was a transaction with respect to the development of the Property within the meaning of §7.2 of Heritage's operating agreement.

79.     **Step Three**. In May 2014, GMH, through its control of South Loop III and Illinois Developer, caused Heritage and MT to be dissolved.

80.     South Loop III did not provide Plaintiffs with any notice of any of the facts alleged in paragraphs 64-79 above.

81.     Instead of dissolving MT, South Loop III (which was controlled by GMH) should have caused MT to acquire an ownership interest in South Loop II as required by §7.2 of Heritage's operating agreement.

82.     Upon dissolving MT, South Loop III should have distributed the right to participate in the future development of the Property to the Plaintiffs as required by § 7.2 of MT's operating agreement.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

FILED DATE: 6/30/2020 1:52 PM   2020L000292

83.     However, South Loop III (and GMH) did not act in accordance with the operating agreements of MT or the Heritage because GMH's goal with the restructuring was to interfere with and deprive Heritage's Class A Investors and Plaintiffs of their economic interests in the development of the Property.

84.     Through its control of Illinois Developer, South Loop III and Heritage, GMH caused Heritage to breach its operating agreement by failing to provide MT with an ownership interest in South Loop II.

85.     Through its control of South Loop III, GMH also caused MT Holdings to breach its operating agreement by failing to distribute the assets of MT (i.e., the right to participate in the future development of the Property) upon its dissolution.

86.     Plaintiffs thus were improperly deprived of the opportunity to participate in and the right to profit from the development of the Property and to receive their proportionate share of assets through their economic interest in MT. GMH and South Loop III's actions have caused Plaintiffs' valuable economic interests in MT to become worthless.

**F.      GMH formed a new joint venture to develop the Property without offering Plaintiffs the opportunity to participate and receive the value of their interest in the Property**

87.     On information and belief, after dissolving Heritage and MT, GMH engaged in extensive discussions with companies that wanted to partner with GMH to develop the Property.

88.     GMH spent over a year soliciting and reviewing offers and negotiating with interested companies.

89.     Eventually, GMH decided to partner with The Related Companies, L.P., a multi-billion-dollar real estate company based in New York.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

90.     By May 2015, GMH had signed a letter of intent with Related Midwest to form a joint venture that would own and develop the Property.

91.     As part of that joint venture, South Loop II and Related R/C LLC formed Roosevelt/Clark Partners LLC ("RCP").

92.     On May 9, 2016 South Loop II and RCP executed a special warranty deed conveying the Property to RCP.

93.     GMH and Related subsequently took significant steps to develop the Property.

94.     Under §7.2 of the Heritage operating agreement, MT had the right to acquire a share of any Class B Member or an affiliate of such a member that entered into a transaction with respect to the development of the Property. (Ex. 1, Heritage's operating agreement, §7.2.)

95.     When Heritage's articles of dissolution were filed in 2014, South Loop III was a Class B Member. Under the terms of Heritage's operating agreement, both South Loop II and GMH were affiliates of South Loop III. That means §7.2 granted MT the right to own a common ownership share of South Loop II when it engaged in a transaction with respect to the development of the Property. The joint venture with Related clearly is such a transaction.

96.     However, MT did not exercise its rights under §7.2 or give Plaintiffs notice of GMH's dealings with Related because GMH wanted to shut Plaintiffs out of the development project.

97.     The dissolution of MT Holdings triggered § 7.2 of the MT operating agreement which requires the member-managers, as a part of the winding up process, to distribute the assets of the company first to its creditors and subsequently to its interest holders.

98.     As assignees of Rezko's economic interest, Plaintiffs were the interest holders of MT and had a right to receive the value of their economic interest.

16

FILED DATE: 6/30/2020 1:52 PM    2020L000292

99.    South Loop III carried out every aspect of its scheme in secrecy and never disclosed to Plaintiffs information about the transfers it made and actions it took with respect to the development project.

100.    The Baghdadi's, who were also Class A Investors in Heritage, did not find out what GMH and South Loop III had done until 2019 when GMH and Related filed Economic Disclosure Statements with the City of Chicago. (On April 26, 2019, the Baghdadi's have filed a separate lawsuit as Class A Investors).

101.    Likewise, because of the attempts of South Loop III to conceal its scheme and the restriction of Plaintiffs' access to information of company affairs, the other Plaintiffs did not find out what GMH and South Loop III had done until 2019 through news reports concerning the development and/or conversations with each other.

## <u>COUNT I</u>

**Breach of Fiduciary Duty**
**Against Defendant South Loop III**

102.    Plaintiffs incorporate the allegations of paragraphs 1 through 101 as though fully set forth herein.

103.    As the sole member-manager of MT, South Loop III exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in South Loop III to protect, preserve and advance MT's interests in the development of the Property.

104.    As a result of the nature of the relationship between Plaintiffs and South Loop III, including the control and dominance that South Loop III exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in South Loop III as to those

FILED DATE: 6/30/2020 1:52 PM    2020L000292

interests, South Loop III owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

105.    South Loop III breached its fiduciary duties to Plaintiffs by: (a) causing the Property to be transferred from Riverside to South Loop II without providing MT with an ownership interest in South Loop II as required by Section 7.2 of Heritage's operating agreement, (b) causing MT to be dissolved, (c) failing to disclose these facts to Plaintiffs, (d) excluding Plaintiffs from the joint venture between South Loop II and Related, and (e) excluding Plaintiffs from the benefits of any development of the Property.

106.    As a result of these breaches, Plaintiffs have each lost their interests in the development of the Property and thus have each been damaged in excess of $75,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

    a)  awarding compensatory damages to Plaintiffs;

    b)  awarding punitive damages to Plaintiffs

    c)  awarding equitable pre-judgment interest to Plaintiffs; and,

    d)  for any and all further relief that the Court deems just, equitable and proper.

### COUNT II

**Violation of Plaintiff's Statutory Right to Receive
Distributions by South Loop III**

107.    Plaintiffs incorporate the allegations of paragraphs of 1-106 as though fully set forth herein.

108.    As non-member transferees of Rezko's economic interest, Plaintiffs are entitled to distributions of the assets of MT from its dissolution pursuant to 805 ILCS 180/30-10 and § 7.2 of the MT operating agreement.

109.    The assets Plaintiffs are entitled to consist of the value of their interest in the development of the Property.

110.    South Loop III violated Plaintiffs' statutory right and right under the MT operating agreement by failing to make distributions to Plaintiffs while winding up the affairs of MT. As a direct and proximate result, Plaintiffs have each been injured in an amount exceeding $75,000.

WHEREFORE Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

a)    awarding the value of Plaintiffs' interest in the development of the Property;

b)    for any and all further relief that the Court deems just, equitable and proper.

## COUNT III

### Tortious Interference with the Contractual Agreement between Rezko and Plaintiffs for distributions from MT against GMH and South Loop III

111.    Plaintiffs incorporate the allegations of paragraphs of 1-110 as though fully set forth herein.

112.    For good and valuable consideration, Rezko and Plaintiffs entered a contractual agreement whereby Rezko assigned his economic interest in MT to the Plaintiffs.

113.    GMH and Orifarm knew about and consented to these assignments.

114.    Through South Loop III, GMH caused MT to dissolve without distributing its assets to its interest-holders, the Plaintiffs.

115.    This was an intentional act by GMH and South Loop III to exclude the Plaintiffs and non-GMH affiliates from participating in and profiting from the development of the Property.

116.    The dissolution of MT and the failure of South Loop III as the member-manager to distribute the assets of MT to the Plaintiffs pursuant to § 30-10 of the Illinois Limited Liability Company Act and § 7.2 of the MT operating agreement caused MT to breach its contractual

FILED DATE: 6/30/2020 1:52 PM    2020L000292

FILED DATE: 6/30/2020 1:52 PM   2020L000292

obligations to Plaintiffs under its operating agreement. As a direct and proximate result, each of the Plaintiffs have been injured in an amount exceeding $75,000.

WHEREFORE Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

    a)   awarding the value of the Plaintiffs' interest in MT;

    b)   for any and all further relief that the Court deems just, equitable and proper.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMOUN,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL   NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, QMQQ
LLC, GEORGE MERJAN

By: ___ /s/  Edward T. Joyce _____
                   One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

FILED DATE: 6/30/2020 1:52 PM    2020L000292

## <u>CERTIFICATE OF SERVICE</u>

I, Edward T. Joyce, an attorney, certify that on June 30, 2020, I caused a true and correct copy of the foregoing AMENDED COMPLAINT to be filed and served via the Circuit Court of Cook County's electronic filing system upon all counsel of record as listed below,

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.

/s/ Edward T. Joyce

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000 Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

FILED DATE: 6/30/2020 1:52 PM   2020L000292

# Exhibit 1

FILED DATE: 6/30/2020 1:52 PM   2020L000292

**HERITAGE DEVELOPMENT PARTNERS, LLC**

**OPERATING AGREEMENT**

FILED DATE: 6/30/2020 1:52 PM    2020L000292

## INDEX

| | | Page |
|---|---|---|
| **ARTICLE 1** | **DEFINITIONS** | 1 |
| **ARTICLE 2** | **FORMATION OF THE COMPANY** | 7 |
| 2.1 | *Formation* | 7 |
| 2.2 | *Name* | 8 |
| 2.3 | *Purpose; Powers* | 8 |
| 2.4 | *Term* | 8 |
| 2.5 | *Principal Place of Business* | 8 |
| 2.6 | *Registered Office and Registered Agent* | 8 |
| 2.7 | *Continuation of Company* | 8 |
| 2.8 | *Qualification in Other Jurisdictions* | 8 |
| **ARTICLE 3** | **UNITS** | 9 |
| 3.1 | *Units* | 9 |
| 3.2 | *Persons Deemed Members.* | 9 |
| 3.3 | *Subscriptions* | 9 |
| 3.4 | *Waiver of Dissenters* | 9 |
| 3.5 | *Expulsion* | 9 |
| **ARTICLE 4** | **CAPITAL CONTRIBUTIONS** | 10 |
| 4.2 | *Capital Contributions of Members* | 10 |
| 4.2 | *Additional Capital Contributions* | 10 |
| 4.3 | *Capital Accounts* | 10 |
| 4.4 | *Interest on Capital Contributions* | 11 |
| 4.5 | *Withdrawal.* | 12 |
| 4.6 | *Return of Capital* | 12 |
| 4.7 | *Liability of Members* | 12 |
| **ARTICLE 5** | **ALLOCATION OF COMPANY PROFITS AND LOSSES** | 12 |
| 5.1 | *Allocations* | 12 |
| 5.2 | *Special Allocations* | 12 |
| 5.3 | *Other Allocation Rules* | 15 |
| 5.4 | *Allocations Solely For Tax Purposes.* | 16 |
| **ARTICLE 6** | **DISTRIBUTIONS AND DISTRIBUTABLE CASH** | 16 |
| 6.1 | *Timing and Amount* | 16 |
| 6.2 | *Distributions for Tax Purposes* | 17 |
| 6.3 | *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items* | 17 |
| 6.4 | *Limitations on Distributions* | 18 |
| 6.5 | *Redemption of the Class A Units* | 18 |
| **ARTICLE 7** | **RESTRICTED TRANSACTIONS** | 18 |
| 7.1 | *Compensation and Distribution* | 18 |
| 7.2 | *Affiliate Transaction Rights* | 18 |

FILED DATE: 6/30/2020 1:52 PM    2020L000292

**ARTICLE 8   ROLE OF MEMBERS**..............................................................................19
    8.1    *General Rules* .................................................................19
    8.2    *Meetings of the Members* .............................................19
    8.3    *Indemnification of Members* ........................................21
**ARTICLE 9   MANAGEMENT** ...................................................................................21
    9.1    *General Powers of the Manager* ..................................21
    9.2    Number and Election.......................................................21
    9.3    *Removal and Vacancies* ................................................22
    9.4    *Vacancies*.......................................................................22
    9.5    *Quorum, Required Vote and Adjournment*. ...................22
    9.4    *No Liability* ....................................................................22
    9.5    *Certain Powers of the Manager* ...................................22
    9.7    *Exculpation From Liability For Certain Acts* ...............24
    9.9    *Indemnification* .............................................................25
    9.10   *Interested Manager*.......................................................25
    9.11   *Compensation to Manager* ...........................................25
**ARTICLE 10 LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS** ........26
    10.1   *Restriction on Transfers; Investment Representations and Warranties*. 26
    10.2   *Permitted Transfers* ......................................................26
    10.3   *Sale of the Company* ......................................................27
    10.4   *Restrictions on Transfers*..............................................28
    10.5   *Prohibited Transfers*.....................................................29
    10.6   *Rights of Unadmitted Assignees* ...................................29
    10.7   *Admission of Transferees as Members* .........................29
    10.8   *Covenants; Representations Regarding Transfers; Legend*..................30
    10.9   *Distribution and Allocations in Respect to Transferred Interests*.........31
    10.10  *Termination of Restrictions* ..........................................31
    10.11  *Waiver of Redemption of Distributional Interest*...........31
**ARTICLE 11 DISSOLUTION AND TERMINATION** ...................................................32
    11.1   *Events of Dissolution* ....................................................32
    11.2   *Liquidation* ....................................................................32
    11.3   *Filings*............................................................................33
    11.4   *Termination* ...................................................................33
**ARTICLE 12 BOOKS AND RECORDS** .......................................................................34
    12.1   *Books and Records; Accounting*.....................................34
    12.2   *Access to Records, Financial Statements* ......................34
    12.3   *Annual Reports* ..............................................................34
    12.4   *Bank Account(s)* .............................................................34
**ARTICLE 13 TAX MATTERS** ....................................................................................34
    13.1   Company Tax Returns ......................................................34
    13.2   *Schedules K-1 and Forms 1065* .....................................35
    13.3   *Taxation as Partnership* ................................................35

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

| | 13.4 | *Withholding* | 35 |
|---|---|---|---|
| **ARTICLE 14** | **MISCELLANEOUS** | | 36 |
| | 14.1 | *Reimbursements* | 36 |
| | 14.2 | *Amendments* | 36 |
| | 14.3 | *Successors* | 37 |
| | 14.4 | *Counterparts* | 37 |
| | 14.5 | *Integration* | 37 |
| | 14.6 | *Entire Agreement* | 37 |
| | 14.7 | *Governing Law* | 37 |
| | 14.8 | *Severability* | 37 |
| | 14.9 | *Headings* | 37 |
| | 14.10 | *Waiver* | 37 |
| | 14.11 | *Filings* | 38 |
| | 14.12 | *Notices* | 38 |
| | 14.13 | *Mediation* | 38 |
| | 14.14 | *Arbitration* | 38 |
| | 14.15 | *Equitable Remedies* | 38 |
| | 14.16 | *Company Losses Due to Member's Litigation* | 39 |
| | 14.17 | *Title to Company Assets* | 39 |
| | 14.18 | *Execution of Additional Documents* | 39 |
| | 14.19 | *Confidentiality* | 39 |

FILED DATE: 6/30/2020 1:52 PM   2020L000292

**OPERATING AGREEMENT of**

**HERITAGE DEVELOPMENT PARTNERS, LLC**

This Operating Agreement is entered into by and among the Persons whose names are set forth on the signature pages hereof and any Person who hereafter becomes a party hereto pursuant to the provisions hereof, and is made effective as of January 1, 2006.

RECITALS

Heritage Development Partners, LLC (the "Company") was organized pursuant to the Illinois Limited Liability Company Act (the "Act") upon the filing of the Articles of Organization (the "Articles") with the office of Secretary of State of the State of Illinois August 15, 2005, as amended on October 19, 2005.

Subsequent to its formation, the Company admitted Michael Rumman and Antion S. Rezko as its initial members (collectively, the "Initial Members") who caused the Company to enter into various transactions, including the acquisition of membership interests in Riverside District Development, LLC, an Illinois limited liability company.

The Initial Members, as of the date of first written above, along with the additional Persons when are set forth in this signature pages hereto, desire to operate the Company in accordance with and subject to the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the persons set forth in the signature pages hereto, intending to be legally bound, agree as follows:

**ARTICLE 1**
**DEFINITIONS**

The following terms used herein shall have the following meanings (unless otherwise expressly provided herein, or unless the context clearly indicates otherwise):

1.1    **"Act"** means the Illinois Limited Liability Company Act, 805 ILCS 180/1-1, et seq., as amended from time to time (or any corresponding provisions of succeeding law).

1.2    **"Affiliate of the Company"** means any Person directly or indirectly, Controlling, Controlled by or under common Control with the Company or any other Affiliate of the Company.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

The header is struck through.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

1.3    **"Affiliate of a Member"** means, in respect of a Member, any other Person, directly or indirectly, Controlling, Controlled by or under common Control with that Person.

1.4    **"Agreement"** means this Operating Agreement of Heritage Development Partners, LLC, as from time to time amended.

1.5    **"Annual Tax Distribution"** means that distribution provided in <u>Section 6.2.</u>

1.6    **"Articles"** means the Articles of Organization filed with the Office of the Secretary of State of Illinois, and all amendments thereto.

1.7    **"Bankruptcy"** means with respect to a Person: (a) a filing by the Person of a voluntary petition in bankruptcy, the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due or the filing against a Member of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (b) the making by the Person of a general assignment for the benefit of creditors, (c) the filing by the Person of an answer admitting the material allegations of, or its consenting to, or defaulting in answering, a bankruptcy petition filed against it in any bankruptcy proceeding, (d) the entry of an order, judgment, decree by any court of competent jurisdiction adjudicating the Person a bankrupt or appointing a trustee of its assets, or (e) any levy of execution being made upon the Interest of the Person in the Company.

1.8    **"Book Value"** means, with respect to any property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g).

1.9    **"Capital Account"** means the account maintained for each Member in accordance with the provisions of the Code and the regulations promulgated thereunder, including but not limited to the rules regarding maintenance of capital accounts set forth in Treasury Regulations Section 1.704-1.

1.10    **"Capital Contribution"** means, with respect to any Member executing this Agreement, the capital contribution such Member actually makes pursuant to <u>Article 4</u> hereof.

1.11    **"Code"** means the Internal Revenue Code of 1986, as amended. Any reference to any specific provision of the Code or any regulations promulgated thereunder shall also refer to any successor provisions thereto.

1.12    **"Common Units"** means, collectively, the Non-Voting Common Units and the Voting Common Units.

1.13    **"Company"** means Heritage Development Partners, LLC, the Illinois limited liability company to be operated in accordance with the provisions of this Agreement.

FILED DATE: 6/30/2020 1:52 PM   2020L000292

1.14    **"Company Business"** is defined in <u>Section 2.3</u>.

1.15    **"Company Expenses"** means all costs and expenses incurred in connection with the business and affairs of the Company, including, without limitation, costs and expenses of acquiring, owning, operating and disposing of Company Investments, and fees and expenses of legal counsel, accountants, appraisers, investment bankers and third party consultants and advisors.

1.16    **"Company Investment"** means the interest of the Company in any business and other assets, owned, directly or indirectly, by the Company and acquired by the Company in one transaction or a series of related transactions, as determined by the Manager (as defined in <u>Section 9.1</u>).

1.17    **"Company Loss"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any loss and net of any gain realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment), where the aggregate of all such items during any applicable period results in a net loss to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.18    **"Company Minimum Gain"** means an amount equal to the Company minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(d).

1.19    **"Company Profit"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any gain and net of any loss realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment), where the aggregate of all such items during any applicable period results in net income to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.20    **"Control"** (including, with correlative meanings, the terms "Controlling," "Controlled by" and "under common Control with"), as applied to any Person, includes the possession, directly or indirectly, of ten percent (10%) or more of the Voting Power (or in the case of a Person which is not a corporation, 10% or more of the ownership interest, beneficial or otherwise) of such Person or the power otherwise to direct or cause the direction of the management and policies of that Person, whether through voting, by contract or otherwise.

1.21    **"Deficit Capital Account"** means, with respect to any Member, the deficit balance (if any) in such Member's Capital Account as of the end of the Fiscal Period or Fiscal Year, after giving effect to the following adjustments:

      1.21.1   credit to such Capital Account any amount which such Member is treated as being obligated to restore under Treasury Regulations Section 1.704-1(b)(2)(ii)(c), as well as

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

any addition thereto pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (i)(5), after taking into account any changes during the period in Company Minimum Gain and in the Member Minimum Gain; and

   1.21.2 debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(ii)(d)(4), (5) and (6).

This definition of "Deficit Capital Account" is intended to comply with Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be construed in a manner consistent with those provisions.

  1.22 **"Dissociation"** of a Member shall have the meaning provided under Section 35-45 of the Act.

  1.23 **"Distribution Interest"** means the right to receive the shares of revenues from production and other income, receipts, or gain of the Company, or of any other distributions from the Company, with respect to an Interest in the Company. The holder of a Distributional Interest is not a Member, nor has any of the other rights herein conferred upon such Member, including the right to vote as a Member until such holder is admitted as a Member (if at all).

  1.24 **"Fiscal Period"** means any interim accounting period within a Fiscal Year which is established by the Manager and which is required or permitted under the Code or Treasury Regulations.

  1.25 **"Fiscal Year"** means the Company's annual accounting period established pursuant to Section 12.1 of this Agreement.

  1.26 **"Illinois Replacement Tax"** means (a) the Illinois Personal Property Tax Replacement Income Tax, 35 ILCS 5/201 et seq., as amended from time to time, and (b) if the Company is subject to any other state tax (i.e., state tax other than Illinois Replacement Tax) the amount of which is dependent upon the tax character of some or all of the Members, the Manager may, in its discretion, treat such other state tax as Illinois Replacement Tax for all purposes of this Agreement.

  1.27 **"Illinois Replacement Tax Savings"** means, with respect to a Fiscal Year for which the Company is subject to Illinois Replacement Tax, the amount (if any) of additional Illinois Replacement Tax that would have been imposed upon the Company for such Fiscal Year but for the fact that some of the Members are themselves subject to the Illinois Replacement Tax for such Fiscal Year.

  1.28 **"Independent Third Party"** means any Person who, immediately prior to the contemplated transaction, does not own in excess of five percent of the Units on a fully-diluted basis

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

(a "5% Owner"), who is not Controlling, Controlled by or under common Control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of any such 5% Owner and/or such other Persons.

1.29   **"Interest"** means the personal property ownership right of a Member, such personal property ownership right being evidenced by and composed of Units, in the Company entitling such Member to, among other things, an allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and a share of distributions made by the Company. Each Member's allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and share of the Company's distributions, as applicable, shall be determined in accordance with this Agreement based upon the number of Units owned by such Member.

1.30   **"Interest Holder"** means any Member, assignee or other transferee of a Member who is not admitted as a Member, but is a holder of a Distributional Interest.

1.31   **"Manager"** means the Person appointed as the manager of the Company under the Act and Article 9 of this Agreement.

1.32   **"Member"** means any Person that holds an Interest in the Company represented by Units and is admitted as a Member of the Company pursuant to this Agreement.

1.33   **"Member Minimum Gain"** means an amount, with respect to each Member Non-recourse Debt, equal to the Company Minimum Gain that would result if such Member Non-recourse Debt were treated as a Company non-recourse liability, as determined in accordance with Treasury Regulations Section 1.704-2.

1.34   **"Member Non-Recourse Debt"** shall have the same meaning as the term "partner non-recourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

1.35   **"Member Non-Recourse Deductions"** shall have the same meaning as the term "partner non-recourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(1) and 1.704-2(i)(2).

1.36   **"Net Cash"** means, for each Fiscal Year or a portion thereof, (a) all cash of the Company derived from Company operations, after deducting: (i) all cash expenditures incurred in connection with the operation of the Company's business; (ii) an amount necessary to pay all liabilities of the Company then due and owing including, without limitation, all loans to the Company and all advances made by any Member to the Company; and (iii) an amount determined by the Manager to be reasonably necessary or desirable as a reserve for the operation of the Company business, liabilities of the Company not yet due, and/or future or contingent liabilities of the Company, and (b) the net cash proceeds from all sales and other dispositions and all refinancing of

FILED DATE: 6/30/2020 1:52 PM   2020L000292

Company Investments, less any portion thereof used to establish reserves, all as determined by the Manager.

1.37    **"Net Invested Capital Balance"** means as to each Member, the cash contributed by such Member to the capital of the Company, less amounts distributed to such Member pursuant to Section 6.1.2 hereof.

1.38    **"Non-Recourse Deductions"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

1.39    **"Non-Recourse Liability"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1.40    **"Ownership Percentage"** means, with respect to any Member as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate of all Units held by all Members on such date.

1.41    **"Person"** means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

1.42    **"Property"** means certain real property located at Roosevelt Road and Clark Street in Chicago, Illinois currently owned by Riverside District Development, LLC.

1.43    **"Quarterly Estimated Tax Distribution"** is defined in Section 6.2.

1.44    **"Redemption Amount"** shall mean an amount sufficient to cause each holder of Class A Units to receive the sum of (x) an amount equal to a 20% per annum return on such holder's Capital Contributions made to the Company plus (y) a return of all Capital Contributions made to the Company by such holder.

1.45    **"Sale of the Company"** means the sale of the Company to an Independent Third Party or group of Independent Third Parties pursuant to which such party or parties acquire (i) Units of the Company possessing the voting power under normal circumstances to elect the Company's Manager (whether by merger, consolidation or sale or transfer of Units) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

1.46    **"Securities Act"** means the Securities Act of 1933, as amended from time to time.

1.47    **"Tax Allowance Amount"** means, with respect to any Member for any calendar quarter, an amount reasonably determined by the Manager, in good faith, to be the estimated income tax liability of such Member (or the owners of such Member that is a flow-through entity for federal income tax purposes) arising from its ownership of Units.  The Tax Allowance Amount for each

FILED DATE: 6/30/2020 1:52 PM 2020L000292

Member shall be computed on the assumption that all Members are subject to taxation at the same combined federal and state income tax rates, which shall be the highest combined rates applicable to any Member, as determined by the Manager.. The amount so determined by the Manager shall be the Tax Allowance Amount for such period and shall be final and binding on all Members.

1.48    **"Tax Matters Partner"** means the Person designated as such in <u>Section 13.1.2</u> of this Agreement.

1.49    **"Transfer"** means, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, or otherwise dispose of.

1.50    **"Treasury Regulations"** means the proposed, temporary and final regulations promulgated under the Code, as amended from time to time.

1.51    **"Unreturned Capital"** means, with respect to a Unit, the excess, if any, of the Capital Contribution made or deemed made in exchange for or on account of such Unit over all Distributions made by the Company with respect to such Unit pursuant to <u>Section 6.1(i)</u>.

1.52    **"Voting Power"** of any Person, means the total number of votes, which may be cast by the holders of the total number of outstanding shares of stock, units or interests of any class or classes of such Person in any election of directors of such Person.

1.53    **"Unit"** means a reference to a Class A Units and Class B Units and represents an ownership Interest issued by the Company represented by Units, with rights, interests, duties and obligations set forth in this Agreement with respect to Units, and representing a Capital Contribution in cash or other property equal to the price per Unit or fraction thereof paid by a Member and set forth on **Schedule I.** Except as otherwise provided in this Agreement, Class A Units shall be non-voting Units.

1.54    **"Withdrawal"** means, with respect to any Member, the death or Bankruptcy of such Member or a complete assignment or disposition of such Member's entire Interest in the Company made during the lifetime (or other existence) of such Member, and with respect to a Manager (in its capacity of Manager), the death, Bankruptcy, or legal incapacity of the Manager, or the Manager's continued failure to perform its duties as a Manager.

## ARTICLE 2
## FORMATION OF THE COMPANY

2.1    *Formation.* The Company has been organized as an Illinois Limited Liability Company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

2.2     *Name*.  The name of the Company is Heritage Development Partners, LLC, and appropriate certificates and affidavits shall be filed and recorded as may be necessary to secure said name.  The name of the Company shall be subject to change by the Manager.

2.3     *Purpose; Powers*.  The purpose of the Company is (i) to own a membership interest in Riverside District Development, LLC, an Illinois limited liability company and (ii) to carry on any and all other lawful business, purpose or activity, except for any purposes prohibited under the Act (the "Company Business").  The Company shall possess and may exercise all powers and privileges granted by the Act, any other law, or by the Agreement, including incidental powers thereto, to the extent that such powers and privileges are necessary, customary, convenient or incidental to the attainment of the Company's purposes.

2.4     *Term*.  The term of the Company commenced on the date that the Articles was filed in the office of the Secretary of State of the State of Illinois and shall continue until the Company is dissolved in accordance with the provisions of either this Agreement or the Act.

2.5     *Principal Place of Business*.  The principal place of business of the Company shall initially be located at 233 South Wacker Drive, 95th Floor, Chicago, IL 60606, or at such other location or locations as the Manager may from time to time designate.

2.6     *Registered Office and Registered Agent*.  The Company's initial registered office shall be at the office of its registered agent at 233 South Wacker Drive, Chicago, Illinois 60606, and the name of its initial registered agent at such address shall be Michael Rumman. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Office of the Secretary of State of the State of Illinois, and paying any fees required under the Act.

2.7     *Continuation of Company*.  The Members hereby agree that the Company shall be organized, administered, operated and terminated in accordance with the provisions of this Agreement and the Act. The Members hereby further agree that the rights, duties, liabilities and obligations of the Members, and each Class thereof, shall be governed by the provisions of this Agreement and the Act.

2.8     *Qualification in Other Jurisdictions*. The Manager shall have the authority to cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company conducts business and in which such qualification, formation or registration is required by law or deemed advisable by the Manager. The Manager, or its authorized representative, as an authorized Person within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to do business.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

# ARTICLE 3
## UNITS

3.1     *Units*.  The Interests in the Company shall be designated as Units and shall be divided into two series, *"Class A Units"* and *"Class B Units."*  The Units of each Member in the Company are personal property.  All Units redeemed, purchased or otherwise acquired by the Company shall be canceled and thereupon restored to the status of authorized but unissued Units.  Holders of Units shall have the respective rights, interests, duties, and obligations that are set forth in this Agreement.  Except as otherwise provided in this Agreement, the Manager may, with the consent of the Members holding at least fifty percent (50%) of the Class A Units, issue new or additional Units or options or other securities to purchase or otherwise acquire or convert to new or additional Units, at any time and from time to time.

3.2     *Persons Deemed Members*.  The Company may treat the Person in whose name any Unit shall be registered on the books and records of the Company as a Member and the sole holder of such Unit for all purposes whatsoever and, accordingly, shall not be bound to recognize any equitable or other claims to or interest in such Unit or the part of any other Person, whether or not the company shall have actual or other notice thereof.

3.3     *Subscriptions*.  A prospective Member of the Company may enter into a Subscription Agreement for the purchase of Units, or fractions thereof.  A Person may not be admitted as a Member until such Person has: (a) executed this Agreement, which may be pursuant to an Additional Member Signature Page in the form attached to this Agreement, (b) purchased Units, and (c) executed and delivered to the Company  such other agreements (including, without limitation, purchase agreements and investment representations) as the Manager may require.

3.4     *Waiver of Dissenters' Rights*.  The Members hereby waive any and all contractual appraisal rights or dissenters' rights, if any, with respect to their Units and any or all similar rights whether set forth in any other applicable law or in any agreement with respect to which the Company or a Member is a party or beneficiary.

**3.5     *Expulsion*.**          Any Member may be expelled as required in Section 35-45(6) of the Act.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

# ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.1     *Capital Contributions of Members, Ownership.* The Members of the Company as of the Acquisition Date are maintained on the Company's books and records. Set forth on **Schedule 1** "Ownership of Members" attached hereto are the number and class of Units issued to each Member. Each Member shall receive, in exchange for the capital contribution of such Member, the number and class of Units set forth opposite such Member's name thereon. Additional capital contributions may be in the form of cash or cash equivalents, unless otherwise determined by the Manager. The initial values of the Members' Capital Accounts are maintained on the Company's books and records.

4.2     *Additional Capital Contributions.* The Members shall not be obligated to contribute additional capital, however, any additional capital contributions shall be in the form of cash unless otherwise approved by the Manager.

4.3     *Capital Accounts.*

4.3.1. A separate Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv) and 1.704-2, as amended. Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to for purposes of Code Section 752); and (3) allocations to such Member of Company Profits and other allocations to such Member of items of Company income or gain. Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); and (3) allocations to such Member of Company Losses and other allocations to such Member of items of Company loss or deduction. The Company may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

4.3.2. For purposes of computing the amount of any item of Company income, gain, loss or deduction to be reflected in the Members' Capital Accounts and to be allocated pursuant to <u>Article 5</u> of this Agreement, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose), provided that:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

4.3.2.1    The computation of all items of income, gain, loss and deduction shall include income and expense of the Company that is exempt from federal income tax and also those items described in Code Section 705(a)(1)(B) or Treasury Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includible in gross income or deductible for federal income tax purposes;

4.3.2.2    If the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from a disposition of such property;

4.3.2.3    Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property;

4.3.2.4    Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

4.3.2.5    To the extent an adjustment pursuant to Code Section 732(d), 734(b) or 743(b) to the adjusted tax basis of any Company property is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis) or loss (if the adjustment decreases the tax basis); and

4.3.2.6    Items of Company income, gain, loss or deduction that are specially allocated pursuant to Section 5.2 shall be determined in the same manner as Company Profits and Company Losses, but such specially allocated items shall not be taken into account in computing Company Profits and Company Losses.

4.3.3.    The rules set forth in this Section 4 are intended to comply with the requirements of the Code and Treasury Regulations.  If, in the opinion of the Manager, the rules set forth in this Section 4.3 must be modified in order for the Company to comply with the requirements of the Code or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified.

4.4    *Interest on Capital Contributions*.  Except as otherwise expressly provided in this Agreement, no Member shall receive interest on such Member's Capital Contribution.

---

FILED DATE: 6/30/2020 1:52 PM    2020L000292

4.5     *Withdrawal.* Each Member hereby covenants that he shall not willfully Dissociate himself as a Member without the consent of the Manager. Any Member that voluntarily Dissociates himself as a Member pursuant to Section 35-45(1) of the Act shall be liable to the Company and its Members for all damages and costs that result from such Dissociations and any consequential dissolution of the Company. Upon the Dissociation of any Member, such Member shall no longer participate in the management or conduct of the Company's business.

4.6     *Return of Capital.* Except as otherwise provided in <u>Article 6</u> and <u>Section 11.2</u>, or another express provision of this Agreement, or required under the Act, no Member shall have priority over any other Member as to the return of any Capital Contribution. Any return of capital to the Members shall be solely from Company assets and the Members shall not be personally liable for any such return except as provided in the Act.

4.7     *Liability of Members.* Except as required under the Act or any other provision of this Agreement, no Member shall have any obligation to restore any portion of any Capital Account deficit or to contribute to the capital of the Company; nor shall any Member have any personal liability for debts or other obligations of the Company, including without limitation obligations for federal and state income taxes and any state replacement taxes.

## ARTICLE 5
## ALLOCATION OF COMPANY PROFITS AND LOSSES

5.1     *Allocations.* Except as otherwise provided in <u>Section 5.2</u>, Company Profits and Company Losses for any Fiscal Period shall be allocated among the Interest Holders such that, as of the end of such Fiscal Period, the Capital Account of each Interest Holder shall equal (a) the amount which would be distributed to him or it or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such liquidation pursuant to <u>Section 6.1</u> *minus* (b) the sum of (i) such Interest Holder's share of Company Minimum Gain (as determined according to Treasury Regulation Sections 1.704-2(d) and (g)(3)) and such Interest Holder's partner minimum gain (as determined according to Treasury Regulation Section 1 704-2(i)) and (ii) the amount, if any, which such Interest Holder is obligated to contribute to the capital of the Company as of the last day of such Fiscal Period.

5.2     *Special Allocations.* The following special allocations will be made in the following order:

5.2.1.  *Company Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this <u>Article 5</u>, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each

---

FILED DATE: 6/30/2020 1:52 PM   2020L000292

Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2.1 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.2. *Member Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article 5, if there is a net decrease in Member Minimum Gain attributable to a Member Non-Recourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2.2 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.3. *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Deficit Capital Account.

5.2.4. *Gross Income Allocation.* In the event any Member has a Deficit Capital Account at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have a Deficit Capital Account after all other allocations provided for in this Article 5 (other than Section 5.2.3 and 5.2.4) have been made.

---

FILED DATE: 6/30/2020 1:52 PM   2020L000292

5.2.5.  *Non-Recourse Deductions.*  Non-Recourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Ownership Percentage.

5.2.6.  *Member Non-Recourse Deductions.*  Member Non-Recourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Non-Recourse Debt to which such Member Non-Recourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

5.2.7.  *Section 754 Adjustments.*  To the extent that an adjustment to the tax basis of any Company property pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or (m)(4) to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain or loss and shall be specially allocated to the Members in proportion to their respective Ownership Percentage in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies.  Other items of gain or loss described in Section 4.3.2.5 shall be allocated in a manner consistent with the manner in which the corresponding adjustments to Capital Accounts are made.

5.2.8.  *Curative Allocations.*

5.2.8.1   The special allocations required under this Section 5.2 are intended to comply with the Treasury Regulations.  It is the intent of the Company and each of the Members that all special allocations made pursuant to Section 5.2.1 through Section 5.2.7 shall be offset either with other special allocations made pursuant to Section 5.2.1 through Section 5.2.7 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 5.2.8.  Therefore, the Manager may, in its sole discretion, make, pursuant to this Section 5.2.8, such offsetting special allocations of Company income, gain, loss or deduction in any manner the Manager determines to be appropriate, consistent with the goal that each Member's Capital Account balance be, to the extent possible, equal to the Capital Account balance such Member would have had in the absence of any allocations pursuant to Section 5.2.1 through 5.2.7.

5.2.8.2   The Members expect and intend that upon the liquidation of the Company, after giving effect to all contributions and all allocations for all periods, each Member's Capital Account will have a positive balance equal to the amount of proceeds distributable to such Member.  If in the opinion of the Manager this intended result would not be achieved without modification of the allocations required under this Article 5, then the allocations required under this Article 5 shall

---

be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause each Member's Capital Account to have a balance equal to the amount of proceeds distributable to such Member upon the liquidation of the Company.

5.2.8.3   If the Manager determines that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Article 5 (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit under this Article 5 is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii) (a "misallocated item"), then the Manager may allocate such unallocated item, or reallocate such misallocated item, to reflect the Members' economic interests in the Company.

5.2.9.   *Allocations Relating to Taxable Issuance of Units.*  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of a Unit by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if such items had not been realized.

5.2.10. *Allocations Relating to Illinois Personal Property Tax Replacement Income Tax and Comparable Items.*  If the Company incurs liability for Illinois Replacement Tax for a Fiscal Year with respect to which the Company also realizes Illinois Replacement Tax Savings, then items of Company loss or deduction attributable to the Company's Illinois Replacement Tax expense shall be allocated to the Members that are not themselves subject to the Illinois Replacement Tax for such Fiscal Year and such allocation shall be made in proportion to the amount of Company Profits allocated to such Members for the period with respect to which such Illinois Replacement Tax is imposed. The principles of this Section 5.2.10 shall also apply if the Company is subject to any other tax, the computation of which depends in whole or in part upon the character of the Members.

5.2     *Other Allocation Rules.*

5.3.1.   Company Profits, Company Losses, and all other items of Company income, gain, loss, deduction and credit shall be determined by the Manager on a daily, monthly or other basis, using any method permitted under Code Section 706 and the Treasury Regulations.

5.3.2.   The Members are aware of the tax consequences of the allocations required under this Article 5 and each Member hereby agrees to be bound by the provisions of this

FILED DATE: 6/30/2020 1:52 PM    2020L000292

Article 5 in reporting such Member's share of Company income, gain, loss and deduction for federal income tax purposes.

5.3.3. Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), such Member's interests in Company profits are in proportion to such Member's Ownership Percentage.

5.3.4. As between a Member and any permitted (under this Agreement) transferee of all or any portion of such Member's Units, Company Profits and Company Losses shall be allocated by the Manager in a manner intended to comply with Section 706 of the Code and the Treasury Regulations promulgated thereunder. In order to make such an allocation, the Manager may, in its discretion, close the Company's books on the date of such permitted transfer.

5.3     *Allocations Solely For Tax Purposes.*

5.4.1. Allocations required under this Section 5.4 are solely for tax purposes and shall not affect any Member's Capital Account or any Member's share of any distribution from the Company.

5.4.2. Allocations of tax credits, tax credit recapture, tax benefit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

5.4.3. Items of Company income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variance between the tax basis of such property to the Company and its Book Value.

5.4.4. If the Book Value of any Company property is adjusted pursuant to Section 4.3.2, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such Company property shall take account of any variation between the tax basis of such Company property and its Book Value in the same manner as required under Code Section 704(c).

## ARTICLE 6
## DISTRIBUTIONS AND DISTRIBUTABLE CASH

6.1     *Timing and Amount.* At such times as it shall determine, the Manager shall calculate the amount of Net Cash, if any, available for distribution to the Members at least quarterly and promptly distribute such amounts in the following order of priority:

FILED DATE: 6/30/2020 1:52 PM   2020L000292

(i)     First, to the holders of the Class A Units (in the proportion that the number of Class A Units held by each holder bears to the aggregate number of Class A Units outstanding immediately prior to such Distribution) until the aggregate amount of Unreturned Capital with respect to the Class A Units has been reduced to zero;

(ii)     The balance, to the holders of the Class A Units and the Class B Units (ratably among such Holders based upon the number of outstanding Units held by each such Holder, regardless of class, immediately prior to such Distribution).

6.2     *Distributions for Tax Purposes.*   To the extent authorized by the Manager, on or before the 90th day after the end of each Fiscal Year, the Company shall distribute to the Members out of Net Cash the cash amount equal to the Tax Allowance Amount multiplied by the excess, if any, of (a) the amount of taxable income allocated to such Members under this Agreement for such Fiscal Year, over (b) the amount, if any, by which the sum of all items of deduction and loss allocated to such Members under this Agreement for all prior Fiscal Years exceeds the sum of all items of taxable income allocated to such Members for all prior Fiscal Years (the "Annual Tax Distribution").   At the end of each quarter of the Fiscal Year, the Manager shall estimate the portion of the current Annual Tax Distribution attributable to such quarter and allocable to specific Members (the "Quarterly Estimated Tax Distribution") and to the extent authorized by the Manager, within 15 days of the end of such Fiscal quarter, the Company shall make a cash distribution to the Members of such Quarterly Estimated Tax Distribution allocable to such Members such that Members may make quarterly estimated federal and estimated state income tax payments. Any Quarterly Estimated Tax Distributions shall be credited against any Annual Tax Distribution due a Member, with any excess Quarterly Estimated Tax Distributions for such Fiscal Year credited against the next Quarterly Estimated Tax Distributions for the following Fiscal Years.   Any Annual Tax Distributions or Quarterly Estimated Tax Distributions may be directly deposited with the appropriate federal or state tax authority for a Member's benefit in lieu of an actual distribution.   Any amounts distributed to a Member under this <u>Section 6.2</u> shall be credited against future amounts otherwise distributed to such member under <u>Section 6.1</u>.

6.3     *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items.*  On or before the 90th day following the close of each Fiscal Year, the Company shall distribute to the Members that are themselves subject to the Illinois Replacement Tax for such Fiscal Year an amount equal to the Company's Illinois Replacement Tax Savings for such Fiscal Year.   Such distribution shall be made to and among such Members in proportion to the amount of Company Profits allocated to such Members for such Fiscal Year.   The Company shall also make distributions to Members, at such times and in such proportionate amounts as provided for in this <u>Section 6.3</u>, in respect of any tax that would have been imposed upon the Company in a Fiscal Year but for the fact that some Members are themselves subject to such tax.

---

Case: 1:20-cv-04043 Document #: 1-1 Filed: 07/09/20 Page 165 of 371 PageID #:177

FILED DATE: 6/30/2020 1:52 PM    2020L000292

6.4    *Limitations on Distributions.*    Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to any Member if such distribution would violate Section 180/25-30 of the Act or other comparable applicable law.

6.5    *Redemption of the Class A Units.*    In the event that, on or before December 31, 2006, Riverside District Development, LLC has entered into one or more contracts to sell all of the Property and the Manager, in good faith, determines that such contracts are with bona fide purchasers, the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Class A Units then outstanding (the "Redemption Right"). In the event that the Company desires to exercise its Redemption Right pursuant to this Section 6.5, the Company may exercise its Redemption Right only by satisfying the following conditions: (i) delivery of written notice to the holders of the Class A Units of the Company's intent to exercise the Redemption Rights, and (ii) making a distribution to the holders of the Class A Units on or before June 30, 2007 of an amount sufficient to cause the cumulative amount distributed to such holders pursuant to Sections 6.1 and 6.2 and this Section 6.5 to be equal to the Redemption Amount. In the event that the Company exercises its Redemption Right in accordance with this Section 6.5, the holders of the Class A Units will cease to be Members for all purposes of this Agreement and their respective rights as a holder of Class A Units shall cease as of the earlier of March 31, 2007 or the date set forth in the written notice delivered to such holders pursuant to this Section.

## ARTICLE 7
## RESTRICTED TRANSACTIONS

7.1    *Compensation and Distributions.*    Unless otherwise approved by the Manager, all compensation, profits or distributions by the Company to any of the Members must be paid in accordance with Article 6 and Article 9. This covenant shall not restrict the payment of bona fide debt due a Member.

7.2    *Affiliate Transaction Rights.*    The Members agree that no Member holding Class B Units or an Affiliate of such Member (either one a "Related Developer") shall enter into any transaction with respect to the development of all or any portion of the Property unless the each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer, which may be in the form of common stock if the Related Developer is a corporation, or common membership interests if the Related Developer is a limited liability company, and shall provide each other Member with the rights, other than voting rights, that are materially equivalent to the rights that a holder of a Unit has with respect to the Company pursuant to this Agreement. The common interests in the Related Developer owned by the other Member shall be subject to the rights of any preferred interest in such Related Developer. The share of common interests each other Member shall own in the Related Developer shall be equal to equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class, by (z) the total number of Units then outstanding, determined regardless of class.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

## ARTICLE 8;
## ROLE OF MEMBERS; INDEMNIFICATION OF MEMBERS

8.1     *General Rules.*  Except as otherwise stated in this Agreement or required under the Act, Members shall not take any part in the day-to-day management or conduct of the business of the Company, nor shall such Members have any right or authority to act for or bind the Company. Except as otherwise required under the Act, any action of the Members shall be taken by the affirmative vote of the holders of a majority of the Class B Units then outstanding.

8.2     *Meetings of the Members.*  Except as otherwise stated in this Agreement or required under the Act, the following provisions shall apply to all meetings of Members:

8.2.1    Place and Time of Annual Meetings.  An annual meeting of the Members shall be held each year on the first Tuesday in the month of April at 10:00 o'clock a.m., unless such day should fall on a legal holiday, in which event the meeting shall be held at the same hour on the next succeeding business day that is not a legal holiday for the purpose of electing the one or more Managers and conducting such other proper business as may come before the meeting.  The date, time and place of the annual meeting shall be determined by the Manager.

8.2.2    Special Meetings.  Special meetings of Members may be called for any purpose and may be held at such time and place, within or without the State of Illinois, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof.  Special meetings of the Members may be called by the Manager or by the holders of not less than 51% of all outstanding Class B Units entitled to vote on the matter for which the meeting is called.

8.2.3    Place of Meetings.  The Manager may designate any place, either within or without the State of Illinois, as the place of meeting for any annual meeting or for any special meeting called.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the Company.

FILED DATE: 6/30/2020 1:52 PM    2020L000292

8.2.4   <u>Notice of Meetings.</u>   Unless otherwise provided by statute, whenever Members are required or permitted to take action at a meeting, written or printed notice stating the place, day, and hour, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each Member entitled to vote at such meeting and to the Manager not less than 10 nor more than 60 days before the date of the meeting or in the case of a merger, consolidation, Unit exchange, dissolution or sale, lease or exchange of all or substantially all assets not less than 20 nor more than 60 days before the date of the meeting. All such notices shall be delivered, either personally or by mail, by or at the direction of the Manager, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the Member at his, her or its address as the same appears on the records of the Company.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Notice may also be waived in writing by any Member.  Unless otherwise provided by herein or by law, neither the business to be transacted at, or the purpose of, any regular or special meeting need be specified in any written waiver of notice.

8.2.5   <u>Quorum.</u>   Unless otherwise provided herein or by statute, the holder or holders of a majority of the outstanding Class B Units entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the Members, however, a quorum shall not consist of less than one-third of the outstanding Units entitled to vote. If a quorum is not present, the holders of a majority of the Class B Units present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  Members may participate in any meeting of Members by means of conference telephone or similar communication equipment by means of which all Members participating in such meeting can hear each other, and such participation shall constitute presence in person at such meeting.

8.2.6   <u>Proxies.</u>  Each Member may appoint a proxy to vote or otherwise act for him or her by signing an appointment form and delivering it to the person so appointed, but no such proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

8.2.7   <u>Voting of Units.</u>  Each outstanding Class B Unit shall be entitled to one vote, and each outstanding fractional Class B Unit shall be entitled such percentage of one vote that is represented by the fractional Class B Unit, in each matter submitted to vote at a meeting of Members, and in all elections for the Manager, every Member shall have the right to vote the number of Class B Units owned by such Member for the Manager. Each Member may vote either in person or by proxy as provided herein.  Except as otherwise provided in <u>Section 3.1</u>, the Class A Units shall have no voting rights other than on matters for which voting by all Members is required under the Act.  In the event that the Company engages in

an act that requires the vote of all Members under the Act, this <u>Section 8.2.7</u> shall apply to both the Class A Units of the Class B Units, regardless of class.

8.2.8 <u>Informal Action.</u> Unless otherwise provided by statute, any action required to be taken at any annual or special meeting of the Members of the Company, or any other action which may be taken at a meeting of the Members may be taken without a meeting and without a vote if a consent in writing setting forth the action so taken shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voting. If such consent is signed by less than all of the Members entitled to vote, then such consent shall become effective only if at least five days prior to execution of the consent a notice in writing is delivered to all the Members entitled to vote with respect to the subject matter thereof and, after the effective date of the consent, prompt notice of the taking of the Company action without a meeting by less than unanimous written consent shall be delivered in writing to those Members who have not consented in writing.

8.3 *Indemnification of Members.* The Company shall, to the fullest extent permitted by law, indemnify, defend and hold harmless its Members and former Members (collectively, the "Indemnified Parties"), from any and all claims, actions, causes of action, suits, proceedings, losses, damages, liability, costs and expenses (including, without limitation, attorneys' fees and court costs) asserted against or incurred or sustained by them by reason of their status as Members of the Company, or by reason of any act performed by them or any omission on their part while acting for or on behalf of the Company and in furtherance of its interests provided that the Indemnified Party acted in good faith and in a manner such party reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, such Indemnified Party had no reason to believe that his or her conduct was unlawful.

# ARTICLE 9
# MANAGEMENT

9.1 *General Powers of the Manager.* The management of the Company shall be vested in a Manager designated by the Members as provided in Section 9.2 hereof. Except as otherwise stated in this Agreement or required under the Act, the Manager shall have full and complete authority, power, an discretion to direct, manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

9.2 *Number and Election.* Initially, the Company shall have one (1) Manager, who shall be Heritage Property Development, Inc., an Illinois corporation. The Members may change the number of Managers upon the affirmative vote of the holders of a majority of the Class B Units then outstanding. The Members, by signing this Agreement, hereby designate the aforementioned

FILED DATE: 6/30/2020 1:52 PM    2020L000292

Persons as Managers of the Company until its successors are designated. Any Manager elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided. Managers need not be residents of the State of Illinois or Members of the Company.

9.3     *Removal and Resignation.* Any Manager may be removed at any time, with or without cause, by the holders of two-thirds of the Units then entitled to vote at an election of Managers. In the event a Manager dies or is unwilling or unable to serve as such, a successor to such Manager shall be appointed pursuant to Section 9.4. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute the Dissociation of such Member. A Manager may resign from the position of Manager at any time by giving written notice to the Company. The resignation shall take effect ten (10) days after receipt by the Company of that notice or, if later, at such time as may be specified in such notice, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. Upon the Withdrawal of any Manager, such Manager shall be treated as having resigned as of the date of Withdrawal and shall automatically cease to be a Manager as of the date of such Withdrawal. Except in the case of resignation by reason of Withdrawal, the resignation of a Manager pursuant to this Section 9.3 shall not affect such Member's rights as a Member and shall not constitute a Dissociation of such Member.

9.4     *Vacancies.* Vacancies and newly created Manager positions resulting from any increase in the authorized number of Managers may be filled by two-thirds of the Managers then in office. Each Manager so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided. Any vacancy that results for any reason other than an increase in the authorized number of Managers shall be filled as provided in Section 9.2.

9.5     *Quorum, Required Vote and Adjournment.* Each Manager shall have one vote. At any time when more than one (1) Manager is in office, a majority of the total number of Managers shall constitute a quorum for the transaction of business. The vote of a majority of Managers present at a meeting at which a quorum is present shall be the act of the Manager. If a quorum shall not be present at any meeting of the Manager, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

9.6     *No Liability.* No Manager shall be liable under a judgment, decree or order of a court or in any other manner, for a debt, obligation or other liability of the Company.

9.7     *Certain Powers of the Manager.* Without limiting the generality of Section 9.1 above, the Manager shall have the right and power and authority, except as otherwise stated in Article 7 or Section 9.12 hereof or otherwise in this Agreement, or required under the Act, on behalf of the Company to:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

9.7.1   authorize, execute and engage in contracts, transactions, investments and dealings on behalf of the Company, including contracts, transactions, investments and dealings with any Member;

9.7.2   borrow money on behalf of the Company, and mortgage, pledge or otherwise encumber any assets of the Company;

9.7.3   collect all amounts due to the Company;

9.7.4   call meetings of Members;

9.7.5   issue Units in accordance with the restrictions of <u>Article 3</u> and the other provisions of this Agreement;

9.7.6   pay all expenses incurred in forming the Company;

9.7.7   lend money;

9.7.8   determine and make distributions, in cash or otherwise, in respect of Interests, in accordance with the provisions of this Agreement and the Act;

9.7.9   establish a record date with respect to all actions to be taken hereunder that require a record date to be established;

9.7.10   establish or set aside any reasonable reserve or reserves for contingencies and for any other reasonable and proper Company purpose;

9.7.11   appoint (and dismiss from appointment) attorneys and agents on behalf of the Company, and employ or otherwise engage (and dismiss from employment or other engagement) any and all persons providing legal, accounting or financial services to the Company, and such employees, consultants, independent contractors, or agents as the Manager deems necessary or desirable for the management and operation of the Company, including, without limitation, any Member;

9.7.12   incur and pay all expenses and obligations incident to the formation, operation and management of the Company, including, without limitation, the services referred to in the preceding paragraph, taxes, interest, travel, rent, insurance, supplies, salaries and wages of the Company's employees and agents;

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

9.7.13  acquire and enter into any contract of insurance necessary or desirable for the protection or conservation of the Company and its assets or otherwise in the interest of the Company as the Manager shall determine;

9.7.14  open accounts and deposit, maintain and withdraw funds in the name of the Company in banks, savings and loan associations, brokerage firms or other financial institutions;

9.7.15  bring, defend, arbitrate, prosecute or compromise on behalf of the Company actions and proceedings at law or equity before any court or governmental, administrative or other regulatory agency, body or commission or otherwise;

9.7.16  prepare and cause to be prepared reports, statements and other relevant information for distribution to Members as may be required or determined to be necessary or desirable by the Manager from time to time;

9.7.17  prepare and file all necessary returns and statements and pay all taxes, charges, assessments and other impositions applicable with respect to the Company or its income or assets;

9.7.18  prosecute, protest, defend and/or protect all proprietary rights (including all trade names, trademarks and service marks, and all licenses and permits and applications with respect thereto) of the Company and all rights of the Company in connection therewith;

9.7.19  execute and deliver, for and on behalf of the Company, promissory notes, evidences of indebtedness, agreements, assignments, deeds, leases, loan agreements, mortgages and other security instruments, in each case as the Manager deems necessary or appropriate for the objects and purposes of the Company;

9.7.20  create offices of the Company, designate the duties of such offices, and select officers; and

9.7.21  execute all other documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary or desirable or incidental to the foregoing.

The express grant of any power or authority in this Agreement to the Manager shall not in any way limit or exclude any other power or authority of the Manager that is not specifically or expressly set forth in this Agreement.

9.8   *Exculpation From Liability For Certain Acts.*  No Manager shall be liable to the Company or any Member for damages attributable to any breach of duty owed by a Manager (by

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

virtue of being a Manager) to the Company or the other Members, except to the extent (i) required under the Act or (ii) such breach of duty is based upon a knowing violation of applicable law or this Agreement or (iii) such breach of duty is based upon violation of applicable law or this Agreement arising out of such Person's gross negligence or willful misconduct as determined conclusively in a final order of a court of competent jurisdiction. The Managers shall not be liable to the Company or any Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by a Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on the Manager by or pursuant to this Agreement. The Managers shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.9     *Indemnification.*   The Company shall, to the fullest extent permitted by law, indemnify and defend any Manager against and hold each Manager harmless from any losses, judgments, liabilities and expenses (including reasonable attorney fees) incurred by any Manager by reason of any act or omission (other than any act or omission carried out in willful misconduct, gross negligence or knowing violation of this Agreement or the Act) performed or omitted in good faith on behalf of the Company and in a manner reasonably believed by such Manager to be within the scope of the authority of the Manager. The Company may also indemnify its employees and other agents who are not a Manager to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by the Manager.

9.10     *Interested Manager.*   No contract or transaction between the Company and any Manager, or between the Company and any other limited liability company, corporation, partnership, association or other organization in which a Manager is a manager or an officer, or has a financial interest, shall be void or voidable solely for this reason, or solely because the Manager or officer is present at or participates in the meeting of the Manager, or solely because his votes are counted for such purpose, if: (a) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon without counting the vote of any Member who is an interested Manager, and the contract or transaction is specifically approved in good faith by vote of the Members; or (b) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers or the Members; or (c) the transaction is one described is Section 7.2 hereof.

9.11     *Compensation to Manager.*   The Company shall pay a management fee to the Manager equal to $1,000 per month.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

9.12 *Additional Consent Required for Specified Actions.* At all times during which Michael Rumman is a member of MT Property Holdings, LLC and during which MT Property Holdings, LLC is a Member, the Company shall not undertake those actions set forth in <u>Sections 9.7.2</u>, <u>9.7.5</u> and <u>9.7.7</u> unless the Manager has obtained the prior written consent of Michael Rumman for such action, which such consent may be granted or withheld in his sole and absolute discretion.

## ARTICLE 10
## LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS

10.1 *Restriction on Transfers; Investment Representations and Warranties.*

10.1.1 Except as otherwise permitted by this <u>Article 10</u> or elsewhere in this Agreement, no Member shall Transfer all or any portion of Units or any interest therein without the prior written consent of the Manager.

10.1.2 Each Member hereby represents and warrants to the Company that its acquisition of its Interest is made as principal for its own account, for investment purposes only, and not with a view to the resale or distribution of such Interest. Each Member agrees that it will not sell, assign, give, hypothecate, pledge, transfer, or otherwise dispose of any or all of its Interest to any Person who or which does not similarly represent and warrant and agree as provided in this <u>Section 10.1.1.</u>

10.2 *Permitted Transfers.*

10.2.1 Subject to the conditions and restrictions set forth in <u>Section 10.2.2,</u> a Member may at any time Transfer all or any portion of his Units to (a) to any member of the transferor's family, or to a custodian, trustee, family limited partnership or other fiduciary for the account of such Member or member of his family or to trusts for the benefit of the family of such Member, as the case may be; provided, that in each case such transfer is made pursuant to a bona fide estate planning transaction, (b) any Affiliate of a Member (including of the transferor), or (c) the transferor's executor, administrator, trustee, or personal representative to whom such Units are transferred at death or involuntarily by operation of law. For purposes of this <u>Article 10,</u> a Member's "family" shall include only such Member's spouse, natural or adoptive lineal ancestors or descendants, brothers or sisters.

10.2.2 A Transfer shall not be treated as a Permitted Transfer under <u>Section 10.2.1</u> unless and until the following conditions are satisfied:

10.2.2.1 Except in the case of a Transfer of Units at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

confirm the agreement of the transferee to be bound by the provisions of this Article 10. In the case of a Transfer of Units at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

10.2.2.2 The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

10.2.2.3 Except in the case of a Transfer of Units at death or involuntarily by operation of law, either (a) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) such Transfer will be exempt from all applicable registration requirements and will not violate any applicable laws regulating the Transfer of securities and, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to such effect.

10.2.2.4 Except in the case of a Transfer of Units at death or involuntarily by operation of law, such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940 as amended, and the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager to such effect and the Manager shall provide to such counsel any information available to them relevant to such opinion.

10.3    *Sale of the Company.*

10.3.1 If the Manager and the holders of the Units then outstanding approve a Sale of the Company (the "Approved Company Sale"), each Member shall consent to and raise no objections against the Approved Company Sale. If the Approved Company Sale is structured as a (i) merger or consolidation, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (ii) sale of Units, each Member shall agree to sell all of his Units and rights to acquire Units on the terms and conditions approved by the Manager. Each Member shall take all necessary or desirable actions no connection

---

FILED DATE: 6/30/2020 1:52 PM    2020L000292

with the consummation of the Approved Company Sale as requested by the Company.

10.3.2 The obligations of the Members with respect to the Approved Company Sale are subject to the satisfaction of the following conditions: (i) upon the consummation of the Approved Company Sale, each Member shall receive the same form of consideration and the same portion of the aggregate consideration such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the consummation of the Approved Company Sale and; (ii)) each holder of then currently exercisable rights to acquire a class of Units shall be given an opportunity to exercise such rights prior to the consummation of the Approved Company Sale and participate in such sale as holders of such class of Units.

10.3.3 All Members will bear their pro-rata share (based upon the number of Units sold) of the costs of any sale of Units pursuant to an Approved Company Sale to the extent such costs are incurred for the benefit of all such Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by the Members on their own behalf will not be considered costs of the Approved Company Sale.

10.4    *Restrictions on Transfers.*  Unless otherwise approved by the Manager, no Transfer of Units shall be made except upon terms which would not, in the opinion of counsel chosen by and mutually acceptable to the Manager and the transferor Member, result in the termination of the Company within the meaning of Section 708 of the Code or cause the application of the rules of Sections 168(g)(1)(B) and 168(h) of the Code or similar rules to apply to the Company. If the immediate Transfer of such Unit would, in the opinion of such counsel, cause a termination within the meaning of Section 708 of the Code, then if, in the opinion of such counsel, the following action would not precipitate such termination, the transferor Member shall be entitled (or required, as the case may be) (i) immediately to Transfer only that portion of his Units as may, in the opinion of such counsel, be transferred without causing such a termination and (ii) to enter into an agreement to Transfer the remainder of his Units, in one or more Transfers, at the earliest date or dates on which such Transfer or Transfers may be effected without causing such termination. The purchase price for the Units shall be allocated between the immediate Transfer and the deferred Transfer or Transfers pro rata on the basis of the percentage of the aggregate Units being transferred, each portion to be payable when the respective Transfer is consummated, unless otherwise agreed by the parties to the Transfer. In the case of a Transfer by one Member to another Member, the deferred purchase price shall be deposited in an interest-bearing escrow account unless another method of securing the payment thereof is agreed upon by the transferor Member and the transferee Member.  In determining whether a particular proposed Transfer will result in a termination of the Company, counsel to the Company shall take into account the existence of prior written commitments to

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

Transfer made pursuant to this Agreement and such commitments shall always be given precedence over subsequent proposed Transfers.

10.5    *Prohibited Transfers.*    Any purported Transfer of Units that is not effected in accordance with the terms and conditions of this Article 10 shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the interest Transferred shall be strictly limited to the transferor's rights to distributions as provided by this Agreement with respect to the transferred Units, which distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Units may have to the Company. In the case of a Transfer or attempted Transfer of Units that is effected in accordance with the terms and conditions of this Article 10, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, increment tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.6    *Rights of Unadmitted Assignees.*    A Person who acquires one or more Units but who is not admitted as a substituted Member pursuant to Section 10.8 shall hold only a Distribution Interest shall and be entitled only to allocations and distributions with respect to such Interests in accordance with this Agreement, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.7    *Admission of Transferees as Members.*    Subject to the other provisions of this Article 10, a transferee of Units may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 10.8:

10.7.1 The Manager consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Manager;

10.7.2 The Units with respect to which the transferee is being admitted were acquired in accordance with the other terms and conditions of this Article 10;

10.7.3 The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Manager may reasonably request as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement;

10.7.4 The transferee shall have delivered to the Manager a letter containing a representation and an agreement in the form set forth in Section 10.1.1 of this Agreement;

FILED DATE: 6/30/2020 1:52 PM    2020L000292

10.7.5  if the Transferee is not an individual, the Transferee shall have provided the Manager with satisfactory evidence of the Transferee's authority to become a Member under the terms and provisions of this Agreement; and

10.7.6  The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Member incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units.

10.8    *Covenants; Representations Regarding Transfers; Legend.*

10.8.1  Each Member hereby represents, covenants and agrees with the Company for the benefit of the Company and all Members, that (i) he is not currently making a market in Units and will not in the future make a market in Units, (ii) he will not Transfer his Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of partnership interests and which are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Units through a matching service that is not approved in advance by the Company.  Each Member further agrees that he will not Transfer any Units to any Person unless such Person agrees to be bound by this Section 10.8 and to Transfer such Units only to Persons who agree to be similarly bound.  The Company shall, from time to time and at the request of a Member, consider whether to approve a matching service and shall notify all Members of any matching service that is so approved.

10.8.2  Each Member hereby agrees that the following legend shall be placed upon any document or instrument evidencing ownership of Units:

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY FEDERAL OR STATE SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED. SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE

---

FILED DATE: 6/30/2020 1:52 PM   2020L000292

AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER OF THE UNITS.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION, OR ASSIGNMENT AS SET FORTH IN THE OPERATING AGREEMENT BETWEEN THE ISSUER OF THE UNITS AND ITS MEMBERS. A COPY OF SUCH OPERATING AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

10.9      *Distribution and Allocations in Respect to Transferred Interests.*  If any Unit is sold, assigned, or Transferred during any Fiscal Year in compliance with the provisions of this Article 10, income, loss, deduction, credit, each item thereof, and all other items attributable to the Transferred Unit for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager. All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee. Solely for purposes of making such allocations and distributions, such Transfer shall be recognized not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten business days prior to the Transfer, the Company shall recognize such Transfer as the date of such Transfer, and provided further that, if the Company does not receive a notice stating the date Units were Transferred and such other information as the Manager may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all such times shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company was the owner of the Units on the last day of the Fiscal Year during which the Transfer occurs. Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.10, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Unit.

10.10      *Termination of Restrictions*.  The restrictions set forth in this Article 10 will continue with respect to each Unit until the earliest of (i) the 2010 anniversary of the date of this Agreement and (ii) the consummation of a Sale of the Company.

10.11      *Waiver of Redemption of Distributional Interest*  Members hereby agree that no Member shall have a right to have his or her Distributional Interest redeemed by the Company upon Dissociation pursuant to Section 35-60 of the Act

## ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1 *Events of Dissolution.* The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

    11.1.1 the consent of the holders of a majority of the Class B Units then outstanding; and

    11.1.2 the sale of substantially all the assets of the Company;

    11.1.3 the entry of a decree of judicial dissolution or an administrative dissolution under the Act; and

    11.1.4 any other event requiring the dissolution of the Company under Section 35-1 of the Act.

Notwithstanding the foregoing, if the Members (and any dissociated Member whose Dissociation caused such dissolution) elect to waive such dissolution as provided under Section 35-3 of the Act, the Company may carry on its business as if no dissolution occurred.

11.2 *Liquidation.* If the Company shall be dissolved by reason of the occurrence of any of the circumstances described in <u>Section 11.1</u>, no further business shall be conducted by the Company except for taking such action as shall be necessary for the winding up of its affairs and the distribution of its assets to the Members. Upon such dissolution of the Company, the Manager shall take the following steps:

    11.2.1 Unless otherwise approved by the Members in accordance with <u>Article 7</u>, dispose of all other Company properties and assets at the best cash price obtainable therefor under the circumstances.

    11.2.2 Pay all Company debts and liabilities, in the order of priority as provided under applicable law, or otherwise make adequate provision therefor.

    11.2.3 Determine by independent appraisal the fair market value of the Company properties and assets to be distributed in kind (if permitted under <u>Article 7</u>), and credit or charge (as the case may be) the Capital Account of each Member with the amount that would have been credited or charged to such Member in accordance with <u>Article 4</u> if such properties and assets had been sold at fair market value.

---

FILED DATE: 6/30/2020 1:52 PM 2020L000292

FILED DATE: 6/30/2020 1:52 PM   2020L000292

11.2.4     Credit or charge (as the case may be) each Member's Capital Account with such Member's share of all Company Profits and Company Losses that were not previously reflected in any Capital Accounts and that were realized or incurred during the Fiscal Year or Fiscal Years which include the dissolution and termination, up to and including the date of distribution, net of all distributions that were not previously reflected in any Capital Accounts and that were made to such Member during such Fiscal Years up to but not including such date.

11.2.5     Distribute to each of the Members the balance, if any, of the properties and assets of the Company in accordance with each Member's Capital Account, as adjusted pursuant to Sections 11.2.3 and 11.2.4.

11.2.6     Notwithstanding Sections 11.2.1 through 11.2.5, if any Member shall be indebted to the Company for any reason whatsoever, the liquidator may apply any cash allocated to such Member in accordance with this Section 11.2 to the payment of such indebtedness. If such cash is not sufficient to liquidate such indebtedness in its entirety then, until payment in full of such indebtedness by such Member, the liquidator shall retain such Member's distributive share of the Company properties and assets and, after applying the cost of operation of such properties and assets during the period of such liquidation against the income therefrom, shall apply the balance of such income toward the liquidation of such indebtedness; provided, however, that if upon the expiration of six months after notice of such outstanding indebtedness has been given to such Member, such amount has not been paid or otherwise liquidated in full, the liquidator may sell the assets allocable to such Member at private or public sale at the best cash price immediately obtainable under the circumstances, and so much of the proceeds of such sale as shall be necessary to liquidate such indebtedness shall then be so applied, and the balance (if any) of such proceeds shall be distributed to such Member.

11.2.7     The liquidator shall comply with all requirements of the Act, or other applicable law, pertaining to the winding up of a limited liability company.

11.3     *Filings.* Upon dissolution and complete winding up of the Company, the liquidator shall file any and all certificates and other documents required under the Act including, but not limited to, Articles of Dissolution as required by Section 35-20 of the Act.

11.4     *Termination.* The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.2 of this Agreement, and the Articles shall have been canceled in the manner required by the Act.

---

FILED DATE: 6/30/2020 1:52 PM   2020L000292

## ARTICLE 12
## BOOKS AND RECORDS

**12.1** *Books and Records; Accounting.* The Manager shall keep or cause to be kept at the address of the Company (or at such other place the Manager shall determine) accurate and proper books and records regarding the status of the business and financial conditions of the Company. The Fiscal Year of the Company shall be the calendar year

**12.2** *Access to Records, Financial Statements.* Each Member shall have the right to review all Company records, agreements, tax returns, financial statements, balance sheet, and financial projections of the Company, which may be prepared from time to time by or at the request of the Manager or an officer of the Company. The Company shall prepare and furnish to each Member promptly after the close of each fiscal quarter an unaudited statement showing the operations of the Company for such quarter and the balance in each Member's Capital Account. The Manager has the authority to select the Company's accountants and determine whether or not to obtain an audit of the Company's books and records.

**12.3** *Annual Reports.* Within ninety (90) days after the end of each Fiscal Year, the Manager shall cause to be prepared and each Member furnished with unaudited financial statements accompanied by a report thereon of the Company's accountants stating that such statements are prepared and fairly stated in all material respects in accordance with generally accepted accounting principles, and, to the extent inconsistent therewith, in accordance with this agreement, including: (i) a copy of the balance sheet of the Company as of the last day of such Fiscal Year; (ii) a statement of income or loss for the Company for the Company for such Fiscal Year; (iii) a statement of the Members' Capital Accounts and changes therein for such Fiscal Year; and (iv) a statement of Company cash flow for such Fiscal Year.

**12.4** *Bank Account(s).* All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be agreed upon by the Manager and checks drawn on such account(s) shall require the signature of a Manager. All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

## ARTICLE 13
## TAX MATTERS

**13.1** *Company Tax Returns.*

**13.1.1** The Manager shall cause to be prepared and timely filed all tax returns required to be filed for the Company, and shall cause to be timely paid all taxes owed by the

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM   2020L000292

Company. The Company shall make an election under Code Section 754. The Manager may, in its discretion, make or refrain from making, any other foreign, federal, state or local income or other tax elections for the Company that it deems necessary or advisable.

13.1.2 MT Property Holdings, LLC is hereby designated as the Company's "Tax Matters Partner" under Code Section 6231(a)(7) and shall have all the powers and responsibilities of such position as provided in the Code. The Manager is specifically directed and authorized to take whatever steps the Manager, in its discretion, deem necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the regulations issued under the Code. Each Member hereby agrees to cooperate with the Tax Matters Partner with respect to all matters within its authority as Tax Matters Partner. Expenses incurred by the Tax Matters Partner, in its capacity as such, will be borne by the Company.

13.2    *Schedules K-1 and Forms 1065.* The Manager shall, as promptly as practicable and in any event within 90 days after the end of each Fiscal Year, cause to be prepared and mailed to each Member of record an Internal Revenue Service Form K-1, Internal Revenue Service Form 1065, and any other forms which are necessary or advisable for the Members to satisfy their federal tax reporting obligations.

13.3    *Taxation as Partnership.* The Members agree that the Company will seek to be treated as a partnership for United States federal income tax purposes. The Manager shall operate the Company in a manner intended to preserve, to the extent practical, the Company's treatment as a partnership for United States federal income tax purposes.

13.4    *Withholding.* Each Member certifies that they are U.S. persons within the meaning of code Section 7701(a)(30). Any Person who may subsequently become a Member shall either (i) provide a certificate of non-foreign status to all Members or (ii) be subject to withholding on all distributions as may be required under the Code.

FILED DATE: 6/30/2020 1:52 PM   2020L000292

## ARTICLE 14
## MISCELLANEOUS

14.1   *Reimbursements.*  The Company shall reimburse the Members and the Managers for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company.  Such expenses shall not include any expenses incurred in connection with a Member's or Manager's exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business.  The sole determination of the Manager of which expenses are allocated to and reimbursed as a result of the Company's activities or business and the amount of such expenses shall be conclusive.  Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

14.2   *Amendments.*  In addition to amendments to this Agreement otherwise authorized under this Agreement, the Manager may, at any time and without consent of any Member, make any amendment to this Agreement provided that such amendment:

14.2.1   does not adversely affect the rights of the Members or their assignees in any material respect;

14.2.2   merely corrects an error or resolves an ambiguity in, or inconsistency among, the provisions of this Agreement;

14.2.3   deletes or adds any provision of this Agreement that is required to be so deleted or added by any federal or state governmental authority;

14.2.4   merely amends this Agreement or the Company's Articles to admit new Members in accordance with this Agreement;

14.2.5   amends Article 4 in accordance with Section 4.3.3;

14.2.6   amends Article 5 in accordance with Section 5.2.8; or

14.2.7   reflects a change in the Act that permits or requires an amendment, without adversely affecting the rights of any Member in any material respect.

Except as otherwise provided in this Agreement, this Agreement may be amended solely by a written instrument executed by the holders of a majority of the Class B Units then outstanding.

---

FILED DATE: 6/30/2020 1:52 PM    2020L000292

14.3    *Successors.*  This Agreement shall be binding as to the executors, administrators, estates, heirs and legal successors, or nominees or representatives, of the Members. Except as otherwise provided in this Agreement, no persons other than the Members and their respective executors, administrators, estates, heirs and legal successors, or their nominees or representatives, shall obtain any rights by virtue of this Agreement.

14.4    *Counterparts.*  This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

14.5    *Integration.*  This Agreement constitutes the entire agreement among the Members pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and undertakings of the Members in connection therewith.

14.6    *Entire Agreement.*  This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. It supersedes any prior agreement or understandings between them relating to the subject matter hereof, and it may not be modified or amended except in a writing executed by all parties hereto.

14.7    *Governing Law.*  This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to the principles of conflict of laws thereof.

14.8    *Severability.*  This Agreement shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Act. If, notwithstanding the previous sentence, a court of competent jurisdiction concludes that any provisions or wording of this Agreement is invalid or unenforceable under the Act or other applicable law, the invalidity or unenforceability or such provisions or wording will not invalidate the entire Agreement. In such a case, this Agreement will be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of applicable law and, in the event such term or provisions cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable provisions or term. If it is determined that any provision relating to the distributions and allocations of the Company or to any fee payable by the Company is invalid or unenforceable, this Agreement shall be construed or interpreted so as (a) to make it enforceable or valid and (b) to make the distributions and allocations as closely equivalent to those set forth in this Agreement as permissible under applicable law.

14.9    *Headings.*  The Headings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

14.10    *Waiver.*  No consent or waiver, express or implied, by any Member to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such Member hereunder. Failure on the part of any Member to complain of any act or failure to act of any other Member or to declare any

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 6/30/2020 1:52 PM    2020L000292

other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Company, of its rights hereunder.

14.11    *Filings.* Following the execution and delivery of this Agreement, the Manager shall promptly prepare any documents required to be filed and recorded under the Act, and the Manager shall promptly cause each such document to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. The Manager shall also promptly cause to be filed, recorded and published such statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

14.12    *Notices.* Notices, requests, reports, payments, calls or other communications required to be given or made to any Member hereunder shall be in writing and shall be delivered personally or mailed, certified mail, return receipt requested, or delivered by overnight courier service to such Member at such Member's address last shown on the Company's books and records, or such other address as any party hereto designates by written notice to the Company, and shall be deemed to have been given upon delivery, if delivered personally, three days after mailing, if mailed, or one business day after delivery to the courier, if delivered by overnight courier service. Addresses shown under the signatures of each Member shall be considered the last known address of such Member unless and until the Company is otherwise notified by such Member.

14.13    *Mediation.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation, the Company and each Member agrees to seek resolution of such controversy or claim through mediation in accordance with the current Commercial Mediation Rules of the American Arbitration Association before resorting to arbitration, litigation, or some other form of dispute resolution.

14.14    *Arbitration.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation or mediation, the Company and each Member agrees to seek resolution of such controversy or claim through arbitration in accordance with the current Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of arbitration shall be allocated among the parties as directed by the arbitrator(s).

14.15    *Equitable Remedies.* The rights and remedies of the Members hereunder shall not be mutually exclusive, i.e., the exercise of rights granted under any provisions hereof shall not preclude the exercise of any other provisions hereof. The Members confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise

FILED DATE: 6/30/2020 1:52 PM    2020L000292

of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this subsection to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

14.16  *Company Losses Due to Member's Litigation.*  In the event the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with any Member's obligations or liabilities which do not arise out of or relate to the business of the Company, and which are not covered by the Company's insurance coverage, such Member shall reimburse the Company for all such expenses incurred, including attorneys' fees, and the interest of such Member in this Company may be charged therefor.

14.17  *Title to Company Assets.*  The assets of the Company shall be owned by the Company as an entity, and no Member shall have any direct ownership interest in such assets or any portion thereof.

14.18  *Execution of Additional Documents.*  Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments reasonably necessary for the Company to comply with any applicable laws, rules or regulations.

14.19  *Confidentiality.*  Any mediators or mediators appointed pursuant to this Agreement shall be under a duty to maintain in confidence, to the greatest extent reasonably possible, any and all information relating to the Company and/or its Members or creditors.

***Signature Page Follows***

FILED DATE: 6/30/2020 1:52 PM   2020L000292

## ADDITIONAL MEMBER SIGNATURE PAGE

The undersigned hereby executes the Operating Agreement, dated as of August 15, 2005 ("Agreement"), by and among Heritage Development Partners, LLC, an Illinois limited liability company (the "Company"), and the Members listed on the signature pages thereto. Each of the parties other than the Company may be referred to individually as a "Member" and collectively as the "Members".

Date: _____, 2206

_____
Name

_____
Address

_____
Signature

HERITAGE DEVELOPMENT PARTNERS, LLC
(on behalf of itself and the Members)

By: _____
       Authorized Manager

FILED DATE: 6/30/2020 1:52 PM   2020L000292

**SCHEDULE 1**
**TO THE**
**HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT**

**Ownership of Members as of January 1, 2006**

| Member | Class A Units | Class B Units | Capital Contribution |
|---|---|---|---|
| MT Property Holdings, LLC | None | 72,000 | $1,000 |
|  |  | None |  |
| **Total** |  | 72,000 | $1,000 |

FILED DATE: 6/30/2020 1:52 PM    2020L000292

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:        **HERITAGE DEVELOPMENT PARTNERS, LLC,**
an Illinois limited liability company

By: **HERITAGE PROPERTY DEVELOPMENT , INC.**
Its: Manager

By: Michael Rumman
Its: President

MEMBER:        **MT PROPERTY HOLDINGS, LLC,**
an Illinois limited liability company

By: Michael Rumman
Its: Member

By: Antion S. Rezko
Its: Member

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

*Page -40-*

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:          **HERITAGE DEVELOPMENT PARTNERS, LLC,**
an Illinois limited liability company

By:  **HERITAGE PROPERTY DEVELOPMENT , INC.**
Its: Manager

By: Michael Rumman
Its: President

MEMBER:         **MT PROPERTY HOLDINGS, LLC,**
an Illinois limited liability company

By: Michael Rumman
Its: Member

By: Antion S. Rezko
Its: Member

# EXHIBIT  E

**IN THE UNITED STATES DISTRICT COURT FOR THE NORTHERN
DISTRICT OF ILLINOIS, EASTERN DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI *et al.* | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. |
| v. | ) | |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf and Chicago South Loop | ) | |
| Holdings III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DECLARATION OF MOHAMMED AL-MIQDADI

1.    I am submitting this declaration in support of the Notice of Removal filed by defendant, Chicago South Loop Holdings III, LLC ("South Loop Holdings"), in this action. I have personal knowledge of the facts set forth in this Declaration.

2.    South Loop Holdings is one of two defendants in this action. The other defendant is General Mediterranean Holdings, S.A., SpF ("GMH").

3.    South Loop Holdings is a limited liability company organized under Delaware law.

4.    The sole member of South Loop Holdings is CSLH Incorporated ("CSLH ").

5.    CSLH was incorporated in Delaware in 2013. Since 2013, its sole office has been located at Lincoln House, 137-143 Hammersmith Road, London W14 0QL United Kingdom. It has never leased or owned office space or other real estate in the United States.

6.    I am the President and sole Director of CSLH, and I have held these positions since 2013. Since 2013 I have been responsible for directing, controlling and coordinating CSLH's business activities. I have performed these activities at CSLH's office in London. I also reside in London.

7.     At the time this action was commenced and now, CSLH has owned South Loop Holdings in its entirety and Chicago South Loop Holdings I, LLC in its entirety.

8.     Pursuant to the terms of South Loop Holdings' operating agreement, in 2013 CSLH appointed CSLH Manager Incorporated, a Delaware corporation, as a Manager of South Loop Holdings. CSLH owns CSLH Manager Incorporated.

9.     From 2013 to the present, CSLH's sole business activities have involved its management of a single real estate asset. The single asset is the 62 acre parcel bounded by Clark Street (E), Roosevelt Road (N) and the Chicago River (W) in Chicago, Illinois (the "Property"). Roosevelt Clark Partners, LLC, a Delaware limited liability company, holds title to the Property. The development manager of the Property is Related R/C LLC, a Delaware limited liability company.

10.    Since its formation in 2013, all of CSLH's material activities and important decisions have occurred at its office in the UK. These include CSLH's inputs and contributions to the masterplan, business plan and budget approval process for the Property. All material business decisions have made in meetings held at CSLH's office in London. Legal and budgetary documentation has been reviewed, commented upon, approved and where necessary, signed and executed in the UK. All quarterly Board meetings of CSLH have taken place in London, requiring representatives of the Property's development manager to travel to London, although Board meetings have been conducted virtually during the COVID-19 pandemic.

11.    In addition to myself, every key member of CSLH's business team is located in London: (i) Arif Husain, Chief Financial Officer of CSLH's affiliate, GMH; (ii) Ahmed El Fadel, Assistant Project Manager of GMH; and (iii) CSLH's real estate finance consultant, Nick Shattock of Chainwork Capital Limited.

4624915-v1\CHIDMS1                                    2

12.     CSLH has worked with two independent contractors who are located in Chicago: Mary Wilk and Kenneth Haldeman.  Ms. Wilk is an independent contractor who has provided administrative support to CSLH.  Ms. Wilk has provided only administrative service to CSLH. She has not participated in material business decisions relating to CSLH's business.  Ms. Wilk has been engaged and paid by a third party affiliate of CSLH.

13.     Mr. Haldeman is the principal of a real estate development consulting firm called ChiCosta Development LLC.  Mr. Haldeman has provided consulting services to CSLH with regard to the Property, but all material business decisions have been made by CSLH in London. ChiCosta Development LLC has been engaged and paid by an affiliate of CSLH.

14.     At no time has CSLH conducted any business activities in Indiana or Pennsylvania.

15.     In addition to my role as President of CSLH, I am the Senior Director of International Development for GMH.  GMH is an entity organized under the laws of Luxembourg and it is headquartered in Luxembourg.   GMH is unaware of any attempt to serve it with the summons, complaint or any other pleadings that have been filed in this proceeding.

16.     Although I understand GMH is not required to consent to the removal of this action from the Circuit Court of Cook County, Illinois to the United States District Court for the Northern District of Illinois, GMH has informed me that it does consent to such removal.

17.     I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on July 7, 2020.


_____
Mohammed Al-Miqdadi

# EXHIBIT F

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

(12/30/15) CCL N530

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

ALI BAGHDADI, et al,

Plaintiff

v.

GENERAL MEDITERRANEANHOLDING, S.A., Spf, et al,

Defendant

No. 2020 L 000292

9002242

Calendar: N - (Hon. Margaret Ann Brennan)

## APPEARANCE

☑ GENERAL APPEARANCE          0900 - APPEARANCE - FEE PAID;  0909 - APPEARANCE - NO FEE;
                              0904 - APPEARANCE FILED - FEE WAIVED

☐ JURY DEMAND                 1900 - APPEARANCE & JURY DEMAND - FEE PAID
                              1909 - APPEARANCE & JURY DEMAND - NO FEE

The undersigned enters the appearance of:        ☐  Plaintiff    ☑  Defendant

Chicago South Loop Holdings III, LLC.

_____

(Insert litigant's name.)

/s/ John M. Murphy

Signature

☑ INITIAL COUNSEL OF RECORD        ☐ PRO SE
☐ ADDITIONAL APPEARANCE            ☐ SUBSTITUTE APPEARANCE

A copy of this appearance shall be given to all parties who have appeared and have not been found by the Court to be in default.

☑ Atty. No.: 90080          ☐ Pro Se  99500

(Please complete the following contact information.)

Name: John M. Murphy, BAKER & McKENZIE LLP

Atty. for: Defendant, Chicago South Loop Holdings III, LLC.

Address: 300 East Randolph Street, Suite 5000

City/State/Zip: Chicago, Illinois 60601

Telephone: +1 312 861 8085

Primary Email: john.murphy@bakermckenzie.com

Secondary Email: _____

Tertiary Email: _____

**Pro Se Only:** ☐ I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

_____

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# EXHIBIT  G

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

Appearance

(12/30/15) CCL N530

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

ALI BAGHDADI, et al,

                                                    Plaintiff

v.

GENERAL MEDITERRANEANHOLDING, S.A., Spf, et al,

                                                    Defendant

No. 2020 L 000292

9002242

Calendar: N - (Hon. Margaret Ann Brennan)

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## APPEARANCE

☑ GENERAL APPEARANCE      0900 - APPEARANCE - FEE PAID; 0909 - APPEARANCE - NO FEE;
                                              0904 - APPEARANCE FILED - FEE WAIVED

☐ JURY DEMAND                 1900 - APPEARANCE & JURY DEMAND - FEE PAID
                                              1909 - APPEARANCE & JURY DEMAND - NO FEE

The undersigned enters the appearance of:      ☐ Plaintiff     ☑ Defendant

Chicago South Loop Holdings III, LLC.

_____

(Insert litigant's name.)

/s/ Matthew G. Allison

Signature

☐ INITIAL COUNSEL OF RECORD      ☐ PRO SE
☑ ADDITIONAL APPEARANCE           ☐ SUBSTITUTE APPEARANCE

     A copy of this appearance shall be given to all parties who have appeared and have not been found by the Court to be in default.

☑ Atty. No.: 90080        ☐ Pro Se 99500

(Please complete the following contact information.)

Name: Matthew G. Allison, BAKER & McKENZIE LLP

Atty. for: Defendant, Chicago South Loop Holdings III, LLC.

Address: 300 East Randolph Street, Suite 5000

City/State/Zip: Chicago, Illinois 60601

Telephone: +1 312 861 2630

Primary Email: matthew.allison@bakermckenzie.com

Secondary Email: _____

Tertiary Email: _____

**Pro Se Only:** ☐ I have read and agree to the terms of the Clerk's Office Electronic Notice Policy and choose to opt in to electronic notice from the Clerk's office for this case at this email address:

_____

## DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS

# EXHIBIT  H

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

FILED DATE: 4/1/2020 3:26 PM  2020L000292

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, | ) | |
| ANTOINE KORKIS, NAJAH NAJJAR, | ) | |
| JACQUELINE NAJJAR, SUHAIL | ) | |
| NAMMARI, NACHWAN REZKO, | ) | |
| BURT REZKO, MILAD SAAD, | ) | |
| MICHAEL SAHLI, GEORGES ZOUKI, | ) | |
| KHALED SHAIR, LAYLA EL SHAIR, | ) | |
| AND QMQQ LLC, | ) | No. 2020 L 000292 |
| | ) | |
| Plaintiffs, | ) | Hon. Margaret Ann Brennan |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf; and CHICAGO | ) | |
| SOUTH LOOP HOLDINGS III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT CHICAGO SOUTH LOOP HOLDINGS III, LLC'S**
**COMBINED SECTION 2-615 AND SECTION 2-619 MOTIONS TO DISMISS**

Defendant, Chicago South Loop Holdings III, LLC ("South Loop III"), moves this Court

to dismiss Plaintiffs' Complaint under Section 2-615 and Section 2-619 of the Code of Civil

Procedure. In support of its motion, Defendant states as follows:

1.       This action alleging breach of fiduciary duties concerns an Illinois limited liability

company, MT Property Holdings, LLC ("MT Holdings"), which was dissolved nearly six years

ago in May 2014. *See* Compl. ¶ 75. At the time of the dissolution, defendant South Loop III was

MT Holdings' sole member. *See* Compl. ¶ 62, 64.

2.       Fatal to their claim against Defendant South Loop III is Plaintiffs' admission that

they were <u>not</u> members of MT Holdings. *See* Compl. ¶¶ 7-19. Rather, Plaintiffs admit that they

were mere "transferees" of a former member's "Distribution Interests" in MT Holdings -- a very

limited, non-member interest specifically defined in both the MT Holdings' Operating Agreement

1

FILED DATE: 4/1/2020 3:26 PM       2020L000292

and the Illinois Limited Liability Act, 805 ILCS 180/1-1 *et seq.* ("the Illinois LLC Act").

3.    Plaintiffs allege that MT Holdings itself was a member of a separate limited liability company called Heritage Development Partners, LLC ("Heritage"), which, in turn, was a member of another entity which owned title to a undeveloped parcel of land south of the Chicago Loop. *See* Compl. ¶¶ 97, 99.

4.    Plaintiffs allege that their Distribution Interests in MT Holdings granted them certain rights pursuant to the Section 7.2 of the Heritage Operating Agreement. Plaintiffs contend that, as a member of Heritage, MT Holdings could not be dispossessed of its right to an ownership share of any deal to develop the parcel of land, which is now known as the "78." *See* Compl. ¶¶ 4, 41-43, 67-74,77.7-19 Plaintiffs allege that in May 2014, South Loop III breached "fiduciary duties of loyalty, due care and good faith and fair dealing" to Plaintiffs by transferring ownership of the parcel to a related entity without ensuring that MT Holdings maintained its prior ownership share, thereby "depriv[ing] [Plaintiffs] of the opportunity to participate in the future development of the property." *See* Compl. ¶ 4, 77, 99.

5.    As explained more fully in Defendant's Memorandum in Support of its Combined Section 2-615 and Section 2-619 l Motion to Dismiss, Plaintiffs' claim against South Loop III must be dismissed with prejudice or at least three independently dispositive reasons: First, as a matter of law, South Loop III did not owe fiduciary duties to Plaintiffs as mere holders of Distribution Interests in MT Holdings. The MT Holdings Operating Agreement and the Illinois LLC Act, South Loop III specifically define the circumscribed rights that are granted to these non-member transferees of a narrow Distribution Interest, and those rights cannot provide the basis for a claim of fiduciary breach. Second, Plaintiffs lack standing to bring their claim against South Loop III because the injuries alleged by Plaintiffs, if there are any injuries, were sustained by MT Holdings,

FILED DATE: 4/1/2020 3:26 PM   2020L000292

rather than by Plaintiffs. Third, Plaintiffs' claim is barred by the five-year limitations period applicable to claims for breach of fiduciary duty. The events that are the subject of this Complaint occurred well over five years ago.

WHEREFORE, for the foregoing reasons, Defendant, Chicago South Loop Holdings III, LLC, prays that this Court dismiss Plaintiffs' complaint with prejudice pursuant to Sections 2-615(a) and 2-619 (5) and (9) of the Code of Civil Procedure.

Dated: April 1, 2020                                        Respectfully submitted,

                                                           /s/ John M. Murphy
                                                          Attorneys for defendant, Chicago Holdings
                                                          South Loop III, LLC

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000
Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

# EXHIBIT I

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

|  |  |  |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN REZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, | ) ) ) ) ) ) ) ) ) ) | No. 2020 L 000292 |
| Plaintiffs, | ) ) | Hon. Margaret Ann Brennan |
| v. | ) ) | |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) ) | |
| Defendants. | ) | |

**NOTICE OF FILING**

To:     See attached Certificate of Service

PLEASE TAKE NOTICE that on April 1, 2020, we filed with the Clerk of the Circuit Court of Cook County, Illinois County Department, Law Division, via the Court's ECF filing system, **Defendant Chicago South Loop Holdings III, LLC's Combined Section 2-615 and Section 2-619 Motions to Dismiss.**

Dated: April 1, 2020                    Respectfully submitted,


                                         /s/ John M. Murphy
                                        Attorneys for defendant, Chicago
                                        Holdings South Loop III, LLC

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000
Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

FILED DATE: 4/1/2020 3:26 PM   2020L000292

STATE OF ILLINOIS   )
                    ) SS.
COUNTY OF COOK      )

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, deposes and states that copies of the foregoing **Notice** and **Defendant Chicago South Loop Holdings III, LLC's Combined Section 2-615 and Section 2-619 Motions to Dismiss** were served upon the following counsel of record via electronic notice pursuant to the Court's ECF system and via email transmission this 1st day of April, 2020:

Edward T. Joyce
The .Law Offices of Edward T. Joyce &
    Assoc. PC
135 S. LaSalle St., Suite 2200
Chicago, IL  60603
312-641-2600
rcarroll@joycelaw.com

_/s/_ John M. Murphy_____
Attorneys for defendant, Chicago
Holdings South Loop III, LLC

4596461-v1\CHIDMS1

# EXHIBIT  J

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED DATE: 4/1/2020 3:26 PM   2020L000292

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN REZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, | ) ) ) ) ) ) ) ) ) ) | |
| | ) | No. 2020 L 000292 |
| Plaintiffs, | ) ) | Hon. Margaret Ann Brennan |
| v. | ) ) ) | |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**DEFENDANT CHICAGO SOUTH LOOP HOLDINGS III, LLC'S**
**MEMORANDUM IN SUPPORT OF ITS COMBINED SECTION**
**2-615 AND SECTION 2-619 MOTIONS TO DISMISS**

Defendant, Chicago South Loop Holdings III, LLC ("South Loop III"), for its memorandum in support of its Section 2-615 and Section 2-619 Motion to Dismiss Plaintiffs' Complaint, states the following.

**I.**    **NATURE OF MOTION**

This action concerns an Illinois limited liability company, MT Property Holdings, LLC ("MT Holdings"), which was dissolved nearly six years ago in May 2014. *See* Compl. ¶ 75. At the time of the dissolution, defendant South Loop III was MT Holdings' sole member. *See* Compl. ¶ 62, 64. MT Holdings itself was a member of a separate limited liability company named Heritage Development Partners, LLC ("Heritage"), which, in turn, was a member of another entity which owned title to a undeveloped parcel of land south of the Chicago Loop. *See* Compl. ¶¶ 97, 99.

1

FILED DATE: 4/1/2020 3:26 PM   2020L000292

Plaintiffs allege in their single-count complaint that their alleged interest in MT Holdings granted them certain rights pursuant to the Section 7.2 of the Heritage Operating Agreement. Plaintiffs contend that, as a member of Heritage, MT Holdings could not be dispossessed of its right to an ownership share of any deal to develop the parcel of land, which is now known as the "78." *See* Compl. ¶¶ 4, 41-43, 67-74,77.7-19   Plaintiffs allege that in May 2014, South Loop III breached "fiduciary duties of loyalty, due care and good faith and fair dealing" to Plaintiffs by transferring ownership of the parcel to a related entity without ensuring that MT Holdings maintained its prior ownership share, thereby "depriv[ing] [Plaintiffs] of the opportunity to participate in the future development of the property." *See* Compl. ¶ 4, 77, 99.[1]

While much of the Complaint's allegations detail the corporate logistics of the 2014 ownership restructuring of the parcel, these details are not legally relevant to this dispute or to this Motion. Admittedly, and thus immediately fatal to the claim asserted here, Plaintiffs **were not members of MT Holdings**. *See* Compl. ¶¶ 7-19. Rather, Plaintiffs plead that they were each transferees of a portion of a former member's "Distribution Interests" in MT Holdings -- a very limited, non-member interest that is specifically defined in both the MT Holdings' Operating Agreement[2] *and* in the Illinois Limited Liability Act, 805 ILCS 180/1-1 *et seq*. ("the Illinois LLC Act"). Pursuant to the explicit terms of both contract and statute, these Plaintiffs did not possess the rights of a member of MT Holdings and did not possess any right whatsoever to participate in,

---

[1] A copy of Plaintiffs' complaint is attached hereto as Exhibit A.

[2] In violation of Section 2-606, plaintiffs failed to attach to their complaint the MT Holdings Operating Agreement, though their claim is premised in significant part on this agreement. *See* 735 ILCS, 5/2-606 ("If a claim or defense is founded on a written instrument, a copy thereof, or so much of the same as is relevant, must be attached to the pleading as an exhibit or recited therein …"). Defendant attaches the MT Holdings Operating Agreement here as Exhibit B and thus, as explained herein, moves to dismiss the Complaint both under Section 2-619(9) and Section 2-615. The Affidavit of Mohammed Al-Miqdadi, attesting that Exhibit B is a true and accurate copy of the MT Holdings Operating Agreement, is attached hereto as Exhibit C.

FILED DATE: 4/1/2020 3:26 PM    2020L000292

or to belatedly complain six years later about, the management affairs of MT Holdings. Indeed, they possessed only dramatically limited rights which cannot and do not provide a basis for their fiduciary claim here.

Plaintiffs' claim against South Loop III for breach of fiduciary duties must be dismissed for at least three independently dispositive reasons.[3] *First, as a matter of law, South Loop III did not owe fiduciary duties to Plaintiffs as mere holders of Distribution Interests in MT Holdings.* The MT Holdings Operating Agreement and the Illinois LLC Act, South Loop III specifically define the circumscribed rights that are granted to these nonmember transferees of a narrow Distribution Interest, and those rights cannot and do not provide the basis for a claim of fiduciary breach. Despite their exhaustive and irrelevant detailing of the chronology of the parcel's ownership and it 2014 restructuring, Plaintiffs simply cannot create the existence of a fiduciary duty out of whole cloth. The parties' contractual relationship (as defined by the MT Holdings Operating Agreement) and the parties' statutory relationship (as defined by the LLC Act) trump any effort by Plaintiffs to sufficiently plead a fiduciary relationship *in fact* based on generic allegations that they placed "trust and confidence" in the Defendants. The lack of any fiduciary relationship here mandates immediate dismissal of this Complaint.

*Second, Plaintiffs lack standing to bring their claim against South Loop III* because the injuries alleged by Plaintiffs, if there are any injuries, were sustained by MT Holdings, rather than by Plaintiffs.

*Third*, *Plaintiffs' claim is barred by the five-year limitations period* applicable to claims for breach of fiduciary duty. The events that are the subject of this Complaint occurred well over five

---

[3] In accord with Section 2-619.1 of the Code of Civil Procedure, Defendant South Loop III identifies the specific statutory grounds for each dismissal argument.

FILED DATE: 4/1/2020 3:26 PM          2020L000292

years ago, and plaintiffs have failed to plead any facts, which if proven, would support a tolling of the statute of limitations under the discovery rule. Defendant had no obligation to provide information to Plaintiffs, mandating that Plaintiffs keep themselves apprised of the affairs of MT Holdings. Yet Plaintiffs sat silent and did nothing. They have failed to timely bring their claim.

## II. DISMISSAL UNDER SECTION 2-619(9): AS A MATTER OF LAW, SOUTH LOOP III DID NOT OWE FIDUCIARY DUTIES TO PLAINTIFFS

### A. Plaintiffs *Were Not Members* of MT Holdings; They were Mere Transferees of a Member's "Distribution Interest"

The factual foundation of Plaintiffs' fiduciary claim is pleaded plainly in the Complaint. Plaintiffs allege that thirteen years ago, Antoin Rezko, who at the time was a member of MT Holdings, transferred to each of them an "economic, non-member interest in MT". *See* Compl. ¶ ¶ 7-19. Indeed, paragraph 3 of the Complaint confirms that "[i]n July 2007, Rezko assigned 30.497% of his economic/distributional interests in MT to Plaintiffs." A "distributional interest" is a narrow and circumscribed right simply to share in the potential proceeds of the LLC. The MT Holdings' Operating Agreement specifically defines the limited rights of a "Distribution Interest" holder as follows:

> "[T]he right to receive the shares of revenues from production and other income, receipts or gain of [MT Holdings], or of any other distributions from the Company, with respect to an Interest in [MT Holdings]. ***The holder of a Distributional Interest is not a Member, nor has any of the other rights herein conferred upon such Member, including the right to vote as a Member*** until such holder is admitted as a Member (if at all)."

Exh. B, MT Holdings Operating Agreement, Sec. 1.18 (emphasis added). *See also Bank of America v. Freed*, 2012 IL App (1st) 101749 P41 (observing that Section 30-5 of the Illinois LLC Act "provides that a transfer of a distributional interest in an LLC does not give the transferee any rights as a member but only the right to receive distributions by the LLC"). The MT Holdings Operating Agreement emphasizes the lack of member status for Distribution Interest holders to

FILED DATE: 4/1/2020 3:26 PM 2020L000292

prevent exactly the sort of stale claim that Plaintiffs attempt to now assert. Without member status, these Plaintiffs are not permitted to interfere in the management of MT Holdings either at the time corporate action is taken -- or several years later through belated litigation. An LLC is run by its members and its manager, and only those entities are empowered to invoke and enforce the duties (whether statutory, contractual or fiduciary) of other members.

**B.      Absent a Statutory or Contractual Duty, a Member of an Illinois LLC Owes no Fiduciary Obligation to other Members, Much Less to a Distributional Interest Holder**

Indeed, the duties owed by a member of an Illinois LLC to any distributional interest holder are governed *exclusively* by the Illinois LLC Act and by an LLC's operating agreement. Such rights and duties do not exist in the common law. As the Illinois Appellate Court has explained, a limited liability company is a "creature of statute," and as such, "[w]e look to the applicable provisions of the Act in determining the fiduciary duties owed by the managers and members of the LLC." *Katris v. Carroll*, 362 Ill. App. 3d 1140, 1144 (1st Dist. 2005).

Under Section 15-5(a) of the Illinois LLC Act, the Members of an LLC are free to define and limit, by contract, their rights and duties to each other and to distribution interest holders:

> "All members of a limited liability company may enter into an operating agreement to regulate the affairs of the company and the conduct its business and to govern relations among the members, managers, and company … To the extent the operating agreement does not otherwise provide, this Act governs relations among the members, managers and company."

805 ILCS 180/15-5(a); The Act makes plain that any fiduciary duties that a member may owe are owed **only** to the "company and its other members" (805 ILCS 180/15-3(a)), and **not** to transferees of a distributional interest. Moreover, the "operating agreement may… restrict or eliminate a fiduciary duty, other than the duty of care [.]" 805 ILCS 180/15-5(c) (1). Plaintiffs' contention that South Loop III owed them a fiduciary duty is denied by the plain language of both the Illinois LLC Act and MT Holdings Operating Agreement.

FILED DATE: 4/1/2020 3:26 PM    2020L000292

### 1.   South Loop III Did Not Owe Plaintiffs Fiduciary Duties Under the Illinois LLC Act

Despite one hundred pleaded paragraphs over seventeen pages, Plaintiffs' Complaint makes no allegation that any fiduciary duty arises under the terms of the Illinois LLC Act. At all relevant times, Plaintiffs were mere "Distribution Interest" holders, which had been transferred in 2007 by former member Rezko. Plaintiffs want to avoid the LLC Act because its provision expose the extremely limited rights that Plaintiffs did have and make plain that they were not in any sort of a fiduciary relationship with South Loop III.

The Illinois LLC Act unambiguously provides that members owe fiduciary duties ***only to each other and to the LLC itself***. 805 ILCS 180/15-3.[4] There is no statutory language anywhere in the Illinois LLC Act that would support any assertion that a member of an Illinois LLC owes fiduciary duties to the transferee of a Distribution Interest. Indeed, the statutory rights afforded Distribution Interest transferees under the Illinois LLC Act are extremely limited, and doom Plaintiffs' Complaint as a matter of law. Confirming the language of the MT Operating Agreement, Section 30-5(b) of the Illinois LLC Act denies member status to any of the Plaintiffs:

> "A transfer of a distributional interest does not entitle the transferee to become or to exercise any rights of a member. A transfer entitles the transferee to receive, to the extent transferred, only the distributions to which the transferor would be entitled."

805 ILCS 180/30-5(b). Distributional Interest holders have but one right: a right to receive of share of funds, but only to the extent that such funds are distributed. Nothing more. To avoid any confusion, the LLC Act continues, confirming that Distribution Interest transferees are (i) ***"not***

---

[4] Additionally, under the Illinois LLC Act, a "distributional interest in a limited liability company is personal property"; the transferee of a distributional interest has no ownership interest in the property of a limited liability company. 805 ILCS 180/30-1(a) (b). This prevents any generic, backdoor claim by Plaintiffs that their "stake" in MT Holdings allows them to piggyback on the fiduciary rights a member owes to the LLC itself.

*entitled to participate in the management or conduct of the limited liability company's business"*
and (i) *"not entitled [to] access to information concerning the company's transactions."* 805
ILCS 180/30-10(d). Plaintiffs here had absolutely no say in the business of MT Holdings, and the
members of MT Holdings had no obligation to keep them apprised of anything that the company
was doing. South Loop III did not owe Plaintiffs a fiduciary duty under the Illinois LLC Act.

**2. South Loop III Did Not Owe Plaintiffs Fiduciary Duties under MT Holdings' Operating Agreement**

In accord with Sections 15-5 and 30-5(b) of the Illinois LLC Act, the members of MT
Holdings ordered their relationships, including their relationships with the transferees of
Distribution Interests, by agreeing to the terms of MT Holdings' Operating Agreement. MT
Holdings Operating Agreement makes it explicit that "[t]he holder of a Distributional Interest is
not a Member, nor has any of the other rights herein conferred upon such Member, including the
right to vote as a Member until such holder is admitted as a Member (if at all)." *See* Ex. B, MT
Holdings' Operating Agreement, Sec. 1.18. No provision in MT Holdings' Operating Agreement
imposed a fiduciary obligation on South Loop III as concerns plaintiffs. To the contrary, the
members of MT Holdings agreed to strictly limit plaintiffs' rights, as mere transferees of a member
Distribution Interests:

> "A Person who acquires Membership Rights or Interest but who is not admitted as
> a substituted Member pursuant to Section 8.6 shall hold only a distribution interest
> [and] shall be entitled only to allocations and distributions with respect to such
> Interests in accordance with this Agreement, shall have no right to any information
> or accounting of the affairs of [MT Holdings], shall not be entitled to inspect the
> books and records of [MT Holdings], and shall not have any of the rights of a
> Member under the [Illinois limited Liability Company] Act or this Agreement."

Exh. B, MT Holdings' Operating Agreement, Sec. 8.5.

Because neither the Illinois LLC Act nor MT Holdings' Operating Agreement affords
Plaintiffs a basis for alleging that South Loop III owed them fiduciary duties, this Court should

FILED DATE: 4/1/2020 3:26 PM   2020L000292

FILED DATE: 4/1/2020 3:26 PM   2020L000292

dismiss the Complaint with prejudice pursuant to Section 2-619(9). *See Wiggs v. Summit Midstream Holdings, LLC*, 2013 Del. Ch. LEXIS 84, *37 (Del. Ch. 2013) ("The difficulty with the Plaintiffs' fiduciary duty claims regarding Services [LLC] is simple. They were not members of Services and no fiduciary duties were owed under the 2009 Services [Operating] Agreement"); *MFB Realty LLC v. Eichner*, 79 N.Y.S. 3d 35, 36 (N.Y. Sup. Ct., May 29, 2018) ("… since MFB is not a member of T Park, defendant Park Central (T Park's managing member) does not owe MFB a fiduciary duty").

## III.   DISMISSAL UNDER SECTION 2-615: PLAINTIFFS ATTEMPT TO PLEAD A *DE FACTO* FIDUCIARY RELATIONSHIP FAILS AS A MATTER OF LAW

### A.   Common Law Principles Governing the Creation of *De Facto* Fiduciary Relationship Do Not Apply Here

Unable to allege that South Loop III owed plaintiffs' fiduciary duties under the Illinois LLC Act or under MT Holdings' Operating Agreement, Plaintiffs attempt to allege the existence of a *de facto* fiduciary relationship resulting from "special circumstances," rather than a fiduciary relationship that exists as a matter of law. *See* Compl. ¶ 95 (alleging the conclusion that South Loop III owed fiduciary duties to plaintiffs because plaintiffs "placed trust and confidence in South Loop III to protect, preserve and advance MT's interests …"). *See Benson v. Stafford*, 407 Ill. App. 3d 902, 912 (1st Dist. 2010) ("A fiduciary relationship may occur as a matter of law, or it may arise 'as a result of the special circumstances of the parties' relationship where one places trust in another so that the latter gains superiority and influence over the former'."), *quoting State Security Insurance Co. v. Frank B. Hall & Co.*, 258 Ill. App. 3d 588, 595 (1st Dist. 1994).

This attempt must fail because common law principles concerning *de facto* fiduciary relationships do not apply in the context of determining the duties owed by a member an LLC to other members or their Distribution Interest transferees. As the court held and emphasized in *800 S. Wells Commer., LLC v Cadden*, 2018 IL App. (1st) 162882:

FILED DATE: 4/1/2020 3:26 PM    2020L000292

> "[P]laintiff asserts that the [Illinois LLC] Act was not intended to supplant the common-law concept that an officer of a corporation owes a fiduciary duty to that corporation. This could not be further from the truth. Undoubtedly, the [Illinois LLC] Act governs here, not common law considerations, since the Act speaks directly to who, and who does not, owe fiduciary duties"

*Id.* at P37. *See also Puleo v. Topel*, 368 Ill. App. 3d. 63, 67-70 (1st Dist. 2006) (dismissing claim against member of LLC alleging personal liability for LLC's debts on grounds that there was no basis for imposing liability under Illinois LLC Act); *Katris v. Carroll*, 362 Ill. App. 3d 1140, 1144 (1st Dist. 2005) ("We look to the applicable provisions of the [Illinois LLC] Act in determining the fiduciary duties owed by the managers and members of the LLC); *Arnest v. Audino*, 332 Ill. App. 3d 468,475-76 (1st Dist. 2002) (same).

The MT Operating Agreement and the Illinois LLC Act create and define the very narrow distributional right held by these Plaintiffs. The Agreement and the Act further make plain that these Plaintiffs are not members and are not entitled to participate in the management of MT, or even to receive information concerning the business activities of the company. Plaintiffs simply cannot, through generic allegations of "trust and confidence," convert their simple property right in their Distribution Interests into a fiduciary right that allows them to belatedly complain about a corporate transaction that occurred six years. They had no rights to stop, influence or even know about that transaction then, and their tardy efforts to claim a fiduciary right now fails as a matter of both law and fact. Plaintiffs' fiduciary duty claim against South Loop III should be dismissed with prejudice under Section 2-615.

**B.    Plaintiffs' Allegations that a *De Facto* Fiduciary Relationship Exists Here are Insufficiently Pleaded under Section 2-615**

In addition to being a legally infirm effort to sidestep the clear absence of a fiduciary duty here, Plaintiffs' allegations are entirely insufficient to plead the existence of a *de facto* fiduciary relationship with South Loop III. It is well recognized that "[i]f the alleged [fiduciary] relationship

FILED DATE: 4/1/2020 3:26 PM    2020L000292

does not exist as a matter of law, facts from which a fiduciary relationship arises must be pleaded and proved by clear and convincing evidence." *Magna Bank of Madison County v. Jameson*, 237 Ill. App. 3d 614, 618 (5th Dist. 1992). Assuming, for the sake of argument, that plaintiffs could premise their claim on the existence of a *de facto* fiduciary relationship, plaintiffs have failed to allege sufficient facts, which if proven, would constitute such "clear and convincing" evidence.

As the Appellate Court explained in *Benson v. Stafford*, 407 Ill. App. 3d 902, 913-14 (1st Dist. 2010), where a fiduciary relationship does not exist as a matter of law, a plaintiff must show by clear and convincing evidence that "a fiduciary relationship existed based on the particular circumstances of their case." To determine whether a fiduciary relationship exists, Illinois courts consider a number of factors, "including the degree of kinship between the parties, the disparity in age, health, education or business experience between the parties, and the extent to which the subservient party entrusted the handling of its business to the dominant party and placed its trust and confidence in it." *Id*. The fact that one places trust in another is by itself insufficient to form a fiduciary relationship in fact. *Id*. at 914. Moreover, to establish a fiduciary relationship, the trust and confidence allegedly reposed by the first party must be accepted by the second party. *See People v. Central Republic Trust Co.*, 300 Ill. App. 297, 303 (1st Dist. 1939) ("It is not sufficient that confidence be reposed by one party, but the confidence must actually be accepted by the other party in order to constitute a fiduciary relationship."); *see also Hensler v. Busey Bank*, 231 Ill. App. 3d 920, 927 (4th Dist. 1984); *County of Cook v. Barrett*, 36 Ill. App. 3d 623, 635 (1st Dist. 1975).

To state a claim for breach of fiduciary duty, it is incumbent on *each of the named plaintiffs* to allege particular facts, which if true, would constitute clear and convincing evidence of "special circumstances" giving rise to a fiduciary relationship with South Loop III. Plaintiffs, however, have failed to allege any "facts" to support the existence of a fiduciary relationship between any

one of them and South Loop III, much less the existence of a fiduciary relationship between all of them (collectively) and South Loop III. Lumping all of the plaintiffs together, plaintiffs collectively allege only the following nearly identical conclusion unsupported by any facts:

> "As the member-manager of MT [Holdings], South Loop III exercised complete control over MT [Holdings'] operations and investment in the development of the Property. Plaintiffs placed their trust and confidence in ... South Loop III, to protect, preserve and advance MT [Holdings'] interests in the development of the Property." *See* Compl. ¶ 74.

> "As the sole member-manager of MT [Holdings], South Loop III exercised complete control over MT [Holdings'] operations. As a consequence, Plaintiffs, as economic interest holders in MT [Holdings] plaintiffs placed their trust and confidence in South Loop III, to protect, preserve and advance MT [Holdings'] interests in the development of the Property." *See* Compl. ¶ 95.

Moreover, nowhere in their do plaintiffs allege that South Loop III allegedly accepted the trust and confidence placed in them. Plaintiffs' conclusory allegations are insufficient as a matter of law, and their complaint must be dismissed under Section 2-615. *See, e.g., D'Attomo v. Baumback*, 2015 Ill. App. (2d) 140865 P60-61 (affirming dismissal of fiduciary duty claim under Section 2-615 where plaintiffs failed to allege sufficient facts supporting the existence of a fiduciary duty relationship in fact); *Gonzales v. American Express Credit Corp.,* 315 Ill. App. 3d 199 (1st Dist. 2000) (affirming dismissal of fiduciary duty claim under Section 2-615 where plaintiffs' allegations were "insufficient to suggest that special circumstances between plaintiffs and defendants created a fiduciary relationship between them").

## IV.   DISMISSAL UNDER SECTION 2-615: PLAINTIFFS LACK STANDING TO BRING THEIR DIRECT CLAIM

The injuries alleged by plaintiffs are to MT Holdings, rather than to Plaintiffs directly. Under Section 7.2 of the Heritage Operating Agreement, the "opportunity" to acquire an ownership interest in a development company belonged to MT Holdings -- not to Plaintiffs. *See* Compl. Exh. 1, Sec. 7.2. Plaintiffs' alleged injury -- a putative diminution of the value of their Distribution

FILED DATE: 4/1/2020 3:26 PM    2020L000292

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Interests in MT Holdings -- is not a direct injury, but **at best** an indirect injury. It is clear that Plaintiffs have no status in Heritage and cannot make claims against any Heritage member or the company itself. Plaintiffs complain that MT should have kept their ownership rights in the parcel and its potential development. That claim is a claim that belongs to MT, and even assuming there was merit to the claim (and there is not), the remedy for such a claim is a remedy that belongs only to MT Holdings -- and not the limited interest holders. As such, plaintiffs lack standing to allege a direct claim against South Loop III.

"Illinois law is well settled that a shareholder seeking relief for an injury to the corporation, rather than a direct injury to the shareholder himself, must bring his suit derivatively on behalf of the corporation." *Small v. Sussman*, 306 Ill. App. 3d 639, 643 (1st Dist. 1999). "The law controlling whether an action is derivative or direct . . . requires a strict focus on the nature of the alleged injury, i.e., whether it is to the corporation or to the individual shareholder that injury has been done." *Id.* at 644.

> "A stockholder of a corporation does not acquire standing to maintain an action in his own right . . . when the alleged injury is inflicted upon the corporation and the only injury to the shareholder is the indirect harm which consists in the diminution in value of his corporate shares resulting from the impairment of corporate assets. In this situation, it has been consistently held that the primary wrong is to the corporate body and, accordingly, that the shareholder, experiencing no direct harm, possesses no primary right to sue."

*Id.* at 643 (citations omitted). *See also Spillyards v. Abboud*, 278 Ill. App. 3d 663, 670-71 (1st Dist. 1996) ("To have standing to sue individually, rather than derivatively on behalf of the corporation, the plaintiff must allege a special injury, 'either an injury which is separate and distinct from that suffered by other shareholders, or a wrong involving a contractual right of a shareholder, such as the right to vote, or to assert majority control, which exists' independently of any right of the corporation") (*quoting Moran v. Household International, Inc.*, 490 A. 2d 1059, 1070 (Del. Ch. 1985)). As the district court observed in *Elmhurst Consulting*, *LLC v. Gibson,* 219

F.R.D. 125 (N.D. Ill. 2003), fiduciary duty claims involving misappropriation of assets and usurpation of corporate opportunities "are classic examples of injuries done to the corporation."

Plaintiffs, however, would lack standing if they attempted to allege a derivative claim against South Loop III on behalf of MT Holdings. The Illinois LLC Act authorizes derivative actions on behalf of limited liability companies, but only a member of a limited liability company may bring a derivative claim. 805 ILCS 180/40-1 *et seq*. These Plaintiffs *are not members* of MT Holdings, *have never been members* of Mt Holdings, and are *explicitly prohibited* from participating in the management of MT Holdings. They accepted as transferees only the potential right to receive an economic distribution from the company -- if the company were to make one. Nothing more. The Operating Agreement and the Illinois Act make that plain. They had no right to provide input into how the company managed its affairs, and indeed MT Holdings was not even required to provide notice or information to these Plaintiffs concerning the operation of the company. These Plaintiffs have absolutely no say in the management of MT Holding and are not empowered to file litigation concerning a corporate restructuring decision made six years that allegedly impacted some right that MT Holdings had in a separate LLC. Because Plaintiffs lack standing here, their complaint must be dismissed pursuant to 2-615.

## V. DISMISSAL UNDER SECTION 2-619: PLAINTIFFS' CLAIM IS BARRED BY THE STATUTE OF LIMITATIONS

In Illinois, actions based on breach of fiduciary duty are governed by the five-year statute of limitations. *DeSantis v. Brauvin Realty Partners, Inc.*, 248 Ill. App. 3d 930, 933-34 (1993). "Generally, the statute of limitations begins to run from the time that the cause of action or right of action accrues, i.e., when facts exist which authorize the bringing of an action." *Schreiber v. Hackett*, 173 Ill. App. 3d 129, 131 (1988). The acts that Plaintiffs complain about here occurred in May of 2014 (*See* Compl. ¶¶ 75-77), and their claim accrued at that time, requiring that

FILED DATE: 4/1/2020 3:26 PM     2020L000292

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Plaintiffs' claim for fiduciary breach be filed *before May of 2019*. It was untimely filed on January 7, 2020, and thus is barred by limitations.

Of course, Plaintiffs is likely contend that their Complaint should be saved by the "discovery rule," which tolls the running of the relevant statute of limitations after accrual until a plaintiff "knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla v. General Motors Corp.*, 167 Ill. 2d 353, 360-61(1995). However, the discovery rule is not license for a plaintiff to stick its head in the sand. Illinois law mandates that if a plaintiff has some knowledge that its rights may have been affected, it has the duty to investigate further concerning the existence of a potential cause of action. *Witherell v. Weimer*, 85 Ill. 2d 146 (1981). In other words, the statute of limitations begins to run when the plaintiff is put on inquiry notice. *Pruitt v. Schultz*, 235 Ill. App. 3d 934, 936 (1992). To be clear, it is not necessary for the plaintiff to know the full extent of his injuries before the statute of limitations begins to run. *Golla*, 167 Ill. 2d at 364.[5]

Plaintiffs cannot rely on a generic invocation of the discovery rule here. As made plain above, MT Holdings and its members had no obligation to provide ***any information*** to these limited interest holders concerning the management and operation of the company. Indeed, the Illinois LLC Act confirms that these Plaintiffs were "not entitled [to] access to information concerning the company's transactions." 805 ILCS 180/30-10(d). Thus, any claim of fraudulent concealment by these Plaintiffs fails as a matter of law, because South Loop III had no notice duty to these Plaintiff. To the contrary, it was Plaintiffs' obligation to stay apprised of any rights it may

---

[5] "Ordinarily, whether plaintiff knew or reasonably should have known both of his injury and that it was caused by a wrongful act are genuine issues of fact to be determined by the finder of fact." *McIntyre v. Christ Hospital*, 181 Ill. App. 3d 76, 81 (1989). However, the question becomes one for the court if only one conclusion can be drawn from the undisputed facts. *Id.* Moreover, any insistence by plaintiffs that an evidentiary hearing is necessary is unfounded.

or may not have under the MT Holdings Operating Agreement. Plaintiffs had no right to sit back and "wait to hear" from Defendant about what was happening with the MT Holdings. Indeed, "inquiry notice" is an inapplicable notion to this specific situation, *because Plaintiffs were on inquiry notice from the moment they acquired their limited rights.*

This Court can determine as a matter of law that plaintiffs' claims are barred by the five-year statute of limitations. Plaintiffs acknowledge in paragraph 75 of their Complaint that MT was dissolved in May 2014. Critically, plaintiffs *do not contend* in the Complaint that they were unaware of the dissolution, but apparently only that they were not aware of the restructuring that proceeded it. *See* Compl. ¶ 76. If they were concerned that they had lost any Distribution Interests when MT Holdings was dissolved, they had a duty to investigate. They do not allege that they did so. Indeed, Plaintiffs do not allege that they did anything over the last six years to try to learn what had happened with respect to their Distributional Interests.

## VI.    CONCLUSION

For these reasons, this Court should dismiss plaintiffs' complaint under Sections 2-615(a) and 2-619 (5) and (9) of the Code of Civil Procedure.

Dated: April 1, 2020                                    Respectfully submitted,

                                                          /s/ John M. Murphy
                                                         Attorneys for defendant, Chicago Holdings
                                                         South Loop III, LLC

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000
Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

FILED DATE: 4/1/2020 3:26 PM   2020L000292

# **EXHIBIT A**

Complaint

FILED
1/7/2020 7:23 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL

7982994

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN RAZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC,<br><br>Plaintiffs,<br><br>v.<br><br>GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC,<br><br>Defendants. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)    2020L000292<br><br>   No.<br><br><br>   **JURY DEMANDED** |

<u>**COMPLAINT**</u>

Plaintiffs Ali Baghdadi ("Baghdadi"), Fouad Chamon ("Chamon"), Antoine Korkis

("Korkis"), Najah Najjar ("N. Najjar"), Jacqueline Najjar ("J. Najjar"), Suhail Nammari

("Nammari"), Nachwan Razko ("Razko"), Burt Rezko ("B. Rezko"), Milad Saad ("Saad"),

Michael Sahli ("Sahli"), Georges Zouki ("Zouki") Khaled Shair ("K. Shair"), Layla El Shair ("L.

Shair") and QMQQ, LLC ("QMQQ") (collectively, "Plaintiffs"), by and through their attorneys,

The Law Offices of Edward T. Joyce & Associates, P.C., respectfully state as follows for their

Complaint against Defendants General Mediterranean Holding, S.A., SpF and Chicago South

Loop Holdings III (collectively, "Defendants"):

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

## **INTRODUCTION**

1.     This case arises out of a multi-billion dollar company's efforts to deprive minority investors of their right to participate in one of the most promising real estate development projects in Chicago.

2.     In January 2006, Antoin S. Rezko ("Rezko") and a business partner were the owners of MT Property Holdings, LLC ("MT"). At that time, MT owned 100% of Heritage Development Partners, LLC ("Heritage"). Heritage owned 50% of the common units and 49% of the voting units of Riverside District Development, LLC ("Riverside"), which owned a 62-acre parcel of land that is now known as the "78." Defendant General Mediterranean Holding, S.A., SpF ("GMH") owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units.

3.     In July 2007, Rezko assigned 30.497% of his economic/distributional interests in MT to Plaintiffs.

4.     All of MT's interest holders, including Plaintiffs, were entitled to participate in and profit from the future development of the Property through MT's ownership interest in the Heritage, which was the company responsible for developing the Property. MT's (and thus Plaintiffs') future development rights were not limited solely to activities carried out by Heritage. Instead, if a co-owner of Heritage or one of its affiliates decided to develop the property through a different vehicle, the Heritage operating agreement expressly granted MT the right to acquire a share of that other development company. By doing so, the Heritage Operating Agreement ensured that MT (and its interest owners) could not be deprived of the opportunity to participate in the future development of the property, regardless of the form or ultimate ownership structure of the project.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

5.     However, seven years after Plaintiffs acquired their interests in MT, GMH attempted to cut Plaintiffs and all other non-GMH affiliated investors out of the development project. By early 2014, GMH obtained complete control over Heritage. Using this control, GMH caused the Property to be transferred to one of its shell companies and replaced Heritage as the developer of the Property with a new company owned and controlled solely by GMH. GMH did all of this without providing any notices to Plaintiffs.

6.     GMH then attempted to cover its tracks and forever extinguish Plaintiffs' ability to participate in the development of the Property by dissolving Heritage and MT. Once again, GMH took this step by exercising the control it had acquired through its web of shell companies. And, once again, GMH did not provide notice to Plaintiffs of what it was doing.  Plaintiffs have only recently learned about GMH's attempt to cut them out of the development of the Property through news reports about the Property and communications with each other. Plaintiffs have brought this action to require GMH and MT's former member-manager, Chicago South Loop Holdings III, LLC ("South Loop III), which GMH controlled, to account for the harm done to Plaintiffs.

## PARTIES

7.     On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Baghdadi.

8.     On July 26, 2007, Rezko assigned a 3.5014% economic, non-member interest in MT to Chamon.

9.     On August 13, 2007, Rezko assigned a 0.8582% economic, non-member interest in MT to Korkis.

10.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to N. Najjar.

3

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

11.     On July 26, 2007, Rezko assigned a 3.8617% economic, non-member interest in MT to J. Najjar.

12.     On July 26, 2007, Rezko assigned a 5.1491% economic, non-member interest in MT to Nammari.

13.     On July 26, 2007, Rezko assigned a 1.6437% economic, non-member interest in MT to Razko.

14.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to B. Rezko.

15.     On July 26, 2007, Rezko assigned a 1.2871% economic, non-member interest in MT to Saad.

16.     On July 26, 2007, Rezko assigned a 2.5745% economic, non-member interest in MT to Sahli.

17.     On July 26, 2007, Rezko assigned a 0.9654% economic, non-member interest in MT to Zouki.

18.     On July 26, 2007, Rezko assigned a 1.225% economic, non-member interest in MT to K. Shair and L. Shair.

19.     On April 22, 2014, QMQQ was assigned Rezko's 5.8917% interest in MT.

20.     Defendant GMH is a Luxembourg-based company. Its principal place of business is located at 29 Avenue de la Porte-Neuve, L-2227 Luxembourg, Grand-Duche de Luxembourg.

21.     Defendant South Loop III is a Delaware limited liability company that GMH indirectly owns and controls. Its principal place of business is located at 211 West Wacker Drive, Suite 1050, Chicago, Illinois.

4

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

22. This Court has personal jurisdiction over GMH pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), and (10).

23. This Court has personal jurisdiction over South Loop III pursuant to 735 ILCS 5/2-209(a)(1), (2), (3), (7), (10) and (11).

24. Venue is proper in this county pursuant to 735 ILCS 5/2-101 because (a) a defendant joined in good faith and with probable cause for the purpose of obtaining a judgment against it and not solely for the purpose of fixing venue resides here and (b) the transaction or some part thereof out of which Plaintiffs' cause of action arose occurred in this county.

## FACTUAL ALLEGATIONS

**A.  The Property was a unique parcel of real estate with significant potential for substantial returns once development was complete.**

25. The Property is located in Chicago's South Loop at the southwest corner of Clark Street and Roosevelt Road.

26. At 62 acres, the Property has been one of the largest parcels of undeveloped land in Chicago and one of the largest contiguous in-fill parcels in any major city in the United States.

27. The Property offers impressive views of Chicago's skyline and includes one-half mile of frontage along the Chicago River.

28. The Property is less than a mile from Chicago's Central Business District, Grant Park, the Museum Campus, McCormick Place, and other significant locations in the city.

29. The Property also has convenient access to public transit – including a Metra line, three "L" lines, and a bus line – and to major highways – including the Dan Ryan and Eisenhower Expressways and Lake Shore Drive.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

30.    In light of these features, the Property is a unique opportunity for a large mix-use development combining hundreds of thousands of square feet in commercial space with several thousand residential units.

**B.    Through various entities, Rezko and GMH acquire the Property**

31.    In the early 2000s, Rezko and GMH recognized the tremendous potential for the Property and they decided to purchase and develop it as partners.

32.    Rezko was responsible for overseeing the development of the Property. During 20 years in the Chicago real estate industry, Rezko had acquired extensive knowledge about real estate development and cultivated relationships with a wide array of professionals from engineers and architects to consultants and attorneys.

33.    GMH was responsible for providing most of the capital needed for the project. As an international holding company with billions of dollars of assets, GMH could not only fund the purchase of the Property but also supply the money that would be needed on an ongoing basis to pay for development efforts.

34.    Mohammed Al-Miqdadi ("Al-Miqdadi") was responsible for the day-to-day business of GMH related to the Property. Al-Miqdadi was the Director of Project Development at GMH and, in this capacity, reported directly to Nadmi Auchi ("Auchi"), who was GMH's sole owner, Chairman, and Chief Executive Officer. Al-Miqdadi is also Auchi's son-in-law.

35.    As of January 1, 2006, the Property was owned by Riverside. GMH owned 50% of Riverside's common units, 51% of its voting units and 100% of its preferred units. Heritage owned the other 50% of Riverside's common units and 49% of its voting units. MT, which was owned and controlled by Rezko and his business partner, Michael Ruman ("Ruman") was the sole owner of Heritage.

6

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

36.     The chart below graphically reflects the ownership structure as of January 1, 2006



C.      **Heritage raises additional capital from Baghdadi and others through a private placement offering**

37.     In early 2006, Heritage conducted a private placement offering to raise additional capital.

38.     Through the offering, Heritage sold Class A Units.

39.     The Class A Units were purchased by Royal Heritage Investments LLC ("Royal Heritage"), Baghdadi and his wife Darlene ("D. Baghdadi"), and Roosevelt-Clark, LLC ("Roosevelt-Clark") (the "Class A Investors").

40.     Under the Heritage operating agreement, these Class A Units had only limited voting rights. Most of the voting power in Heritage belonged only to the members who held Class B Units. However, as explained below, Section 7.2 of the Heritage operating agreement granted Class A and Class B members the same right to participate in the future development of the Property.

41.     Section 7.2 of Heritage's operating agreement states that "no Member holding Class B Units or an Affiliate of such Member (either one a 'Related Developer') shall enter into any transaction with respect to the development of all or any portion of the Property unless the

7

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" (Ex. 1, Heritage's Operating Agreement, §7.2.)

42.     In short, this portion of §7.2 prohibited any members of Heritage holding Class B Units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless <u>all</u> members of Heritage were granted an opportunity to own a common interest in the Related Developer.

43.     Section 7.2 also set forth a formula to calculate the share of the common ownership interest in the Related Developer that a member would have the right to own. (Ex. 1, Heritage's Operating Agreement, §7.2.) Specifically, each member was entitled to a share of the common ownership interests in the Related Developer that was "equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class[,] by (z) the total number of Units then outstanding, determined regardless of class." *Id.* Under this equation, each member thus was entitled to retain the same proportion of ownership in the Related Developer that it had in the original developer, Heritage.

**D.     Rezko is indicted, GMH takes control of Heritage and MT, and Rezko assigns 30.497% of his economic interest in MT to Plaintiffs**

44.     In October 2006, it was publicly revealed that the government had indicted Rezko on fraud and bribery charges.

45.     GMH concluded that the indictment made Rezko a liability to its efforts to develop the Property.

46.     Therefore, on July 24, 2007, GMH caused a wholly-owned and wholly-controlled affiliate named Orifarm, S.A. ("Orifarm"), to acquire 60 Class B Units of Heritage from MT. In addition, Heritage admitted Orifarm as a member.

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

47. Thus, following this July 24, 2007 transaction, Orifarm owned 60% of Heritage, MT owned 38.1% of Heritage and the Class A Investors owned 1.9% of Heritage.

48. At or about the same time, Orifarm acquired all of Rezko's and Ruman's membership interests in MT and was admitted as a member. Because MT was a member-managed LLC, Orifarm, as the only admitted member of MT, gained complete control of MT.

49. Through its ownership of 60% of Heritage's Class B Units and its control of MT, which owned Heritage's other Class B Units, Orifarm gained complete control of the majority of Heritage's voting rights. Because GMH owned and controlled Orifarm, this meant that GMH had in effect gained complete control of Heritage.

50. On July 26, 2007, Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs (except for Korkis and QMQQ, who received their assigned interests on August 13, 2007 and September 6, 2007 respectively.)

51. As a member of Heritage, MT was entitled to receive its share of any distributions that flowed from the development of the Property. As owners of an economic interest in MT, Plaintiffs were each entitled to receive their proportionate share of any such distributions that MT received.

52. Because Orifarm was the only admitted member and manager of MT, it exercised complete control over MT's operations and investment in the development of the Property. Thus, Orifarm had complete control over Plaintiffs' economic interests in the development of the Property. Accordingly, Plaintiffs placed their trust and confidence in Orifarm to protect, preserve and advance MT's interests in the development of the Property.

53. When Rezko transferred control of MT to Orifarm, it was his expectation and intent that Orifarm would facilitate the future development of the Property for the benefit of MT and that

9

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

Orifarm would not take any actions to dilute, extinguish or interfere with Plaintiffs' economic interests in MT.

54.     The chart below reflects the ownership of the Property and its development after GMH completed its buy out of Rezko.



55.     GMH further secured its control over Heritage by installing one of its own executives as Heritage's manager.

56.     Heritage's operating agreement provided that it was to be a manager-managed LLC. (Ex. 1, Heritage's Operating Agreement, §9.1.) The operating agreement also vested the manager with significant power to control Heritage's operations. (*Id.* §§9.1-9.7.)

57.     On July 24, 2007, GMH installed Illinois Developer, LLC ("Illinois Developer") as Heritage's new manager.

58.     Illinois Developer was managed and controlled by a British Virgin Islands corporation called Moni Equities, Inc., which was wholly owned and controlled by GMH. Al-Miqdadi was president of Moni Equities and one of its three directors.

59.     GMH also installed Al-Miqdadi as president of Illinois Developer.

10

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

**E.    GMH developed a scheme to deprive Heritage's Class A Investors and Plaintiffs of their right to participate in and profit from the development of the Property**

60.     In 2014, after having amassed total control over Heritage, GMH set its sights on depriving Heritage's Class A Members and Plaintiffs of their rights to participate in and profit from the development of the Property.

61.     GMH did this in three steps.

62.     **Step One**. In 2014, GMH caused Orifarm to dissolve and to transfer all its interests in Heritage and MT to South Loop III. Through a web of shell companies, GMH owned and controlled South Loop III. Specifically, South Loop III was wholly-owned by CSLH Incorporated ("CSLH Inc."), which was wholly-owned by CSLH Lux I S.àr.l ("CSLH Lux I"), which was wholly-owned by CSLH Lux II S.àr.l ("CSLH Lux II"), which was wholly-owned by GMH.

63.     GMH also exercised complete control over South Loop III's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop III's president. Also, South Loop III's manager was CSLH Manager Incorporated ("CSLH Manager"). CSLH Manager was directly owned by CSLH Inc. Thus, GMH ultimately owned and controlled CSLH Manager.

64.     As the member-manager of MT, South Loop III exercised complete control over MT's operations and its investment in the development of the Property. Plaintiffs placed their trust and confidence in MT's member-manager, first Orifarm and then South Loop III, to protect, preserve and advance MT's interests in the development of the Property.

65.     **Step Two**. On April 28, 2014, GMH caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC ("South Loop II"). Through a web of shell companies, GMH owned and controlled South Loop II. Specifically, South Loop II was wholly owned by

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

Chicago South Loop Holdings I, LLC ("South Loop I") which was wholly owned by CSLH Inc., which was wholly owned by CSLH Lux I, which was wholly owned by CSLH Lux II, which was wholly owned by GMH.

66.     GMH also exercised complete control over South Loop II's management and policies. Al-Miqdadi, who was employed by and acted at the direction and in the interest of GMH, was South Loop II's president. Also, South Loop II's manager was CSLH Manager, which GMH ultimately owned and controlled.

67.     Under Section 7.2 of Heritage's operating agreement, MT's rights were triggered if a transaction met two requirements: (1) it involved a Class B member or its affiliate, and (2) it was with respect to the development of the Property.

68.     With respect to the first requirement, the two parties to the transfer of the Property on April 28 were South Loop II and Riverside.

69.     Both South Loop II and Riverside were affiliates South Loop III, which was a Class B Member of Heritage.

70.     In that regard, under §1.3 of Heritage's operating agreement, any entity "under common Control" with South Loop III was one of South Loop III's affiliates. (Ex. 1, Heritage Operating Agreement, §1.3.) Because South Loop III was under the control of GMH, any other developer entity controlled by GMH was "under common Control" with South Loop III for purposes of §7.2. Under §1.20 of Heritage's operating agreement, GMH controlled an entity if it either (1) possessed, directly or indirectly, at least (a) 10% of its voting power, if a corporation, or (b) 10% of its ownership interest if not a corporation, or (2) had the power to direct or cause the direction of its management and policies. (Ex. 1, Heritage Operating Agreement §1.20.)

71.     Both South Loop II and Riverside satisfied this standard.

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

72. Because GMH controlled South Loop II and Riverside (within the meaning of §1.20), they were both affiliates of a Class B Member of Heritage (South Loop III), within the meaning of §7.2. Thus, the April 28 transfer of the Property from Riverside to South Loop II satisfied the first requirement of §7.2.

73. The April 28 transfer of the Property also satisfied the second requirement of §7.2.

74. The purpose of this transaction (i.e., transferring the Property from Riverside to South Loop II) was to allow South Loop II to hold title to the Property and to engage in future transactions with respect to its development. That means the April 28th transfer of the Property was a transaction with respect to the development of the Property within the meaning of §7.2 of Heritage's operating agreement.

75. **Step Three**. In May 2014, GMH, through its control of South Loop III and Illinois Developer, caused Heritage and MT to be dissolved.

76. Defendants did not provide Plaintiffs with any notice of any of the facts alleged in paragraphs 60-73 above.

77. Instead of dissolving MT, South Loop III (which was controlled by GMH) should have caused MT to acquire an ownership interest in South Loop II as required by §7.2 of Heritage's operating agreement.

78. However, South Loop III/GMH did not do this because GMH's goal with the restructuring was to deprive Heritage's Class A Investors and Plaintiffs of their economic interests in the development of the Property.

79. Through its control of Illinois Developer, South Loop III and Heritage, GMH caused Heritage to breach its operating agreement by failing to provide MT with an ownership interest in South Loop II.

13

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

80.   Plaintiffs thus were improperly deprived of the opportunity to participate in the development of the Property through their economic interest in MT. GMH and South Loop III's actions have caused Plaintiffs' valuable economic interests in MT to become worthless.

**F.     GMH formed a new joint venture to develop the Property without offering Plaintiffs the opportunity to participate**

81.   On information and belief, after dissolving Heritage and MT, GMH engaged in extensive discussions with companies that wanted to partner with GMH to develop the Property.

82.   GMH spent over a year soliciting and reviewing offers and negotiating with interested companies.

83.   Eventually, GMH decided to partner with The Related Companies, L.P., a multi-billion-dollar real estate company based on New York.

84.   By May 2015, GMH had signed a letter of intent with Related Midwest to form a joint venture that would own and develop the Property.

85.   As part of that joint venture, South Loop II and Related R/C LLC formed Roosevelt/Clark Partners LLC ("RCP").

86.   On May 9, 2016 South Loop II and RCP executed a special warranty deed conveying the Property to RCP.

87.   GMH and Related subsequently took significant steps to develop the Property.

88.   Under §7.2 of the Heritage operating agreement, MT had the right to acquire a share of any Class B Member or an affiliate of such a member that entered into a transaction with respect to the development of the Property. (Ex. 1, Heritage's operating agreement, §7.2.)

89.   When Heritage's articles of dissolution were filed in 2014, South Loop III was a Class B Member. Under the terms of Heritage's operating agreement, both South Loop II and GMH were affiliates of South Loop III. That means §7.2 granted MT the right to own a common

14

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

ownership share of South Loop II when it engaged in a transaction with respect to the development of the Property. The joint venture with Related clearly is such a transaction.

90.     However, MT did not exercise its rights under §7.2 or give Plaintiffs notice of GMH's dealings with Related because GMH wanted to shut Plaintiffs out of the development project.

91.     GMH carried out every aspect of its scheme in secrecy and never disclosed to Plaintiffs information about the transfers it made and actions it took with respect to the development project.

92.     The Baghdadi's, who were also Class A Investors in Heritage, did not find out what GMH had done until 2019 when GMH and Related filed Economic Disclosure Statements with the City of Chicago. (On April 26, 2019, the Baghdadi's have filed a separate lawsuit as Class A Investors).

93.     Likewise, because of GMH's attempts to conceal its scheme, the other Plaintiffs did not find out what GMH had done until 2019 through news reports concerning the development and/or conversations with each other.

## COUNT I

### Breach of Fiduciary Duty
### Against Defendants GMH and South Loop III

94.     Plaintiffs incorporate the allegations of paragraphs 1 through 93 as though fully set forth herein.

95.     As the sole member-manager of MT, South Loop III exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in South Loop III to protect, preserve and advance MT's interests in the development of the Property.

15

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

96.    Through its indirect ownership of South Loop III, GMH exercised complete control over South Loop III. Therefore, GMH in effect exercised complete control over MT's operations. As a consequence, Plaintiffs, as economic interest holders in MT, placed their trust and confidence in GMH to protect, preserve and advance MT's interests in the development of the Property.

97.    As a result of the nature of the relationship between Plaintiffs and South Loop III, including the control and dominance that South Loop III exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in South Loop III as to those interests, South Loop III owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

98.    As a result of the nature of the relationship between Plaintiffs and GMH, including the control and dominance that GMH exercised over Plaintiffs' economic interests in MT and the trust and confidence that Plaintiffs placed in GMH as to those interests, GMH owed Plaintiffs fiduciary duties, including the duties of loyalty, due care and good faith and fair dealing.

99.    GMH and South Loop III breached their fiduciary duties to Plaintiffs by: (a) causing the Property to be transferred from Riverside to South Loop II without providing MT with an ownership interest in South Loop II as required by Section 7.2 of Heritage's operating agreement, (b) causing MT to be dissolved, (c) failing to disclose these facts to Plaintiffs, (d) excluding Plaintiffs from the joint venture between South Loop II and Related, and (e) excluding Plaintiffs from the benefits of any development of the Property.

100.    As a result of these breaches, Plaintiffs have lost their interests in the development of the Property and thus have been damaged in excess of $50,000.

WHEREFORE, Plaintiffs respectfully request that this Court enter judgment in their favor and against Defendants as follows:

16

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

a) awarding compensatory damages to Plaintiffs;

b) awarding punitive damages to Plaintiffs

c) awarding equitable pre-judgment interest to Plaintiffs; and,

d) for any and all further relief that the Court deems just, equitable and proper.

Respectfully submitted,

ALI BAGHDADI, FOUAD CHAMON,
ANTOINE KORKIS, NAJAH NAJJAR,
JACQUELINE NAJJAR, SUHAIL   NAMMARI,
NACHWAN RAZKO, BURT REZKO, MILAD
SAAD,MICHAEL SAHLI, GEORGES ZOUKI,
KHALED SHAIR, LAYLA EL SHAIR, AND
QMQQ LLC,

By:     /s/  Edward T. Joyce
                        One of their attorneys

Edward T. Joyce, ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
The Law Offices of Edward T. Joyce & Assoc. PC
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

17

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

# Exhibit 1

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

**HERITAGE DEVELOPMENT PARTNERS, LLC**

**OPERATING AGREEMENT**

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

## INDEX

| | | Page |
|---|---|---|
| **ARTICLE 1** | **DEFINITIONS** | 1 |
| **ARTICLE 2** | **FORMATION OF THE COMPANY** | 7 |
| | 2.1 *Formation* | 7 |
| | 2.2 *Name* | 8 |
| | 2.3 *Purpose; Powers* | 8 |
| | 2.4 *Term* | 8 |
| | 2.5 *Principal Place of Business* | 8 |
| | 2.6 *Registered Office and Registered Agent* | 8 |
| | 2.7 *Continuation of Company* | 8 |
| | 2.8 *Qualification in Other Jurisdictions* | 8 |
| **ARTICLE 3** | **UNITS** | 9 |
| | 3.1 *Units* | 9 |
| | 3.2 *Persons Deemed Members* | 9 |
| | 3.3 *Subscriptions* | 9 |
| | 3.4 *Waiver of Dissenters* | 9 |
| | 3.5 *Expulsion* | 9 |
| **ARTICLE 4** | **CAPITAL CONTRIBUTIONS** | 10 |
| | 4.2 *Capital Contributions of Members* | 10 |
| | 4.2 *Additional Capital Contributions* | 10 |
| | 4.3 *Capital Accounts* | 10 |
| | 4.4 *Interest on Capital Contributions* | 11 |
| | 4.5 *Withdrawal* | 12 |
| | 4.6 *Return of Capital* | 12 |
| | 4.7 *Liability of Members* | 12 |
| **ARTICLE 5** | **ALLOCATION OF COMPANY PROFITS AND LOSSES** | 12 |
| | 5.1 *Allocations* | 12 |
| | 5.2 *Special Allocations* | 12 |
| | 5.3 *Other Allocation Rules* | 15 |
| | 5.4 *Allocations Solely For Tax Purposes* | 16 |
| **ARTICLE 6** | **DISTRIBUTIONS AND DISTRIBUTABLE CASH** | 16 |
| | 6.1 *Timing and Amount* | 16 |
| | 6.2 *Distributions for Tax Purposes* | 17 |
| | 6.3 *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items* | 17 |
| | 6.4 *Limitations on Distributions* | 18 |
| | 6.5 *Redemption of the Class A Units* | 18 |
| **ARTICLE 7** | **RESTRICTED TRANSACTIONS** | 18 |
| | 7.1 *Compensation and Distribution* | 18 |
| | 7.2 *Affiliate Transaction Rights* | 18 |

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

**ARTICLE 8   ROLE OF MEMBERS** ..................................................................... 19
    8.1    *General Rules* ................................................................ 19
    8.2    *Meetings of the Members* ............................................ 19
    8.3    *Indemnification of Members* ...................................... 21
**ARTICLE 9   MANAGEMENT** ............................................................................ 21
    9.1    *General Powers of the Manager* ................................ 21
    9.2    Number and Election ...................................................... 21
    9.3    *Removal and Vacancies* .............................................. 22
    9.4    *Vacancies* ..................................................................... 22
    9.5    *Quorum, Required Vote and Adjournment.* ............... 22
    9.4    *No Liability* ................................................................. 22
    9.5    *Certain Powers of the Manager* ................................ 22
    9.7    *Exculpation From Liability For Certain Acts* ............ 24
    9.9    *Indemnification* ........................................................... 25
    9.10   *Interested Manager* ..................................................... 25
    9.11   *Compensation to Manager* ......................................... 25
**ARTICLE 10 LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS** ......... 26
    10.1   *Restriction on Transfers; Investment Representations and Warranties.* 26
    10.2   *Permitted Transfers* ..................................................... 26
    10.3   *Sale of the Company* .................................................... 27
    10.4   *Restrictions on Transfers* ............................................ 28
    10.5   *Prohibited Transfers* .................................................... 29
    10.6   *Rights of Unadmitted Assignees* .................................. 29
    10.7   *Admission of Transferees as Members* ........................ 29
    10.8   *Covenants; Representations Regarding Transfers; Legend* ............ 30
    10.9   *Distribution and Allocations in Respect to Transferred Interests* .... 31
    10.10  *Termination of Restrictions* ......................................... 31
    10.11  *Waiver of Redemption of Distributional Interest.* ....... 31
**ARTICLE 11 DISSOLUTION AND TERMINATION** ......................................... 32
    11.1   *Events of Dissolution* ................................................... 32
    11.2   *Liquidation* .................................................................. 32
    11.3   *Filings* .......................................................................... 33
    11.4   *Termination* .................................................................. 33
**ARTICLE 12 BOOKS AND RECORDS** ............................................................. 34
    12.1   *Books and Records; Accounting* .................................. 34
    12.2   *Access to Records, Financial Statements* ................... 34
    12.3   *Annual Reports* ............................................................ 34
    12.4   *Bank Account(s)* .......................................................... 34
**ARTICLE 13 TAX MATTERS** ........................................................................... 34
    13.1   *Company Tax Returns* .................................................. 34
    13.2   *Schedules K-1 and Forms 1065* .................................. 35
    13.3   *Taxation as Partnership* .............................................. 35

FILED DATE: 4/1/2020 3:26 PM    2020L000292
FILED DATE: 1/7/2020 7:23 PM    2020L000292

| 13.4 | *Withholding* | 35 |
| **ARTICLE 14** | **MISCELLANEOUS** | **36** |
| 14.1 | *Reimbursements* | 36 |
| 14.2 | *Amendments* | 36 |
| 14.3 | *Successors* | 37 |
| 14.4 | *Counterparts* | 37 |
| 14.5 | *Integration* | 37 |
| 14.6 | *Entire Agreement* | 37 |
| 14.7 | *Governing Law* | 37 |
| 14.8 | *Severability* | 37 |
| 14.9 | *Headings* | 37 |
| 14.10 | *Waiver* | 37 |
| 14.11 | *Filings* | 38 |
| 14.12 | *Notices* | 38 |
| 14.13 | *Mediation* | 38 |
| 14.14 | *Arbitration* | 38 |
| 14.15 | *Equitable Remedies* | 38 |
| 14.16 | *Company Losses Due to Member's Litigation* | 39 |
| 14.17 | *Title to Company Assets* | 39 |
| 14.18 | *Execution of Additional Documents* | 39 |
| 14.19 | *Confidentiality* | 39 |

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

# OPERATING AGREEMENT of

# HERITAGE DEVELOPMENT PARTNERS, LLC

This Operating Agreement is entered into by and among the Persons whose names are set forth on the signature pages hereof and any Person who hereafter becomes a party hereto pursuant to the provisions hereof, and is made effective as of January 1, 2006.

## RECITALS

Heritage Development Partners, LLC (the "Company") was organized pursuant to the Illinois Limited Liability Company Act (the "Act") upon the filing of the Articles of Organization (the "Articles") with the office of Secretary of State of the State of Illinois August 15, 2005, as amended on October 19, 2005.

Subsequent to its formation, the Company admitted Michael Rumman and Antion S. Rezko as its initial members (collectively, the "Initial Members") who caused the Company to enter into various transactions, including the acquisition of membership interests in Riverside District Development, LLC, an Illinois limited liability company.

The Initial Members, as of the date of first written above, along with the additional Persons when are set forth in this signature pages hereto, desire to operate the Company in accordance with and subject to the terms and conditions set forth in this Agreement.

NOW THEREFORE, for good and valuable consideration, the persons set forth in the signature pages hereto, intending to be legally bound, agree as follows:

## ARTICLE 1
## DEFINITIONS

The following terms used herein shall have the following meanings (unless otherwise expressly provided herein, or unless the context clearly indicates otherwise):

1.1     **"Act"** means the Illinois Limited Liability Company Act, 805 ILCS 180/1-1, et seq., as amended from time to time (or any corresponding provisions of succeeding law).

1.2     **"Affiliate of the Company"** means any Person directly or indirectly, Controlling, Controlled by or under common Control with the Company or any other Affiliate of the Company.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

1.3    **"Affiliate of a Member"** means, in respect of a Member, any other Person, directly or indirectly, Controlling, Controlled by or under common Control with that Person.

1.4    **"Agreement"** means this Operating Agreement of Heritage Development Partners, LLC, as from time to time amended.

1.5    **"Annual Tax Distribution"** means that distribution provided in Section 6.2.

1.6    **"Articles"** means the Articles of Organization filed with the Office of the Secretary of State of Illinois, and all amendments thereto.

1.7    **"Bankruptcy"** means with respect to a Person: (a) a filing by the Person of a voluntary petition in bankruptcy, the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due or the filing against a Member of an involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (b) the making by the Person of a general assignment for the benefit of creditors, (c) the filing by the Person of an answer admitting the material allegations of, or its consenting to, or defaulting in answering, a bankruptcy petition filed against it in any bankruptcy proceeding, (d) the entry of an order, judgment, decree by any court of competent jurisdiction adjudicating the Person a bankrupt or appointing a trustee of its assets, or (e) any levy of execution being made upon the Interest of the Person in the Company.

1.8    **"Book Value"** means, with respect to any property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g).

1.9    **"Capital Account"** means the account maintained for each Member in accordance with the provisions of the Code and the regulations promulgated thereunder, including but not limited to the rules regarding maintenance of capital accounts set forth in Treasury Regulations Section 1.704-1.

1.10    **"Capital Contribution"** means, with respect to any Member executing this Agreement, the capital contribution such Member actually makes pursuant to Article 4 hereof.

1.11    **"Code"** means the Internal Revenue Code of 1986, as amended. Any reference to any specific provision of the Code or any regulations promulgated thereunder shall also refer to any successor provisions thereto.

1.12    **"Common Units"** means, collectively, the Non-Voting Common Units and the Voting Common Units.

1.13    **"Company"** means Heritage Development Partners, LLC, the Illinois limited liability company to be operated in accordance with the provisions of this Agreement.

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

1.14   **"Company Business"** is defined in <u>Section 2.3.</u>

1.15   **"Company Expenses"** means all costs and expenses incurred in connection with the business and affairs of the Company, including, without limitation, costs and expenses of acquiring, owning, operating and disposing of Company Investments, and fees and expenses of legal counsel, accountants, appraisers, investment bankers and third party consultants and advisors.

1.16   **"Company Investment"** means the interest of the Company in any business and other assets, owned, directly or indirectly, by the Company and acquired by the Company in one transaction or a series of related transactions, as determined by the Manager (as defined in <u>Section 9.1</u>).

1.17   **"Company Loss"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any loss and net of any gain realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment), where the aggregate of all such items during any applicable period results in a net loss to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.18   **"Company Minimum Gain"** means an amount equal to the Company minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(d).

1.19   **"Company Profit"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company (including any gain and net of any loss realized upon the refinancing or sale or other disposition of such Company Investment (or portion thereof) and Company Expenses primarily related to such Company Investment ), where the aggregate of all such items during any applicable period results in net income to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.20   **"Control"** (including, with correlative meanings, the terms "Controlling," "Controlled by" and "under common Control with"), as applied to any Person, includes the possession, directly or indirectly, of ten percent (10%) or more of the Voting Power (or in the case of a Person which is not a corporation, 10% or more of the ownership interest, beneficial or otherwise) of such Person or the power otherwise to direct or cause the direction of the management and policies of that Person, whether through voting, by contract or otherwise.

1.21   **"Deficit Capital Account"** means, with respect to any Member, the deficit balance (if any) in such Member's Capital Account as of the end of the Fiscal Period or Fiscal Year, after giving effect to the following adjustments:

1.21.1   credit to such Capital Account any amount which such Member is treated as being obligated to restore under Treasury Regulations Section 1 704-1(b)(2)(ii)(c), as well as

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

any addition thereto pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (i)(5), after taking into account any changes during the period in Company Minimum Gain and in the Member Minimum Gain; and

      1.21.2 debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(ii)(d)(4), (5) and (6).

This definition of "Deficit Capital Account" is intended to comply with Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be construed in a manner consistent with those provisions.

      1.22   **"Dissociation"** of a Member shall have the meaning provided under Section 35-45 of the Act.

      1.23   **"Distribution Interest"** means the right to receive the shares of revenues from production and other income, receipts, or gain of the Company, or of any other distributions from the Company, with respect to an Interest in the Company. The holder of a Distributional Interest is not a Member, nor has any of the other rights herein conferred upon such Member, including the right to vote as a Member until such holder is admitted as a Member (if at all).

      1.24   **"Fiscal Period"** means any interim accounting period within a Fiscal Year which is established by the Manager and which is required or permitted under the Code or Treasury Regulations.

      1.25   **"Fiscal Year"** means the Company's annual accounting period established pursuant to Section 12.1 of this Agreement.

      1.26   **"Illinois Replacement Tax"** means (a) the Illinois Personal Property Tax Replacement Income Tax, 35 ILCS 5/201 et seq., as amended from time to time, and (b) if the Company is subject to any other state tax (i.e., state tax other than Illinois Replacement Tax) the amount of which is dependent upon the tax character of some or all of the Members, the Manager may, in its discretion, treat such other state tax as Illinois Replacement Tax for all purposes of this Agreement.

      1.27   **"Illinois Replacement Tax Savings"** means, with respect to a Fiscal Year for which the Company is subject to Illinois Replacement Tax, the amount (if any) of additional Illinois Replacement Tax that would have been imposed upon the Company for such Fiscal Year but for the fact that some of the Members are themselves subject to the Illinois Replacement Tax for such Fiscal Year.

      1.28   **"Independent Third Party"** means any Person who, immediately prior to the contemplated transaction, does not own in excess of five percent of the Units on a fully-diluted basis

---

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

(a "5% Owner"), who is not Controlling, Controlled by or under common Control with any such 5% Owner and who is not the spouse or descendent (by birth or adoption) of any such 5% Owner or a trust for the benefit of any such 5% Owner and/or such other Persons.

1.29    **"Interest"** means the personal property ownership right of a Member, such personal property ownership right being evidenced by and composed of Units, in the Company entitling such Member to, among other things, an allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and a share of distributions made by the Company. Each Member's allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and share of the Company's distributions, as applicable, shall be determined in accordance with this Agreement based upon the number of Units owned by such Member.

1.30    **"Interest Holder"** means any Member, assignee or other transferee of a Member who is not admitted as a Member, but is a holder of a Distributional Interest.

1.31    **"Manager"** means the Person appointed as the manager of the Company under the Act and Article 9 of this Agreement.

1.32    **"Member"** means any Person that holds an Interest in the Company represented by Units and is admitted as a Member of the Company pursuant to this Agreement.

1.33    **"Member Minimum Gain"** means an amount, with respect to each Member Non-recourse Debt, equal to the Company Minimum Gain that would result if such Member Non-recourse Debt were treated as a Company non-recourse liability, as determined in accordance with Treasury Regulations Section 1.704-2.

1.34    **"Member Non-Recourse Debt"** shall have the same meaning as the term "partner non-recourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

1.35    **"Member Non-Recourse Deductions"** shall have the same meaning as the term "partner non-recourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(1) and 1.704-2(i)(2).

1.36    **"Net Cash"** means, for each Fiscal Year or a portion thereof, (a) all cash of the Company derived from Company operations, after deducting: (i) all cash expenditures incurred in connection with the operation of the Company's business; (ii) an amount necessary to pay all liabilities of the Company then due and owing including, without limitation, all loans to the Company and all advances made by any Member to the Company; and (iii) an amount determined by the Manager to be reasonably necessary or desirable as a reserve for the operation of the Company business, liabilities of the Company not yet due, and/or future or contingent liabilities of the Company, and (b) the net cash proceeds from all sales and other dispositions and all refinancing of

Company Investments, less any portion thereof used to establish reserves, all as determined by the Manager.

1.37 **"Net Invested Capital Balance"** means as to each Member, the cash contributed by such Member to the capital of the Company, less amounts distributed to such Member pursuant to Section 6.1.2 hereof.

1.38 **"Non-Recourse Deductions"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

1.39 **"Non-Recourse Liability"** shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1.40 **"Ownership Percentage"** means, with respect to any Member as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate of all Units held by all Members on such date.

1.41 **"Person"** means any individual, corporation, association, partnership (general or limited), joint venture, trust, estate, limited liability company, or other legal entity or organization.

1.42 **"Property"** means certain real property located at Roosevelt Road and Clark Street in Chicago, Illinois currently owned by Riverside District Development, LLC.

1.43 **"Quarterly Estimated Tax Distribution"** is defined in <u>Section 6.2.</u>

1.44 **"Redemption Amount"** shall mean an amount sufficient to cause each holder of Class A Units to receive the sum of (x) an amount equal to a 20% per annum return on such holder's Capital Contributions made to the Company plus (y) a return of all Capital Contributions made to the Company by such holder.

1.45 **"Sale of the Company"** means the sale of the Company to an Independent Third Party or group of Independent Third Parties pursuant to which such party or parties acquire (i) Units of the Company possessing the voting power under normal circumstances to elect the Company's Manager (whether by merger, consolidation or sale or transfer of Units) or (ii) all or substantially all of the Company's assets determined on a consolidated basis.

1.46 **"Securities Act"** means the Securities Act of 1933, as amended from time to time.

1.47 **"Tax Allowance Amount"** means, with respect to any Member for any calendar quarter, an amount reasonably determined by the Manager, in good faith, to be the estimated income tax liability of such Member (or the owners of such Member that is a flow-through entity for federal income tax purposes) arising from its ownership of Units. The Tax Allowance Amount for each

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

Member shall be computed on the assumption that all Members are subject to taxation at the same combined federal and state income tax rates, which shall be the highest combined rates applicable to any Member, as determined by the Manager.. The amount so determined by the Manager shall be the Tax Allowance Amount for such period and shall be final and binding on all Members.

1.48    **"Tax Matters Partner"** means the Person designated as such in <u>Section 13.1.2</u> of this Agreement.

1.49    **"Transfer"** means, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, or otherwise dispose of.

1.50    **"Treasury Regulations"** means the proposed, temporary and final regulations promulgated under the Code, as amended from time to time.

1.51    **"Unreturned Capital"** means, with respect to a Unit, the excess, if any, of the Capital Contribution made or deemed made in exchange for or on account of such Unit over all Distributions made by the Company with respect to such Unit pursuant to <u>Section 6.1(i)</u>.

1.52    **"Voting Power"** of any Person, means the total number of votes, which may be cast by the holders of the total number of outstanding shares of stock, units or interests of any class or classes of such Person in any election of directors of such Person.

1.53    **"Unit"** means a reference to a Class A Units and Class B Units and represents an ownership Interest issued by the Company represented by Units, with rights, interests, duties and obligations set forth in this Agreement with respect to Units, and representing a Capital Contribution in cash or other property equal to the price per Unit or fraction thereof paid by a Member and set forth on <u>**Schedule I**</u>.  Except as otherwise provided in this Agreement, Class A Units shall be non-voting Units.

1.54    **"Withdrawal"** means, with respect to any Member, the death or Bankruptcy of such Member or a complete assignment or disposition of such Member's entire Interest in the Company made during the lifetime (or other existence) of such Member, and with respect to a Manager (in its capacity of Manager), the death, Bankruptcy, or legal incapacity of the Manager, or the Manager's continued failure to perform its duties as a Manager.

## ARTICLE 2
## FORMATION OF THE COMPANY

2.1    *Formation*.  The Company has been organized as an Illinois Limited Liability Company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

2.2     *Name*.  The name of the Company is Heritage Development Partners, LLC, and appropriate certificates and affidavits shall be filed and recorded as may be necessary to secure said name.  The name of the Company shall be subject to change by the Manager.

2.3     *Purpose; Powers*.  The purpose of the Company is (i) to own a membership interest in Riverside District Development, LLC, an Illinois limited liability company and (ii) to carry on any and all other lawful business, purpose or activity, except for any purposes prohibited under the Act (the "Company Business").  The Company shall possess and may exercise all powers and privileges granted by the Act, any other law, or by the Agreement, including incidental powers thereto, to the extent that such powers and privileges are necessary, customary, convenient or incidental to the attainment of the Company's purposes.

2.4     *Term*.  The term of the Company commenced on the date that the Articles was filed in the office of the Secretary of State of the State of Illinois and shall continue until the Company is dissolved in accordance with the provisions of either this Agreement or the Act.

2.5     *Principal Place of Business*.  The principal place of business of the Company shall initially be located at 233 South Wacker Drive, 95th Floor, Chicago, IL 60606, or at such other location or locations as the Manager may from time to time designate.

2.6     *Registered Office and Registered Agent*.  The Company's initial registered office shall be at the office of its registered agent at 233 South Wacker Drive, Chicago, Illinois 60606, and the name of its initial registered agent at such address shall be Michael Rumman.  The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Office of the Secretary of State of the State of Illinois, and paying any fees required under the Act.

2.7     *Continuation of Company*.  The Members hereby agree that the Company shall be organized, administered, operated and terminated in accordance with the provisions of this Agreement and the Act.  The Members hereby further agree that the rights, duties, liabilities and obligations of the Members, and each Class thereof, shall be governed by the provisions of this Agreement and the Act.

2.8     *Qualification in Other Jurisdictions*.  The Manager shall have the authority to cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company conducts business and in which such qualification, formation or registration is required by law or deemed advisable by the Manager.  The Manager, or its authorized representative, as an authorized Person within the meaning of the Act, shall execute, deliver and file any certificates (and any amendments and/or restatements thereof) necessary for the Company to qualify to do business in a jurisdiction in which the Company may wish to do business.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ARTICLE 3
## UNITS

3.1    *Units.* The Interests in the Company shall be designated as Units and shall be divided into two series, *"Class A Units"* and *"Class B Units."* The Units of each Member in the Company are personal property. All Units redeemed, purchased or otherwise acquired by the Company shall be canceled and thereupon restored to the status of authorized but unissued Units. Holders of Units shall have the respective rights, interests, duties, and obligations that are set forth in this Agreement. Except as otherwise provided in this Agreement, the Manager may, with the consent of the Members holding at least fifty percent (50%) of the Class A Units, issue new or additional Units or options or other securities to purchase or otherwise acquire or convert to new or additional Units, at any time and from time to time.

3.2    *Persons Deemed Members.* The Company may treat the Person in whose name any Unit shall be registered on the books and records of the Company as a Member and the sole holder of such Unit for all purposes whatsoever and, accordingly, shall not be bound to recognize any equitable or other claims to or interest in such Unit or the part of any other Person, whether or not the company shall have actual or other notice thereof.

3.3    *Subscriptions.* A prospective Member of the Company may enter into a Subscription Agreement for the purchase of Units, or fractions thereof. A Person may not be admitted as a Member until such Person has: (a) executed this Agreement, which may be pursuant to an Additional Member Signature Page in the form attached to this Agreement, (b) purchased Units, and (c) executed and delivered to the Company such other agreements (including, without limitation, purchase agreements and investment representations) as the Manager may require.

3.4    *Waiver of Dissenters' Rights.* The Members hereby waive any and all contractual appraisal rights or dissenters' rights, if any, with respect to their Units and any or all similar rights whether set forth in any other applicable law or in any agreement with respect to which the Company or a Member is a party or beneficiary.

3.5    *Expulsion.*       Any Member may be expelled as required in Section 35-45(6) of the Act.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

*Page -9-*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.1     *Capital Contributions of Members, Ownership.*  The Members of the Company as of the Acquisition Date are maintained on the Company's books and records.  Set forth on **Schedule 1** "Ownership of Members" attached hereto are the number and class of Units issued to each Member. Each Member shall receive, in exchange for the capital contribution of such Member, the number and class of Units set forth opposite such Member's name thereon.  Additional capital contributions may be in the form of cash or cash equivalents, unless otherwise determined by the Manager.  The initial values of the Members' Capital Accounts are maintained on the Company's books and records.

4.2     *Additional Capital Contributions.*  The Members shall not be obligated to contribute additional capital, however, any additional capital contributions shall be in the form of cash unless otherwise approved by the Manager.

4.3     *Capital Accounts.*

4.3.1.   A separate Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv) and 1.704-2, as amended. Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to for purposes of Code Section 752); and (3) allocations to such Member of Company Profits and other allocations to such Member of items of Company income or gain.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); and (3) allocations to such Member of Company Losses and other allocations to such Member of items of Company loss or deduction.  The Company may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

4.3.2.   For purposes of computing the amount of any item of Company income, gain, loss or deduction to be reflected in the Members' Capital Accounts and to be allocated pursuant to <u>Article 5</u> of this Agreement, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose), provided that:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

4.3.2.1   The computation of all items of income, gain, loss and deduction shall include income and expense of the Company that is exempt from federal income tax and also those items described in Code Section 705(a)(1)(B) or Treasury Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that such items are not includible in gross income or deductible for federal income tax purposes;

4.3.2.2   If the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from a disposition of such property;

4.3.2.3   Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property;

4.3.2.4   Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

4.3.2.5   To the extent an adjustment pursuant to Code Section 732(d), 734(b) or 743(b) to the adjusted tax basis of any Company property is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis) or loss (if the adjustment decreases the tax basis); and

4.3.2.6   Items of Company income, gain, loss or deduction that are specially allocated pursuant to Section 5.2 shall be determined in the same manner as Company Profits and Company Losses, but such specially allocated items shall not be taken into account in computing Company Profits and Company Losses.

4.3.3.   The rules set forth in this Section 4 are intended to comply with the requirements of the Code and Treasury Regulations. If, in the opinion of the Manager, the rules set forth in this Section 4.3 must be modified in order for the Company to comply with the requirements of the Code or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified.

4.4   *Interest on Capital Contributions.* Except as otherwise expressly provided in this Agreement, no Member shall receive interest on such Member's Capital Contribution.

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

**4.5** *Withdrawal.* Each Member hereby covenants that he shall not willfully Dissociate himself as a Member without the consent of the Manager. Any Member that voluntarily Dissociates himself as a Member pursuant to Section 35-45(1) of the Act shall be liable to the Company and its Members for all damages and costs that result from such Dissociations and any consequential dissolution of the Company. Upon the Dissociation of any Member, such Member shall no longer participate in the management or conduct of the Company's business.

**4.6** *Return of Capital.* Except as otherwise provided in Article 6 and Section 11.2, or another express provision of this Agreement, or required under the Act, no Member shall have priority over any other Member as to the return of any Capital Contribution. Any return of capital to the Members shall be solely from Company assets and the Members shall not be personally liable for any such return except as provided in the Act.

**4.7** *Liability of Members.* Except as required under the Act or any other provision of this Agreement, no Member shall have any obligation to restore any portion of any Capital Account deficit or to contribute to the capital of the Company; nor shall any Member have any personal liability for debts or other obligations of the Company, including without limitation obligations for federal and state income taxes and any state replacement taxes.

## ARTICLE 5
### ALLOCATION OF COMPANY PROFITS AND LOSSES

**5.1** *Allocations.* Except as otherwise provided in Section 5.2, Company Profits and Company Losses for any Fiscal Period shall be allocated among the Interest Holders such that, as of the end of such Fiscal Period, the Capital Account of each Interest Holder shall equal (a) the amount which would be distributed to him or it or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such liquidation pursuant to Section 6.1 *minus* (b) the sum of (i) such Interest Holder's share of Company Minimum Gain (as determined according to Treasury Regulation Sections 1.704-2(d) and (g)(3)) and such Interest Holder's partner minimum gain (as determined according to Treasury Regulation Section 1 704-2(i)) and (ii) the amount, if any, which such Interest Holder is obligated to contribute to the capital of the Company as of the last day of such Fiscal Period.

**5.2** *Special Allocations.* The following special allocations will be made in the following order:

**5.2.1.** *Company Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article 5, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury Regulations. This <u>Section 5.2.1</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.2. *Member Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this <u>Article 5</u>, if there is a net decrease in Member Minimum Gain attributable to a Member Non-Recourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This <u>Section 5.2.2</u> is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.3. *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Deficit Capital Account.

5.2.4. *Gross Income Allocation.* In the event any Member has a Deficit Capital Account at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this <u>Section 5.2.4</u> shall be made only if and to the extent that such Member would have a Deficit Capital Account after all other allocations provided for in this <u>Article 5</u> (other than <u>Section 5.2.3</u> and <u>5.2.4</u>) have been made.

---

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

**5.2.5.** *Non-Recourse Deductions.* Non-Recourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Ownership Percentage.

**5.2.6.** *Member Non-Recourse Deductions.* Member Non-Recourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Non-Recourse Debt to which such Member Non-Recourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

**5.2.7.** *Section 754 Adjustments.* To the extent that an adjustment to the tax basis of any Company property pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or (m)(4) to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain or loss and shall be specially allocated to the Members in proportion to their respective Ownership Percentage in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies. Other items of gain or loss described in Section 4.3.2.5 shall be allocated in a manner consistent with the manner in which the corresponding adjustments to Capital Accounts are made.

**5.2.8.** *Curative Allocations.*

**5.2.8.1** The special allocations required under this Section 5.2 are intended to comply with the Treasury Regulations. It is the intent of the Company and each of the Members that all special allocations made pursuant to Section 5.2.1 through Section 5.2.7 shall be offset either with other special allocations made pursuant to Section 5.2.1 through Section 5.2.7 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 5.2.8. Therefore, the Manager may, in its sole discretion, make, pursuant to this Section 5.2.8, such offsetting special allocations of Company income, gain, loss or deduction in any manner the Manager determines to be appropriate, consistent with the goal that each Member's Capital Account balance be, to the extent possible, equal to the Capital Account balance such Member would have had in the absence of any allocations pursuant to Section 5.2.1 through 5.2.7.

**5.2.8.2** The Members expect and intend that upon the liquidation of the Company, after giving effect to all contributions and all allocations for all periods, each Member's Capital Account will have a positive balance equal to the amount of proceeds distributable to such Member. If in the opinion of the Manager this intended result would not be achieved without modification of the allocations required under this Article 5, then the allocations required under this Article 5 shall

---

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause each Member's Capital Account to have a balance equal to the amount of proceeds distributable to such Member upon the liquidation of the Company.

5.2.8.3  If the Manager determines that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this <u>Article 5</u> (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit under this <u>Article 5</u> is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii) (a "misallocated item"), then the Manager may allocate such unallocated item, or reallocate such misallocated item, to reflect the Members' economic interests in the Company.

5.2.9.  *Allocations Relating to Taxable Issuance of Units.*  Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of a Unit by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if such items had not been realized.

5.2.10. *Allocations Relating to Illinois Personal Property Tax Replacement Income Tax and Comparable Items.*  If the Company incurs liability for Illinois Replacement Tax for a Fiscal Year with respect to which the Company also realizes Illinois Replacement Tax Savings, then items of Company loss or deduction attributable to the Company's Illinois Replacement Tax expense shall be allocated to the Members that are not themselves subject to the Illinois Replacement Tax for such Fiscal Year and such allocation shall be made in proportion to the amount of Company Profits allocated to such Members for the period with respect to which such Illinois Replacement Tax is imposed.  The principles of this <u>Section 5.2.10</u> shall also apply if the Company is subject to any other tax, the computation of which depends in whole or in part upon the character of the Members.

5.2  *Other Allocation Rules.*

5.3.1.  Company Profits, Company Losses, and all other items of Company income, gain, loss, deduction and credit shall be determined by the Manager on a daily, monthly or other basis, using any method permitted under Code Section 706 and the Treasury Regulations.

5.3.2.  The Members are aware of the tax consequences of the allocations required under this <u>Article 5</u> and each Member hereby agrees to be bound by the provisions of this

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

Article 5 in reporting such Member's share of Company income, gain, loss and deduction for federal income tax purposes.

5.3.3.   Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), such Member's interests in Company profits are in proportion to such Member's Ownership Percentage.

5.3.4.   As between a Member and any permitted (under this Agreement) transferee of all or any portion of such Member's Units, Company Profits and Company Losses shall be allocated by the Manager in a manner intended to comply with Section 706 of the Code and the Treasury Regulations promulgated thereunder. In order to make such an allocation, the Manager may, in its discretion, close the Company's books on the date of such permitted transfer.

5.3     *Allocations Solely For Tax Purposes.*

5.4.1.   Allocations required under this Section 5.4 are solely for tax purposes and shall not affect any Member's Capital Account or any Member's share of any distribution from the Company.

5.4.2.   Allocations of tax credits, tax credit recapture, tax benefit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items as determined by the Manager taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

5.4.3.   Items of Company income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variance between the tax basis of such property to the Company and its Book Value.

5.4.4.   If the Book Value of any Company property is adjusted pursuant to Section 4.3.2, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such Company property shall take account of any variation between the tax basis of such Company property and its Book Value in the same manner as required under Code Section 704(c).

## ARTICLE 6
## DISTRIBUTIONS AND DISTRIBUTABLE CASH

6.1     *Timing and Amount.*   At such times as it shall determine, the Manager shall calculate the amount of Net Cash, if any, available for distribution to the Members at least quarterly and promptly distribute such amounts in the following order of priority:

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

(i)    First, to the holders of the Class A Units (in the proportion that the number of Class A Units held by each holder bears to the aggregate number of Class A Units outstanding immediately prior to such Distribution) until the aggregate amount of Unreturned Capital with respect to the Class A Units has been reduced to zero;

(ii)    The balance, to the holders of the Class A Units and the Class B Units (ratably among such Holders based upon the number of outstanding Units held by each such Holder, regardless of class, immediately prior to such Distribution).

6.2    *Distributions for Tax Purposes.* To the extent authorized by the Manager, on or before the 90th day after the end of each Fiscal Year, the Company shall distribute to the Members out of Net Cash the cash amount equal to the Tax Allowance Amount multiplied by the excess, if any, of (a) the amount of taxable income allocated to such Members under this Agreement for such Fiscal Year, over (b) the amount, if any, by which the sum of all items of deduction and loss allocated to such Members under this Agreement for all prior Fiscal Years exceeds the sum of all items of taxable income allocated to such Members for all prior Fiscal Years (the "Annual Tax Distribution"). At the end of each quarter of the Fiscal Year, the Manager shall estimate the portion of the current Annual Tax Distribution attributable to such quarter and allocable to specific Members (the "Quarterly Estimated Tax Distribution") and to the extent authorized by the Manager, within 15 days of the end of such Fiscal quarter, the Company shall make a cash distribution to the Members of such Quarterly Estimated Tax Distribution allocable to such Members such that Members may make quarterly estimated federal and estimated state income tax payments. Any Quarterly Estimated Tax Distributions shall be credited against any Annual Tax Distribution due a Member, with any excess Quarterly Estimated Tax Distributions for such Fiscal Year credited against the next Quarterly Estimated Tax Distributions for the following Fiscal Years. Any Annual Tax Distributions or Quarterly Estimated Tax Distributions may be directly deposited with the appropriate federal or state tax authority for a Member's benefit in lieu of an actual distribution. Any amounts distributed to a Member under this Section 6.2 shall be credited against future amounts otherwise distributed to such member under Section 6.1.

6.3    *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items.* On or before the 90th day following the close of each Fiscal Year, the Company shall distribute to the Members that are themselves subject to the Illinois Replacement Tax for such Fiscal Year an amount equal to the Company's Illinois Replacement Tax Savings for such Fiscal Year. Such distribution shall be made to and among such Members in proportion to the amount of Company Profits allocated to such Members for such Fiscal Year. The Company shall also make distributions to Members, at such times and in such proportionate amounts as provided for in this Section 6.3, in respect of any tax that would have been imposed upon the Company in a Fiscal Year but for the fact that some Members are themselves subject to such tax.

---

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

6.4    *Limitations on Distributions.*   Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to any Member if such distribution would violate Section 180/25-30 of the Act or other comparable applicable law.

6.5    *Redemption of the Class A Units.*  In the event that, on or before December 31, 2006, Riverside District Development, LLC has entered into one or more contracts to sell all of the Property and the Manager, in good faith, determines that such contracts are with bona fide purchasers, the Company shall have the right, but not the obligation, to purchase all, but not less than all, of the Class A Units then outstanding (the "Redemption Right"). In the event that the Company desires to exercise its Redemption Right pursuant to this Section 6.5, the Company may exercise its Redemption Right only by satisfying the following conditions: (i) delivery of written notice to the holders of the Class A Units of the Company's intent to exercise the Redemption Rights, and (ii) making a distribution to the holders of the Class A Units on or before June 30, 2007 of an amount sufficient to cause the cumulative amount distributed to such holders pursuant to Sections 6.1 and 6.2 and this Section 6.5 to be equal to the Redemption Amount. In the event that the Company exercises its Redemption Right in accordance with this Section 6.5, the holders of the Class A Units will cease to be Members for all purposes of this Agreement and their respective rights as a holder of Class A Units shall cease as of the earlier of March 31, 2007 or the date set forth in the written notice delivered to such holders pursuant to this Section.

# ARTICLE 7
# RESTRICTED TRANSACTIONS

7.1    *Compensation and Distributions.*   Unless otherwise approved by the Manager, all compensation, profits or distributions by the Company to any of the Members must be paid in accordance with Article 6 and Article 9. This covenant shall not restrict the payment of bona fide debt due a Member.

7.2    *Affiliate Transaction Rights.*  The Members agree that no Member holding Class B Units or an Affiliate of such Member (either one a "Related Developer") shall enter into any transaction with respect to the development of all or any portion of the Property unless the each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer, which may be in the form of common stock if the Related Developer is a corporation, or common membership interests if the Related Developer is a limited liability company, and shall provide each other Member with the rights, other than voting rights, that are materially equivalent to the rights that a holder of a Unit has with respect to the Company pursuant to this Agreement. The common interests in the Related Developer owned by the other Member shall be subject to the rights of any preferred interest in such Related Developer. The share of common interests each other Member shall own in the Related Developer shall be equal to the quotient obtained by dividing (y) the number of Units held by such Member, determined regardless of class. by (z) the total number of Units then outstanding, determined regardless of class.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

# ARTICLE 8;
# ROLE OF MEMBERS; INDEMNIFICATION OF MEMBERS

**8.1**     *General Rules.*  Except as otherwise stated in this Agreement or required under the Act, Members shall not take any part in the day-to-day management or conduct of the business of the Company, nor shall such Members have any right or authority to act for or bind the Company. Except as otherwise required under the Act, any action of the Members shall be taken by the affirmative vote of the holders of a majority of the Class B Units then outstanding.

**8.2**     *Meetings of the Members.*  Except as otherwise stated in this Agreement or required under the Act, the following provisions shall apply to all meetings of Members:

**8.2.1**   <u>Place and Time of Annual Meetings.</u>  An annual meeting of the Members shall be held each year on the first Tuesday in the month of April at 10:00 o'clock a.m., unless such day should fall on a legal holiday, in which event the meeting shall be held at the same hour on the next succeeding business day that is not a legal holiday for the purpose of electing the one or more Managers and conducting such other proper business as may come before the meeting.  The date, time and place of the annual meeting shall be determined by the Manager.

**8.2.2**   <u>Special Meetings.</u>  Special meetings of Members may be called for any purpose and may be held at such time and place, within or without the State of Illinois, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof.  Special meetings of the Members may be called by the Manager or by the holders of not less than 51% of all outstanding Class B Units entitled to vote on the matter for which the meeting is called.

**8.2.3**   <u>Place of Meetings.</u>  The Manager may designate any place, either within or without the State of Illinois, as the place of meeting for any annual meeting or for any special meeting called.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the Company.

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

**8.2.4  Notice of Meetings.**  Unless otherwise provided by statute, whenever Members are required or permitted to take action at a meeting, written or printed notice stating the place, day, and hour, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each Member entitled to vote at such meeting and to the Manager not less than 10 nor more than 60 days before the date of the meeting or in the case of a merger, consolidation, Unit exchange, dissolution or sale, lease or exchange of all or substantially all assets not less than 20 nor more than 60 days before the date of the meeting. All such notices shall be delivered, either personally or by mail, by or at the direction of the Manager, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the Member at his, her or its address as the same appears on the records of the Company.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Notice may also be waived in writing by any Member.  Unless otherwise provided by herein or by law, neither the business to be transacted at, or the purpose of, any regular or special meeting need be specified in any written waiver of notice.

**8.2.5  Quorum.**  Unless otherwise provided herein or by statute, the holder or holders of a majority of the outstanding Class B Units entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the Members, however, a quorum shall not consist of less than one-third of the outstanding Units entitled to vote. If a quorum is not present, the holders of a majority of the Class B Units present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place.  Members may participate in any meeting of Members by means of conference telephone or similar communication equipment by means of which all Members participating in such meeting can hear each other, and such participation shall constitute presence in person at such meeting.

**8.2.6  Proxies.**  Each Member may appoint a proxy to vote or otherwise act for him or her by signing an appointment form and delivering it to the person so appointed, but no such proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

**8.2.7  Voting of Units.**  Each outstanding Class B Unit shall be entitled to one vote, and each outstanding fractional Class B Unit shall be entitled such percentage of one vote that is represented by the fractional Class B Unit, in each matter submitted to vote at a meeting of Members, and in all elections for the Manager, every Member shall have the right to vote the number of Class B Units owned by such Member for the Manager.  Each Member may vote either in person or by proxy as provided herein.  Except as otherwise provided in Section 3.1, the Class A Units shall have no voting rights other than on matters for which voting by all Members is required under the Act.  In the event that the Company engages in

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

an act that requires the vote of all Members under the Act, this <u>Section 8.2.7</u> shall apply to both the Class A Units of the Class B Units, regardless of class.

8.2.8   <u>Informal Action</u>.  Unless otherwise provided by statute, any action required to be taken at any annual or special meeting of the Members of the Company, or any other action which may be taken at a meeting of the Members may be taken without a meeting and without a vote if a consent in writing setting forth the action so taken shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voting.  If such consent is signed by less than all of the Members entitled to vote, then such consent shall become effective only if at least five days prior to execution of the consent a notice in writing is delivered to all the Members entitled to vote with respect to the subject matter thereof and, after the effective date of the consent, prompt notice of the taking of the Company action without a meeting by less than unanimous written consent shall be delivered in writing to those Members who have not consented in writing.

8.3   *Indemnification of Members*.  The Company shall, to the fullest extent permitted by law, indemnify, defend and hold harmless its Members and former Members (collectively, the "Indemnified Parties"), from any and all claims, actions, causes of action, suits, proceedings, losses, damages, liability, costs and expenses (including, without limitation, attorneys' fees and court costs) asserted against or incurred or sustained by them by reason of their status as Members of the Company, or by reason of any act performed by them or any omission on their part while acting for or on behalf of the Company and in furtherance of its interests provided that the Indemnified Party acted in good faith and in a manner such party reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, such Indemnified Party had no reason to believe that his or her conduct was unlawful.

## ARTICLE 9
## MANAGEMENT

9.1   *General Powers of the Manager*.  The management of the Company shall be vested in a Manager designated by the Members as provided in Section 9.2 hereof.  Except as otherwise stated in this Agreement or required under the Act, the Manager shall have full and complete authority, power, an discretion to direct, manage and control the business, affairs, and properties of the Company, to make all decisions regarding those matters and to perform any and all other acts or activities customary or incident to the management of the Company's business.

9.2   *Number and Election*.  Initially, the Company shall have one (1) Manager, who shall be Heritage Property Development, Inc., an Illinois corporation.  The Members may change the number of Managers upon the affirmative vote of the holders of a majority of the Class B Units then outstanding.  The Members, by signing this Agreement, hereby designate the aforementioned

---

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

Persons as Managers of the Company until its successors are designated. Any Manager elected shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as hereinafter provided. Managers need not be residents of the State of Illinois or Members of the Company.

9.3     *Removal and Resignation.* Any Manager may be removed at any time, with or without cause, by the holders of two-thirds of the Units then entitled to vote at an election of Managers. In the event a Manager dies or is unwilling or unable to serve as such, a successor to such Manager shall be appointed pursuant to Section 9.4. The removal of a Manager who is also a Member shall not affect the Manager's rights as a Member and shall not constitute the Dissociation of such Member. A Manager may resign from the position of Manager at any time by giving written notice to the Company. The resignation shall take effect ten (10) days after receipt by the Company of that notice or, if later, at such time as may be specified in such notice, and unless otherwise specified therein, no acceptance of such resignation shall be necessary to make it effective. Upon the Withdrawal of any Manager, such Manager shall be treated as having resigned as of the date of Withdrawal and shall automatically cease to be a Manager as of the date of such Withdrawal. Except in the case of resignation by reason of Withdrawal, the resignation of a Manager pursuant to this Section 9.3 shall not affect such Member's rights as a Member and shall not constitute a Dissociation of such Member.

9.4     *Vacancies.* Vacancies and newly created Manager positions resulting from any increase in the authorized number of Managers may be filled by two-thirds of the Managers then in office. Each Manager so chosen shall hold office until a successor is duly elected and qualified or until his or her earlier death, resignation or removal as herein provided. Any vacancy that results for any reason other than an increase in the authorized number of Managers shall be filled as provided in Section 9.2.

9.5     *Quorum, Required Vote and Adjournment.* Each Manager shall have one vote. At any time when more than one (1) Manager is in office, a majority of the total number of Managers shall constitute a quorum for the transaction of business. The vote of a majority of Managers present at a meeting at which a quorum is present shall be the act of the Manager. If a quorum shall not be present at any meeting of the Manager, the Managers present thereat may adjourn the meeting from time to time, without notice other than announcement at the meeting, until a quorum shall be present.

9.6     *No Liability.* No Manager shall be liable under a judgment, decree or order of a court or in any other manner, for a debt, obligation or other liability of the Company.

9.7     *Certain Powers of the Manager.* Without limiting the generality of Section 9.1 above, the Manager shall have the right and power and authority, except as otherwise stated in Article 7 or Section 9.12 hereof or otherwise in this Agreement, or required under the Act, on behalf of the Company to:

---

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

9.7.1   authorize, execute and engage in contracts, transactions, investments and dealings on behalf of the Company, including contracts, transactions, investments and dealings with any Member;

9.7.2   borrow money on behalf of the Company, and mortgage, pledge or otherwise encumber any assets of the Company;

9.7.3   collect all amounts due to the Company;

9.7.4   call meetings of Members;

9.7.5   issue Units in accordance with the restrictions of <u>Article 3</u> and the other provisions of this Agreement;

9.7.6   pay all expenses incurred in forming the Company;

9.7.7   lend money;

9.7.8   determine and make distributions, in cash or otherwise, in respect of Interests, in accordance with the provisions of this Agreement and the Act;

9.7.9   establish a record date with respect to all actions to be taken hereunder that require a record date to be established;

9.7.10   establish or set aside any reasonable reserve or reserves for contingencies and for any other reasonable and proper Company purpose;

9.7.11   appoint (and dismiss from appointment) attorneys and agents on behalf of the Company, and employ or otherwise engage (and dismiss from employment or other engagement) any and all persons providing legal, accounting or financial services to the Company, and such employees, consultants, independent contractors, or agents as the Manager deems necessary or desirable for the management and operation of the Company, including, without limitation, any Member;

9.7.12   incur and pay all expenses and obligations incident to the formation, operation and management of the Company, including, without limitation, the services referred to in the preceding paragraph, taxes, interest, travel, rent, insurance, supplies, salaries and wages of the Company's employees and agents;

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

9.7.13  acquire and enter into any contract of insurance necessary or desirable for the protection or conservation of the Company and its assets or otherwise in the interest of the Company as the Manager shall determine;

9.7.14  open accounts and deposit, maintain and withdraw funds in the name of the Company in banks, savings and loan associations, brokerage firms or other financial institutions;

9.7.15  bring, defend, arbitrate, prosecute or compromise on behalf of the Company actions and proceedings at law or equity before any court or governmental, administrative or other regulatory agency, body or commission or otherwise;

9.7.16  prepare and cause to be prepared reports, statements and other relevant information for distribution to Members as may be required or determined to be necessary or desirable by the Manager from time to time;

9.7.17  prepare and file all necessary returns and statements and pay all taxes, charges, assessments and other impositions applicable with respect to the Company or its income or assets;

9.7.18  prosecute, protest, defend and/or protect all proprietary rights (including all trade names, trademarks and service marks, and all licenses and permits and applications with respect thereto) of the Company and all rights of the Company in connection therewith;

9.7.19  execute and deliver, for and on behalf of the Company, promissory notes, evidences of indebtedness, agreements, assignments, deeds, leases, loan agreements, mortgages and other security instruments, in each case as the Manager deems necessary or appropriate for the objects and purposes of the Company;

9.7.20  create offices of the Company, designate the duties of such offices, and select officers; and

9.7.21  execute all other documents or instruments, perform all duties and powers and do all things for and on behalf of the Company in all matters necessary or desirable or incidental to the foregoing.

The express grant of any power or authority in this Agreement to the Manager shall not in any way limit or exclude any other power or authority of the Manager that is not specifically or expressly set forth in this Agreement.

9.8  *Exculpation From Liability For Certain Acts.*  No Manager shall be liable to the Company or any Member for damages attributable to any breach of duty owed by a Manager (by

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

virtue of being a Manager) to the Company or the other Members, except to the extent (i) required under the Act or (ii) such breach of duty is based upon a knowing violation of applicable law or this Agreement or (iii) such breach of duty is based upon violation of applicable law or this Agreement arising out of such Person's gross negligence or willful misconduct as determined conclusively in a final order of a court of competent jurisdiction. The Managers shall not be liable to the Company or any Member for any loss, damage or claim incurred by reason of any act or omission performed or omitted by a Manager in good faith on behalf of the Company and in a manner reasonably believed to be within the scope of authority conferred on the Manager by or pursuant to this Agreement. The Managers shall be fully protected in relying in good faith upon the records of the Company and upon such information, opinions, reports or statements presented to the Company by any Person as to matters the Manager reasonably believes are within such other Person's professional or expert competence and who has been selected with reasonable care by or on behalf of the Company, including information, opinions, reports or statements as to the value and amount of the assets, liabilities, profits, losses, or any other facts pertinent to the existence and amount of assets from which distributions to Members might properly be paid.

9.9   *Indemnification.*   The Company shall, to the fullest extent permitted by law, indemnify and defend any Manager against and hold each Manager harmless from any losses, judgments, liabilities and expenses (including reasonable attorney fees) incurred by any Manager by reason of any act or omission (other than any act or omission carried out in willful misconduct, gross negligence or knowing violation of this Agreement or the Act) performed or omitted in good faith on behalf of the Company and in a manner reasonably believed by such Manager to be within the scope of the authority of the Manager.  The Company may also indemnify its employees and other agents who are not a Manager to the fullest extent permitted by law, provided that the indemnification in any given situation is approved by the Manager.

9.10   *Interested Manager.*   No contract or transaction between the Company and any Manager, or between the Company and any other limited liability company, corporation, partnership, association or other organization in which a Manager is a manager or an officer, or has a financial interest, shall be void or voidable solely for this reason, or solely because the Manager or officer is present at or participates in the meeting of the Manager, or solely because his votes are counted for such purpose, if: (a) the material facts as to his relationship or interest and as to the contract or transaction are disclosed or are known to the Members entitled to vote thereon without counting the vote of any Member who is an interested Manager, and the contract or transaction is specifically approved in good faith by vote of the Members; or (b) the contract or transaction is fair as to the Company as of the time it is authorized, approved or ratified, by the Board of Managers or the Members; or (c) the transaction is one described is <u>Section 7.2</u> hereof.

9.11   *Compensation to Manager.*   The Company shall pay a management fee to the Manager equal to $1,000 per month.

---

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

9.12 *Additional Consent Required for Specified Actions.* At all times during which Michael Rumman is a member of MT Property Holdings, LLC and during which MT Property Holdings, LLC is a Member, the Company shall not undertake those actions set forth in Sections 9.7.2, 9.7.5 and 9.7.7 unless the Manager has obtained the prior written consent of Michael Rumman for such action, which such consent may be granted or withheld in his sole and absolute discretion.

## ARTICLE 10
## LIMITATIONS ON DISPOSITION OF MEMBERS' INTERESTS

10.1 *Restriction on Transfers; Investment Representations and Warranties.*

10.1.1 Except as otherwise permitted by this Article 10 or elsewhere in this Agreement, no Member shall Transfer all or any portion of Units or any interest therein without the prior written consent of the Manager.

10.1.2 Each Member hereby represents and warrants to the Company that its acquisition of its Interest is made as principal for its own account, for investment purposes only, and not with a view to the resale or distribution of such Interest. Each Member agrees that it will not sell, assign, give, hypothecate, pledge, transfer, or otherwise dispose of any or all of its Interest to any Person who or which does not similarly represent and warrant and agree as provided in this Section 10.1.1.

10.2 *Permitted Transfers.*

10.2.1 Subject to the conditions and restrictions set forth in Section 10.2.2, a Member may at any time Transfer all or any portion of his Units to (a) to any member of the transferor's family, or to a custodian, trustee, family limited partnership or other fiduciary for the account of such Member or member of his family or to trusts for the benefit of the family of such Member, as the case may be; provided, that in each case such transfer is made pursuant to a bona fide estate planning transaction, (b) any Affiliate of a Member (including of the transferor), or (c) the transferor's executor, administrator, trustee, or personal representative to whom such Units are transferred at death or involuntarily by operation of law. For purposes of this Article 10, a Member's "family" shall include only such Member's spouse, natural or adoptive lineal ancestors or descendants, brothers or sisters.

10.2.2 A Transfer shall not be treated as a Permitted Transfer under Section 10.2.1 unless and until the following conditions are satisfied:

10.2.2.1 Except in the case of a Transfer of Units at death or involuntarily by operation of law, the transferor and transferee shall execute and deliver to the Company such documents and instruments of conveyance as may be necessary or appropriate in the opinion of counsel to the Company to effect such Transfer and to

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

confirm the agreement of the transferee to be bound by the provisions of this Article 10. In the case of a Transfer of Units at death or involuntarily by operation of law, the Transfer shall be confirmed by presentation to the Company of legal evidence of such Transfer, in form and substance satisfactory to counsel to the Company. In all cases, the Company shall be reimbursed by the transferor or transferee for all costs and expenses that it reasonably incurs in connection with such Transfer.

10.2.2.2 The transferor and transferee shall furnish the Company with the transferee's taxpayer identification number, sufficient information to determine the transferee's initial tax basis in the Units transferred, and any other information reasonably necessary to permit the Company to file all required federal and state tax returns and other legally required information statements or returns. Without limiting the generality of the foregoing, the Company shall not be required to make any distribution otherwise provided for in this Agreement with respect to any transferred Units until it has received such information.

10.2.2.3 Except in the case of a Transfer of Units at death or involuntarily by operation of law, either (a) such Units shall be registered under the Securities Act of 1933, as amended, and any applicable state securities laws, or (b) such Transfer will be exempt from all applicable registration requirements and will not violate any applicable laws regulating the Transfer of securities and, the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager, to such effect.

10.2.2.4 Except in the case of a Transfer of Units at death or involuntarily by operation of law, such Transfer will not cause the Company to be deemed to be an "investment company" under the Investment Company Act of 1940 as amended, and the transferor shall provide an opinion of counsel, which opinion and counsel shall be reasonably satisfactory to the Manager to such effect and the Manager shall provide to such counsel any information available to them relevant to such opinion.

10.3    *Sale of the Company*.

10.3.1 If the Manager and the holders of the Units then outstanding approve a Sale of the Company (the "Approved Company Sale"), each Member shall consent to and raise no objections against the Approved Company Sale. If the Approved Company Sale is structured as a (i) merger or consolidation, each Member shall waive any dissenters rights, appraisal rights or similar rights in connection with such merger or consolidation or (ii) sale of Units, each Member shall agree to sell all of his Units and rights to acquire Units on the terms and conditions approved by the Manager. Each Member shall take all necessary or desirable actions no connection

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

with the consummation of the Approved Company Sale as requested by the Company.

10.3.2 The obligations of the Members with respect to the Approved Company Sale are subject to the satisfaction of the following conditions: (i) upon the consummation of the Approved Company Sale, each Member shall receive the same form of consideration and the same portion of the aggregate consideration such Member would have received if such aggregate consideration had been distributed by the Company in complete liquidation pursuant to the rights and preferences set forth in this Agreement as in effect immediately prior to the consummation of the Approved Company Sale and; (ii) each holder of then currently exercisable rights to acquire a class of Units shall be given an opportunity to exercise such rights prior to the consummation of the Approved Company Sale and participate in such sale as holders of such class of Units.

10.3.3 All Members will bear their pro-rata share (based upon the number of Units sold) of the costs of any sale of Units pursuant to an Approved Company Sale to the extent such costs are incurred for the benefit of all such Members and are not otherwise paid by the Company or the acquiring party. Costs incurred by the Members on their own behalf will not be considered costs of the Approved Company Sale.

10.4 *Restrictions on Transfers.* Unless otherwise approved by the Manager, no Transfer of Units shall be made except upon terms which would not, in the opinion of counsel chosen by and mutually acceptable to the Manager and the transferor Member, result in the termination of the Company within the meaning of Section 708 of the Code or cause the application of the rules of Sections 168(g)(1)(B) and 168(h) of the Code or similar rules to apply to the Company. If the immediate Transfer of such Unit would, in the opinion of such counsel, cause a termination within the meaning of Section 708 of the Code, then if, in the opinion of such counsel, the following action would not precipitate such termination, the transferor Member shall be entitled (or required, as the case may be) (i) immediately to Transfer only that portion of his Units as may, in the opinion of such counsel, be transferred without causing such a termination and (ii) to enter into an agreement to Transfer the remainder of his Units, in one or more Transfers, at the earliest date or dates on which such Transfer or Transfers may be effected without causing such termination. The purchase price for the Units shall be allocated between the immediate Transfer and the deferred Transfer or Transfers pro rata on the basis of the percentage of the aggregate Units being transferred, each portion to be payable when the respective Transfer is consummated, unless otherwise agreed by the parties to the Transfer. In the case of a Transfer by one Member to another Member, the deferred purchase price shall be deposited in an interest-bearing escrow account unless another method of securing the payment thereof is agreed upon by the transferor Member and the transferee Member. In determining whether a particular proposed Transfer will result in a termination of the Company, counsel to the Company shall take into account the existence of prior written commitments to

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

Transfer made pursuant to this Agreement and such commitments shall always be given precedence over subsequent proposed Transfers.

10.5 *Prohibited Transfers.* Any purported Transfer of Units that is not effected in accordance with the terms and conditions of this Article 10 shall be null and void and of no force or effect whatever; provided that, if the Company is required to recognize a Transfer that is not a Permitted Transfer (or if the Company, in its sole discretion, elects to recognize a Transfer that is not a Permitted Transfer), the interest Transferred shall be strictly limited to the transferor's rights to distributions as provided by this Agreement with respect to the transferred Units, which distributions may be applied (without limiting any other legal or equitable rights of the Company) to satisfy any debts, obligations, or liabilities for damages that the transferor or transferee of such Units may have to the Company. In the case of a Transfer or attempted Transfer of Units that is effected in accordance with the terms and conditions of this Article 10, the parties engaging or attempting to engage in such Transfer shall be liable to indemnify and hold harmless the Company and the other Members from all cost, liability, and damage that any of such indemnified Persons may incur (including, without limitation, increment tax liability and lawyers' fees and expenses) as a result of such Transfer or attempted Transfer and efforts to enforce the indemnity granted hereby.

10.6 *Rights of Unadmitted Assignees.* A Person who acquires one or more Units but who is not admitted as a substituted Member pursuant to Section 10.8 shall hold only a Distribution Interest and be entitled only to allocations and distributions with respect to such Interests in accordance with this Agreement, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

10.7 *Admission of Transferees as Members.* Subject to the other provisions of this Article 10, a transferee of Units may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 10.8:

10.7.1 The Manager consents to such admission, which consent may be given or withheld in the sole and absolute discretion of the Manager;

10.7.2 The Units with respect to which the transferee is being admitted were acquired in accordance with the other terms and conditions of this Article 10;

10.7.3 The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the Manager may reasonably request as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement;

10.7.4 The transferee shall have delivered to the Manager a letter containing a representation and an agreement in the form set forth in Section 10.1.1 of this Agreement;

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

10.7.5  if the Transferee is not an individual, the Transferee shall have provided the Manager with satisfactory evidence of the Transferee's authority to become a Member under the terms and provisions of this Agreement; and

10.7.6  The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Member incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units.

10.8  *Covenants; Representations Regarding Transfers; Legend.*

10.8.1  Each Member hereby represents, covenants and agrees with the Company for the benefit of the Company and all Members, that (i) he is not currently making a market in Units and will not in the future make a market in Units, (ii) he will not Transfer his Units on an established securities market, a secondary market (or the substantial equivalent thereof) within the meaning of Code Section 7704(b) (and any regulations, proposed regulations, revenue rulings, or other official pronouncements of the Internal Revenue Service or Treasury Department that may be promulgated or published thereunder), and (iii) in the event such Regulations, revenue rulings, or other pronouncements treat any or all arrangements which facilitate the selling of partnership interests and which are commonly referred to as "matching services" as being a secondary market or substantial equivalent thereof, he will not Transfer any Units through a matching service that is not approved in advance by the Company. Each Member further agrees that he will not Transfer any Units to any Person unless such Person agrees to be bound by this Section 10.8 and to Transfer such Units only to Persons who agree to be similarly bound. The Company shall, from time to time and at the request of a Member, consider whether to approve a matching service and shall notify all Members of any matching service that is so approved.

10.8.2  Each Member hereby agrees that the following legend shall be placed upon any document or instrument evidencing ownership of Units:

THE UNITS REPRESENTED BY THIS DOCUMENT HAVE NOT BEEN REGISTERED UNDER ANY FEDERAL OR STATE SECURITIES LAWS AND THE TRANSFERABILITY OF SUCH UNITS IS RESTRICTED. SUCH UNITS MAY NOT BE SOLD, ASSIGNED OR TRANSFERRED, NOR WILL ANY ASSIGNEE, VENDEE, TRANSFEREE OR ENDORSEE THEREOF BE RECOGNIZED AS HAVING ACQUIRED ANY SUCH INTERESTS BY THE ISSUER FOR ANY PURPOSES, UNLESS (1) A REGISTRATION STATEMENT UNDER THE SECURITIES ACT OF 1933, AS AMENDED, WITH RESPECT TO SUCH UNITS SHALL THEN BE IN EFFECT AND SUCH TRANSFER HAS BEEN QUALIFIED UNDER ALL APPLICABLE STATE SECURITIES LAWS, OR (2) THE

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

AVAILABILITY OF AN EXEMPTION FROM SUCH REGISTRATION AND QUALIFICATION SHALL BE ESTABLISHED TO THE SATISFACTION OF COUNSEL TO THE ISSUER OF THE UNITS.

THE UNITS REPRESENTED BY THIS DOCUMENT ARE SUBJECT TO FURTHER RESTRICTIONS AS TO THEIR SALE, TRANSFER, HYPOTHECATION, OR ASSIGNMENT AS SET FORTH IN THE OPERATING AGREEMENT BETWEEN THE ISSUER OF THE UNITS AND ITS MEMBERS.  A COPY OF SUCH OPERATING AGREEMENT WILL BE FURNISHED WITHOUT CHARGE BY THE COMPANY TO THE HOLDER HEREOF UPON WRITTEN REQUEST.

10.9        *Distribution and Allocations in Respect to Transferred Interests.*  If any Unit is sold, assigned, or Transferred during any Fiscal Year in compliance with the provisions of this Article 10, income, loss, deduction, credit, each item thereof, and all other items attributable to the Transferred Unit for such Fiscal Year shall be divided and allocated between the transferor and the transferee by taking into account their varying Interests during such Fiscal Year in accordance with Code Section 706(d), using any conventions permitted by law and selected by the Manager.  All distributions on or before the date of such Transfer shall be made to the transferor, and all distributions thereafter shall be made to the transferee.  Solely for purposes of making such allocations and distributions, such Transfer shall be recognized not later than the end of the calendar month during which it is given notice of such Transfer, provided that, if the Company is given notice of a Transfer at least ten business days prior to the Transfer, the Company shall recognize such Transfer as the date of such Transfer, and provided further that, if the Company does not receive a notice stating the date Units were Transferred and such other information as the Manager may reasonably require within 30 days after the end of the Fiscal Year during which the Transfer occurs, then all such times shall be allocated, and all distributions shall be made, to the Person who, according to the books and records of the Company was the owner of the Units on the last day of the Fiscal Year during which the Transfer occurs.  Neither the Company nor any Manager shall incur any liability for making allocations and distributions in accordance with the provisions of this Section 10.10, whether or not any Manager or the Company has knowledge of any Transfer of ownership of any Unit.

10.10      *Termination of Restrictions.*  The restrictions set forth in this Article 10 will continue with respect to each Unit until the earliest of (i) the 2010 anniversary of the date of this Agreement and (ii) the consummation of a Sale of the Company.

10.11      *Waiver of Redemption of Distributional Interest*  Members hereby agree that no Member shall have a right to have his or her Distributional Interest redeemed by the Company upon Dissociation pursuant to Section 35-60 of the Act

---

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

# ARTICLE 11
## DISSOLUTION AND TERMINATION

11.1 *Events of Dissolution.* The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

      11.1.1      the consent of the holders of a majority of the Class B Units then outstanding; and

      11.1.2      the sale of substantially all the assets of the Company;

      11.1.3      the entry of a decree of judicial dissolution or an administrative dissolution under the Act; and

      11.1.4      any other event requiring the dissolution of the Company under Section 35-1 of the Act.

Notwithstanding the foregoing, if the Members (and any dissociated Member whose Dissociation caused such dissolution) elect to waive such dissolution as provided under Section 35-3 of the Act, the Company may carry on its business as if no dissolution occurred.

11.2 *Liquidation.* If the Company shall be dissolved by reason of the occurrence of any of the circumstances described in <u>Section 11.1</u>, no further business shall be conducted by the Company except for taking such action as shall be necessary for the winding up of its affairs and the distribution of its assets to the Members. Upon such dissolution of the Company, the Manager shall take the following steps:

      11.2.1      Unless otherwise approved by the Members in accordance with <u>Article 7</u>, dispose of all other Company properties and assets at the best cash price obtainable therefor under the circumstances.

      11.2.2      Pay all Company debts and liabilities, in the order of priority as provided under applicable law, or otherwise make adequate provision therefor.

      11.2.3      Determine by independent appraisal the fair market value of the Company properties and assets to be distributed in kind (if permitted under <u>Article 7</u>), and credit or charge (as the case may be) the Capital Account of each Member with the amount that would have been credited or charged to such Member in accordance with <u>Article 4</u> if such properties and assets had been sold at fair market value.

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

11.2.4    Credit or charge (as the case may be) each Member's Capital Account with such Member's share of all Company Profits and Company Losses that were not previously reflected in any Capital Accounts and that were realized or incurred during the Fiscal Year or Fiscal Years which include the dissolution and termination, up to and including the date of distribution, net of all distributions that were not previously reflected in any Capital Accounts and that were made to such Member during such Fiscal Years up to but not including such date.

11.2.5    Distribute to each of the Members the balance, if any, of the properties and assets of the Company in accordance with each Member's Capital Account, as adjusted pursuant to Sections 11.2.3 and 11.2.4.

11.2.6    Notwithstanding Sections 11.2.1 through 11.2.5, if any Member shall be indebted to the Company for any reason whatsoever, the liquidator may apply any cash allocated to such Member in accordance with this Section 11.2 to the payment of such indebtedness. If such cash is not sufficient to liquidate such indebtedness in its entirety then, until payment in full of such indebtedness by such Member, the liquidator shall retain such Member's distributive share of the Company properties and assets and, after applying the cost of operation of such properties and assets during the period of such liquidation against the income therefrom, shall apply the balance of such income toward the liquidation of such indebtedness; provided, however, that if upon the expiration of six months after notice of such outstanding indebtedness has been given to such Member, such amount has not been paid or otherwise liquidated in full, the liquidator may sell the assets allocable to such Member at private or public sale at the best cash price immediately obtainable under the circumstances, and so much of the proceeds of such sale as shall be necessary to liquidate such indebtedness shall then be so applied, and the balance (if any) of such proceeds shall be distributed to such Member.

11.2.7    The liquidator shall comply with all requirements of the Act, or other applicable law, pertaining to the winding up of a limited liability company.

11.3    *Filings.* Upon dissolution and complete winding up of the Company, the liquidator shall file any and all certificates and other documents required under the Act including, but not limited to, Articles of Dissolution as required by Section 35-20 of the Act.

11.4    *Termination.* The Company shall terminate when all of the assets of the Company have been distributed in the manner provided for in Section 11.2 of this Agreement, and the Articles shall have been canceled in the manner required by the Act.

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

# ARTICLE 12
## BOOKS AND RECORDS

12.1    *Books and Records; Accounting.*  The Manager shall keep or cause to be kept at the address of the Company (or at such other place the Manager shall determine) accurate and proper books and records regarding the status of the business and financial conditions of the Company. The Fiscal Year of the Company shall be the calendar year

12.2    *Access to Records, Financial Statements.*  Each Member shall have the right to review all Company records, agreements, tax returns, financial statements, balance sheet, and financial projections of the Company, which may be prepared from time to time by or at the request of the Manager or an officer of the Company. The Company shall prepare and furnish to each Member promptly after the close of each fiscal quarter an unaudited statement showing the operations of the Company for such quarter and the balance in each Member's Capital Account. The Manager has the authority to select the Company's accountants and determine whether or not to obtain an audit of the Company's books and records.

12.3    *Annual Reports.*    Within ninety (90) days after the end of each Fiscal Year, the Manager shall cause to be prepared and each Member furnished with unaudited financial statements accompanied by a report thereon of the Company's accountants stating that such statements are prepared and fairly stated in all material respects in accordance with generally accepted accounting principles, and, to the extent inconsistent therewith, in accordance with this agreement, including: (i) a copy of the balance sheet of the Company as of the last day of such Fiscal Year; (ii) a statement of income or loss for the Company for the Company for such Fiscal Year; (iii) a statement of the Members' Capital Accounts and changes therein for such Fiscal Year; and (iv) a statement of Company cash flow for such Fiscal Year.

12.4    *Bank Account(s).*  All funds of the Company shall be deposited in the name of the Company in such bank or banks as may be agreed upon by the Manager and checks drawn on such account(s) shall require the signature of a Manager.  All funds received from the operation and business of the Company shall be promptly deposited in the account(s) maintained in its name and all debts, expenses and charges shall be paid by checks drawn on such account(s). There shall be no commingling of the funds of the Company with the funds of any other entity.

# ARTICLE 13
## TAX MATTERS

13.1    *Company Tax Returns.*

13.1.1 The Manager shall cause to be prepared and timely filed all tax returns required to be filed for the Company, and shall cause to be timely paid all taxes owed by the

---

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

Company. The Company shall make an election under Code Section 754. The Manager may, in its discretion, make or refrain from making, any other foreign, federal, state or local income or other tax elections for the Company that it deems necessary or advisable.

13.1.2 MT Property Holdings, LLC is hereby designated as the Company's "Tax Matters Partner" under Code Section 6231(a)(7) and shall have all the powers and responsibilities of such position as provided in the Code. The Manager is specifically directed and authorized to take whatever steps the Manager, in its discretion, deem necessary or desirable to perfect such designation, including filing any forms or documents with the Internal Revenue Service and taking such other action as may from time to time be required under the regulations issued under the Code. Each Member hereby agrees to cooperate with the Tax Matters Partner with respect to all matters within its authority as Tax Matters Partner. Expenses incurred by the Tax Matters Partner, in its capacity as such, will be borne by the Company.

13.2    *Schedules K-1 and Forms 1065.* The Manager shall, as promptly as practicable and in any event within 90 days after the end of each Fiscal Year, cause to be prepared and mailed to each Member of record an Internal Revenue Service Form K-1, Internal Revenue Service Form 1065, and any other forms which are necessary or advisable for the Members to satisfy their federal tax reporting obligations.

13.3    *Taxation as Partnership.* The Members agree that the Company will seek to be treated as a partnership for United States federal income tax purposes. The Manager shall operate the Company in a manner intended to preserve, to the extent practical, the Company's treatment as a partnership for United States federal income tax purposes.

13.4    *Withholding.* Each Member certifies that they are U.S. persons within the meaning of code Section 7701(a)(30). Any Person who may subsequently become a Member shall either (i) provide a certificate of non-foreign status to all Members or (ii) be subject to withholding on all distributions as may be required under the Code.

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ARTICLE 14
## MISCELLANEOUS

14.1     *Reimbursements.* The Company shall reimburse the Members and the Managers for all expenses incurred and paid by any of them in the organization of the Company and as authorized by the Company, in the conduct of the Company's business, including, but not limited to, expenses of maintaining an office, telephones, travel, office equipment and secretarial and other personnel as may reasonably be attributable to the Company. Such expenses shall not include any expenses incurred in connection with a Member's or Manager's exercise of its rights as a Member or a Manager apart from the authorized conduct of the Company's business. The sole determination of the Manager of which expenses are allocated and reimbursed as a result of the Company's activities or business and the amount of such expenses shall be conclusive. Such reimbursement shall be treated as expenses of the Company and shall not be deemed to constitute distributions to any Member of profit, loss or capital of the Company.

14.2     *Amendments.* In addition to amendments to this Agreement otherwise authorized under this Agreement, the Manager may, at any time and without consent of any Member, make any amendment to this Agreement provided that such amendment:

    14.2.1     does not adversely affect the rights of the Members or their assignees in any material respect;

    14.2.2     merely corrects an error or resolves an ambiguity in, or inconsistency among, the provisions of this Agreement;

    14.2.3     deletes or adds any provision of this Agreement that is required to be so deleted or added by any federal or state governmental authority;

    14.2.4     merely amends this Agreement or the Company's Articles to admit new Members in accordance with this Agreement;

    14.2.5     amends Article 4 in accordance with Section 4.3.3;

    14.2.6     amends Article 5 in accordance with Section 5.2.8; or

    14.2.7     reflects a change in the Act that permits or requires an amendment, without adversely affecting the rights of any Member in any material respect.

Except as otherwise provided in this Agreement, this Agreement may be amended solely by a written instrument executed by the holders of a majority of the Class B Units then outstanding.

14.3 *Successors.* This Agreement shall be binding as to the executors, administrators, estates, heirs and legal successors, or nominees or representatives, of the Members. Except as otherwise provided in this Agreement, no persons other than the Members and their respective executors, administrators, estates, heirs and legal successors, or their nominees or representatives, shall obtain any rights by virtue of this Agreement.

14.4 *Counterparts.* This Agreement may be executed in several counterparts with the same effect as if the parties executing the several counterparts had all executed one counterpart.

14.5 *Integration.* This Agreement constitutes the entire agreement among the Members pertaining to the subject matter hereof and supersedes all prior and contemporaneous agreements and undertakings of the Members in connection therewith.

14.6 *Entire Agreement.* This Agreement constitutes the entire agreement between the parties relating to the subject matter hereof. It supersedes any prior agreement or understandings between them relating to the subject matter hereof, and it may not be modified or amended except in a writing executed by all parties hereto.

14.7 *Governing Law.* This Agreement shall be governed by and construed in accordance with the laws of the State of Illinois without giving effect to the principles of conflict of laws thereof.

14.8 *Severability.* This Agreement shall be construed to the maximum extent possible to comply with all of the terms and conditions of the Act. If, notwithstanding the previous sentence, a court of competent jurisdiction concludes that any provisions or wording of this Agreement is invalid or unenforceable under the Act or other applicable law, the invalidity or unenforceability or such provisions or wording will not invalidate the entire Agreement. In such a case, this Agreement will be construed so as to limit any term or provision so as to make it valid or enforceable within the requirements of applicable law and, in the event such term or provisions cannot be so limited, this Agreement will be construed to omit such invalid or unenforceable provisions or term. If it is determined that any provision relating to the distributions and allocations of the Company or to any fee payable by the Company is invalid or unenforceable, this Agreement shall be construed or interpreted so as (a) to make it enforceable or valid and (b) to make the distributions and allocations as closely equivalent to those set forth in this Agreement as permissible under applicable law.

14.9 *Headings.* The Headings in this Agreement are included for convenience and identification only and are in no way intended to describe, interpret, define or limit the scope, extent or intent of this Agreement or any provision hereof.

14.10 *Waiver.* No consent or waiver, express or implied, by any Member to or of any breach or default by the other in the performance of obligations hereunder shall be deemed or construed to be a consent or waiver of any other obligations of such Member hereunder. Failure on the part of any Member to complain of any act or failure to act of any other Member or to declare any

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

other Member in default, irrespective of how long such failure continues, shall not constitute a waiver by such Company, of its rights hereunder.

14.11 *Filings.* Following the execution and delivery of this Agreement, the Manager shall promptly prepare any documents required to be filed and recorded under the Act, and the Manager shall promptly cause each such document to be filed and recorded in accordance with the Act and, to the extent required by local law, to be filed and recorded or notice thereof to be published in the appropriate place in each jurisdiction in which the Company may hereafter establish a place of business. The Manager shall also promptly cause to be filed, recorded and published such statements or other instruments required by any provision of any applicable law of the United States or any state or other jurisdiction which governs the conduct of its business from time to time.

14.12 *Notices.* Notices, requests, reports, payments, calls or other communications required to be given or made to any Member hereunder shall be in writing and shall be delivered personally or mailed, certified mail, return receipt requested, or delivered by overnight courier service to such Member at such Member's address last shown on the Company's books and records, or such other address as any party hereto designates by written notice to the Company, and shall be deemed to have been given upon delivery, if delivered personally, three days after mailing, if mailed, or one business day after delivery to the courier, if delivered by overnight courier service. Addresses shown under the signatures of each Member shall be considered the last known address of such Member unless and until the Company is otherwise notified by such Member.

14.13 *Mediation.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation, the Company and each Member agrees to seek resolution of such controversy or claim through mediation in accordance with the current Commercial Mediation Rules of the American Arbitration Association before resorting to arbitration, litigation, or some other form of dispute resolution.

14.14 *Arbitration.* With respect to any controversy or claim which arises under the terms of this Agreement and which is not resolved through negotiation or mediation, the Company and each Member agrees to seek resolution of such controversy or claim through arbitration in accordance with the current Commercial Arbitration Rules of the American Arbitration Association, and judgment upon the award entered by the arbitrator(s) may be entered in any court having jurisdiction thereof. The costs of arbitration shall be allocated among the parties as directed by the arbitrator(s).

14.15 *Equitable Remedies.* The rights and remedies of the Members hereunder shall not be mutually exclusive, i.e., the exercise of rights granted under any provisions hereof shall not preclude the exercise of any other provisions hereof. The Members confirm that damages at law may be an inadequate remedy for a breach or threatened breach of this Agreement and agree that, in the event of a breach or threatened breach of any provision hereof, the respective rights and obligations hereunder shall be enforceable by specific performance, injunction or other equitable remedy, but nothing herein contained is intended to, nor shall it, limit or affect any rights at law or by statute or otherwise

---

*HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT*

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

of any party aggrieved as against the other for a breach or threatened breach of any provision hereof, it being the intention by this subsection to make clear the agreement of the Members that the respective rights and obligations of the Members hereunder shall be enforceable in equity as well as at law or otherwise.

14.16 *Company Losses Due to Member's Litigation.* In the event the Company is made a party to any litigation or otherwise incurs any losses or expenses as a result of or in connection with any Member's obligations or liabilities which do not arise out of or relate to the business of the Company, and which are not covered by the Company's insurance coverage, such Member shall reimburse the Company for all such expenses incurred, including attorneys' fees, and the interest of such Member in this Company may be charged therefor.

14.17 *Title to Company Assets.* The assets of the Company shall be owned by the Company as an entity, and no Member shall have any direct ownership interest in such assets or any portion thereof.

14.18 *Execution of Additional Documents.* Each Member hereby agrees to execute such other and further statements of interest and holdings, designations, powers of attorney and other instruments reasonably necessary for the Company to comply with any applicable laws, rules or regulations.

14.19 *Confidentiality.* Any mediators or mediators appointed pursuant to this Agreement shall be under a duty to maintain in confidence, to the greatest extent reasonably possible, any and all information relating to the Company and/or its Members or creditors.

***Signature Page Follows***

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

## ADDITIONAL MEMBER SIGNATURE PAGE

The undersigned hereby executes the Operating Agreement, dated as of August 15, 2005 ("Agreement"), by and among Heritage Development Partners, LLC, an Illinois limited liability company (the "Company"), and the Members listed on the signature pages thereto. Each of the parties other than the Company may be referred to individually as a "Member" and collectively as the "Members".

Date: _____, 2206

_____
Name

_____
Address

_____
Signature

HERITAGE DEVELOPMENT PARTNERS, LLC
(on behalf of itself and the Members)

By: _____
         Authorized Manager

FILED DATE: 4/1/2020 3:26 PM 2020L000292
FILED DATE: 1/7/2020 7:23 PM 2020L000292

<u>**SCHEDULE 1**</u>
**TO THE**
**HERITAGE DEVELOPMENT PARTNERS, LLC OPERATING AGREEMENT**

<u>**Ownership of Members as of January 1, 2006**</u>

| Member | <u>Class A Units</u> | <u>Class B Units</u> | <u>Capital Contribution</u> |
|---|---|---|---|
| MT Property Holdings, LLC | None | 72,000 | $1,000 |
|  |  | <u>None</u> |  |
| **Total** |  | 72,000 | $1,000 |

FILED DATE: 4/1/2020 3:26 PM  2020L000292
FILED DATE: 1/7/2020 7:23 PM  2020L000292

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:        **HERITAGE DEVELOPMENT PARTNERS, LLC,**
an Illinois limited liability company

By: **HERITAGE PROPERTY DEVELOPMENT , INC.**
Its: Manager

By: Michael Rumman
Its: President

MEMBER:        **MT PROPERTY HOLDINGS, LLC,**
an Illinois limited liability company

By: Michael Rumman
Its: Member

By: Antion S. Rezko
Its: Member

FILED DATE: 4/1/2020 3:26 PM   2020L000292
FILED DATE: 1/7/2020 7:23 PM   2020L000292

**IN WITNESS WHEREOF,** the parties hereto have executed and delivered this Operating Agreement of Limited Liability Company as of the date first above written.

COMPANY:        **HERITAGE DEVELOPMENT PARTNERS, LLC,**
an Illinois limited liability company

By:  **HERITAGE PROPERTY DEVELOPMENT , INC.**
Its: Manager

By: Michael Rumman
Its: President

MEMBER:        **MT PROPERTY HOLDINGS, LLC,**
an Illinois limited liability company

By: Michael Rumman
Its: Member

By: Antion S. Rezko
Its: Member

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

FILED DATE: 4/1/2020 3:26 PM   2020L000292

# EXHIBIT B

AMENDED  AND RESTATED

OPERATING AGREEMENT  OF

MT PROPERTY HOLDINGS, LLC

FILED DATE: 4/1/2020 3:26 PM   2020L000292

**AMENDED AND RESTATED**

**OPERATING AGREEMENT**

**OF**

**MT PROPERTY HOLDINGS, LLC**

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## INDEX

| | | Page |
|---|---|---|
| **ARTICLE 1** | **DEFINITIONS** | 1 |
| **ARTICLE 2** | **FORMATION OF THE COMPANY** | 6 |
| 2.1 | *Formation* | 6 |
| 2.2 | *Name* | 6 |
| 2.3 | *Purpose; Powers* | 6 |
| 2.4 | *Term* | 6 |
| 2.5 | *Principal Place of Business* | 6 |
| 2.6 | *Registered Office and Registered Agent* | 7 |
| 2.7 | *Continuation of Company* | 7 |
| 2.8 | *Qualification in Other Jurisdictions* | 7 |
| **ARTICLE 3** | **UNITS** | 7 |
| 3.1 | *Units* | 7 |
| 3.2 | *Persons Deemed Members* | 7 |
| **ARTICLE 4** | **CAPITAL CONTRIBUTIONS** | 8 |
| 4.1 | *Capital Contributions of Members* | 8 |
| 4.2 | *Additional Capital Contributions* | 8 |
| 4.3 | *Capital Accounts* | 8 |
| 4.4 | *Interest on Capital Contributions* | 8 |
| 4.5 | *Withdrawal* | 9 |
| 4.6 | *Return of Capital* | 10 |
| 4.7 | *Liability of Members* | 10 |
| **ARTICLE 5** | **ALLOCATION OF COMPANY PROFITS AND LOSSES** | 10 |
| 5.1 | *Allocations* | 10 |
| 5.2 | *Special Allocations* | 10 |
| 5.3 | *Other Allocation Rules* | 13 |
| 5.4 | *Allocations Solely For Tax Purposes* | 14 |
| **ARTICLE 6** | **DISTRIBUTIONS AND DISTRIBUTABLE CASH** | 14 |
| 6.1 | *Timing and Amount* | 14 |
| 6.2 | *Distributions for Tax Purposes* | 15 |
| 6.3 | *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items* | 15 |
| 6.4 | *Limitations on Distributions* | 15 |
| **ARTICLE 7** | **MANAGEMENT: RIGHTS, POWERS AND DUTIES** | 15 |
| 7.1 | *Management* | 15 |
| 7.2 | *Meetings of and Voting by Members* | 16 |
| 7.3 | *Personal Services* | 17 |
| 7.4 | *Duties of Parties* | 17 |
| 7.5 | *Liability and Indemnification* | 17 |
| **ARTICLE 8** | **TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS** | 18 |
| 8.1 | *Transfer* | 18 |

FILED DATE: 4/1/2020 3:26 PM    2020L000292

| | | |
|---|---|---|
| 8.2 | *Voluntary Withdrawal* | 18 |
| 8.3 | *Involuntary Withdrawal* | 19 |
| 8.4 | *No Right to Terminate the Company* | 19 |
| 8.5 | *Rights of Unadmitted Assignees* | 19 |
| 8.6 | *Admission of Transferees as Members* | 19 |
| **ARTICLE 9 ROLE OF MEMBERS; INDEMNIFICATION OF MEMBERS** | | **19** |
| 9.1 | *General Rules* | 19 |
| 9.2 | *Meetings of the Members* | 20 |
| **ARTICLE 10 DISSOLUTION AND TERMINATION** | | **22** |
| 10.1 | *Events of Dissolution* | 22 |
| 10.2 | *Liquidation* | 22 |
| 10.3 | *Filings* | 23 |
| 10.4 | *Termination* | 23 |
| **ARTICLE 11 BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS** | | **24** |
| 11.1 | *Bank Accounts* | 24 |
| 11.2 | *Books and Records* | 24 |
| 11.3 | *Annual Accounting Period* | 24 |
| 11.4 | *Reports* | 24 |
| 11.5 | *Tax Matters Person* | 25 |
| 11.6 | *Tax Elections* | 25 |
| 11.7 | *Title to Company Property* | 25 |
| **ARTICLE 12 GENERAL PROVISIONS** | | **25** |
| 12.1 | *Assurances* | 25 |
| 12.2 | *Notifications* | 25 |
| 12.3 | *Specific Performance* | 25 |
| 12.4 | *Complete Agreement* | 26 |
| 12.5 | *Agreement* | 26 |
| 12.6 | *Applicable Law* | 26 |
| 12.7 | *Titles* | 26 |
| 12.8 | *Binding Provisions* | 26 |
| 12.9 | *Jurisdiction and Venue* | 26 |
| 12.10 | *Terms* | 26 |
| 12.11 | *Separability of Provisions* | 27 |
| 12.12 | *Counterparts* | 27 |
| 12.13 | *Trustee's Obligations* | 27 |
| 12.14 | *Securities Law Restrictions/Accredited Investor Statutes* | 27 |

FILED DATE: 4/1/2020 3:26 PM   2020L000292

AMENDED AND RESTATED
OPERATING AGREEMENT
OF
MT PROPERTY HOLDINGS, LLC

This Amended and Restated Operating Agreement is entered into by and among the Persons whose names are set forth on the signature pages hereof and any Person who hereafter becomes a party hereto pursuant to the provisions hereof, and is made effective as of January 1, 2006.

RECITALS

MT Property Holdings, LLC (the "Company") was organized pursuant to the Illinois Limited Liability Company Act (the "Act") upon the filing of the Articles of Organization (the "Articles") with the Office of Secretary of State at the State of Illinois on December 28, 2000. 5

The existing Members, who previously entered into an operating agreement for the Company, desire to amend and restate the prior operating agreement and, as of the date first written above, operate the Company in accordance with and subject to the terms and conditions set forth in such amended and restated operating agreement.

NOW THEREFORE, for good and valuable consideration, the Persons set forth in the signature pages hereto, intending to be legally bound, agree as follows:

ARTICLE 1
DEFINITIONS

The following terms used herein shall have the following meanings (unless otherwise expressly provided herein, or unless the context clearly indicates otherwise):

1.1     "Act" means the Illinois Limited Liability Company Act, 805 ILCS Sec 180/1-1, et seq., as amended from time to time (or any corresponding provisions of succeeding law).

1.2     "Agreement" means this Amended and Restated Operating Agreement of MT Property Holdings, LLC, as from time to time amended.

1.3     "Annual Tax Distribution" means that distribution provided in Section 6.2.

1.4     "Articles" means the Articles of Organization filed with the Office of the Secretary of State of Illinois, and all amendments thereto.

1.5     "Bankruptcy" means with respect to a Person: (a) a filing by the Person of a voluntary petition in bankruptcy, the filing of a pleading in any court of record admitting in writing its inability to pay its debts as they come due or the filing against a Member of an

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

involuntary petition in bankruptcy that is not dismissed within thirty (30) days, (b) the making by the Person of a general assignment for the benefit of creditors, (c) the filing by the Person of an answer admitting the material allegations of, or its consenting to, or defaulting in answering, a bankruptcy petition filed against it in any bankruptcy proceeding, (d) the entry of an order, judgment, decree by any court of competent jurisdiction adjudicating the Person a bankrupt or appointing a trustee of its assets, or (e) any levy of execution being made upon the Interest of the Person in the Company.

1.6     **"Book Value"** means, with respect to any property, the Company's adjusted basis for federal income tax purposes, adjusted from time to time as required or permitted under Treasury Regulations Section 1.704-1(b)(2)(iv)(d)-(g).

1.7     **"Capital Account"** means the account maintained for each Member in accordance with the provisions of the Code and the regulations promulgated thereunder, including but not limited to the rules regarding maintenance of capital accounts set forth in Treasury Regulations Section 1.704-1.

1.8     **"Capital Contribution"** means, with respect to any Member executing this Agreement, the capital contribution such Member actually makes pursuant to Article 4 hereof.

1.9     **"Class A Payment Preference"** means the sum of following:

(1)  the cumulative amount for all prior and current periods distributable to the Holders of Class A Units pursuant to Section 6.1(ii) computed as if the amounts so distributed included (i) Net Cash and (ii) Company Offering Payments;

plus:

(2) the amount of all Member Offering Payments;

minus:

(3) the cumulative amount for all prior and current periods distributable to the Holders of Class A Units pursuant to Section 6.1(ii) computed without regard to any Section 6.1(i) distributions.

1.10    **"Code"** means the Internal Revenue Code of 1986, as amended. Any reference to any specific provision of the Code or any regulations promulgated thereunder shall also refer to any successor provisions thereto.

1.11    **"Company"** means MT Property Holdings, LLC, the Illinois limited liability company to be operated in accordance with the provisions of this Agreement.

1.12    **"Company Loss"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company, where the aggregate of all such items during any

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

applicable period results in a net loss to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.13    **"Company Minimum Gain"** means an amount equal to the Company minimum gain, as determined in accordance with Treasury Regulations Section 1.704-2(d).

1.14    **"Company Offering Payment"** means any amount paid by the Company with respect to any liability, claim or settlement of any matter related to the sale of membership interests by Heritage Development Partners, LLC..

1.15    **"Company Profit"** means, for any applicable fiscal period, all items of income, gain, deduction and loss of the Company, where the aggregate of all such items during any applicable period results in net income to the Company, determined in accordance with <u>Section 4.3.2</u> of this Agreement.

1.16    **"Deficit Capital Account"** means, with respect to any Member, the deficit balance (if any) in such Member's Capital Account as of the end of the Fiscal Period or Fiscal Year, after giving effect to the following adjustments:

1.15.1  credit to such Capital Account any amount which such Member is treated as being obligated to restore under Treasury Regulations Section 1.704-1(b)(2)(ii)(c), as well as any addition thereto pursuant to the penultimate sentence of Treasury Regulations Section 1.704-2(g)(1) and (i)(5), after taking into account any changes during the period in Company Minimum Gain and in the Member Minimum Gain; and

1.15.2  debit to such Capital Account the items described in Treasury Regulations Sections 1.704-1(b)(ii)(d)(4), (5) and (6).

This definition of "Deficit Capital Account" is intended to comply with Treasury Regulations Sections 1.704-1(b)(2)(ii)(d) and 1.704-2, and shall be construed in a manner consistent with those provisions.

1.17    **"Dissociation"** of a Member shall have the meaning provided under Section 35-45 of the Act.

1.18    **"Distribution Interest"** means the right to receive the shares of revenues from production and other income, receipts, or gain of the Company, or of any other distributions from the Company, with respect to an Interest in the Company. The holder of a Distributional Interest is not a Member, nor has any of the other rights herein conferred upon such Member, including the right to vote as a Member until such holder is admitted as a Member (if at all).

1.19    **"Heritage Investor Percentage"** means an amount, expressed as a percentage, that is equal to the amount by which 100 exceeds the product of (x) 100 multiplied by (y) a fraction, the numerator of which is the number of units (or amount of membership interests) in Heritage Development Partners, LLC owned by the Company from time to time, as determined

10656657v9

FILED DATE: 4/1/2020 3:26 PM   2020L000292

without regard to class and the denominator of which is the aggregate number of units (or amount of membership interests) in Heritage Development Partners, LLC then outstanding.

1.20   **"Illinois Replacement Tax"** means (a) the Illinois Personal Property Tax Replacement Income Tax, 35 ILCS 5/201 et seq., as amended from time to time, and (b) if the Company is subject to any other state tax (i.e., state tax other than Illinois Replacement Tax) the amount of which is dependent upon the tax character of some or all of the Members.

1.21   **"Illinois Replacement Tax Savings"** means, with respect to a Calendar Year for which the Company is subject to Illinois Replacement Tax, the amount (if any) of additional Illinois Replacement Tax that would have been imposed upon the Company for such Fiscal Year but for the fact that some of the Members are themselves subject to the Illinois Replacement Tax for such year.

1.22   **"Interest"** means the personal property ownership right of a Member, such personal property ownership right being evidenced by and composed of Units, in the Company entitling such Member to, among other things, an allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and a share of distributions made by the Company. Each Member's allocation of the Company's income, gains, losses, deductions and credits (for both book and tax purposes) and share of the Company's distributions, as applicable, shall be determined in accordance with this Agreement based upon the number of Units owned by such Member.

1.23   **"Interest Holder"** or **"Holder"** means any Member, assignee or other transferee of a Member who is not admitted as a Member, but is a holder of a Distributional Interest.

1.24   **"Member"** means any Person that holds an Interest in the Company represented by Units and is admitted as a Member of the Company pursuant to this Agreement.

1.25   **"Member Minimum Gain"** means an amount, with respect to each Member Non-recourse Debt, equal to the Company Minimum Gain that would result if such Member Non-recourse Debt were treated as a Company non-recourse liability, as determined in accordance with Treasury Regulations Section 1.704-2.

1.26   **"Member Non-Recourse Debt"** shall have the same meaning as the term "partner non-recourse debt" set forth in Treasury Regulations Section 1.704-2(b)(4).

1.27   **"Member Non-Recourse Deductions"** shall have the same meaning as the term "partner non-recourse deductions" set forth in Treasury Regulations Section 1.704-2(i)(1) and 1.704-2(i)(2).

1.28   **"Member Offering Payment"** means any amount paid by a Holder of Class A Units with respect to any liability, claim or settlement of any matter related to any sale of membership interests by Heritage Development Partners, LLC.

1065657v9

4

FILED DATE: 4/1/2020 3:26 PM    2020L000292

1.29   "Net Cash" means, for each Fiscal Year or a portion thereof, (a) all cash of the Company derived from Company operations, after deducting: (i) all cash expenditures incurred in connection with the operation of the Company's business; (ii) an amount necessary to pay all liabilities of the Company then due and owing including, without limitation, all loans to the Company and all advances made by any Member to the Company; and (iii) an amount determined by the Members to be reasonably necessary or desirable as a reserve for the operation of the Company business, liabilities of the Company not yet due, and/or future or contingent liabilities of the Company, and (b) the net cash proceeds from all sales and other dispositions and all refinancing of Company Assets, less any portion thereof used to establish reserves, all as determined by the Member.

1.30   "Non-Recourse Deductions" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(1).

1.31   "Non-Recourse Liability" shall have the meaning set forth in Treasury Regulations Section 1.704-2(b)(3).

1.32   "Ownership Percentage" means, with respect to any Member as of any date, the ratio (expressed as a percentage) of the number of Units held by such Member on such date to the aggregate of all Units held by all Members on such date.

1.33   "Property" means certain real property located at Roosevelt Road and Clark Street in Chicago, Illinois currently owned by Riverside District Development, LLC.

1.34   "Quarterly Estimated Tax Distribution" is defined in Section 6.2.

1.35   "Securities Act" means the Securities Act of 1933, as amended from time to time.

1.36   "Tax Allowance Amount" means, with respect to any Member for any calendar quarter, an amount reasonably determined by the Members, in good faith, to be the estimated income tax liability of such Member (or the owners of such Member that is a flow-through entity for federal income tax purposes) arising from its ownership of Units.  The Tax Allowance Amount for each Member shall be computed on the assumption that all Members are subject to taxation at the same combined federal and state income tax rates, which shall be the highest combined rates applicable to any Member, as determined by the Members.  The amount so determined by the Members shall be the Tax Allowance Amount for such period and shall be final and binding on all Members.

1.37   "Tax Matters Partner" means the Person designated as such in Section 13.1.2 of this Agreement.

1.38   "Transfer" means, as a noun, any voluntary or involuntary transfer, sale, assignment, pledge or other disposition and, as a verb, voluntarily or involuntarily to transfer, sell, assign, pledge, or otherwise dispose of.

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

1.39    "**Treasury Regulations**" means the proposed, temporary and final regulations promulgated under the Code, as amended from time to time.

1.40    "**Unit**" means a reference to a Class A Unit, Class B Units, and/or Class C Unit and represents an ownership Interest issued by the Company represented by Units, with rights, Interests, duties and obligations set forth in this Agreement with respect to Units, and representing a Capital Contribution in cash or other property equal to the price per Unit or fraction thereof paid by a Member and set forth on Schedule I.

1.41    "**Unpaid Class A Payment Preference Balance**" means, for the Holders of Class A Units, such Holders' Class A Payment Preference less amounts distributed to such Holders pursuant to Section 6.1(i) hereof.

1.42    "**Voting Power**" of any Person, means the total number of votes, which may be cast by the Members of the total number of outstanding shares of stock, units or interests of any class or classes of such Person in any election of directors of such Person.

1.43    "**Withdrawal**" means, with respect to any Member, the death or Bankruptcy of such Member or a complete assignment or disposition of such Member's entire Interest in the Company made during the lifetime (or other existence) of such Member.

## ARTICLE 2
## FORMATION OF THE COMPANY

2.1    *Formation.*  The Company has been organized as an Illinois Limited Liability Company pursuant to the provisions of the Act and upon the terms and conditions set forth in this Agreement.

2.2    *Name*  The name of the Company is MT Property Holdings, LLC, and appropriate certificates and affidavits shall be filed and recorded as may be necessary to secure said name.

2.3    *Purpose; Powers.*  The purpose of the Company is (i) to own a membership interest in Heritage Development Partners, LLC, an Illinois limited liability company and (ii) to carry on any and all other lawful business, purpose or activity, except for any purposes prohibited under the Act.  The Company shall possess and may exercise all powers and privileges granted by the Act, any other law, or by the Agreement, including incidental powers thereto, to the extent that such powers and privileges are necessary, customary, convenient or incidental to the attainment of the Company's purposes.

2.4    *Term.*  The term of the Company commenced on the date that the Articles was filed in the office of the Secretary of State of the State of Illinois and shall continue until the Company is dissolved in accordance with the provisions of either this Agreement or the Act.

1065657v9

6

FILED DATE: 4/1/2020 3:26 PM    2020L000292

2.5     *Principal Place of Business.*  The principal place of business of the Company shall initially be located at 233 South Wacker Drive, 95th Floor, Chicago, IL 60606, or at such other location or locations as the Members may from time to time designate.

2.6     *Registered Office and Registered Agent.*  The Company's initial registered office shall be at the office of its registered agent at 233 South Wacker Drive, Chicago, Illinois 60606, and the name of its initial registered agent at such address shall be Michael Rumman. The registered office and registered agent may be changed from time to time by filing the address of the new registered office and/or the name of the new registered agent with the Office of the Secretary of State of the State of Illinois, and paying any fees required under the Act.

2.7     *Continuation of Company.*  The Members hereby agree that the Company shall be organized, administered, operated and terminated in accordance with the provisions of this Agreement and the Act. The Members hereby further agree that the rights, duties, liabilities and obligations of the Members, and each class thereof, shall be governed by the provisions of this Agreement and the Act.

2.8     *Qualification in Other Jurisdictions.*  The Members shall have the authority to cause the Company to be qualified, formed or registered under assumed or fictitious name statutes or similar laws in any jurisdiction in which the Company conducts business and in which such qualification, formation or registration is required by law or deemed advisable by the Members.

## ARTICLE 3
## UNITS

3.1     *Units.*  The Interests in the Company shall be designated as Units and shall be divided into three series, "Class A Units"; "Class B Units"; and "Class C Units." The Units of each Member in the Company are personal property. All Units redeemed, purchased or otherwise acquired by the Company shall be canceled and thereupon restored to the status of authorized but unissued Units. Holders of Units shall have the respective rights, interests, duties, and obligations that are set forth in this Agreement. The Company shall not issue new or additional Units or options or other securities to purchase or otherwise acquire or convert to new or additional Units, at any time and from time to time without the unanimous consent of the Members.

3.2     *Persons Deemed Members.*  The Company may treat the Person in whose name any Unit shall be registered on the books and records of the Company as a Member and the sole Holder of such Unit for all purposes whatsoever and, accordingly, shall not be bound to recognize any equitable or other claims to or interest in such Unit or the part of any other Person, whether or not the company shall have actual or other notice thereof.

1065652v9

7

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## ARTICLE 4
## CAPITAL CONTRIBUTIONS

4.1    *Capital Contributions of Members; Ownership.*  The names of the Members of the Company are maintained on the Company's books and records.  Set forth on Schedule 1 "Ownership of Members" attached hereto are the number and class of Units issued to each Member.  Each Member shall receive, in exchange for the capital contribution of such Member, the number and class of Units set forth opposite such Member's name thereon.  The initial values of the Members' Capital Accounts are maintained on the Company's books and records.

4.2    *Additional Capital Contributions.*   The Members shall not be obligated to contribute additional capital, however, any additional capital contributions shall be in the form of cash unless otherwise approved by the Members.

4.3    *Capital Accounts.*

4.3.1.  A separate Capital Account will be maintained for each Member in accordance with Treasury Regulations Sections 1.704-1(b)(2)(iv) and 1.704-2, as amended.  Each Member's Capital Account will be increased by (1) the amount of money contributed by such Member to the Company; (2) the fair market value of property contributed by such Member to the Company (net of liabilities secured by such property that the Company assumes or takes subject to for purposes of Code Section 752); and (3) allocations to such Member of Company Profits and other allocations to such Member of items of Company income or gain.  Each Member's Capital Account will be decreased by (1) the amount of money distributed to such Member by the Company; (2) the fair market value of property distributed to such Member by the Company (net of liabilities secured by such distributed property that such Member is considered to assume or take subject to under Code Section 752); and (3) allocations to such Member of Company Losses and other allocations to such Member of items of Company loss or deduction.  The Company may, upon the occurrence of the events specified in Treasury Regulations Section 1.704-1(b)(2)(iv)(f), increase or decrease the Capital Accounts in accordance with the rules of Treasury Regulations Sections 1.704-1(b)(2)(iv)(f) and 1.704-1(b)(2)(iv)(g) to reflect a revaluation of Company property.

4.3.2.  For purposes of computing the amount of any item of Company income, gain, loss or deduction to be reflected in the Members' Capital Accounts and to be allocated pursuant to Article 5 of this Agreement, the determination, recognition and classification of any such item shall be the same as its determination, recognition and classification for federal income tax purposes (including any method of depreciation, cost recovery or amortization used for this purpose), provided that:

4.3.2.1 The computation of all items of income, gain, loss and deduction shall include income and expense of the Company that is exempt from federal income tax and also those items described in Code Section 705(a)(1)(B) or Treasury Regulations Section 1.704-1(b)(2)(iv)(i), without regard to the fact that

1065657v9

8

FILED DATE: 4/1/2020 3:26 PM   2020L000292

such items are not includible in gross income or deductible for federal income tax purposes;

4.3.2.2 If the Book Value of any Company property is adjusted pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(e) or (f), the amount of such adjustment shall be taken into account as gain or loss from a disposition of such property;

4.3.2.3 Items of income, gain, loss or deduction attributable to the disposition of Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property;

4.3.2.4 Items of depreciation, amortization and other cost recovery deductions with respect to Company property having a Book Value that differs from its adjusted basis for federal income tax purposes shall be computed by reference to the Book Value of such property in accordance with Treasury Regulations Section 1.704-1(b)(2)(iv)(g);

4.3.2.5 To the extent an adjustment pursuant to Code Section 732(d), 734(b) or 743(b) to the adjusted tax basis of any Company property is required, pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m), to be taken into account in determining Capital Accounts, the amount of such adjustment to the Capital Accounts shall be treated as an item of gain (if the adjustment increases the tax basis) or loss (if the adjustment decreases the tax basis); and

4.3.2.6 Items of Company income, gain, loss or deduction that are specially allocated pursuant to Section 5.2 shall be determined in the same manner as Company Profits and Company Losses, but such specially allocated items shall not be taken into account in computing Company Profits and Company Losses.

4.3.3. The rules set forth in this Section 4.3 are intended to comply with the requirements of the Code and Treasury Regulations. If, in the opinion of the Members, the rules set forth in this Section 4.3 must be modified in order for the Company to comply with the requirements of the Code or the Treasury Regulations, then the method in which Capital Accounts are maintained shall be so modified.

4.4    *Interest on Capital Contributions.* Except as otherwise expressly provided in this Agreement, no Member shall receive interest on such Member's Capital Contribution.

4.5    *Withdrawal.*    Each Member hereby covenants that he shall not willfully Dissociate himself as a Member without the consent of the Members. Any Member that voluntarily Dissociates himself as a Member pursuant to Section 35-45(1) of the Act shall be liable to the Company and its Members for all damages and costs that result from such

7055657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Dissociations and any consequential dissolution of the Company. Upon the Dissociation of any Member, such Member shall no longer participate in the management or conduct of the Company's business.

4.6     *Return of Capital*.  Except as otherwise provided in Article 6 and Section 11.2, or another express provision of this Agreement, or required under the Act, no Member shall have priority over any other Member as to the return of any Capital Contribution.  Any return of capital to the Members shall be solely from Company assets and the Members shall not be personally liable for any such return except as provided in the Act.

4.7     *Liability of Members*.  Except as required under the Act or any other provision of this Agreement, no Member shall have any obligation to restore any portion of any Capital Account deficit or to contribute to the capital of the Company; nor shall any Member have any personal liability for debts or other obligations of the Company, including without limitation obligations for federal and state income taxes and any state replacement taxes.

## ARTICLE 5
## ALLOCATION OF COMPANY PROFITS AND LOSSES

5.1     *Allocations*  Except as otherwise provided in Section 5.2, Company Profits and Company Losses for any calendar year shall be allocated among the Interest Holders such that, as of the end of such year, the Capital Account of each Interest Holder shall equal (a) the amount which would be distributed to him or it or for which they would be liable to the Company under the Act, determined as if the Company were to (i) liquidate the assets of the Company for an amount equal to their Book Value and (ii) distribute the proceeds of such liquidation pursuant to Section 6.1 *minus* (b) the sum of (i) such Interest Holder's share of Company Minimum Gain (as determined according to Treasury Regulation Sections 1.704-2(d) and (g)(3)) and such Interest Holder's partner minimum gain (as determined according to Treasury Regulation Section 1.704-2(i)) and (ii) the amount, if any, which such Interest Holder is obligated to contribute to the capital of the Company as of the last day of such Fiscal Period.

5.2     *Special Allocations*.  The following special allocations will be made in the following order:

5.2.1.  *Company Minimum Gain Chargeback*.  Except as otherwise provided in Section 1.704-2(f) of the Treasury Regulations, notwithstanding any other provision of this Article 5, if there is a net decrease in Company Minimum Gain during any Fiscal Year, each Member shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Company Minimum Gain, determined in accordance with Treasury Regulations Section 1.704-2(g).  Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto.  The items to be so allocated shall be determined in accordance with Sections 1.704-2(f)(6) and 1.704-2(j)(2) of the Treasury

1065657v9

10

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Regulations. This Section 5.2.1 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(f) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.2. *Member Minimum Gain Chargeback.* Except as otherwise provided in Section 1.704-2(i)(4) of the Treasury Regulations, notwithstanding any other provision of this Article 5, if there is a net decrease in Member Minimum Gain attributable to a Member Non-Recourse Debt during any Fiscal Year, each Member who has a share of the Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Section 1.704-2(i)(5) of the Treasury Regulations, shall be specially allocated items of Company income and gain for such Fiscal Year (and, if necessary, subsequent Fiscal Years) in an amount equal to such Member's share of the net decrease in Member Minimum Gain attributable to such Member Non-Recourse Debt, determined in accordance with Regulations Section 1.704-2(i)(4). Allocations pursuant to the previous sentence shall be made in proportion to the respective amounts required to be allocated to each Member pursuant thereto. The items to be so allocated shall be determined in accordance with Sections 1.704-2(i)(4) and 1.704-2(j)(2) of the Treasury Regulations. This Section 5.2.2 is intended to comply with the minimum gain chargeback requirement in Section 1.704-2(i)(4) of the Treasury Regulations and shall be interpreted consistently therewith.

5.2.3. *Qualified Income Offset.* In the event any Member unexpectedly receives any adjustments, allocations or distributions described in Section 1.704-1(b)(2)(ii)(d)(4), Section 1.704-1(b)(2)(ii)(d)(5) or Section 1.704-1(b)(2)(ii)(d)(6) of the Treasury Regulations, items of Company income and gain shall be specially allocated to each such Member in an amount and manner sufficient to eliminate, to the extent required by the Treasury Regulations, such Member's Deficit Capital Account.

5.2.4. *Gross Income Allocation.* In the event any Member has a Deficit Capital Account at the end of any Fiscal Year, each such Member shall be specially allocated items of Company income and gain in the amount of such Deficit Capital Account as quickly as possible, provided that an allocation pursuant to this Section 5.2.4 shall be made only if and to the extent that such Member would have a Deficit Capital Account after all other allocations provided for in this Article 5 (other than Section 5.2.3 and 5.2.4) have been made.

5.2.5. *Non-Recourse Deductions.* Non-Recourse Deductions for any Fiscal Year shall be specially allocated among the Members in proportion to their respective Ownership Percentage.

5.2.6. *Member Non-Recourse Deductions.* Member Non-Recourse Deductions for any Fiscal Year shall be specially allocated to the Member who bears the economic risk of loss with respect to the Member Non-Recourse Debt to which such Member Non-Recourse Deductions are attributable in accordance with Treasury Regulations Section 1.704-2(i)(1).

1065657v9

FILED DATE: 4/1/2020 3:26 PM   2020L000292

5.2.7. *Section 754 Adjustments.* To the extent that an adjustment to the tax basis of any Company property pursuant to Code Section 734(b) or 743(b) is required pursuant to Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) or (m)(4) to be taken into account in determining Capital Accounts as a result of a distribution to a Member in complete liquidation of its Interest, the amount of such adjustment to Capital Accounts shall be treated as an item of gain or loss and shall be specially allocated to the Members in proportion to their respective Ownership Percentage in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(2) applies, or to the Member to whom such distribution was made in the event Treasury Regulations Section 1.704-1(b)(2)(iv)(m)(4) applies. Other items of gain or loss described in Section 4.3.2.5 shall be allocated in a manner consistent with the manner in which the corresponding adjustments to Capital Accounts are made.

5.2.8. *Curative Allocations.*

5.2.8.1 The special allocations required under this Section 5.2.8.1 are intended to comply with the Treasury Regulations. It is the intent of the Company and each of the Members that all special allocations made pursuant to Section 5.2.1 through Section 5.2.7 shall be offset either with other special allocations made pursuant to Section 5.2.1 through Section 5.2.7 or with special allocations of other items of Company income, gain, loss or deduction pursuant to this Section 5.2.8. Therefore, the Members may, in its sole discretion, make, pursuant to this Section 5.2.8, such offsetting special allocations of Company income, gain, loss or deduction in any manner the Members determine to be appropriate, consistent with the goal that each Member's Capital Account balance be, to the extent possible, equal to the Capital Account balance such Member would have had in the absence of any allocations pursuant to Section 5.2.1 through 5.2.7.

5.2.8.2 The Members expect and intend that upon the liquidation of the Company, after giving effect to all contributions and all allocations for all periods, each Member's Capital Account will have a positive balance equal to the amount of proceeds distributable to such Member. If in the opinion of the Members this intended result would not be achieved without modification of the allocations required under this Article 5, then the allocations required under this Article 5 shall be modified in a manner consistent with Treasury Regulations Section 1.704-1(b) and 1.704-2 to the extent necessary to cause each Member's Capital Account to have a balance equal to the amount of proceeds distributable to such Member upon the liquidation of the Company.

5.2.8.3 If the Members determine that the allocation of any item of Company income, gain, loss, deduction or credit is not specified in this Article 5 (an "unallocated item"), or that the allocation of any item of Company income, gain, loss, deduction or credit under this Article 5 is clearly inconsistent with the Members' economic interests in the Company (determined by reference to the

FILED DATE: 4/1/2020 3:26 PM    2020L000292

general principles of Treasury Regulations Section 1.704-1(b) and the factors set forth in Treasury Regulations Section 1.704-1(b)(3)(ii) (a "misallocated item"), then the Company may cause the Company to allocate such unallocated item, or reallocate such misallocated item, to reflect the Members' economic interests in the Company.

5.2.9. *Allocations Relating to Taxable Issuance of Units.* Any income, gain, loss or deduction realized as a direct or indirect result of the issuance of a Unit by the Company to a Member shall be allocated among the Members so that, to the extent possible, the net amount of such items, together with all other allocations under this Agreement to each Member, shall be equal to the net amount that would have been allocated to each Member if such items had not been realized.

5.2.10. *Allocations Relating to Illinois Personal Property Tax Replacement Income Tax and Comparable Items.* If the Company incurs liability for Illinois Replacement Tax for a Fiscal Year with respect to which the Company also realizes Illinois Replacement Tax Savings, then items of Company loss or deduction attributable to the Company's Illinois Replacement Tax expense shall be allocated to the Members that are not themselves subject to the Illinois Replacement Tax for such Fiscal Year and such allocation shall be made in proportion to the amount of Company Profits allocated to such Members for the period with respect to which such Illinois Replacement Tax is imposed. The principles of this Section 5.2.10 shall also apply if the Company is subject to any other tax, the computation of which depends in whole or in part upon the character of the Members.

5.3    *Other Allocation Rules.*

5.3.1. Company Profits, Company Losses, and all other items of Company income, gain, loss, deduction and credit shall be determined using any method permitted under Code Section 706 and the Treasury Regulations.

5.3.2. The Members are aware of the tax consequences of the allocations required under this Article 5 and each Member hereby agrees to be bound by the provisions of this Article 5 in reporting such Member's share of Company income, gain, loss and deduction for federal income tax purposes.

5.3.3. Solely for purposes of determining a Member's proportionate share of the "excess non-recourse liabilities" of the Company (within the meaning of Treasury Regulations Section 1.752-3(a)(3)), such Member's interests in Company profits are in proportion to such Member's Ownership Percentage.

5.3.4. As between a Member and any permitted (under this Agreement) transferee of all or any portion of such Member's Units, Company Profits and Company Losses shall be allocated by the Members in a manner intended to comply with Section 706 of the Code and the Treasury Regulations promulgated thereunder. In order to make

1065657v9

13

FILED DATE: 4/1/2020 3:26 PM    2020L000292

such an allocation, the Members may, in its discretion, close the Company's books on the date of such permitted transfer.

5.4    *Allocations Solely For Tax Purposes.*

5.4.1.    Allocations required under this Section 5.4.1 are solely for tax purposes and shall not affect any Member's Capital Account or any Member's share of any distribution from the Company.

5.4.2.    Allocations of tax credits, tax credit recapture, tax benefit recapture, and any items related thereto shall be allocated to the Members according to their interests in such items taking into account the principles of Treasury Regulations Section 1.704-1(b)(4)(ii).

5.4.3.    Items of Company income, gain, loss and deduction with respect to any property contributed to the capital of the Company shall be allocated among the Members in accordance with Code Section 704(c) so as to take account of any variance between the tax basis of such property to the Company and its Book Value.

5.4.4.    If the Book Value of any Company property is adjusted pursuant to Section 5.4.4, subsequent allocations of items of taxable income, gain, loss and deduction with respect to such Company property shall take account of any variation between the tax basis of such Company property and its Book Value in the same manner as required under Code Section 704(c).

## ARTICLE 6
## DISTRIBUTIONS AND DISTRIBUTABLE CASH

6.1    *Timing and Amount.* At such times as they shall determine, the Members shall calculate the amount of Net Cash, if any, available for distribution to the Members at least quarterly and promptly distribute such amounts in the following order of priority:

(i)    First, to the Holders of Class A Units, until the Unpaid Class A Payment Preference Balance equals zero.

(ii)    Thereafter, to the Holders of the Class A Units, the Class B Units and the Class C Units in proportion to the following percentages:

A.    with respect to the Holders of Class B Units, a percentage equal to the sum of (x) 78.4% minus (y) the Heritage Investor Percentage; and

B.    with respect to the Holders of the Class A Units and the Class C Units, in proportion to the number of Units held by such Holders, a percentage equal to the sum of (x) 100% minus (y) the percentage determined with respect to the Holders of the Class B Units pursuant to Section 6.1(ii)(A) above.

1065657v9

14

FILED DATE: 4/1/2020 3:26 PM    2020L000292

6.2    *Distributions for Tax Purposes.*  On or before the 90th day after the end of each year, the Company shall distribute to the Members out of Net Cash the cash amount equal to the Tax Allowance Amount multiplied by the excess, if any, of (a) the amount of taxable income allocated to such Members under this Agreement for such year, over (b) the amount, if any, by which the sum of all items of deduction and loss allocated to such Members under this Agreement for all prior years exceeds the sum of all items of taxable income allocated to such Members for all prior years (the "Annual Tax Distribution").  At the end of each quarter of the year, the Company shall estimate the portion of the current Annual Tax Distribution attributable to such quarter and allocable to specific Members (the "Quarterly Estimated Tax Distribution") and within 15 days of the end of such calendar quarter, the Company shall make a cash distribution to the Members of such Quarterly Estimated Tax Distribution allocable to such Members such that Members may make quarterly estimated federal and estimated state income tax payments. Any Quarterly Estimated Tax Distributions shall be credited against any Annual Tax Distribution due a Member, with any excess Quarterly Estimated Tax Distributions for such Fiscal Year credited against the next Quarterly Estimated Tax Distributions for the following Fiscal Years. Any Annual Tax Distributions or Quarterly Estimated Tax Distributions may be directly deposited with the appropriate federal or state tax authority for a Member's benefit in lieu of an actual distribution.  Any amounts distributed to a Member under this <u>Section 6.2</u> shall be credited against future amounts otherwise distributed to such member under <u>Section 6.2</u>.

6.3    *Distributions In Respect of Illinois Replacement Tax Savings and Comparable Items.*  On or before the 90th day following the close of each year, the Company shall distribute to the Members that are themselves subject to the Illinois Replacement Tax for such year an amount equal to the Company's Illinois Replacement Tax Savings for such year.  Such distribution shall be made to and among such Members in proportion to the amount of Company Profits allocated to such Members for such year.  The Company shall also make distributions to Members, at such times and in such proportionate amounts as provided for in this <u>Section 6.3</u>, in respect of any tax that would have been imposed upon the Company in a year but for the fact that some Members are themselves subject to such tax.

6.4    *Limitations on Distributions.*  Notwithstanding any provision to the contrary contained in this Agreement, the Company shall not make any distribution to any Member if such distribution would violate Section 180/25-30 of the Act or other comparable applicable law.

### ARTICLE 7
### MANAGEMENT: RIGHTS, POWERS AND DUTIES

7.1    *Management.*

7.1.1   The Company shall be managed by the Members; provided, however, that responsibility for making ministerial decisions in connection with the ordinary course of business may be delegated by the Members to one or more Officers. Except as otherwise provided in this Agreement, no Member shall have the right to act for and bind the

1065657v9

15

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Company in the ordinary course of its business or otherwise without the written approval of Members owning a majority of the Ownership Percentages then held by the Members.

7.1.2   The Members, by the vote required under Section 7.2.2, may from time to time appoint or remove various individuals ("Officers") to supervise and manage the day-to-day affairs of the Company who shall be assigned such title(s) as the Members deem appropriate. An Officer need not be a Member. The Officers' authority shall be ministerial only, and the Officers shall not make any decisions on behalf of the Company out of the ordinary course of business.

7.2     *Meetings of and Voting by Members.*

7.2.1   A meeting of the Members may be called at any time by those Members holding at least twenty percent (20%) of the Ownership Percentages then held by Members. Meetings of Members shall be held at the Company's principal place of business or at any other place in Cook County, Illinois, designated by the Person calling the meeting. Not less than ten (10) nor more than ninety (90) days before each meeting, the Person calling the meeting shall give written Notice of the meeting to each Member entitled to vote at the meeting. The Notice shall state the time, place and purpose of the meeting. Notwithstanding the foregoing provisions, each Member who is entitled to notice waives notice if before or after the meeting the Member signs a waiver of the notice which is filed with the records of Members' meetings, or is present at the meeting in person or by proxy. Unless this Agreement provides otherwise, at a meeting of Members, the presence in person or by proxy of Members holding not less than fifty one percent (51%) of the Ownership Percentages then held by Members constitutes a quorum. A Member may vote either in person or by written proxy signed by the Member or by his duly authorized attorney in fact.

7.2.2   Except as otherwise provided in this Agreement, including but not limited to Section 7.1.2 hereof, the affirmative vote of Members holding fifty one percent (51%) or more of the Ownership Percentages then held by Members shall be required to approve any matter coming before the Members.

7.2.3   In lieu of holding a meeting, the Members may vote or otherwise take action by a written instrument indicating the consent of Members holding a majority of the Ownership Percentages then held by Members.

7.2.4   Except as otherwise provided in this Agreement, wherever the Act requires unanimous consent to approve or take any action, that consent shall be given in writing.

7.2.5   If a Member is a corporation, partnership or limited liability company, it shall provide the Company and all other Members with a written Notice identifying the individual authorized to represent, vote, bind and act on behalf of such Member on all Company affairs. The individual so identified shall continue to have authority to act on

1065657v9

16

FILED DATE: 4/1/2020 3:26 PM    2020L000292

behalf of the Member until such time as the Member provides written Notice to the Company and the remaining Members that such individual's authority to act on behalf of the Company has been terminated.

7.2.6   Notwithstanding any other provision of this Agreement to the contrary, the Company shall not, without the prior unanimous written consent of the Members, (i) borrow money on behalf of the Company or mortgage, pledge or otherwise encumber any asset of the Company, (ii) execute or deliver, for or on behalf of the Company, promissory notes, evidences of indebtedness, leases, loan agreements, mortgages and other security instruments; or (iii) redeem any Units.

7.3   *Personal Services.*

7.3.1   No Member shall be required to perform services for the Company solely by virtue of being a Member.  Absent prior written approval by the Members, no Member shall perform services for the Company or be entitled to compensation for services performed for the Company.

7.3.2   Upon substantiation of the amount and purpose thereof, Members shall be entitled to reimbursement for expenses reasonably incurred in connection with the activities of the Company.

7.4   *Duties of Parties.*

7.4.1   The Members shall devote such time to the business and affairs of the Company as is necessary to carry out the Member's duties as set forth in this Agreement.

7.4.2   Except as otherwise expressly provided in Section 7.4.3, nothing in this Agreement shall be deemed to restrict in any way the rights of any Member to conduct any other business or activity whatsoever, and the Member shall not be accountable to the Company or to any Member with respect to that business or activity even if the business or activity competes with the Company's business.  The organization of the Company shall be without prejudice to their respective rights to maintain, expand or diversify such other interests and activities and to receive and enjoy profits or compensation therefrom. Each Member waives any rights the Member might otherwise have to share or participate in such other interests or activities of any other Member.

7.4.3   Each Member understands and acknowledges that the conduct of the Company's business may involve business dealings and undertakings with Members.  In any of those cases, those dealings and undertakings shall be at arm's length and on commercially reasonable terms.

7.5   *Liability and Indemnification*

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

7.5.1  No Member, Person acting on behalf of a Member on matters relating to the Company, or Officer of the Company (an "Indemnified Person") shall be liable, responsible, or accountable, in damages or otherwise, to any other Member or to the Company for any breach of fiduciary duty, loss sustained or liability incurred in connection with, or attributable to, ordinary negligence, errors in judgment, failure to use ordinary skill or for any other act or omission with respect to Company matters that do not constitute for fraud, gross negligence, recklessness or an intentional breach of this Agreement.

7.5.2  The Company shall indemnify each Indemnified Person for any act performed by the Indemnified Person with respect to Company matters, as and to the full extent permitted by law, but in no event for fraud, gross negligence, recklessness, or an intentional breach of this Agreement.

7.5.3  Expenses (including legal fees and costs) incurred by an Indemnified Person in defending any claim, demand, action, suit or proceeding subject to Section 7.5.2, above (collectively, a "Proceeding"), shall be paid by the Company in advance of the final disposition of such Proceeding upon receipt of an undertaking (whether or nor secured) by or on behalf of such Indemnified Person to repay such amount if it shall be finally determined by a court of competent jurisdiction that such Person is not entitled to be indemnified by the Company as authorized hereunder.

## ARTICLE 8
## TRANSFER OF INTERESTS AND WITHDRAWALS OF MEMBERS

8.1.  *Transfer.*  No Person may Transfer all or any portion of or any interest or rights in the Person's Membership Rights or Interest without the unanimous consent of all Members.

8.2.  *Voluntary Withdrawal.*  Any Member who Voluntarily Withdraws from the Company is wrongfully dissociating from the Company (a "Disassociating Member"). Any Disassociating Member shall give the other Member(s) written Notice of the withdrawal, which shall be effective as of the date specified in Section 8.2 (the "Effective Date"). Upon the Effective Date, the Interest of the Disassociating Member shall be converted to the Interest of a non-member Interest Holder. At any time thereafter, the Company may elect to purchase the Interest of the Disassociating Member. If the Company purchases the Disassociating Member's Interest before the Company is dissolved, the purchase price of the Interest shall be the lesser of (a) the fair market value of the interest on the Effective Date, and (b) the fair market value of the Interest on a date which is thirty days before the date fixed by the remaining Member(s) for the Company's purchase of the Interest. Fair market value shall be determined by an appraiser reasonably acceptable to the Company and the Disassociating Member. If the Company purchases the Disassociating Member's Interest at dissolution, the purchase price shall be the lesser of (x) the fair market value of the Interest on the Effective Date, and (y) the fair market value of the interest on the Dissolution Date, and (z) the amount the Disassociating Member would have received based upon his Percentage had he remained a Member through the

r0856574-9

18

FILED DATE: 4/1/2020 3:26 PM    2020L000292

liquidation of the Company. The purchase price for the Disassociating Member's Interest shall be paid in wired federal funds or by cashier's or certified check drawn on any national bank located in Illinois. The Disassociating Member shall receive distributions and allocations of net income and loss in lieu of interest until the purchase price for his Interest has been paid.

8.3.    *Involuntary Withdrawal.* Immediately upon the occurrence of an Involuntary Withdrawal, the successor of the Withdrawn Member shall thereupon become a Holder but shall not become a Member. The successor Holder shall have all the rights of a Holder but neither the predecessor nor the successor Holder shall be entitled to receive, at the time of the Involuntary Withdrawal and in liquidation of the Interest pursuant the Act, the fair market value of the Member's Interest as of the date the Member involuntarily withdrew from the Company, but in lieu thereof, the Holder shall be entitled to receive the Distributions as provided in Section 6.1.

8.4.    *No Right to Terminate the Company.* No Member shall have the right to terminate or dissolve the Company except as set forth in this Agreement or in Sections 35-1(3) and(4) of the Act.

8.5.    *Rights of Unadmitted Assignees.* A Person who acquires Membership Rights or Interest but who is not admitted as a substituted Member pursuant to Section 8.6 shall hold only a distribution interest shall and be entitled only to allocations and distributions with respect to such Interests in accordance with this Agreement, shall have no right to any information or accounting of the affairs of the Company, shall not be entitled to inspect the books or records of the Company, and shall not have any of the rights of a Member under the Act or this Agreement.

8.6.    *Admission of Transferees as Members.* Subject to the other provisions of this Article 6, a transferee of Units may be admitted to the Company as a Member only upon satisfaction of the conditions set forth below in this Section 8.6:

8.6.1.  The Members consent to such admission, which consent may be given or withheld in the sole and absolute discretion of the Members;

8.6.2.  The transferee becomes a party to this Agreement as a Member and executes such documents and instruments as the other Members may reasonably request as may be necessary or appropriate to confirm such transferee as a Member in the Company and such transferee's agreement to be bound by the terms and conditions of this Agreement;

8.6.3.  The transferee pays or reimburses the Company for all reasonable legal, filing, and publication costs that the Member incurs in connection with the admission of the transferee as a Member with respect to the Transferred Units.

### ARTICLE 9
### ROLE OF MEMBERS; INDEMNIFICATION OF MEMBERS

1065657v9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

9.1    *General Rules.*  Except as otherwise stated in this Agreement or required under the Act, Members shall not take any part in the day-to-day management or conduct of the business of the Company, nor shall such Members have any right or authority to act for or bind the Company.  Except as otherwise required under the Act, any action of the Members shall be taken by the affirmative vote of the Members holding a majority of the Units then held by Members who are entitled to vote pursuant to this Article 9.

9.2    *Meetings of the Members.*  Except as otherwise stated in this Agreement or required under the Act, the following provisions shall apply to all meetings of Members:

9.2.1.  Place and Time of Annual Meetings.  An annual meeting of the Members shall be held each year on the first Tuesday in the month of April at 10:00 o'clock a.m., unless such day should fall on a legal holiday, in which event the meeting shall be held at the same hour on the next succeeding business day that is not a legal holiday.

9.2.2.  Special Meetings.  Special meetings of Members may be called for any purpose and may be held at such time and place, within or without the State of Illinois, as shall be stated in a notice of meeting or in a duly executed waiver of notice thereof.  Special meetings of the Members may be called by the Members holding not less than 51% of all outstanding Units entitled to vote on the matter for which the meeting is called.

9.2.3.  Place of Meetings.  The Members may designate any place, either within or without the State of Illinois, as the place of meeting for any annual meeting or for any special meeting called.  If no designation is made, or if a special meeting be otherwise called, the place of meeting shall be the principal office of the Company.

9.2.4.  Notice of Meetings.  Unless otherwise provided by statute, whenever Members are required or permitted to take action at a meeting, written or printed notice stating the place, day, and hour, and, in the case of special meetings, the purpose or purposes, of such meeting, shall be given to each Member entitled to vote at such meeting not less than 10 nor more than 60 days before the date of the meeting or in the case of a merger, consolidation, Unit exchange, dissolution or sale, lease or exchange of all or substantially all assets not less than 20 nor more than 60 days before the date of the meeting. All such notices shall be delivered, either personally or by mail, by or at the direction of the officers, and if mailed, such notice shall be deemed to be delivered when deposited in the United States mail, postage prepaid, addressed to the Member at his, her or its address as the same appears on the records of the Company.  Attendance of a person at a meeting shall constitute a waiver of notice of such meeting, except when the person attends for the express purpose of objecting at the beginning of the meeting to the transaction of any business because the meeting is not lawfully called or convened.  Notice may also be waived in writing by any Member.

1065657v9

FILED DATE: 4/1/2020 3:26 PM   2020L000292

Unless otherwise provided by herein or by law, neither the business to be transacted at, or the purpose of, any regular or special meeting need be specified in any written waiver of notice.

9.2.5.  **Quorum.**  Unless otherwise provided herein or by statute, a majority of the outstanding Units entitled to vote at a meeting, present in person or represented by proxy, shall constitute a quorum for the transaction of business at all meetings of the Members, however, a quorum shall not consist of less than one-third of the outstanding Units entitled to vote. If a quorum is not present, the Members holding a majority of the Units present in person or represented by proxy at the meeting, and entitled to vote at the meeting, may adjourn the meeting to another time and/or place. Members may participate in any meeting of Members by means of conference telephone or similar communication equipment by means of which all Members participating in such meeting can hear each other, and such participation shall constitute presence in person at such meeting.

9.2.6.  **Proxies.** Each Member may appoint a proxy to vote or otherwise act for him or her by signing an appointment form and delivering it to the person so appointed, but no such proxy shall be valid after 11 months from the date of its execution, unless otherwise provided in the proxy.

9.2.7.  **Voting of Units.**  Each outstanding Unit owned by a Member shall be entitled to one vote, and each outstanding fractional Unit owned by a Member shall be entitled such percentage of one vote that is represented by the fractional Unit. In each matter submitted to vote at a meeting of Members, every Member shall have the right to vote the number of Units owned by such Member. Each Member may vote either in person or by proxy as provided herein.

9.2.8.  **Informal Action.** Unless otherwise provided by statute, any action required to be taken at any annual or special meeting of the Members of the Company, or any other action which may be taken at a meeting of the Members may be taken without a meeting and without a vote if a consent in writing setting forth the action so taken shall be signed by the holders of outstanding Units having not less than the minimum number of votes that would be necessary to authorize or take such action at a meeting at which all Units entitled to vote thereon were present and voting. If such consent is signed by less than all of the Members entitled to vote, then such consent shall become effective only if at least five days prior to execution of the consent a notice in writing is delivered to all the Members entitled to vote with respect to the subject matter thereof and, after the effective date of the consent, prompt notice of the taking of the Company action without a meeting by less than unanimous written consent shall be delivered in writing to those Members who have not consented in writing.

9.2.9.  **Indemnification of Members.** The Company shall, to the fullest extent permitted by law, indemnify, defend and hold harmless its Members and former Members

1065657v9

21

FILED DATE: 4/1/2020 3:26 PM   2020L000292

(collectively, the "Indemnified Parties"), from any and all claims, actions, causes of action, suits, proceedings, losses, damages, liability, costs and expenses (including, without limitation, attorneys' fees and court costs) asserted against or incurred or sustained by them by reason of their status as Members of the Company, or by reason of any act performed by them or any omission on their part while acting for or on behalf of the Company and in furtherance of its interests provided that the Indemnified Party acted in good faith and in a manner such party reasonably believed to be in, or not opposed to, the best interest of the Company and, with respect to any criminal action or proceeding, such Indemnified Party had no reason to believe that his or her conduct was unlawful.

## ARTICLE 10
## DISSOLUTION AND TERMINATION

10.1. *Events of Dissolution.* The Company shall be dissolved, and shall terminate and wind up its affairs, upon the first to occur of the following:

> 10.1.1. the consent of the Members holding of a majority of the Units then outstanding; and

> 10.1.2. the sale of substantially all the assets of the Company;

> 10.1.3. the entry of a decree of judicial dissolution or an administrative dissolution under the Act; and

> 10.1.4. any other event requiring the dissolution of the Company under Section 35-1 of the Act.

Notwithstanding the foregoing, if the Members (and any dissociated Member whose Dissociation caused such dissolution) elect to waive such dissolution as provided under Section 35-3 of the Act, the Company may carry on its business as if no dissolution occurred.

10.2. *Liquidation.* If the Company shall be dissolved by reason of the occurrence of any of the circumstances described in Section 10.1, no further business shall be conducted by the Company except for taking such action as shall be necessary for the winding up of its affairs and the distribution of its assets to the Members. Upon such dissolution of the Company, the Members shall take the following steps:

> 10.2.1. Unless otherwise approved by the Members in accordance with Article 7, dispose of all other Company properties and assets at the best cash price obtainable therefor under the circumstances.

> 10.2.2. Pay all Company debts and liabilities, in the order of priority as provided under applicable law, or otherwise make adequate provision therefor.

1065657v9

22

FILED DATE: 4/1/2020 3:26 PM    2020L000292

10.2.3. Determine by independent appraisal the fair market value of the Company properties and assets to be distributed in kind (if permitted under Article 7), and credit or charge (as the case may be) the Capital Account of each Member with the amount that would have been credited or charged to such Member in accordance with Article 4 if such properties and assets had been sold at fair market value.

10.2.4. Credit or charge (as the case may be) each Member's Capital Account with such Member's share of all Company Profits and Company Losses that were not previously reflected in any Capital Accounts and that were realized or incurred during the Fiscal Year or Fiscal Years which include the dissolution and termination, up to and including the date of distribution, net of all distributions that were not previously reflected in any Capital Accounts and that were made to such Member during such Fiscal Years up to but not including such date.

10.2.5. Distribute to each of the Members the balance, if any, of the properties and assets of the Company in accordance with each Member's Capital Account, as adjusted pursuant to Sections 11.2.3 and 11.2.4.

10.2.6. Notwithstanding Sections 11.2.1 through 11.2.5, if any Member shall be indebted to the Company for any reason whatsoever, the liquidator may apply any cash allocated to such Member in accordance with this Section 11.2 to the payment of such indebtedness. If such cash is not sufficient to liquidate such indebtedness in its entirety then, until payment in full of such indebtedness by such Member, the liquidator shall retain such Member's distributive share of the Company properties and assets and, after applying the cost of operation of such properties and assets during the period of such liquidation against the income therefrom, shall apply the balance of such income toward the liquidation of such indebtedness; provided, however, that if upon the expiration of six months after notice of such outstanding indebtedness has been given to such Member, such amount has not been paid or otherwise liquidated in full, the liquidator may sell the assets allocable to such Member at private or public sale at the best cash price immediately obtainable under the circumstances, and so much of the proceeds of such sale as shall be necessary to liquidate such indebtedness shall then be so applied, and the balance (if any) of such proceeds shall be distributed to such Member.

10.2.7. The liquidator shall comply with all requirements of the Act, or other applicable law, pertaining to the winding up of a limited liability company.

10.3. *Filings.* Upon dissolution and complete winding up of the Company, the liquidator shall file any and all certificates and other documents required under the Act including, but not limited to, Articles of Dissolution as required by Section 35-20 of the Act.

10.4. *Termination.* The Company shall terminate when all of the assets of the

1065657v9

23

FILED DATE: 4/1/2020 3:26 PM    2020L000292

Company have been distributed in the manner provided for in Section 11.2 of this Agreement, and the Articles shall have been canceled in the manner required by the Act.

## ARTICLE 11
## BOOKS, RECORDS, ACCOUNTING, AND TAX ELECTIONS

11.1. *Bank Accounts.* All funds of the Company shall be deposited in a bank account or accounts maintained in the Company's name. The Members shall determine the institution or institutions at which the accounts will be opened and maintained, the types of accounts, and the Persons who will have authority with respect to the accounts and the funds therein.

11.2. *Books and Records.*

11.2.1. The Company shall keep or cause to be kept complete and accurate books and records of the Company and supporting documentation of the transactions with respect to the conduct of the Company's business. The records shall include, but not be limited to, complete and accurate information regarding the state of the business and financial condition of the Company, a copy of the articles of organization and operating agreement and all amendments to the articles and operating agreement; a current list of the names and last known business, residence, or mailing addresses of all Members; and the Company's federal, state or local tax returns.

11.2.2. The books and records shall be maintained in accordance with sound accounting practices and shall be available at the Company's principal office for examination by any Member or the Member's duly authorized representative at any and all reasonable times during normal business hours.

11.2.3. Each Member shall reimburse the Company for all costs and expenses incurred by the Company in connection with the Member's inspection and copying of the Company's books and records.

11.3. *Annual Accounting Period.* The annual accounting period of the Company shall be its taxable year. The Company's taxable year shall be selected by the Members, subject to the requirements and limitations of the Code.

11.4. *Reports.* As soon as practicable after the end of each taxable year of the Company, the Company shall cause to be sent to each Person who was an Interest Holder at any time during the taxable year then ended, that tax information concerning the Company which is necessary for preparing the Interest Holder's income tax returns for that year. At the request of any Member, and at the Member's expense, the Company shall cause an audit of the Company's books and records to be prepared by independent accountants for the period requested by the Member.

1665657v9

24

FILED DATE: 4/1/2020 3:26 PM    2020L000292

11.5. *Tax Matters Person.* The Members shall designate a Member who shall be the Company's "tax matters person" ("Tax Matters Person"). The Tax Matters Person shall have all powers and responsibilities provided in Code Section 6221, et seq. or such other provisions as may become applicable to limited liability companies. The Tax Matters Person shall keep all Members informed of all notices from government taxing authorities that may come to the attention of the Tax Matters Person. The Company shall pay and be responsible for all reasonable third-party costs and expenses incurred by the Tax Matters Person in performing those duties. A Member shall be responsible for any costs incurred by the Member with respect to any tax audit or tax-related administrative or judicial proceeding against any Member, even though it relates to the Company. The Tax Matters Person may not compromise any dispute with the Internal Revenue Service without the approval of the Members.

11.6. *Tax Elections.* The Tax Matters Person shall have the authority to make all Company elections permitted under the Code, including, without limitation, elections of methods of depreciation and elections under Code Section 754. The decision to make or not make an election shall be at the Tax Matters Person's sole and absolute discretion.

11.7. *Title to Company Property .*

11.7.1. Except as provided in Section 11.7.1, all real and personal property acquired by the Company shall be acquired and held by the Company in its name.

11.7.2. The Member may direct that legal title to all or any portion of the Company's property be acquired or held in a name other than the Company's name. Without limiting the foregoing, the Member may cause title to be acquired and held in its name or in the names of trustees, nominees, or straw parties for the Company. It is expressly understood and agreed that the manner of holding title to the Company's property (or any part thereof) is solely for the convenience of the Company, and all of that property shall be treated as Company property.

## ARTICLE 12
## GENERAL PROVISIONS

12.1. *Assurances.* Each Member shall execute all such certificates and other documents and shall do all such filing, recording, publishing and other acts as the Member deems appropriate to comply with the requirements of law for the formation and operation of the Company and to comply with any laws, rules, and regulations relating to the acquisition, operation, or holding of the property of the Company.

12.2. *Notifications.* Any notice, demand, consent, election, offer, approval, request, or other communication (collectively, a "Notice") required or permitted under this Agreement must be in writing and either delivered personally sent by certified or registered mail, postage prepaid, return receipt requested sent by recognized overnight delivery service or by facsimile transmittal. A notice must be addressed to an Interest Holder at the Interest Holder's last known address on

10656574-9

FILED DATE: 4/1/2020 3:26 PM    2020L000292

the records of the Company. A notice to the Company must be addressed to the Company's principal office. A notice delivered personally will be deemed given only when acknowledged in writing by the person to whom it is delivered. A notice that is sent by mail will be deemed given three (3) business days after it is mailed. A notice sent by recognized overnight delivery service will be deemed given when received or refused. A notice sent by facsimile shall be deemed given when sent provided notice by personal delivery or overnight delivery service is effective the day following such facsimile transmission. Any party may designate, by notice to all of the others, substitute addresses or addressees for notices; and, thereafter, notices are to be directed to those substitute addresses or addressees.

12.3.  *Specific Performance.*  The parties recognize that irreparable injury will result from a breach of any provision of this Agreement and that money damages will be inadequate to fully remedy the injury. Accordingly, in the event of a breach or threatened breach of one or more of the provisions of this Agreement, any party who may be injured (in addition to any other remedies which may be available to that party) shall be entitled to one or more preliminary or permanent orders (i) restraining and enjoining any act which would constitute a breach or (ii) compelling the performance of any obligation which, if not performed, would constitute a breach.

12.4.  *Complete Agreement.*  This Agreement constitutes the complete and exclusive statement of the agreement among the Members. It supersedes all prior written and oral statements, including any prior representation, statement, condition, or warranty.

12.5.  *Amendment.*  Except as expressly provided otherwise herein, this Agreement may be amended upon the unanimous written consent of all of the Members.

12.6.  *Applicable Law.*  All questions concerning the construction, validity, and interpretation of this Agreement and the performance of the obligations imposed by this Agreement shall be governed by the internal law, not the law of conflicts, of the State of Illinois.

12.7.  *Titles.*  The headings herein are inserted as a matter of convenience only, and do not define, limit, or describe the scope of this Agreement or the intent of the provisions hereof.

12.8.  *Binding Provisions.*  This Agreement is binding upon, and inures to the benefit of, the parties hereto and their respective heirs, executors, administrators, personal and legal representatives, successors, and permitted assigns.

12.9.  *Jurisdiction and Venue.*  Any suit involving any dispute or matter arising under this Agreement may only be brought in any United States District Court in the State of Illinois or Illinois or any Illinois or Illinois State Court having jurisdiction over the subject matter of the dispute or matter. All Members hereby consent to the exercise of personal jurisdiction by any such court with respect to any such proceeding.

12.10.  *Terms.*  Common nouns and pronouns shall be deemed to refer to the masculine, feminine, neuter, singular and plural, as the identity of the Person may in the context require.

FOK56574-9

26

FILED DATE: 4/1/2020 3:26 PM   2020L000292

12.11. *Separability of Provisions.* Each provision of this Agreement shall be considered separable; and if, for any reason, any provision or provisions herein are determined to be invalid and contrary to any existing or future law, such invalidity shall not impair the operation of or affect those portions of this Agreement which are valid.

12.12. *Counterparts.* This Agreement may be executed simultaneously in two or more counterparts, each of which shall be deemed an original and all of which, when taken together, constitute one and the same document. The signature of any party to any counterpart shall be deemed a signature to, and may be appended to, any other counterpart.

12.13. *Trustee's Obligations.* This Agreement has been executed by certain persons not individually but solely as Trustee. All covenants and obligations to be performed hereunder are undertaken by them solely in their capacity as Trustees and not individually. No personal liability shall be asserted or enforceable against such persons by reason of any of the covenants, statements, representations, or warranties contained in this Agreement.

12.14. *Securities Law Restrictions/Accredited Investor Statutes.* Each of the Members represents and warrants that he is an "Accredited Investor" as that term is defined in Rule 501 of the Securities Act of 1933, that he is acquiring his interest for his own account as an investment and not with a view toward resale, that he is aware of and understands the risk inherent in this investment and can afford to lose his entire investment in the Company, and that any transfer of his interest is subject to numerous restrictions which are both set forth in this Agreement and arise under applicable Federal and State Law. Each Member agrees to indemnify and hold the Company and all Members harmless from any loss, liability or expense resulting from a breach of these representations.

IN WITNESS WHEREOF, the parties have executed, or caused this Agreement to be executed as of the date fist set forth above.

Michael Rumman

Antoin S. Rezko

H. Edward Wynn

1065657v9

27

FILED DATE: 4/1/2020 3:26 PM  2020L000292

## MT PROPERTY HOLDINGS, LLC OPERATING AGREEMENT

### EXHIBIT A
### LIST OF MEMBERS, CAPITAL, AND PERCENTAGES

| Name of Members | Initial Capital Contribution | Number and Class of Units |
|---|---|---|
| Michael Rumman | $196.00 | 196 Class A Units |
| Antoin S. Rezko | $784.00 | 784 Class B Units |
| H. Edward Wynn | $20.00 | 20 Class C Units |
| Total | $1,000 | 1,000 Units |

MT PROPERTY HOLDINGS, *LLC OPERATING AGREEMENT*
*Doc. #1065657v8*

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## CONSENT RESOLUTION
## MT PROPERTY HOLDINGS, LLC

WHEREAS, the Members of MT Property Holdings, LLC are Antoin Rezko, Michael Rumman, and H. Edward Wynn; and

WHEREAS, Exhibit A of the Amended and Restated Operating Agreement of MT Property Holdings, LLC, states the number of units as:

196 Class A Units
784 Class B Units
20 Class C Units

WHEREAS, the Members wish to restate the number of Units to reflect the same percentages of ownership, as follows:

19.6 Class A Units
78.4 Class B Units
2.0 Class C Units

NOW, THEREFORE, having considered the matter, the Members of MT Property Holdings, LLC, hereby Consent to the Restatement of the Units in Exhibit A as described herein.

Dated this 14th day of June, 2006.


_____
Antoin Rezko

_____
Michael Rumman

_____
H. Edward Wynn

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## NOTICE OF WITHDRAWAL

TO:        The Members of MT Property Holdings, LLC

I, H.Edward Wynn, hereby provide notice this 13th day of October, 2006, that, pursuant to Section 8.2 of the Amended and Restated Operating Agreement of MT Property Holdings, LLC, that I am withdrawing as a Member of the Company. This withdrawal shall be effective as of today.

_H. Edward Wynn_

H. Edward Wynn

OFFICIAL SEAL
MARIA WILK
NOTARY PUBLIC - STATE OF ILLINOIS
MY COMMISSION EXPIRES:08/25/10

FILED DATE: 4/1/2020 3:26 PM   2020L000292

# FIRST AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

MT PROPERTY HOLDINGS, LLC

FILED DATE: 4/1/2020 3:26 PM    2020L000292

**MT PROPERTY HOLDINGS, LLC**
**AMENDMENT TO AMENDED AND RESTATED**
**OPERATING AGREEMENT**

This Amendment to the Amended and Restated Operating Agreement of MT Property Holdings, LLC (this "Amendment") is made as of March 15, 2007 by those Members who have executed this Amendment below.

**WHEREAS**, the Members have heretofore executed an Amended and Restated Operating Agreement effective June 24, 2005 (the "Agreement"); and

**WHEREAS**, the Members desire to amend the Agreement to permit transfers of Units in certain situations.

**NOW, THEREFORE**, the Agreement is hereby amended as follows:

Section 8.1 of the Agreement shall be deleted in its entirety and replaced with the following:

8.1   *Transfer*.    No Person may Transfer all or any portion or any interest or rights in the Person's Membership Rights or Interest without the consent of Members holding a majority of the Units of the Company. An informal consent to any such transfer which is executed by Members holding a majority of the Units pursuant to this Section 8.1 shall not be required to comply the notice provisions of Section 9.2.8 of this Agreement.

IN WITNESS WHEREOF, the undersigned have executed this MT Property Holdings, LLC Amendment to Amended and Restated Operating Agreement as of the day and year first written above.

_____
Antoin S. Rezko

_____
Michael Rumman

_____
Michel Malek

130730Sv1

FILED DATE: 4/1/2020 3:26 PM   2020L000292

## SECOND AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

MT PROPERTY HOLDINGS, LLC

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## MT PROPERTY HOLDINGS, LLC
## SECOND AMENDMENT TO AMENDED AND RESTATED
## OPERATING AGREEMENT

This Amendment (this "Amendment") to the Amended and Restated Operating Agreement of MT Property Holdings, LLC (the "Company") is made as of July 25, 2007 by the Member who has executed this Amendment below.

WHEREAS, the Members of the Company had heretofore executed an Amended and Restated Operating Agreement effective January 1, 2006 (as amended, the "Agreement"); and

WHEREAS, the Agreement provided that on June 14, 2006, the number of Units were held as follows:

| | |
|---|---|
| 19.6 Class A Units | Michael Rumman |
| 78.4 Class B Units | Antoin S. Rezko |
| 2.0 Class C Units | H. Edward Wynn |

WHEREAS, on October 13, 2006, H. Edward Wynn withdrew from the Company, thereby forfeiting his Class C Units; and

WHEREAS, pursuant to a series of transactions occurring on July 24, 2007, the Company redeemed all of the outstanding 19.6 Class A Units and 40.2972 Class B Units, resulting in 31.1028 Class B Units as the sole remaining outstanding Units, which were held as follows:

| | | |
|---|---|---|
| Antoin S. Rezko | Member | 35.0643 Class B Units |
| Michel Malek | Non-Member Interest Holder | 2.0385 Class B Units |
| Equity Investment I, LLC | Non-Member Interest Holder | 1.0000 Class B Units |

WHEREAS, the Members desire to restate the number of outstanding Units to provide for a total of 100 Units outstanding, while preserving the existing Unitholders' percentages.

NOW, THEREFORE, the Agreement is hereby amended as follows:

Exhibit A of the Agreement shall be deleted in its entirety and replaced with the Exhibit A appearing on the following page:

1373100v1

FILED DATE: 4/1/2020 3:26 PM   2020L000292

IN WITNESS WHEREOF, the undersigned have executed this MT Property Holdings, LLC Second Amendment to Amended and Restated Operating Agreement as of the day and year first written above.

_____
Antoin S. Rezko, Sole Member

1373100v1

FILED DATE: 4/1/2020 3:26 PM    2020L000292

## MT PROPERTY HOLDINGS, LLC OPERATING AGREEMENT

### EXHIBIT A
### LIST OF MEMBERS, UNITHOLDERS, AND CAPITAL
### AS OF JULY 25, 2007

| Name | Initial Capital Contribution | Number and Class of Units | Type of Holder |
|---|---|---|---|
| Antoin S. Rezko | $980.00 | 91.5338 Class B Units | Member |
| Michel Malek | None | 5.8917 Class B Units | Non-Member Interest Holder |
| Equity Investment I, LLC | None | 2.5745 Class B Units | Non-Member Interest Holder |
| **TOTAL** | **$980.00** | **100.0000 Class B Units** | |

1373100v1

FILED DATE: 4/1/2020 3:26 PM   2020L000292

## THIRD AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

MT PROPERTY HOLDINGS, LLC

FILED DATE: 4/1/2020 3:26 PM   2020L000292

## MT PROPERTY HOLDINGS, LLC
## THIRD AMENDMENT TO AMENDED AND RESTATED
## OPERATING AGREEMENT

This Amendment (this "Amendment") to the Amended and Restated Operating Agreement of MT Property Holdings, LLC (the "Company") is made as of February 6, 2008 by the Member who has executed this Amendment below.

**WHEREAS**, the Members of the Company had heretofore executed an Amended and Restated Operating Agreement effective January 1, 2006 (as amended, the "Agreement"); and

**WHEREAS**, pursuant to the Second Amendment to the Amended and Restated Operating Agreement dated July 25, 2007 (the "Second Amendment"), the Members restated the number of outstanding Units to provide for a total of 100 Units outstanding, while preserving the then existing Unitholders' percentages; and

**WHEREAS,** subsequent to the Second Amendment, the sole Member assigned Class B Units to certain persons; and

**WHEREAS**, the Member desires to amend the Agreement to reflected the current ownership of Units by Members and Non-Member Interest Holders resulting from such assignments.

**NOW, THEREFORE**, the Agreement is hereby amended as follows:

Exhibit A of the Agreement shall be deleted in its entirety and replaced with the Exhibit A appearing on the following page:

1477610v1

FILED DATE: 4/1/2020 3:26 PM     2020L000292

# MT PROPERTY HOLDINGS, LLC OPERATING AGREEMENT

## EXHIBIT A
### LIST OF MEMBERS, UNITHOLDERS, AND CAPITAL
### AS OF FEBRUARY 6, 2008

| Unitholder Name | Initial Capital Contribution | Number of Units | Class of Units | Type of Holder |
|---|---|---|---|---|
| 1. MICHEL MALEK | None | 5.8917 | Class B | Non-Member Interest Holder |
| 2. EQUITY INVESTMENT I, LLC | None | 2.5745 | Class B | Non-Member Interest Holder |
| 3. AMERIMARK BANK | None | 2.0041 | Class B | Non-Member Interest Holder |
| 4. ALI AND DARLENE BAGHDADI | None | 2.5745 | Class B | Non-Member Interest Holder |
| 5. SYLVIA EDWARDS | None | 0.0097 | Class B | Non-Member Interest Holder |
| 6. THOMAS AND KATHLEEN LANCTOT | None | 0.0097 | Class B | Non-Member Interest Holder |
| 7. MICHAEL J. SREENAN | None | 0.6437 | Class B | Non-Member Interest Holder |
| 8. KATHERINE G. STEPHENS | None | 0.0979 | Class B | Non-Member Interest Holder |
| 9. JACQUELINE NAJJAR | None | 3.8617 | Class B | Non-Member Interest Holder |
| 10. NAJAH NAJJAR | None | 3.8617 | Class B | Non-Member Interest Holder |
| 11. DOROTHY A. WILLIAMS TRUST | None | 2.5842 | Class B | Non-Member Interest Holder |
| 12. SUHEIL NAMMARI | None | 5.1491 | Class B | Non-Member Interest Holder |
| 13. FOUAD CHAMON | None | 3.5014 | Class B | Non-Member Interest Holder |
| 14. ROBERT WILLIAMS | None | 2.5745 | Class B | Non-Member Interest Holder |
| 15. NACHWAN RAZKO | None | 1.6437 | Class B | Non-Member Interest Holder |
| 16. BURT REZKO | None | 0.9654 | Class B | Non-Member Interest Holder |
| 17. GEORGE MERJAN | None | 0.6437 | Class B | Non-Member Interest Holder |
| 18. MILAD SAAD | None | 1.2871 | Class B | Non-Member Interest Holder |
| 19. ORLANDO G. JONES AND CERRELDA JONES | None | 1.2871 | Class B | Non-Member Interest Holder |
| 20. LORI QUARTARO AND AL CHAIB | None | 4.1491 | Class B | Non-Member Interest Holder |
| 21. GEORGES ZOUKI | None | 0.9654 | Class B | Non-Member Interest Holder |
| 22. MICHAEL SAHLI | None | 2.5745 | Class B | Non-Member Interest Holder |
| 23. ANTOINE KORKIS | None | 0.8582 | Class B | Non-Member Interest Holder |
| 24. CHRISTOPHER KELLY | None | 6.4363 | Class B | Non-Member Interest Holder |
| 25. CHICAGO RIVERSIDE INVESTMENTS | None | 4.9431 | Class B | Non-Member Interest Holder |
| 26. BROADWAY BANK | None | 0.5529 | Class B | Non-Member Interest Holder |
| 27. SAMIR FINANCIAL | None | 12.8724 | Class B | Non-Member Interest Holder |
| 28. ALI ATA | None | 5.8502 | Class B | Non-Member Interest Holder |
| 29. STONEBRIDGE | None | 0.9009 | Class B | Non-Member Interest Holder |
| 30. VANGUARD CONDO ASSOCIATION | None | 0.0618 | Class B | Non-Member Interest Holder |
| 31. ANTOIN S. REZKO | $980.00 | 18.6698 | Class B | Member |
| **Total** | **980.0000** | **100.0000** | | |

1477610v1

IN WITNESS WHEREOF, the undersigned have executed this MT Property Holdings, LLC Third Amendment to Amended and Restated Operating Agreement as of the day and year first written above.

Antoin S. Rezko, Sole Member

FILED DATE: 4/1/2020 3:26 PM   2020L000292

1477610v1

FILED DATE: 4/1/2020 3:26 PM   2020L000292

# FOURTH AMENDMENT TO

AMENDED AND RESTATED

OPERATING AGREEMENT

OF

MT PROPERTY HOLDINGS, LLC

# MT PROPERTY HOLDINGS, LLC
## FOURTH AMENDMENT TO AMENDED AND RESTATED OPERATING AGREEMENT

FILED DATE: 4/1/2020 3:26 PM   2020L000292

This Fourth Amendment (the "Amendment") to the Amended and Restated Operating Agreement of MT Property Holdings, LLC, an Illinois limited liability company (the "Company") is made as of January 27, 2014, by the Member who have executed this Amendment below.

**WHEREAS**, that certain Amended and Restated Operating Agreement of the Company was entered into by its then members effective as of January 1, 2006 (the "Amended and Restated Operating Agreement"), as amended by that Amendment to Amended and Restated Operating Agreement dated March 15, 2007 (the "First Amendment"), as amended by that Second Amendment to the Amended and Restated Operating Agreement dated July 25, 2007 (the "Second Amendment"), as amended by that Third Amendment to the Amended and Restated Operating Agreement dated February 6, 2008 (the "Third Amendment"; the Amended and Restated Operating Agreement together with the First Amendment, Second Amendment and Third Amendment, the "Operating Agreement");

**WHEREAS**, on the 27th day of January, 2014, Orifarm S.A., a Luxembourg company ("Orifarm"), was dissolved, pursuant to Luxembourg law, into its wholly owned parent company, Chicago South Loop Holdings III, LLC, a Delaware limited liability company ("Holdings III LLC");

**WHEREAS**, within and by way of the dissolution of Orifarm, 30.2648 Class B Units of the Company held by Orifarm (the "Liquidation Distribution") have been transferred to Holdings III LLC;

**WHEREAS**, the Member desires to amend the Operating Agreement to reflect the current ownership of Units by Members and Non-Member Interest Holders resulting from the Liquidation Distribution.

**NOW, THEREFORE**, the Operating Agreement is hereby amended as follows:

Exhibit A of the Operating Agreement shall be deleted in its entirety and replaced with the Exhibit A appearing on the following page.

**Exhibit A**

|  | Member Name | Number of Units in MT Property | Class of Units | Type of Holder |
|---|---|---|---|---|
| 1 | Michel Malek | 5.8917 | Class B | Non-Member Interest Holder |
| 2 | Equity Investment I, LLC | 2.5745 | Class B | Non-Member Interest Holder |
| 3 | Amerimark Bank | 2.0041 | Class B | Non-Member Interest Holder |
| 4 | Ali and Darlene Baghdadi | 2.5745 | Class B | Non-Member Interest Holder |
| 5 | Sylvia Edwards | 0.0097 | Class B | Non-Member Interest Holder |
| 6 | Thomas and Kathleen Lanctot | 0.0097 | Class B | Non-Member Interest Holder |
| 7 | Michael J. Sreenan | 0.6437 | Class B | Non-Member Interest Holder |
| 8 | Katherine G. Stephens | 0.0979 | Class B | Non-Member Interest Holder |
| 9 | Jacqueline Najjar | 3.8617 | Class B | Non-Member Interest Holder |
| 10 | Najah Najjar | 3.8617 | Class B | Non-Member Interest Holder |
| 11 | Suheil Nammari | 5.1491 | Class B | Non-Member Interest Holder |
| 12 | Fouad Chamon | 3.5014 | Class B | Non-Member Interest Holder |
| 13 | Nachwan Razko | 1.6437 | Class B | Non-Member Interest Holder |
| 14 | Burt Rezko | 0.9654 | Class B | Non-Member Interest Holder |
| 15 | George Merjan | 0.6437 | Class B | Non-Member Interest Holder |
| 16 | Milad Saad | 1.2871 | Class B | Non-Member Interest Holder |
| 17 | Orlando G. Jones and Cerrelda Jones | 1.2871 | Class B | Non-Member Interest Holder |
| 18 | Lori Ouartaro and Al Chaib | 4.1491 | Class B | Non-Member Interest Holder |
| 19 | Georges Zouki | 0.9654 | Class B | Non-Member Interest Holder |
| 20 | Michael Sahli | 2.5745 | Class B | Non-Member Interest Holder |
| 21 | Antoine Korkis | 0.8582 | Class B | Non-Member Interest Holder |
| 22 | Chicago Riverside Investments | 4.9431 | Class B | Non-Member Interest Holder |
| 23 | Broadway Bank | 0.5529 | Class B | Non-Member Interest Holder |
| 24 | Samir Financial | 12.8724 | Class B | Non-Member Interest Holder |
| 25 | Ali Ata | 5.8502 | Class B | Non-Member Interest Holder |
| 26 | Stonebridge | 0.9009 | Class B | Non-Member Interest Holder |
| 27 | Vanguard Condo Association | 0.0618 | Class B | Non-Member Interest Holder |
| 28 | Chicago South Loop Holdings III, LLC | 30.265 | Class B | Member |
|  | Total | 100 |  |  |

FILED DATE: 4/1/2020 3:26 PM    2020L000292

FILED DATE: 4/1/2020 3:26 PM   2020L000292

IN WITNESS WHEREOF, the undersigned has executed this Fourth Amendment to the Amended and Restated Operating Agreement of MT Property Holdings, LLC effective as of the day and year first written above.

**SOLE MEMBER:**

**Chicago South Loop Holdings III, LLC,**
**a Delaware limited liability company**

By its manager, CSLH Manager Incorporated

By: _____
Name: Mohammed Al-Miqdadi
Title: President

[Signature page to Fourth Amendment to A&R Operating Agreement - MT]

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

FILED DATE: 4/1/2020 3:26 PM    2020L000292

# **EXHIBIT C**

Affidavit of Mohammed Al-Miqdadi

FILED DATE: 4/1/2020 3:26 PM    2020L000292

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| ALI BAGHDADI *et al*. | ) |
| | ) |
| Plaintiffs, | ) |
| | ) No. 2020 L 000292 |
| v. | ) |
| | ) Hon. Margaret Ann Brennan |
| GENERAL MEDITERRANEAN | ) |
| HOLDING, S.A., Spf *et al*. | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF MOHAMMED AL-MIQDADI

1.  Chicago South Loop Holdings, III ("South Loop III") is a limited liability company organized under Delaware law. CSLH Incorporated ("CSLH") is a member of South Loop III. I am the President of CSLH. I have personal knowledge of the facts set forth below.

2.  In 2014, South Loop III was a Member of MT Property Holdings, LLC ("MT Holdings"). MT Holdings was dissolved on or about May 14, 2014.

3.  A true and accurate copy of the Amended and Restated Operating Agreement of MT Holdings, LLC, dated January 1, 2006, and amendments thereto, is attached to the pleading filed by South Loop III in the above-captioned action, styled "Defendant Chicago South Loop Holdings III, LLC's Memorandum in Support of its Combined Section 2-615 and Section 2-619 Motions to Dismiss."

4.  Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct.

Mohammed Al-Miqdadi

4594289-v1\CHIDMS1                                               1

# EXHIBIT  K

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

FILED
4/1/2020 3:26 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9002242

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN REZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, | ) ) ) ) ) ) ) ) ) | |
| | ) | No. 2020 L 000292 |
| Plaintiffs, | ) ) | Hon. Margaret Ann Brennan |
| v. | ) ) ) | |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) ) | |
| Defendants. | ) ) | |

**NOTICE OF FILING**

To:     See attached Certificate of Service

        PLEASE TAKE NOTICE that on April 1, 2020**,** we filed with the Clerk of the Circuit Court of Cook County, Illinois County Department, Law Division, via the Court's ECF filing system, **Defendant Chicago South Loop Holdings III, LLC's Memorandum in Support of Its Combined Section 2-615 and Section 2-619 Motions to Dismiss.**

Dated: April 1, 2020                         Respectfully submitted,

                                             /s/ John M. Murphy
                                             Attorneys for defendant, Chicago
                                             Holdings South Loop III, LLC

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000
Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

FILED DATE: 4/1/2020 3:26 PM   2020L000292

STATE OF ILLINOIS    )
                     ) SS.
COUNTY OF COOK       )

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, deposes and states that copies of the foregoing **Notice** and **Defendant Chicago South Loop Holdings III, LLC's Memorandum in Support of Its Combined Section 2-615 and Section 2-619 Motions to Dismiss** were served upon the following counsel of record via electronic notice pursuant to the Court's ECF system and via email transmission this 1st day of April, 2020:

Edward T. Joyce
The .Law Offices of Edward T. Joyce &
      Assoc. PC
135 S. LaSalle St., Suite 2200
Chicago, IL   60603
312-641-2600
rcarroll@joycelaw.com


                                        /s/  John M. Murphy
                                        Attorneys for defendant, Chicago
                                        Holdings  South Loop III, LLC

4595706-v1\CHIDMS1

# EXHIBIT  L

Return Date: No return date scheduled
Hearing Date: No hearing scheduled
Courtroom Number: No hearing scheduled
Location: No hearing scheduled

FILED
4/21/2020 5:28 PM
DOROTHY BROWN
CIRCUIT CLERK
COOK COUNTY, IL
2020L000292

9117861

**IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**
**COUNTY DEPARTMENT, LAW DIVISION**

| | |
|---|---|
| **ALI BAGHDADI, FOUAD CHAMON,** | ) |
| **ANTOINE KORKIS, NAJAH NAJJAR,** | ) |
| **JACQUELINE NAJJAR, SUHAIL** | ) |
| **NAMMARI, NACHWAN RAZKO,** | ) |
| **BURT REZKO, MILAD SAAD,** | ) |
| **MICHAEL SAHLI, GEORGES ZOUKI,** | ) |
| **KHALED SHAIR, LAYLA EL SHAIR,** | ) |
| **AND QMQQ LLC,** | ) |
| | ) |
| **Plaintiffs,** | ) |
| | ) |
| **v.** | ) **No. 2020 L 000292** |
| | ) |
| **GENERAL MEDITERRANEAN** | ) |
| **HOLDING, S.A., Spf; and CHICAGO** | ) |
| **SOUTH LOOP HOLDINGS III, LLC,** | ) |
| | ) |
| **Defendants.** | ) |

## MOTION FOR SUBSTITUTION OF JUDGE AS A MATTER OF RIGHT

NOW COMES Plaintiff Ali Baghdadi by and through his attorneys, The Law Offices of Edward T. Joyce & Associates, P.C., and pursuant to Section 2-1001(a)(2) of the Illinois Code of Civil Procedure, hereby moves for a substitution of judge as a matter of right. In support of this motion, Plaintiff states as follows:

1.      Section 2-1001(a)(2)(i) entitles each party "to one substitution of judge without cause as a matter of right." 735 ILCS 5/2-1001(a)(2)(i).

2.      The motion for substitution of judge as a matter of right "shall be granted if it is presented before trial or hearing begins and before the judge to whom it is presented has ruled on any substantial issue in the case[.]" 735 ILCS 5/2-1001(a)(2)(ii).

FILED DATE: 4/21/2020 5:28 PM    2020L000292

3.      On January 7, 2020, Plaintiff filed his complaint and it was assigned to the Honorable Judge Margaret A. Brennan.

4.      On April 1, 2020, Defendant South Loop Holdings III LLC filed an appearance through counsel.

5.      This is Plaintiff's first request for substitution of judge without cause as a matter of right.

6.      From the date the case was assigned to the Honorable Judge Margaret A. Brennan, Judge Brennan has not ruled on any substantial issues in the case.

7.      This motion is being presented before any trial or hearing.

WHEREFORE, the Plaintiff Ali Baghdadi respectfully requests entry of an Order granting its motion for substitution of judge as a matter of right and grant such other and further relief as the court deems just and proper.

Respectfully submitted,
Ali Baghdadi


By:    /s/ Robert D. Carroll
          One of Their Attorneys.

Edward T. Joyce (ejoyce@joycelaw.com)
Robert D. Carroll (rcarroll@joycelaw.com)
Victoria P. Worley (vworley@joycelaw.com)
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 S. LaSalle Street, Suite 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

2

## <u>CERTIFICATE OF SERVICE</u>

I, Robert D. Carroll, an attorney, certify that on April 21, 2020, I caused a true and correct copy of the foregoing MOTION FOR SUBSTITUTION OF JUDGE AS A MATTER OF RIGHT to be filed via the Circuit Court of Cook County's electronic filing system and to be served upon all counsel of record as listed below by electronic mail delivery.

Under penalties as provided by law pursuant to Section 1-109 of the Code of Civil Procedure, the undersigned certifies that the statements set forth in this instrument are true and correct, except as to matters therein stated to be on information and belief and as to such matters the undersigned certifies as aforesaid that he verily believes the same to be true.



/s/ Robert D. Carroll

John M. Murphy
Matthew G. Allison
BAKER & McKENZIE LLP (No. 90080)
300 East Randolph St., Suite 5000 Chicago, IL 60601
(312) 861-8085
john.murphy@bakermckenzie.com
matthew.allison@bakermckenzie.com

FILED DATE: 4/21/2020 5:28 PM   2020L000292

# EXHIBIT M

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

ALI BAGHDADI, FOUAD CHAMON,           )
ANTOINE KORKIS, NAJAH NAJJAR,         )
JACQUELINE NAJJAR, SUHAIL             )
NAMMARI, NACHWAN RAZKO,               )
BURT REZKO, MILAD SAAD,               )
MICHAEL SAHLI, GEORGES ZOUKI,         )
KHALED SHAIR, LAYLA EL SHAIR,         )
AND QMQQ LLC,                         )
                                      )
            Plaintiffs,               )
                                      )      No. 2020 L 000292
      v.                              )
                                      )
GENERAL MEDITERRANEAN                 )
HOLDING, S.A., Spf; and CHICAGO       )
SOUTH LOOP HOLDINGS III, LLC,         )
                                      )
            Defendants.               )

## ORDER

This matter coming on to be heard on Plaintiff Ali Baghdad's Motion for Substitution of

Judge as a Matter of Right, due notice having been given, and the Court being fully advised in

premises,

IT IS HEREBY ORDERED: Plaintiff's motion is granted. 4330

ENTERED

Judge Margaret A. Brennan
APR 23 2020
Circuit Court - 1846

Edward T. Joyce (ejoyce@joycelaw.com)
Robert D. Carroll (rcarroll@joycelaw.com)
Victoria P. Worley (vworley@joycelaw.com)
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 S. LaSalle Street, Suite 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

# EXHIBIT  N

Reassignment Order                                   (Rev. 9/8/03) CCL 0513

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT - LAW DIVISION

BAGHDADI

        v.                 }   No. _20L 292_

General Mediterranean

## REASSIGNMENT ORDER

**This cause coming to be heard for reassignment, the case having been returned to the**

Presiding Judge pursuant to a

☒ **Substitution of judge**

☐ **Recusal**

from Judge _Brennan_____ , Calendar _N_____

---

      **IT IS HEREBY ORDERED that this cause is reassigned to**

☒ **Commercial Calendar** _W_____ , Judge _Shelley_____    8282

☐ **Motion Calendar** _____ , Judge _____    4288

☐ **Individual Calendar** _____ , Judge _____    441

pursuant to a computer generated random assignment.    1925

Atty. No.: _____

Name: _____

Atty. for: _____

Address: _____

City/State/Zip: _____

Telephone: _____

> JUDGE JAMES P. FLANNERY
>
> APR 23 2020
>
> Circuit Court-1506
>
> *Judge's Signature*

ENTERED:

_____ 1505
Judge         Judge's No.

**DOROTHY BROWN, CLERK OF THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS**

# EXHIBIT O

## IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
## COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN RAZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, | ) ) ) ) ) ) ) ) ) | |
| Plaintiffs, | ) | |
| v. | ) | No. 2020 L 000292 |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) ) | Judge Diane M Shelley Cal. W |
| Defendants. | ) ) | |

### ORDER

This matter coming on to be heard on Plaintiffs' Motion for Leave to File Amended Complaint, due notice having been given, and the Court being fully advised in premises,
IT IS HEREBY ORDERED:

1. Plaintiffs' motion is Granted. Plaintiffs shall file their amended complaint on or before July 2.
2. Defendants' Motion to Dismiss is voluntarily withdrawn without prejudice. Defendants shall answer or otherwise plead to the amended complaint by July 16, 2020.
3. If Defendants decide to otherwise plead, a copy of such pleading shall be sent to this court's attention at **law.calwcc@cookcountyil.gov** for the purpose of scheduling a presentment date.

ENTERED:

_____

Judge Diane M Shelley
June 27, 2020

Edward T. Joyce (ejoyce@joycelaw.com)
Robert D. Carroll (rcarroll@joycelaw.com)
THE LAW OFFICES OF
EDWARD T. JOYCE & ASSOCIATES, P.C.
135 S. LaSalle Street, Suite 2200
Chicago, IL 60603
(312) 641-2600
Firm No. 47922

**Judge Diane M. Shelley**

**JUN 2 7 2020**

**Circuit Court** - ₁ .

# EXHIBIT  P

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, | ) | |
| ANTOINE KORKIS, NAJAH NAJJAR, | ) | |
| JACQUELINE NAJJAR, SUHAIL | ) | |
| NAMMARI, NACHWAN REZKO, | ) | |
| BURT REZKO, MILAD SAAD, | ) | |
| MICHAEL SAHLI, GEORGES ZOUKI, | ) | |
| KHALED SHAIR, LAYLA EL SHAIR, | ) | |
| AND QMQQ LLC, | ) | No. 2020 L 000292 |
| | ) | |
| Plaintiffs, | ) | Hon. Margaret Ann Brennan |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf; and CHICAGO | ) | |
| SOUTH LOOP HOLDINGS III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

## DEFENDANT SOUTH LOOP III's JURISDICTIONAL WRITTEN INTERROGATORIES TO EACH PLAINTIFF OTHER THAN QMQQ LLC

Defendant, Chicago South Loop Holdings, III ("South Loop III") submits the jurisdictional interrogatories below to each of the plaintiffs, other than plaintiff QMQQ LLC, pursuant to Illinois Supreme Court Rule 213 to be answered within twenty-eight (28) days of service hereof.

## INSTRUCTIONS

1.      These Interrogatories call for all responsive information in your possession, custody or control without regard to the physical location of such information.

2.      If you are unable to fully answer any Interrogatory, answer or respond to the extent possible and specify the reasons for your inability to answer or respond in full.

3.      If any information responsive to these Interrogatories is withheld based on a claim of privilege, state separately for each such piece of information, the specific interrogatory calling

for the information, the nature of the privilege claimed, and all facts relied on in support of that claim, including the following:

          a.      the date and medium of the information withheld; and

          b.      the identity of the persons to such communication;

    4.     If any information requested herein is withheld based on a claim that such information constitutes attorney work product, please provide all of the information described above and also identify the litigation in connection with which the information was obtained and/or prepared.

    5.     You shall supplement the answers to these Interrogatories at appropriate intervals, consistent with your obligation under Illinois Supreme Court Rule 213(i).

## DEFINITIONS

    1.     "Person(s)" means: natural persons, corporations, partnerships, all other forms of legal entities, and the offices, directors, employees, agents, partners and personal representatives thereof.

    2.     The words "and" and "or" shall not be construed to limit the scope of this request due to either its disjunctive or conjunctive form.

    3.     The singular form of a word shall be interpreted to include the plural, and the plural form shall be interpreted to include the singular.

    4.     "Complaint" shall refer to the Complaint, and any subsequent amendments thereto, in the above-captioned action.

    5.     "Communication" shall mean any oral statement, dialogue, colloquy, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents such as letters, memoranda, etc., and includes any transfer of data from one location to another by electronic or similar means.

6.     "Document(s)" include, but are not limited to, all written, typed, printed, recorded, drawn or diagrammed, graphic or photographic, material, electronic data and audio or video reproduction tapes, discs or other devices, however produced or reproduced, including: agreements, communications, books, records, invoices, ledgers, journals, accounts, memoranda, stenographic or hand-written notes, letters, notices, telefaxes, telexes, telegrams, transcripts, diaries, calendars, contracts, opinions, studies, publications, analyses, summaries, messages, correspondence, reports, surveys, statistical compilations, records of telephone conversations, records of personal conversations or interviews, records of meetings or conferences, graphs, notebooks, plans, drawings, sketches, maps, reports of investigations or negotiations, photographs, tapes, motion picture film, videotapes, brochures, pamphlets, advertisements, circulars, data processing cards, computer tapes or print-outs, electronically stored data, including e-mail messages, press releases, drafts, work papers, any marginal comments appearing in writing or copy thereof, and all other writings and recordings of any kind.

7.     "Identify," when used with respect to a person or persons means: (a) to state the name, address(es) and telephone number(s) of each such person; (b) to state the name of the present employer, place of employment or business, and job title of each such person; and (c) if such person was affiliated at any time with any party to this litigation, by employment or otherwise, to state the nature and dates of such affiliation.

8.     "Identify," when used with respect to a document means to state the date of the document, the author, sender, the addressee(s) or recipient(s), the number of pages, the general subject matter, and the current custodian of the document.  It shall be a sufficient response to produce a copy of the document in lieu of providing such information about the documents.

9.      "Relate to," "relating to," or "concerning" a given subject shall mean referring to, dealing with, commenting upon, describing, summarizing, analyzing, explaining, detailing, outlining, defining, interpreting or pertaining to that subject.

10.      "Residence" means the place where you live or reside, your dwelling place or your home.

## INTERROGATORIES

1.      Identify the state in which you were domiciled as of January 7, 2007.

2.      Identify the state in which you are currently domiciled.

3.      Identify the address of your residence as of January 7, 2020.  If the address of your residence has changed since January 7, 2020, identify the address of your current residence.

4.      If, on or after January 7, 2020, you have maintained more than one residence: (i) identify the address for each such residence; and (ii) identify the address of the residence which is your primary residence (rather than a secondary residence, i.e., a seasonal residence or temporary residence).

5.      With regard to the primary residence you identified in response to Interrogator No. 4 above, state whether, at any time after January 7, 2020, you have intended to relocate to a different primary residence.  If so, (i) identify the state to which you intend to relocate; (ii) the date on which you intend to relocate; and (iii) the activities you have engaged in for the purpose of effectuating your intent to relocate.

6.      Identify the state in which, for purposes of state income tax reporting, you identified yourself as a resident for 2018, 2019 and 2020.

7.      Identify the primary location of your belongings and personal possessions as of January 7, 2020 and presently.

8.    Identify the state(s) which have issued to you a current driver's license

9.    Identify the state(s) which issued to you a driver's license that was current as of January 7, 2020.

10.    Identify the name and address of your employer as of January 7, 2020 and if different, the name and address of your current employer.

11.    Identify the primary office or other type of business location at which you perform your employment responsibilities.

12.    Identify the location of your church, synagogue, temple or other place of worship, as applicable.

13.    Identify the state of the primary residence of your spouse and the primary residence(s) of your children, as applicable.

14.    Do you believe you have sustained or will sustain compensatory damages in excess of $75,000, exclusive of interest and costs, as a result of defendants' actions, as alleged in the pending complaint?

15.    What is the amount of compensatory damages (or range of the amount of compensatory damages) you believe you have sustained or will sustain as a result of defendants' actions, as alleged in the pending complaint?

16.    Will you be asking the court (or jury) to award you compensatory damages in excess of $75,000, exclusive of interest and costs, as a result of defendants' actions, as alleged in the pending complaint?

17.    Do you believe you are entitled to punitive damages as a result of defendants' actions, as alleged in the pending complaint?

18.    If the answer to the foregoing interrogatory is yes, what is the amount of punitive damages (or a range for the amount of punitive damages) you believe you are entitled to?

Dated: April 6, 2020                    Respectfully submitted,


                                         /s/ John M. Murphy_____
                                        One of the Attorneys for Defendant, Chicago South Loop Holdings III, LLC




John M. Murphy
Matthew G. Allison
BAKER & McKENZIE (I.D. 90080)
300 East Randolph Drive, Suite 5000
Chicago, IL 60601
(312) 861-8000
#90080

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, deposes and states that he caused a copy of the foregoing **Defendant South Loop III's Jurisdictional Interrogatories to Plaintiff** to be served upon the following counsel, via e-mail, this 6th day of April, 2020.

Edward T. Joyce ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
Law Offices of Edward T. Joyce & Assoc.
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600

*Counsel for Plaintiffs.*

/s/ John M. Murphy
John M. Murphy

3163603-v1\CHIDMS1

4594214-v1\CHIDMS1                                          7

# EXHIBIT  Q

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, | ) | |
| ANTOINE KORKIS, NAJAH NAJJAR, | ) | |
| JACQUELINE NAJJAR, SUHAIL | ) | |
| NAMMARI, NACHWAN REZKO, | ) | |
| BURT REZKO, MILAD SAAD, | ) | |
| MICHAEL SAHLI, GEORGES ZOUKI, | ) | |
| KHALED SHAIR, LAYLA EL SHAIR, | ) | |
| AND QMQQ LLC, | ) | No. 2020 L 000292 |
| | ) | |
| Plaintiffs, | ) | Hon. Margaret Ann Brennan |
| | ) | |
| v. | ) | |
| | ) | |
| GENERAL MEDITERRANEAN | ) | |
| HOLDING, S.A., Spf; and CHICAGO | ) | |
| SOUTH LOOP HOLDINGS III, LLC, | ) | |
| | ) | |
| Defendants. | ) | |

**DEFENDANT SOUTH LOOP III's JURISDICTIONAL
WRITTEN INTERROGATORIES TO PLAINTIFF QMQQ LLC**

Defendant, Chicago South Loop Holdings, III ("South Loop III") submits the interrogatories below to plaintiff, QMQQ, LLC ("QMQQ", pursuant to Illinois Supreme Court Rule 213 to be answered within twenty-eight (28) days of service hereof.

**INSTRUCTIONS**

1.     These Interrogatories call for all responsive information in your possession, custody or control without regard to the physical location of such information.

2.     If you are unable to fully answer any Interrogatory, answer or respond to the extent possible and specify the reasons for your inability to answer or respond in full.

3.     If any information responsive to these Interrogatories is withheld based on a claim of privilege, state separately for each such piece of information, the specific interrogatory calling

for the information, the nature of the privilege claimed, and all facts relied on in support of that claim, including the following:

        a.      the date and medium of the information withheld; and

        b.      the identity of the persons to such communication;

4.     If any information requested herein is withheld based on a claim that such information constitutes attorney work product, please provide all of the information described above and also identify the litigation in connection with which the information was obtained and/or prepared.

5.     You shall supplement the answers to these Interrogatories at appropriate intervals, consistent with your obligation under Illinois Supreme Court Rule 213(i).

## DEFINITIONS

1.     "Person(s)" means: natural persons, corporations, partnerships, all other forms of legal entities, and the offices, directors, employees, agents, partners and personal representatives thereof.

2.     The words "and" and "or" shall not be construed to limit the scope of this request due to either its disjunctive or conjunctive form.

3.     The singular form of a word shall be interpreted to include the plural, and the plural form shall be interpreted to include the singular.

4.     "Complaint" shall refer to the Complaint, and any subsequent amendments thereto, in the above-captioned action.

5.     "Communication" shall mean any oral statement, dialogue, colloquy, discussion or conversation, and also means any transfer of thoughts or ideas between persons by means of documents such as letters, memoranda, etc., and includes any transfer of data from one location to another by electronic or similar means.

6. "Document(s)" include, but are not limited to, all written, typed, printed, recorded, drawn or diagrammed, graphic or photographic, material, electronic data and audio or video reproduction tapes, discs or other devices, however produced or reproduced, including: agreements, communications, books, records, invoices, ledgers, journals, accounts, memoranda, stenographic or hand-written notes, letters, notices, telefaxes, telexes, telegrams, transcripts, diaries, calendars, contracts, opinions, studies, publications, analyses, summaries, messages, correspondence, reports, surveys, statistical compilations, records of telephone conversations, records of personal conversations or interviews, records of meetings or conferences, graphs, notebooks, plans, drawings, sketches, maps, reports of investigations or negotiations, photographs, tapes, motion picture film, videotapes, brochures, pamphlets, advertisements, circulars, data processing cards, computer tapes or print-outs, electronically stored data, including e-mail messages, press releases, drafts, work papers, any marginal comments appearing in writing or copy thereof, and all other writings and recordings of any kind.

7. "Identify," when used with respect to a person or persons means: (a) to state the name, address(es) and telephone number(s) of each such person; (b) to state the name of the present employer, place of employment or business, and job title of each such person; and (c) if such person was affiliated at any time with any party to this litigation, by employment or otherwise, to state the nature and dates of such affiliation.

8. "Identify," when used with respect to a document means to state the date of the document, the author, sender, the addressee(s) or recipient(s), the number of pages, the general subject matter, and the current custodian of the document. It shall be a sufficient response to produce a copy of the document in lieu of providing such information about the documents.

9.    "Relate to," "relating to," or "concerning" a given subject shall mean referring to, dealing with, commenting upon, describing, summarizing, analyzing, explaining, detailing, outlining, defining, interpreting or pertaining to that subject.

10.    "Residence" means the place where you live or reside, your dwelling place or your home.

## INTERROGATORIES

1.    Identify the assignor of the interest assigned to QMQQ, as alleged in Paragraph 19 of the Complaint.

2.    Identify the state of citizenship of QMQQ for purposes of federal court subject matter jurisdiction under 28 U.S.C. Sec.1332 as of January 7, 2020 and at present.

3.    Identify each of the members of QMQQ as of January 7, 2020 and at present.

4.    For each member identified in response the foregoing interrogatory, identify each member's state of citizenship for purposes of federal court subject matter jurisdiction under 28 U.S.C. Sec.1332, as of January 7, 2020 and at present.

5.    For each member of QMQQ who is a natural person, identify each member's state of domicile and residential address as of January 7, 2020 and at present.

6.    For each member of QMQQ who is a natural person, state whether such person maintained a residence in the state of Delaware at any time from January 7, 2020 to the present.

7.    For each member of QMQQ, which is not a natural person, identity the type of entity such member is. If any such member is a corporation, identify its state of incorporation and principal place of business as of January 7, 2020 and at present. If any such member is a limited liability company, identify each of the members of such limited liability company and their respective states of citizenship for purposes of subject matter jurisdiction under 28 U.S.C.

Sec.1332, as of January 7, 2020 and at present. If any such member is a partnership, identify each of the partners of such partnership and their respective states of citizenship for purposes of subject matter jurisdiction under 28 U.S.C. Sec.1332, as of January 7, 2020 and at present.

8.    For each natural person identified in response to Interrogatory No. 3, if, on or after January 7, 2020, such person maintained more than one residence: (i) identify the address for each such residence; and (ii) identify the address of the residence which is such person's primary residence (rather than a secondary residence, i.e., a seasonal residence or temporary residence).

9.    For each natural person identified in response to Interrogatory No. 3, with regard to the primary residence identified in response to Interrogator No. 9 above, state whether, at any time after January 7, 2020, such person intended to relocate to a different primary residence. If so, (i) identify the location (including the state) to which such person intends to relocate; (ii) the date on which such person intends to relocate; and (iii) the activities such person has engaged in for the purpose of effectuating an intent to relocate.

10.    For each natural person identified in response to Interrogatory No. 3, identify the state in which, for purposes of state income tax reporting, such person identified herself or himself as a resident for 2018, 2019 and 2020.

11.    For each natural person identified in response to Interrogatory No. 3, identify the primary location of such person's belongings and personal possessions as of January 7, 2020 and at present.

12.    For each natural person identified in response to Interrogatory No. 3, identify the state(s) which have issued to such person a current driver's license

13.    For each natural person identified in response to Interrogatory No. 3, identify the state(s) which have issued to such person a driver's license that was current as of January 7, 2020.

14.     For each natural person identified in response to Interrogatory No. 3, identify the name and address of such person's employer as of January 7, 2020 and if different, the name and address of such person's current employer.

15.     For each natural person identified in response to Interrogatory No. 3, identify the state of the primary office location (or other business location) at which such person performs his or her employment responsibilities.

16.     For each natural person identified in response to Interrogatory No. 3, identify the location of such person's church, synagogue, temple or other place of worship, as applicable.

17.     For each natural person identified in response to Interrogatory No. 3, identify the state(s) of the primary residence of his or her spouse and the state(s) of the primary residence of his or her children, as applicable.

18.     Will QMQQ ask the court (or jury) to award it in excess of $75,000, exclusive of interest and costs, as a result of defendants' actions, as alleged in the pending complaint?

19.     What is the amount of compensatory damages (or a range for the amount of compensatory damages) the members of QMQQ believe QMQQ sustained or will sustain as a result of defendants' actions, as alleged in the pending complaint?

20.     Do the members of QMQQ believe that it is entitled to punitive damages as a result of defendants' actions, as alleged in the pending complaint?

21.     If the answer to the foregoing interrogatory is yes, what is the amount of punitive damages (or a range for the amount of punitive damages) QMQQ will ask the court (or jury) to award?

Dated: April 6, 2020

Respectfully submitted,


_____/s/ John M. Murphy_____
One of the Attorneys for Defendant, Chicago South
Loop Holdings III, LLC


John M. Murphy
Matthew G. Allison
BAKER & McKENZIE (I.D. 90080)
300 East Randolph Drive, Suite 5000
Chicago, IL 60601
(312) 861-8000

## <u>CERTIFICATE OF SERVICE</u>

The undersigned, an attorney, deposes and states that he caused a copy of the foregoing **Defendant South Loop III's Jurisdictional Interrogatories to Plaintiff** to be served upon the following counsel, via e-mail, this 6th day of April, 2020.

Edward T. Joyce ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
Law Offices of Edward T. Joyce & Assoc.
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600


*Counsel for Plaintiffs.*


_____/s/ John M. Murphy_____
John M. Murphy


4594803-v1\CHIDMS1

# EXHIBIT  R

IN THE CIRCUIT COURT OF COOK COUNTY, ILLINOIS
COUNTY DEPARTMENT, LAW DIVISION

| | | |
|---|---|---|
| ALI BAGHDADI, FOUAD CHAMON, ANTOINE KORKIS, NAJAH NAJJAR, JACQUELINE NAJJAR, SUHAIL NAMMARI, NACHWAN REZKO, BURT REZKO, MILAD SAAD, MICHAEL SAHLI, GEORGES ZOUKI, KHALED SHAIR, LAYLA EL SHAIR, AND QMQQ LLC, | ) ) ) ) ) ) ) ) ) | |
| | ) | No. 2020 L 000292 |
| Plaintiffs, | ) | |
| | ) | Hon. Margaret Ann Brennan |
| v. | ) | **WARNING: If you fail to serve the** |
| | ) | **response required by Rule 216 within** |
| GENERAL MEDITERRANEAN HOLDING, S.A., Spf; and CHICAGO SOUTH LOOP HOLDINGS III, LLC, | ) ) ) | **28 days after you are served with this document, all the facts set forth in the** |
| | ) | **requests will be deemed genuine.** |
| Defendants. | ) | |

**DEFENDANT SOUTH LOOP III's RULE 216
REQUESTS FOR ADMISSION TO EACH OF THE INDIVIDUAL PLAINTIFFS**

Defendant, Chicago South Loop Holdings, III ("South Loop III") submits the requests for admission set forth below to each of the individual plaintiffs named in this action (every plaintiff except QMQQ LLC) pursuant to Illinois Supreme Court Rule 216 to be answered by each such plaintiff within twenty-eight (28) days of service hereof.

**INSTRUCTIONS**

1.       From January 7, 2020 to the present, you have not maintained a residence in the state of Delaware.

2.       From January 7, 2020 to the present, you have not been domiciled in the state of Delaware.

3.       You are a citizen of the United States of America.

4.       You are a citizen or subject of a foreign state.

5.     At no time from January 7, 2020 to the present, you have you intended to relocate your residence to the state of Delaware.

6.     In this court proceeding, you will neither seek nor accept an award in excess of $75,000 exclusive of interest and costs.

7.     The economic losses you have sustained and/or will sustain as a result of defendants' actions, as alleged in the complaint, exceed $75,000 exclusive of interest and costs.

Dated: April 6, 2020                    Respectfully submitted,


                                        _/s/ John M. Murphy_____
                                        One of the Attorneys for Defendant, Chicago South
                                        Loop Holdings III, LLC




John M. Murphy
Matthew G. Allison
BAKER & McKENZIE (I.D. 90080)
300 East Randolph Drive, Suite 5000
Chicago, IL 60601
(312) 861-8000
#90080

## CERTIFICATE OF SERVICE

The undersigned, an attorney, deposes and states that he caused a copy of the foregoing **Defendant South Loop III's Rule 216 Requests for Admission to Each of the Individual Plaintiffs** to be served upon the following counsel, via e-mail, this 6th day of April, 2020.

Edward T. Joyce ejoyce@joycelaw.com
Robert D. Carroll, rcarroll@joycelaw.com
Law Offices of Edward T. Joyce & Assoc.
135 S. LaSalle St., Ste., 2200
Chicago, IL 60603
(312) 641-2600

*Counsel for Plaintiffs.*

    /s/ John M. Murphy
John M. Murphy

4595056-v1\CHIDMS1