**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ILLINOIS
EASTERN DIVISION**

ALI BAGHDADI, FOUAD CHAMON,　　　)
ANTOINE KORKIS, NAJAH NAJJAR,　　)
JACQUELINE NAJJAR, SUHAIL　　　　)
NAMMARI, NACHWAN RAZKO,　　　　 )
BURT REZKO, MILAD SAAD,　　　　　)
MICHAEL SAHLI, GEORGES ZOUKI,　 )
KHALED SHAIR, LAYLA EL SHAIR,　　)
QMQQ LLC, and GEORGE MERJAN,　 )
　　　　　　　　　　　　　　　　 )
　　　　Plaintiffs,　　　　　　　　)
　　　　　　　　　　　　　　　　 )
　　　　v.　　　　　　　　　　　　)
　　　　　　　　　　　　　　　　 )
GENERAL MEDITERRANEAN　　　　　)
HOLDING, S.A., Spf; and CHICAGO　　)
SOUTH LOOP HOLDINGS III, LLC,　　)
　　　　　　　　　　　　　　　　 )
　　　　Defendants.　　　　　　　 )

No. 20-CV-4043

Judge John J. Tharp, Jr.

<u>**MEMORANDUM OPINION AND ORDER**</u>

Fifteen plaintiffs, who were transferees of distributional interests in an Illinois LLC named MT Holdings, LLC, sued defendants General Mediterranean Holdings, S.A., SPF ("GMH"), and Chicago South Loop Holdings III, LLC ("South Loop III") for allegedly interfering with and depriving them of their right to receive value from those distributional interests. They first brought a lawsuit against the defendants in the Circuit Court of Cook County, Illinois. After some early jurisdictional discovery, South Loop III removed the case to this Court on the basis of diversity jurisdiction with GMH's consent.[1] Both of the defendants have moved to dismiss the amended

---

[1] The group of 15 plaintiffs comprises citizens of Illinois, Indiana, Pennsylvania, Canada, Syria, and Argentina. Defendant GMH is a citizen of Luxembourg; South Loop III is an LLC with one member, CSLH Incorporated. South Loop III's citizenship is thus determined by that of CSLH Incorporated. *See Thomas v. Guardsmark, LLC*, 487 F.3d 531, 534 (7th Cir. 2007). CSLH Incorporated is a Delaware corporation and thus a Delaware citizen for diversity purposes (its principal place of business is in the United Kingdom, but for purposes of diversity jurisdiction, the citizenship of a domestically incorporated entity with a foreign principal place of business is

complaint because it fails to state any claims against them. In response to the defendants' motions to dismiss and in a separate motion to supplement the record, the plaintiffs have alerted the Court to arbitration decisions that, they argue, collaterally estop the defendants from pursuing certain arguments on which their motions to dismiss hinge. For the reasons that follow, the arbitration decisions do not preclude the litigation of any issues in this case, the amended complaint states a claim against South Loop III, and South Loop III's motion to dismiss is denied whereas GMH's motion to dismiss is granted.

## BACKGROUND

The dispute centers around an undeveloped 62-acre parcel of land now commonly known as the "78" (the "Property"), located in the South Loop neighborhood of Chicago, Illinois. More specifically, it lies southwest of the intersection of Roosevelt Road and Clark Street, bordering the south branch of the Chicago River to the west and 16th Street to the south. According to the amended complaint, Ex. D to the Notice of Removal (ECF No. 1-1), the Property has for some time been one of the most promising real estate development projects in the city due to its size, contiguity, and proximity to various Chicago landmarks, public transportation, and highways. Recognizing the Property's potential, an individual named Antoin Rezko and defendant GMH decided to purchase it in the early 2000s. Rezko, an experienced player in the Chicago real estate world, brought his knowledge and connections to the partnership. GMH mainly brought the purchasing capital and funds needed for future development of the Property.

---

determined solely by its place of incorporation—*see MAS Capital, Inc. v. Biodelivery Scis. Intern., Inc.*, 524 F.3d 831, 832-33 (7th Cir. 2008)). Accordingly, there is diversity of citizenship under 28 U.S.C. § 1332(a)(3). *See Allendale Mut. Ins. Co. v. Bull Data Sys., Inc.*, 10 F.3d 425, 427-28 (7th Cir. 1993) (finding jurisdiction under § 1332(a)(3) adequate where suit is between citizen of state A + alien v. citizen of state B + alien). The plaintiffs have expressly and reasonably alleged an amount in controversy in excess of $75,000, so the Court has subject matter jurisdiction.

*Year Zero*

A rotating cast of entities has owned and managed the Property ever since. In January 2006, the Property belonged entirely to Riverside District Development, LLC. Heritage Development Partners, LLC owned 50% of Riverside's common units and 49% of its voting units. MT Holdings, in turn, owned 100% of Heritage. Rezko and his partner Michael Rumman owned 100% of MT Holdings. Defendant GMH owned the other 50% of Riverside's common units, 51% of its voting units, and 100% of its preferred units. The figure below provides a snapshot of the ownership structure at this relevant juncture, January 2006 (based on the plaintiffs' graphical representation of, and factual allegations pertaining to, the same, Am. Compl. ¶ 39).

<u>January 2006 Structure:</u>[2]



*Heritage's 2006 Capital Raising and Operating Agreement Section 7.2*

In early 2006, Heritage conducted a private placement offering of Class A units to raise additional capital. Various investors purchased these Class A units.[3] Under the Heritage operating

---

[2] Ownership is total, *i.e.*, 100%, wherever the ownership percentage is not listed. *E.g.*, MT Holdings was the sole member of Heritage at this time.

[3] Namely: Royal Heritage Investments LLC, Ali Baghdadi (a plaintiff in this case), Darlene Baghdadi, and Roosevelt-Clark, LLC (together, "Class A Investors). Note that although the Class A Investors did include one of the plaintiffs in this action, none of the plaintiffs here are suing to vindicate any rights they had in their capacities as Class A Investors in Heritage.

agreement, Class A unit holders had limited voting rights; most of the voting power in Heritage belonged to the members who held Class B units. Nonetheless, Section 7.2 of the Heritage operating agreement granted to both Class A and Class B unit holders the same right to participate in future development of the Property. This clause will be discussed in more detail later.

*Developments in 2007 Following Rezko's Indictment*

The federal government indicted Rezko in 2006. The charges are neither relevant to, nor outlined in, the complaint. What is relevant, though, is that GMH considered Rezko's indictment a liability to its plans for developing the Property. Rezko and his business partners needed to divest. So, on July 24, 2007, GMH caused a wholly owned and wholly controlled affiliate named Orifarm, S.A. to acquire a number of Class B units of Heritage from MT Holdings. Heritage then admitted Orifarm as a member. Following this July 24, 2007 transaction, Orifarm owned 60%, MT Holdings owned 38.1%, and the Class A Investors owned the remaining 1.9% of Heritage. At or about the same time, Orifarm also acquired all of Rezko and Rumman's membership interests in MT Holdings and thus became the only admitted member of MT Holdings.

On July 26, 2007, Rezko transacted with the plaintiffs to assign distributional interests in MT Holdings to each of them in accordance with the MT operating agreement.[4] The plaintiffs did not then, nor did they ever, become members of MT Holdings. MT Holdings, as a member of Heritage, had a right to its share of distributions flowing from the Property through Riverside. By extension, the plaintiffs, as transferees of distributional interests in MT Holdings, had a right to their share of any distributions MT Holdings received. After these events, the structure of relevant entities having ownership or economic interests flowing from the Property was as follows:

---

[4] Except for Korkis and QMQQ; they received their economic interests later that same year.

Structure After the 2007 Rezko Buy Outs:



Through this restructuring, GMH and/or its wholly owned affiliate Orifarm consolidated the controlling interest at every level of ownership over the Property. Since MT Holdings was a member-managed LLC, and Orifarm was its sole member, Orifarm (and, by extension, GMH) had complete control of MT Holdings. Also, since Orifarm owned 60% of Heritage's Class B units and controlled MT Holdings, which held the remaining 40% of Heritage's Class B units, it had complete control over Heritage. The plaintiffs further allege that GMH installed persons of its own choosing to control Heritage's operations. Am. Compl. ¶¶ 59, 62-63. Specifically, it installed Illinois Developer, LLC, which it controlled through a series of wholly owned subsidiaries, as Heritage's new manager. Am. Compl. ¶ 61-62.

The claim in this case concerns the defendants' actions surrounding Heritage and MT Holdings. As a reminder, Rezko only assigned to the plaintiffs a collective 30% (approximately) *economic*, or distributional, interest in MT Holdings. This means they were not members, did not have voting rights, and otherwise lacked any formal input into the management of the LLC or any

of the entities in which it had an ownership interest.[5] The plaintiffs allege that Orifarm knew about and consented to Rezko's assignment of those distributional interests. Am. Compl. ¶ 54. Moreover, the plaintiffs allege that they "placed their trust and confidence in… Orifarm… to protect, preserve and advance MT's interests in the development of the Property." Am. Compl. ¶ 68.

*GMH's Alleged Scheme Giving Rise to the Plaintiffs' Claims*

A substantial portion of the plaintiffs' amended complaint outlines how, in 2014, GMH allegedly took a number of steps to deprive the plaintiffs (and the Class A investors) of their right to profit from the development of the Property. *See* Am. Compl. ¶¶ 64-101.

***First***, defendant GMH allegedly caused Orifarm to dissolve and transfer all its interests in Heritage and MT Holdings to defendant South Loop III, which GMH owned and controlled through a series of wholly owned shell companies. South Loop III essentially replaced Orifarm at all relevant levels of ownership/control in the organizational chart stemming from the Property. Accordingly, South Loop III exercised complete control over MT Holdings as its sole member-manager, and in this capacity MT Holdings' operating agreement required it to make any distributions to the other interest-holders of MT Holdings, namely the plaintiffs. The plaintiffs allege that the "trust and confidence" they placed in Orifarm to protect, preserve, and advance MT Holdings' interests in the development of the Property transferred to South Loop III when it replaced Orifarm as MT Holdings' sole member-manager.

***Second***, on April 28, 2014, GMH allegedly caused Riverside to transfer the Property to Chicago South Loop Holdings II, LLC, which GMH also owned and controlled through a similar series of wholly owned shell companies to the one through which GMH owned and controlled

---

[5] There are no allegations that MT Holdings was engaged in, and could therefore possibly receive any distributions related to, any enterprises other than the Property and its development through its stake in Heritage.

South Loop III. GMH apparently exercised complete control over South Loop II's management and policies.

*Third*, in May 2014, GMH, through its control of South Loop III and Illinois Developer (the manager of Heritage that GMH had installed) caused Heritage and MT Holdings to dissolve. At the time of dissolution, Heritage (and by extension, MT Holdings) had no direct or indirect ownership interest in the Property since its title had been transferred to South Loop II. The plaintiffs' economic interests in MT Holdings were thus treated as worthless.[6]

After dissolving those two entities, GMH had discussions with potential partners to develop the Property. After a year of soliciting, reviewing, and negotiating with interested companies, GMH settled on The Related Companies, L.P., and they formed a joint venture called Roosevelt/Clark Partners LLC ("RCP"). On May 9, 2016, South Loop II and RCP executed a special warranty deed conveying the Property to RCP. They subsequently took significant steps to develop the Property.

The plaintiffs allege that South Loop III did not provide the plaintiffs with any notice of Orifarm's dissolution and transfer of interests to South Loop III, the transfer of the Property from Riverside to South Loop II, or the dissolution of Heritage and MT Holdings. Am. Compl. ¶¶ 5, 80, 99. The plaintiffs allegedly did not find out what GMH and South Loop III had done until 2019, when they were made aware through news reports and conversations among themselves.

*Relevant Portions of Heritage and MT Holdings' Operating Agreements*

Section 7.2 of Heritage's operating agreement states, "[N]o Member holding Class B Units or an Affiliate of such Member (either one a 'Related Developer') shall enter into any transaction

---

[6] It is likely those distributional interests in MT Holdings were already practically worthless as a result of the April 2014 transfer of the Property from Riverside, which MT Holdings indirectly and partially owned through its interest in Heritage, to South Loop II.

with respect to the development of all or any portion of the Property unless the [sic] each other Member is offered, at no cost, the opportunity to own a share of the common ownership interests of the Related Developer…" Am. Compl. ¶ 44; *see also* "Heritage Development Partners, LLC Operating Agreement," Ex. 1 to Am. Compl. (ECF No. 1-1 and ECF No. 13-1) at p. 18. Essentially, this portion of § 7.2 prohibits any members of Heritage holding Class B units ("Class B Members") or an affiliate of a Class B Member from entering into a transaction to develop the Property unless all members of Heritage were granted an opportunity to own a common interest in the Related Developer without additional investment. The section also sets forth a formula for how to calculate the share of common ownership interests in the related developer to which each member of Heritage would be entitled. The specifics of the formula are not relevant at this juncture.

Section 1.3 of the Heritage Operating Agreement defines "Affiliate of a Member" as, "in respect of a Member, any other Person, directly or indirectly, Controlling, Controlled by or under common Control with that Person." Ex. 1 to Am. Compl. "Control" (and by extension "Controlling," "Controlled by," and "under common Control with") means "as applied to any Person, includes the possession, directly or indirectly, of ten percent (10%) or more of the Voting Power (or in the case of a Person which is not a corporation, 10% or more of the ownership interest, beneficial or otherwise) of such Person or the power otherwise to direct or cause the direction of the management and policies of that Person, whether through voting, by contract or otherwise." *Id*. at § 1.20.

Sections 8.5 and 10.2 of MT Holdings' operating agreement sets forth the rights of members and Distributional Interest holders with regard to the dissolution and winding up of MT Holdings' affairs. In short, upon dissolution, all company property and assets were to be liquidated and, after payment of all debts and liabilities, the balance (if any) was to be distributed to the

members (or their Distribution Interest transferees) in accordance with each member's adjusted Capital Account. *See* Ex. B to South Loop III's Memo. in Support of Mot. to Dismiss (ECF 13-1). Section 8.5 also precludes any distributional interest holders of MT Holdings' from having any "right to any information or accounting of the affairs of the Company," inspecting its books or records, or exercising "any of the rights of a Member under the Act or this Agreement." *Id*.

Accordingly, the plaintiffs' amended complaint purports to set forth a single claim, *i.e.*, a set of facts that, if true, give rise to liability pursuant to one or more legal theories. Essentially, the plaintiffs claim that the defendants, through their various restructurings, transfers, and failure to cause MT Holdings to acquire an ownership interest in South Loop II, deprived the plaintiffs of the value of their economic interests in MT Holdings.[7] The defendants allegedly accomplished this by (1) transferring the Property from Riverside to South Loop II, which was a transaction triggering Section 7.2 of Heritage's operating agreement,[8] (2) failing to cause MT Holdings to exercise or selling its contractual right—as set forth in Section 7.2 of Heritage's operating agreement—to acquire an interest in the developer of the Property, and (3), as a result, dissolving Heritage and MT Holdings without any distributions stemming from the future development of the Property flowing to the plaintiffs. Had MT Holdings instead acquired an interest in South Loop II, according to the plaintiffs, they would have reaped their proportionate value of the future development of the Property through their distributional interests in MT Holdings. Instead, the plaintiffs claim, their economic interests in MT Holdings became worthless. Alternatively, they have argued, MT

---

[7] Recall that, prior to the May 2014 dissolutions of Heritage and MT Holdings, South Loop III was the sole member of MT Holdings. The plaintiffs were distributional/economic interest holders of MT Holdings. MT Holdings was a minority owner of Heritage's Class B units. South Loop III was itself a majority owner of Heritage's Class B units and thus had control over Heritage.

[8] The plaintiffs allege that Riverside and South Loop II were Affiliates of Member South Loop III pursuant to Section 1.3 of the Heritage operating agreement because they were all under the common Control of GMH. The defendants do not dispute this.

Holdings did have an asset at the time of dissolution because it retained the option under Section 7.2 of the Heritage operating agreement to receive a materially equivalent interest in the related developer, South Loop II. But South Loop III caused MT Holdings to dissolve without distributing the economic value of this asset to the plaintiffs in proportion to their distributional interests in MT Holdings.

The plaintiffs' amended complaint sets out three legal theories in support of this claim.[9] It charges South Loop III with breach of fiduciary duty in its operation of MT Holdings, violations of the plaintiffs' statutory right under the Illinois LLC Act and the corresponding contractual right under the MT Holdings operating agreement to receive distributions upon the winding up of MT Holdings' affairs, and tortious interference with the initial contract between Rezko and the plaintiffs transacting for the assignment of the economic interests in MT Holdings. The plaintiffs also assert that GMH is liable under the tortious interference theory.

The defendants have filed separate motions to dismiss. South Loop III argues that it owed no contractual, statutory, or common-law duties to the plaintiffs because they were merely distributional interest transferees of MT Holdings, not members. South Loop III also contends that the plaintiffs lack standing to assert their supposedly indirect injuries. Both defendants argue that that the plaintiffs fail to allege tortious interference with contract because there are no allegations that there was ultimately a breach of that contract. Finally, they argue that the applicable statutes of limitations bar all but the breach of contract theory. The plaintiffs contest the defendants' arguments on the merits, and they have also supplemented the record with records of arbitral proceedings that resulted in favorable rulings to the Class A investors in Heritage.

---

[9] These theories are set forth as "counts" in the amended complaint, which was filed in state court.

<u>ANALYSIS</u>

To survive a Fed. R. Civ. P. 12(b)(6) motion to dismiss for failure to state a claim, a complaint must "state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007). "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). This standard "is not akin to a probability requirement, but it asks for more than a sheer possibility that a defendant has acted unlawfully." *Id.* (cleaned up). "Where a complaint pleads facts that are merely consistent with a defendant's liability, it stops short of the line between possibility and plausibility of entitlement to relief." *Id.* (cleaned up).

When considering a motion to dismiss, courts "accept the allegations in the complaint as true, and draw all reasonable inferences in favor of the plaintiff." *Crescent Plaza Hotel Owner, L.P. v. Zurich Am. Ins. Co.*, 20 F.4th 303, 307 (7th Cir. 2021) (cleaned up). But "allegations in the form of legal conclusions are insufficient," as are "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements." *Def. Sec. Co. v. First Mercury Ins. Co.*, 803 F.3d 327, 334 (7th Cir. 2015) (cleaned up) (quoting *Iqbal*, 556 U.S. at 678). The Court will also consider certain extrinsic documents that are (1) attached to the amended complaint or the defendants' motions to dismiss and (2) central to the plaintiffs' claim, such as the Heritage and MT Holdings operating agreements. *See 188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 735 (7th Cir. 2002).

## I. Statute of Limitations

Both defendants note—and the plaintiffs do not dispute—that the facts underpinning the plaintiffs' claim are alleged to have occurred no later than May 2014, more than five years and seven months before the plaintiffs filed their original complaint in January 2020. Based on this

11

timeline, the defendants argue, Illinois' five-year statute of limitations period bars the plaintiffs' claim (except under the breach of operating agreement theory). *See Malone v. Bankhead Enters.*, 125 F.3d 535, 538 (7th Cir. 1997) ("[A] federal court sitting in diversity must apply the statute of limitations laws of the state in which it sits."); *see also* 735 Ill. Comp. Stat. 5/13-205. The plaintiffs respond that the statute of limitations did not begin to run until May 2019 because they were, as they allege in the complaint, unaware of the relevant 2014 restructurings and dissolutions giving rise to their injuries until May 2019. They allege that the defendants kept them in the dark, as the MT Holdings operating agreement allowed them to do to non-members, during this period.

Illinois courts recognize the "discovery rule," which operates "to postpone the commencement of the relevant statute of limitations until the injured plaintiff knows or reasonably should know that he has been injured and that his injury was wrongfully caused." *Golla v. Gen. Motors Corp.*, 657 N.E.2d 894 (Ill. 1995). But the defendants reply that it is unreasonable for the plaintiffs to have sat idly by without inquiring as to the status of their interests in MT Holdings during this period of several years.

"Dismissing a complaint as untimely at the pleading stage is an unusual step, since a complaint need not anticipate and overcome affirmative defenses, such as the statute of limitations." *Cancer Found., Inc. v. Cerberus Capital Mgmt., LP*, 559 F.3d 671, 674 (7th Cir. 2009). "Further, these defenses typically turn on facts not before the court at that stage in the proceedings." *Brownmark Films, LLC v. Comedy Partners*, 682 F.3d 687, 690 (7th Cir. 2012). For this reason, the Seventh Circuit has repeatedly cautioned district courts to dismiss complaints on statute-of-limitation grounds only "when the plaintiff pleads himself out of court by alleging facts sufficient to establish the complaint's tardiness." *Cancer Found., Inc.*, 559 F.3d at 674-75.

The Court will not dismiss the plaintiffs' complaint on the basis of this defense. The question of whether Illinois' discovery rule applies to postpone the commencement of the limitations period in this case, and for how long, would require an appraisal of facts not currently before the Court, *i.e.*, facts beyond those alleged in the plaintiffs' amended complaint. There certainly exist conceivable sets of facts that would be consistent with the allegations in the complaint **and** support the application of the discovery rule for at least some time such that the plaintiffs' theories would not be time barred. For instance, it is uncertain whether and how long it would take for a reasonable person in the plaintiffs' shoes to inquire as to the status of their economic interests in a company such as MT Holdings, particularly when the company was not required to provide any information to them. Further, the discovery rule not only involves an inquiry into when the plaintiff knew he was injured but also whether he was wrongfully injured. Therefore, even if the plaintiffs could have inquired into the diminished **status** of their economic interests far earlier, it is not at all clear how long thereafter they should reasonably have been expected to discover **any details** about the potential wrongdoing that affected their interests.

## II.    Arbitration Award

Responding to the motions to dismiss, the plaintiffs invoke the doctrine of collateral estoppel offensively. They have submitted an arbitration decision by an American Arbitration Association panel in a related matter, *Royal Heritage Investments, LLC, et al. v. GMH, South Loop III et al.*, Case No. 01-19-0002-2896 (the "AAA Case"). *See* Pls.' Mot. to Suppl. (ECF No. 60) and accompanying exhibits. The claimants in the AAA Case were the aforementioned Class A Investors of Heritage, who bought Class A units of Heritage and became members of the company in 2006. The respondents were the defendants in this case and some of their affiliated companies. The plaintiffs assert that the AAA panel's decisions in favor of the Class A Investors and against the AAA respondents precludes re-litigation of those issues here.

Illinois law controls the application of collateral estoppel in this case. *See Plastic Recovery Techs., Co. v. Samson*, 11 C 2641, 2011 WL 3205349, at *3 (N.D. Ill. July 28, 2011) ("In diversity cases, federal law incorporates the rules of preclusion applied by the state in which the federal diversity court sits."); *Kunzelman v. Thompson*, 799 F.2d 1172, 1176 (7th Cir. 1986) ("In determining when collateral estoppel applies federal courts must look to state law and determine whether another state court would give preclusive effect to the prior proceeding."). Under Illinois law, collateral estoppel applies when "(1) the issue decided in the prior adjudication is identical with the one presented in the suit in question; (2) there was a final judgment on the merits in the prior adjudication; and (3) the party against whom the estoppel is asserted was a party or in privity with a party to the prior adjudication." *Bajwa v. Metro. Life Ins. Co.*, 804 N.E.2d 519, 532 (Ill. 2004)**.**

The parties do not dispute the third element, whether the party against whom the estoppel is asserted is the same as, or in privity with, the party in the prior adjudication. Indeed, defendants GMH and South Loop III were both parties to the AAA Case. Rather, they dispute whether the AAA panel's decision was final and whether the issues resolved in that decision are identical to the issues presented in this case. The Court ultimately finds that, although the AAA panel's decision should be considered final and on the merits, the issues presented there and here are not the same. Collateral estoppel therefore does not apply to bar the parties from litigating any issues in this case.

### A. Finality of Judgment on the Merits in Prior Adjudication

The parties dispute whether the AAA panel's decisions are final judgments for purposes of collateral estoppel. The defendants argue that the AAA panel's decisions are not final for purposes of collateral estoppel because, as of December 2022, the claimants' motion to confirm the arbitration award and the respondents' motion to vacate or modify the award remain pending in

Illinois state court. The Court has not received any further updates regarding the status of those motions. The defendants further argue that, in any event, the arbitration judgment cannot be considered final until they exhaust all avenues of appeal. They do not dispute that the panel reached its judgment "on the merits." The plaintiffs, on the other hand, note that the AAA panel has entered a Final Award confirming its findings in its prior orders, and this, they argue, renders the judgment final.

The Seventh Circuit has held that "both federal district courts and the Illinois Appellate Court have held that Illinois affords preclusive effect to binding arbitration awards, even if unconfirmed, unless preclusion impinges on a party's federal rights." *Matlin v. Spin Master Corp.*, 979 F.3d 1177, 1181 (7th Cir. 2020) (collecting cases); *see also Plastic Recovery Techs., Co.,* 2011 WL 3205349, at *3 (same). This case does not implicate any federal rights. Accordingly, the Court will consider the panel's findings in the AAA Case final.

### B.    Identicality of the Issues Presented

A detailed accounting of the issues the panel decided in the AAA Case is unnecessary. At bottom, they do not bear on the plaintiffs' claim in this case. To understand why, it is crucial to distinguish the types of interests—and in which entities—that the plaintiffs in this case held from the arbitration claimants'. The plaintiffs here were ***non-member*** distributional interest holders of MT Holdings. The claimants there were ***members*** of Heritage, owning approximately 1.9% of that LLC. Although the arbitration claims arose from the same conduct by the defendants[10] as the plaintiffs' claims arise from here, the duties owed by the defendants to the claimants and the respondents differed due to the differing interests of the Class A Investors and the plaintiffs here.

---

[10] For ease, the respondents in the AAA Case and the defendants here will be considered the same, since the respondents in the AAA Case that are not defendants here are essentially alter egos of the defendants, given that they were all wholly owned by GMH.

First, recall that Section 7.2 of the Heritage operating agreement required that, if a transaction with respect to the development of the Property conveying the Property to a Related Developer (such as South Loop II) occurred, then any members of Heritage should have been notified and given the opportunity to receive a certain amount of ownership interest in the Related Developer. The AAA panel found that the defendants breached Section 7.2 of the Heritage operating agreement by (1) failing to notify the claimants (the Class A Investors) of the 2014 restructuring resulting in a transfer of the Property from Riverside to South Loop II and (2) not offering the claimants the opportunity to receive rights in South Loop II that were materially equivalent to their holdings in Heritage. The panel *did not* find that the defendants breached the operating agreement with respect to MT Holdings'—also a member of Heritage—right to receive materially equivalent rights in South Loop II, let alone that they breached any of the plaintiffs' rights in their capacities as non-member distributional interest holders in MT Holdings. It does not necessarily follow from the AAA panel's decision that the defendants failed to perform the duties they owed to the claimants that they also failed to perform any duties owed to MT Holdings and/or the plaintiffs in their capacity as holders of distributional interest. In any event, the plaintiffs are not purporting to bring a claim on behalf of MT Holdings for any injury done to it (*i.e.*, a derivative action).

Second, the panel found that Illinois Developer (as manager of Heritage), South Loop III (as the majority member of Heritage's Class B units), MT Holdings (as the owner of the remaining Heritage Class B units and a minority member), and GMH (as the entity owning these entities and all the Respondents and directing their conduct) breached their fiduciary duty to the claimants by terminating their interest in Heritage and not giving them notice of the restructuring. The panel *did not* find that the defendants—or any of their alter egos—breached any duties to non-members of

any of any of the relevant entities. As explained below, the existence and breach of a fiduciary duty to a non-member is a different legal and factual issue entirely from any questions involving breach of fiduciary duty owed to a member, which is explicitly embodied in Illinois' statutory framework for LLCs.

## III.     Merits

### A.     Breach of Fiduciary Duty

A claim for breach of fiduciary duty must allege: "(1) that a fiduciary duty exists; (2) that the fiduciary duty was breached; and (3) that such breach proximately caused the injury of which the party complains." *Lawlor v. N. Am. Corp. of Illinois*, 2012 IL 112530, ¶ 69. Before determining whether South Loop III breached any fiduciary duty it owed to the plaintiffs, the Court must first determine whether any such duty existed in the first place.

To begin, no fiduciary duty existed between the plaintiffs and South Loop III solely by virtue of their relationship. Illinois law imposes a fiduciary duty as a matter of law only on a limited number of relationships: attorneys and clients; principals and agents; guardians and wards; and members of a partnership or joint venture. *D'Attomo v. Baumbeck*, 2015 IL App (2d) 140865k, ¶ 59. The plaintiffs were not members of Heritage or MT Holdings and therefore did not have a fiduciary relationship with those LLCs or their controlling members as a matter of law.

Further, neither the MT Holdings operating agreement nor the Illinois LLC Act gives rise to a fiduciary relationship between the member-manager(s) of MT Holdings and the plaintiffs in their capacity as distributional interest holders; indeed, the Illinois LLC Act specifically excludes transferees of distributional interests from exercising any rights of a member, 805 Ill. Comp. Stat. 180/30-5, such as the right "to maintain an action against a[n LLC], a manager, or another member for legal or equitable relief. . . to enforce . . . (1) [t]he member's rights under the operating agreement; (2) [t]he member's rights under this Act; and (3) [t]he rights and otherwise protect the

17

interests of the member, including rights and interests arising independently of the member's relationship to the company," 805 Ill. Comp. Stat. 180/15-20. Thus, under Illinois law, the plaintiffs have no standing to pursue a breach of fiduciary duty claim against the LLC manager. *See Doherty v. Country Faire Conversion, LLC*, 2020 IL App. (1st) 192385, ¶¶ 42-47.[11] Under section 15-20 of the LLC Act, only members have standing to assert a claim for breach of fiduciary duty (or any other legal or equitable claim) against an LLC, its managers, or its other members. *Id.*

Thus, Illinois law forecloses a non-member distributional interest holder from pursuing a breach of fiduciary duty claim under the LLC Act unless the LLC operating agreement departs from that rule. And the MT Holdings operating agreement does not provide any recourse for those without member status, either. *See* MT Holdings Operating Agreement, Ex. B to Am. Compl. (ECF Nos. 1-1, 13-1) at Section 8.5 ("A Person who acquires Membership Rights or Interest but who is not admitted as a substitute Member shall hold only a distribution interest. . . shall not have any of the rights of a Member under the Act or this Agreement."). As a result, the plaintiffs resort to arguing for the existence of a *de facto* fiduciary relationship under the common law. But, as the defendants observe, "common law principles concerning *de facto* fiduciary relationships do not apply in the context of determining the duties owed by" an LLC and its members. South Loop III Memo. (ECF No. 13) at 6. "[L]imited liability companies are creatures of statute," and as such, the fiduciary duties owed by the managers and members of an LLC are determined by the LLC Act and the LLC's operating agreement. *Katris v. Carroll*, 842 N.E.2d 221, 224-25 (Ill. App. 1st

---

[11] South Loop III also asserts that the plaintiffs lack standing to bring their claim in a different but related manner. It characterizes the plaintiffs' complaint as seeking relief for an injury to MT Holdings that resulted in a diminution in the value of their economic interests. Therefore, according to South Loop III, the plaintiffs' claim can only belong to MT Holdings itself, or to a member bringing a derivative action on behalf of MT Holdings. Because the plaintiffs lack standing under the LLC Act in any event, the Court need not delve into this alternative theory.

Dist. 2005); *see also 800 S. Wells Commer., LLC v. Cadden*, 2018 IL App. (1st) 162882 (LLC Act

supplants common law principles governing who owes and who does not owe fiduciary duties in

context of LLCs). This isn't merely a matter of deficient pleading that can be cured by amendment.

Illinois' statutory framework and the MT Holdings operating agreement precludes the plaintiffs'

common-law breach of fiduciary duty theory, and no amendment to the complaint can change that.

But *even if* the LLC Act does not bar non-member distributional interest transferees from

pursuing common-law breach of fiduciary duty actions against controlling members of LLCs, the

plaintiffs still fail to allege the existence of a fiduciary relationship between them and South Loop

III as a matter of fact. "Where a fiduciary or confidential relationship does not exist as a matter of

law, 'facts from which a fiduciary relationship arises must be pleaded and proved by clear and

convincing evidence.'" *Id.* (quoting *Magna Bank of Madison County v. Jameson*, 604 N.E.2d 541,

545 (Ill. App. 5th Dist. 1992)). "Thus, the party seeking to prove a fiduciary relationship must

show that he placed trust and confidence in the other so that the latter gained influence and

superiority over him. The degree of trust and confidence can be established by the following

factors: degree of kinship, age disparity, health, mental condition, education, business experience

between the parties, and the extent of the reliance." *Magna Bank of Madison County*, 604 N.E.2d

at 545.

The plaintiffs do not—and cannot—allege sufficient facts from which a fiduciary

relationship can be said to have arisen. They conclusorily allege that they "placed trust and

confidence" in South Loop III (as the successor to Orifarm). Their amended complaint does not

speak to any of the factors above, except perhaps to suggest they were reliant upon South Loop III

to advance MT Holdings' interests, and Orifarm consented to the assignment of distributional

rights. But reliance alone is not enough. It is clear from Illinois' statutory framework and MT

Holdings' operating agreement that the right to maintain such a claim—*i.e.*, to have a fiduciary duty owed to you—is a part of the bundle of rights belonging only to those with membership interests. A distributional interest transferee bargains for a solely economic right that by its nature depends on those with control to safekeep its value unless he also bargains for a membership interest. He cannot use the impotence of that position—to wit, complete reliance on the controlling members—as a sword to demand non-economic rights for which he did not bargain.

**B.  Breach of Statutory and/or Contractual Right to Receive Share of Assets Upon Dissolution**

In Count II, the plaintiffs assert that South Loop III failed to distribute to them their share of MT's assets upon dissolution. South Loop III characterizes the premise of the plaintiffs' argument to be "that South Loop III owed Plaintiffs a duty to cause MT Holdings to exercise the alleged contractual right in question." Reply, ECF No. 20, at 5-6. That's not an unreasonable take on the plaintiffs' theory given some of the allegations of the complaint. *See, e.g.*, ¶ 81 ("Instead of dissolving MT, South Loop III . . . should have caused MT to acquire an ownership interest in South Loop II as required by § 7.2 of Heritage's operating agreement."). And to the extent that accurately captures the plaintiffs' theory, it can be easily dispatched. MT Holdings never had any ownership interest or rights in South Loop II to distribute. What Section 7.2 of Heritage's operating agreement provided MT Holdings was, at best, an option to obtain an ownership share in a Related Developer, but it was an option MT Holdings never exercised. As such, it generated nothing for MT Holdings to distribute.

To the extent that the plaintiffs' theory is premised on the failure of MT Holdings to exercise that option (or, more accurately, on South Loop III's failure to cause MT Holdings to exercise that option) prior to dissolution of MT Holdings, that is a beef with the management of MT Holdings and as such is barred by the operating agreement and the LLC Act. Sections 1.8 and

8.5 of the MT operating agreement each confirm that distribution interest holders have none of the rights of members of the company and no say in managing or governing the company; indeed, distributional interest holders "have no right to any information or accounting of the affairs of the Company" at all. These limitations on the rights of distributional interest holders are consistent with the provisions of the LLC Act, which makes clear that "[a] transferee who does not become a member is not entitled to participate in the management or conduct of the limited liability company's business, require access to information concerning the company's transactions, or . . . inspect or copy any of the company's records," 805 Ill. Comp. Stat. 180/30-10(d), and, "A transfer of a distributional interest does not entitle the transferee to become or to exercise any rights of a member. A transfer entitles the transferee to receive, to the extent transferred, only the distributions to which the transferor would be entitled." *Id*. at § 30-5(b).

That said, however, the allegations set forth in Count II suggest a different focus of this theory, based not on a failure to exercise the option to obtain an ownership interest in South Loop II, but on the failure to liquidate that option in connection with that dissolution and to distribute the requisite share of the proceeds of that sale to the plaintiffs. Count II asserts that "[t]he assets Plaintiffs are entitled to consist of the ***value*** of their interest in the development of the Property"— not an ongoing ownership interest in the developer. As set forth in their response brief, the plaintiffs allege that the interest conferred by Section 7.2 of Heritage's operating agreement "were an asset of MT that had a value. South Loop III's dissolution and winding up of MT without a distribution of that asset was a violation of Section 30-10 of the Act." Pls.' Resp. (ECF No. 19) at 10.

Section 30-10 of the LLC Act, again, expressly provides that holders of distribution interests are entitled to receive "distributions to which the transferor would otherwise be entitled,

including more specifically, the amount due to the transferor "upon dissolution and winding up of the limited liability company's business." And under the MT Holdings operating agreement, the members of the LLC at the time of dissolution—namely, the only member, South Loop III—were required to "dispose of all other Company properties and assets at the best cash price obtainable therefor under the circumstances." Section 10.2.1. The plaintiffs plausibly allege that the option to obtain an ownership interest in South Loop II was an asset of MT Holdings that had value but was not liquidated, thereby depriving them of their share of the company's assets on dissolution. Thus, it would appear that the plaintiffs have stated a plausible claim for violation of the plaintiffs' statutory and contractual rights to their share of MT Holdings' assets upon dissolution of the company.

It might be argued that, here, too, Section 30-10 bars distribution interest holders from asserting claims against members of the LLC for violating their duties. But unlike the plaintiffs' breach of fiduciary duty theory, which is premised on the existence of a duty that, if recognized, would controvert both the LLC Act and the MT Holdings operating agreement, their failure to distribute theory is premised on a duty expressly created by those instruments—namely, the right to receive their proportionate share of the value of the company's assets upon dissolution. Indeed, the proportionate distribution of cash assets is essentially the only right the LLC Act and operating agreement provide to the distribution interest holders.[12] Given that the LLC Act affirmatively

---

[12] There is one exception. The LLC Act allows "a transferee of a distributional interest" to apply for dissolution of an LLC—or another remedy, such as a buyout of the applicant's distributional interest—"upon judicial decree that the managers or those in control of the company" have acted illegally, fraudulently, or otherwise in an oppressive manner directly harming the applicant. 805 Ill. Comp. Stat. 180/35-1. Though the plaintiffs have not pursued that route here—they likely could not have done so given the timeline of the purported "oppressive" acts, MT Holdings' dissolution, and their lack of notification of what had transpired—this provision confirms that the LLC Act does not leave distribution interest holders with no remedy for oppressive conduct that deprives them of the value of their interests in the LLC, and that

provides this right, it is inconceivable that the Act would also deny distribution interest holders any means of enforcing that right. The defendants cite no authority that would bar the plaintiffs' claim (as noted, the defendants don't discuss this theory at all) and the Court has found none. In the absence of any such authority, this Court is not inclined to adopt a reading of the Act that would render the only right provided to distribution interest holders a nullity.

In misconstruing—whether intentionally or inadvertently—the plaintiffs' dissolution distribution theory, the defendants have whiffed in trying to strike that theory; they have not demonstrated that the theory cannot plausibly support the plaintiffs' claim. There may be such arguments (one, adverted to but inadequately developed in their reply brief, may be that the right to obtain an interest in South Loop II actually had no value due to its subordination to the preferred interest of GMH in South Loop II) but the defendants will have to raise any such defenses on summary judgment and/or at trial.

One final controverted point with respect to this theory concerns the plaintiffs' alleged injury and their standing to bring a claim to recover for it. *See supra* n. 11. South Loop III argues, "The loss of MT Holdings' corporate opportunity to acquire an ownership interest in the developer of the Property is a direct injury sustained by MT Holdings. Only MT Holdings could maintain a claim and obtain a recovery against South Loop III for the loss of the alleged corporate opportunity." Reply at 7. But, as discussed in detail above, the plaintiffs' injury under this particular theory, Count II, is not that their distributional interest diminished in value due to loss of corporate opportunity, but rather that at the time of dissolution, MT Holdings had an asset— that is, the option to receive, with no further investment, a materially equivalent interest in South

---

liquidation in connection with dissolution—the remedy the plaintiffs seek in Count II—is an enforceable right.

Loop II—that was not liquidated and the economic value of which was not distributed to them upon dissolution in accordance with the LLC Act or the MT Holdings operating agreement. Their injury under this theory is therefore direct, *i.e.*, it does not flow through MT Holdings.

### C. Tortious Interference[13]

Finally, the plaintiffs assert that GMH and South Loop III are liable for tortiously interfering with their contract with Rezko assigning them distributional interests by violating their duties under Section 7.2 of the Heritage operating agreement.[14] "To state a claim for tortious interference with contract, a plaintiff must allege facts sufficient to establish: (1) a valid contract, (2) defendant's knowledge of the contract, (3) defendant's intentional and unjustified inducement of a breach of the contract, (4) ***a subsequent breach of contract caused by defendant's wrongful conduct***, and (5) damages." *Webb v. Frawley*, 906 F.3d 569, 577 (7th Cir. 2018) (applying Illinois law) (emphasis added). The plaintiffs' amended complaint contains no allegations indicating that Rezko breached his contract to assign distributional interests to the plaintiffs. As far as can be discerned from the pleadings, Rezko assigned those interests. Am. Compl. ¶ 53 ("Rezko, for good and valuable consideration, assigned economic, non-member interests in MT to each of the Plaintiffs."). The fact that the interests ultimately became worthless does not indicate the existence of a breach of the initial assignment contract. Just like with any investment, the plaintiffs assumed the risk that their investments could diminish in value. Just because their investment diminished

---

[13] Having concluded that the plaintiffs' claim can go forward on at least one theory, it would not be necessary to assess the merits of the plaintiffs' final theory, tortious interference—except for the fact that the plaintiffs' claim against GMH rests solely on this theory.

[14] The plaintiffs confirmed in their briefs responding to both South Loop III and GMH's motions to dismiss that this theory is based on alleged interference with the plaintiffs' contracts with Rezko, not with any interference with the MT Holdings operating agreement, implicitly conceding that a theory based on interference with MT's operating agreement would fail. *See* Pls.' Resp. to South Loop III Mot. to Dismiss (ECF No. 19) at 11; Pls.' Resp. to GMH Mot. to Dismiss and South Loop III's Supp. Auth. (ECF 51) at 10.

in value due to alleged abuses by the defendants does not mean that the defendants interfered with the contract wherein the plaintiffs received their interests in the first place.

*     *     *

For the foregoing reasons, defendant GMH's motion to dismiss is granted with prejudice and defendant South Loop III's motion to dismiss is denied. GMH is dismissed as a defendant in this action.

Dated: February 6, 2023

John J. Tharp, Jr.
United States District Judge